# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ALLIED ERECTING AND DISMANTLING CO., INC., | ) ) ) | CASE NO. 4:12CV1390 |
| PLAINTIFF, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) | |
| UNITED STATES STEEL CORPORATION, | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| DEFENDANT. | ) ) | |

Before the Court is defendant's partial motion to dismiss (Doc. No. 46), seeking a Rule 12(b)(6) dismissal of Counts I, II, III, IV, V, and VIII of plaintiff's second amended complaint. Defendant asserts that the claims in these counts of the complaint are contrary to the plain meaning of the controlling contracts[1] and, in addition, that Count III is time-barred. Plaintiff filed its opposition (Doc. No. 57), and defendant filed its reply (Doc. No. 58). The Court conducted a hearing on the motion on July 12, 2013. (Transcript ["Tr."], Doc. No. 73.) For the reasons set forth herein, the motion is **GRANTED IN PART and DENIED IN PART**. Only Count VIII is dismissed; all other counts survive the motion.

---

[1] The parties have jointly submitted the controlling contracts, portions of which have been redacted. (Doc. No. 59.) They have also supplied the Court with unredacted copies. Consideration herein of these contracts, all of which are outlined in detail in the complaint (although not attached thereto), does not convert the motion to dismiss to a motion for summary judgment. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) ("When a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein.")

# I. BACKGROUND

This action was filed on June 4, 2012 and later amended.[2] The second amended complaint (hereafter, "complaint") sets forth nine counts: one for declaratory judgment (Count I) and eight for breach of contract (Counts II through IX).[3]

Plaintiff Allied Erecting and Dismantling Co., Inc. ("Allied") is an industrial dismantling contractor incorporated in Ohio with its principal place of business in Youngstown. (Compl. ¶ 1; Answer ¶ 1.) Defendant United States Steel Corporation ("U.S. Steel") is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. (Compl. ¶ 2; Answer ¶ 2.) Allied has performed work as an industrial dismantling contractor for U.S. Steel at numerous locations throughout the United States for over thirty years. (Compl. ¶ 5; Answer ¶ 5.)

Between 1993 and 2003, Allied and U.S. Steel were the plaintiff and defendant, respectively, in two lawsuits[4] concerning various disputes regarding the parties' rights and responsibilities under a long term contract for industrial dismantling work at U.S. Steel's Fairless Works steelmaking facility in Fairless Hills, Pennsylvania ("the Fairless Works") and at various other U.S. Steel locations throughout the United States. (Compl. ¶ 6; Answer ¶ 6.)

---

[2] By way of a miscellaneous case filing (4:12mc77), plaintiff was granted leave to file the complaint and its exhibits under seal. On June 12, 2012, this Court determined that it would be inappropriate to allow the entire complaint to remain under seal and granted plaintiff leave to edit its complaint to avoid the disclosure of information that is highly sensitive or subject to any confidentiality provision. (Doc. No. 10.) On June 22, 2012, plaintiff filed an amended and redacted complaint (Doc. No. 11), with sealed exhibits (Doc. Nos. 12-22). Later, plaintiff was granted leave to file a second amended complaint, no part of which was sealed. (*See* Doc. No. 43.) It is the second amended complaint that is the current pleading.

[3] In addition to filing a motion to dismiss as to some counts of the complaint, defendant also filed a partial answer and counterclaims. (Doc. No. 47.)

[4] These were Civil Action No. 93-0575 ("the 93-0575 Litigation") and Civil Action No. 02-2216 ("the 02-2216 Litigation"). Both cases were filed in the U.S. District Court for the Western District of Pennsylvania. (Compl. ¶ 6; Answer ¶ 6.)

On November 17, 2003, Allied and U.S. Steel entered into a settlement agreement in the 93-0575 Litigation, which was styled as an Agreement in Principle ("the 2003 AIP").[5] (Compl. ¶ 7; Answer ¶ 7.)[6] Further, in order to implement various terms of the 2003 AIP, on or about July 15, 2004, Allied and U.S. Steel entered into a Dismantling Services Agreement ("the 2004 DSA").[7] (Compl. ¶ 20; Answer ¶ 20.)

On April 5, 2004, Allied and U.S. Steel entered into a settlement agreement in the 02-2216 Litigation, also styled as an Agreement in Principle ("the 2004 AIP").[8] (Compl. ¶ 9; Answer ¶ 9.)[9] Once again, by its terms, the 2004 AIP renewed the 1993 Blanket Agreement. (Compl. ¶ 10; Answer ¶ 10.)[10]

Prior to entering into the 2003 AIP, Allied's previous work at the first phase, or "Hot End," of the Fairless Works[11] was performed pursuant to a Construction Contract dated

---

[5] A copy of the 2003 AIP can be found at Doc. No. 59-4.

[6] Under its terms, the 2003 AIP continued and/or preserved certain claims and issues from the 93-0575 Litigation for inclusion in the 02-2216 Litigation; it stipulated how that would be accomplished procedurally. (*See* Doc. No. 59-4 at 962, § I(B).) Also included in the terms of the 2003 AIP was the express renewal of a May 1, 1993 "Blanket Agreement Covering Work Performed on Behalf of USX Corporation" (the "1993 Blanket Agreement"). A copy of the 1993 Blanket Agreement can be found at Doc. No. 59-3.

[7] A copy of the 2004 DSA can be found at Doc. No. 59-7.

[8] A copy of the 2004 AIP can be found at Doc. No. 59-6.

[9] By its terms, the 2004 AIP resolved all the issues in the 02-2216 Litigation, as well as the issues from the 93-0575 Litigation that had been continued and/or preserved for resolution in the 02-2216 Litigation. (Compl. ¶ 10; Doc. No. 59-6 at 996, § I.)

[10] The provision that renewed the 1993 Blanket Agreement, § II(B)(14), also made it applicable to "the work hereunder[,]" and provided: "However for any such work involving Asbestos and/or Environmental Remediation, the Environmental Rider attached as Attachment 3 to the [2004 DSA] shall also apply." (Doc. No. 59-6 at 1001.)

[11] In its motion to dismiss, U.S. Steel explains that Allied has done dismantling work over the last 20 years at U.S. Steel's mostly-idled Fairless Works steelmaking facility in Pennsylvania, as part of U.S. Steel's conversion from an operating steel mill to an industrial park. This dismantling work has been conducted in three stages beginning with the Hot End Facilities in 1992. "As is customary within the steelmaking industry, a 'Hot End' generally refers to those facilities where raw materials are processed and melted as part of ironmaking and steelmaking with the end-product being steel slabs. This is opposed to the 'Cold End' where the slabs are rolled, treated, cut and otherwise processed to customers' specifications." (Doc. No. 46 at 650, n.2.) The Hot End phase was followed by the 80 Inch Hot Strip Mill phase in 1999 and, most recently, work at the Fairless Sheet and Tin Facility. The subject matter of the instant complaint relates to Allied's dismantling at the Sheet and Tin Facility. (*Id.* at 649.)

April 24, 1992 and an accompanying Final Confirmed Specification (the "1992 Specification") dated September 11, 1992.[12] (Compl. ¶ 11; Answer ¶ 11.)

On February 11, 2010, the parties entered into another dismantling agreement ("the 2010 DSA") that permitted Allied to perform certain dismantling work for U.S. Steel at sites other than Fairless Works. (Compl. ¶ 121.)[13] For purposes of the instant motion, this agreement applies only to Count VIII.

## II. STANDARD ON A MOTION TO DISMISS

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 44, 47 (1957). Although this pleading standard does not require great detail, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing authorities). In other words, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id*. at 556, n.3 (criticizing the *Twombly* dissent's assertion that the pleading standard of Rule 8 "does not require, or even invite, the pleading of facts").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id*. at 1950. "While legal conclusions can provide the framework of a complaint, they must be supported by factual

---

[12] The documents can be found at Doc. No. 59-1 (Construction Contract) and Doc. No. 59-2 (Final Confirmed Specification).

[13] A copy of the 2010 DSA can be found at Doc. No. 59-9.

allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "The court need not, however, accept unwarranted factual inferences." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F. 3d 430, 434 (6th Cir. 2008) (citing *Morgan v. Church's Fried Chicken*, 829 F. 2d 10, 12 (6th Cir. 1987)). *See Northampton Rest. Grp., Inc. v. FirstMerit Bank, N.A.*, 492 F. App'x 518, 522 (6th Cir. 2012) (affirming Rule 12(b)(6) dismissal where plaintiff's contractual allegations were not "sufficient to make its breach-of-contract claim plausible on its face"); *Toohig v. PNC Fin. Servs. Grp., Inc.*, No. 1:10CV657, 2010 WL 4824530, at *3 (N.D. Ohio Nov. 19, 2010) (granting a Rule 12(b)(6) motion based on the "plain language" of an ERISA plan, which conferred "substantial discretion over the distribution of benefits"); *Karmely v. Wertheimer*, No. 11 Cv. 541(RPP), 2012 WL 3583141, at *7 (S.D.N.Y. Aug. 21, 2012) (granting motion to dismiss breach of loan agreement claim because "[i]f the language of the contract is clear and unambiguous, the Court may dismiss a breach of contract claim on a Rule 12(b)(6) motion").

## III. DISCUSSION

Defendant asks this Court to dismiss six of the nine counts in plaintiff's complaint for *failure to state a claim* for breach of contract because, under defendant's reading of the contract provisions, plaintiff cannot win on any of these six counts. Defendant argues that, even taking all the factual allegations in the complaint as true, which is the correct standard on a motion to dismiss, plaintiff "does not state a claim that is plausible on its face." (Doc. No. 46 at 656.) Not surprisingly, plaintiff argues in rebuttal, under *its* reading of the contract provisions, that, at the very least, its interpretation is reasonable and is sufficient to withstand a motion to dismiss.

Resolution of the current dispute requires interpretation of the interplay between and among some, if not all, of the above-outlined contracts. This is rendered exceedingly difficult by the parties' unfortunate habit of resolving their myriad disputes over these many years by piecing together a jigsaw puzzle of contracts with vague, ambiguous, and undefined cross-references to "relevant" terms and conditions contained in other contracts.

Although there may be circumstances where a Rule 12(b)(6) motion to dismiss contract claims would be appropriate, this is not one of them, as is illustrated by the discussion below. Indeed, because of the complexity of this case and the intertwined nature of the relevant contracts, and because of the wide divergence in the parties' own interpretations of these contracts, the Court prefers to exercise caution, rather than inadvertently engaging in unwarranted and improper fact findings at the motion to dismiss stage.

Therefore, the Court has evaluated the challenged counts of the complaint in light of the motion to dismiss for failure to state a claim and determines that, with the exception of Count VIII, which will be dismissed, all other counts survive the motion.

With respect to those counts that survive, the Court explicitly notes that any construction it now attributes to the relevant contracts will remain subject to change, as shown to be necessary,[14] as this case proceeds. The Court remains open to the possibility that, following discovery, further briefing and argument, its view of contract construction may change. It also acknowledges that there may ultimately be a need for a finder of fact.

---

[14] As noted in the discussion *infra*, the contracts at issue here are ambiguous and, therefore, the law permits the Court to consider parol evidence when construing the contracts. That said, the record as it stands is virtually devoid of facts upon which the Court could base its construction of the contracts, except for facts in the complaint, which are taken as true for purposes of a Rule 12 motion. As a result, although the Court will construe the contracts based upon the record as it now exists and the inferences the Court can safely draw at this time, since this is not a final order, modified constructions may later be required.

**A.      Counts I and II (The Basement Work Claims)**[15]

In Count I, Allied seeks a declaratory judgment that it is not contractually obligated under the 2003 AIP and the 2004 DSA to remove concrete below "top of floor slab" or to backfill the foundation/basement areas at the Fairless Works at "no cost" to U.S. Steel. (Compl. ¶ 74.) Allied further seeks a declaration that the backcharges U.S. Steel now intends to assess (to offset U.S. Steel's costs for obtaining a substitute contractor to do the work) are not authorized by the 2003 AIP, the 2004 DSA, or otherwise, and would be wrongfully assessed by U.S. Steel. (*Id.* ¶ 75.) Finally, Allied seeks a declaration that the concrete removal below "top of floor slab" and the backfilling of foundations/basements at the Fairless Works are within its scope of work under the 2003 AIP and the 2004 DSA, that U.S. Steel must compensate Allied for this additional work, and that U.S. Steel must cease and desist from performing the balance of this work through another contractor and, in the process, misappropriating Allied's property. (*Id.* ¶ 76.)

In Count II, Allied alleges a claim for breach of contract, seeking damages related to the matters on which it seeks a declaratory judgment in Count I.

In its motion to dismiss Counts I and II, U.S. Steel argues that Allied is required to remove equipment[16] from and backfill basements at Fairless Works at "no cost" to U.S. Steel because that work is included within the definition of "dismantling work" in all the relevant

---

[15] *See also* Tr. at 1164-1176, 1189-1201.

[16] The Court sees no specific challenge in the complaint to equipment removal. Rather, the Court reads ¶¶ 18 and 19 of the complaint as challenging uncompensated removal of concrete that is below "top of floor slab" and uncompensated backfilling and grading of basements (because that work is also below "top of floor slab").

contracts. It challenges Allied's assertion that it must be compensated for *any work* it performs below "top of floor slab," be it concrete demolition or basement backfilling.[17]

Thus, the dispute is over what portion of Allied's work is to be at "no cost" to U.S. Steel and how much is to be "for U.S. Steel's account." Resolution of this dispute, at least in part, requires the Court to construe the contracts. Although neither party has pointed out what law applies, from the Court's reading of the various contracts, it appears that Pennsylvania contract law must apply in this case. (*See* 1992 Construction Contract, § 27.1, Doc. No. 59-1 at 875 ("[t]his agreement shall be governed by the laws of the state in which the work is performed"); 1993 Blanket Agreement, § 19.1, Doc. No. 59-3 at 959 ("[t]his Agreement shall be governed by the laws of the Commonwealth of Pennsylvania, excluding Pennsylvania conflict of laws rules").)

Under Pennsylvania law[18]

> [w]hen the terms of a contract are clear and unambiguous, its meaning "must be determined from the four corners of the contract." *Glenn Distribs. Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 300 (3d Cir. 2002); *see also Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) ("When the words are clear and unambiguous, the intent of the parties must be determined from the express language of the agreement." (internal quotation marks omitted)). In contrast, "if the written contract is ambiguous, a court may look to extrinsic evidence to resolve the ambiguity and determine the intent of the parties." *Glenn Distribs.*, 297 F.3d at 300. A contract provision is ambiguous under Pennsylvania law
>
>> if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if

---

[17] The motion to dismiss, to the extent it seeks dismissal of Counts I and II, does not address the allegations in Allied's complaint regarding backcharges and scope of work.

[18] Federal common law and Ohio law would be substantively the same as Pennsylvania's. *See, e.g. In re AmTrust Financial Corp.*, 694 F.3d 741, 749-50 (6th Cir. 2012) (applying federal common law); *Dottore v. Huntington Nat'l Bank*, 480 F. App'x 351, 352 (6th Cir. 2012) (applying Ohio law).

> the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.
>
> *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995) (internal quotation marks omitted). . . .

*In re Diet Drugs Prod. Liab. Lit.*, 706 F.3d 217, 223-24 (3d Cir. 2013) (internal footnote omitted); *see also Nova Chems., Inc. v. Sekisui Plastics Co., Ltd.*, 579 F.3d 319, 323 (3d Cir. 2009) ("[W]here language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended.") (quoting *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 661 (1982)).

"'The court, as a matter of law, determines the existence of an ambiguity and interprets the contract[,] whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact.'" *In re Old Summit Mfg., LLC*, 523 F.3d 134, 137 (3d Cir. 2008) (quoting *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 390 (1986)).

Here, the two most relevant contracts underlying resolution of Counts I and II are the 2003 AIP and its implementing contract, the 2004 DSA. (Doc. Nos. 59-4 and 59-7.) By cross-referencing the 1992 Specification for the dismantling of buildings and facilities at Fairless Works (Doc. No. 59-2), the 2003 AIP and the 2004 DSA recognize that "relevant" portions of the 1992 Specification will also continue to control.[19] Unfortunately, relevancy is nowhere defined.

---

[19] Although the 1992 Construction Contract (Doc. No. 59-1) is also cross-referenced in the later agreements, it adds nothing to the discussion and need not be considered in depth for purposes of this motion.

Defendant asserts that § III(a) of the 2003 AIP and § II(A)(i) of the 2004 DSA state unequivocally that Allied must perform "Dismantling Work" at "no cost" to U.S. Steel,[20] and that just as unequivocally, § II(B)(6)(a) and § I(A) of the respective contracts define "Dismantling Work" to include "Structure Removal," "Equipment Removal," and "Backfilling and Grading."[21] It then argues that §§ 4, 6.1.1 and 6.2.5 of the 1992 Specification are "relevant" provisions confirming these responsibilities.[22] (Doc. No. 46 at 657.)

---

[20] Section III of the 2003 AIP provides:

FURTHER DISMANTLING WORK AT FAIRLESS

Any further DISMANTLING WORK at the steelmaking or former steelmaking facilities owned by U.S. Steel's Fairless Works, regardless of time, that is released and authorized in writing for dismantling, will be awarded to and performed by [Allied] pursuant to the Fairless Contract which shall contain the same relevant terms and conditions contained in the Contract and Specification for the first phase or "Hot End" of Fairless, specifically excluding Article 14 of the Final Conformed Specification. In accordance therewith, (a) such dismantling shall be at no cost to U.S. Steel (other than the Advance Payment); (b) concrete removal will be to top of floor slab; and (c) asbestos abatement, Hazmat removal, utility relocation and/or new construction will be for U.S. Steel's account, provided, however, that U.S. Steel and [Allied] shall endeavor to agree upon terms upon which said work (under subpart (c) immediately above) will be performed by [Allied] and, if the parties are unable to reach agreement, the award of this work will be accomplished in accordance with the procedures described in Section II(B)(4) and II(B)(5) above. U.S. Steel reserves the right to retain and to transfer any equipment or facility from the steelmaking facilities at Fairless for use at any other facility or location owned by U.S. Steel. Proceeds of all facility and/or equipment sales to third parties (not sold for scrap) will be shared 50/50 between [Allied] and U. S. Steel, provided, however, that any such sales to third parties must be approved by U.S. Steel in advance of the sale. This provision supersedes and replaces Section III(B) of the April 24, 1992 Settlement Agreement.

(Doc. No. 59-4 at 963-67.) The Court notes that the referenced "April 24, 1992 Settlement Agreement" is not in the record. Section II(A) of the 2004 DSA is almost, but not entirely identical to § III.  (*See* Doc. No. 59-7 at 1014.)

[21] Section II(B) of the 2003 AIP provides in relevant part:

(B)  Future Work and Services.

* * *

(6) The work subject to this Agreement will include DISMANTLING WORK and such other work that U.S. Steel may offer to [Allied].

(a) For purposes of this Agreement, DISMANTLING WORK may include, but is not limited to, the following, performed in connection with a dismantling project:

Structure Removal
Asbestos Abatement
Environmental Remediation
Equipment Sales
Property Transfers

10

Plaintiff rebuts this argument by stating that defendant is "cherry-picking" provisions from the 1992 Specification, arguing for application of certain provisions that suit defendant's purposes and ignoring other provisions that do not. For example, § 6.1.2 of the 1992 Specification (in the same "General Requirements" section of the contract relied upon by defendant) provides that all dismantling was to be "down to final grade" (Doc. No. 59-2 at 933) and this would be at "no cost" to U.S. Steel, apparently in return for "ownership of each facility to be dismantled." (Doc. No. 59-2 at 930, § 5.2.) In plaintiff's view, the provision in § III of the 2003 AIP and § II(A) of the 2004 DSA specifying that concrete removal was to be "to top of

---

Equipment Removal
Concrete Removal
Utility Relocation
New Construction
Backfilling and Grading

(Doc. No. 59-4 at 965.) Section I(A) of the 2004 DSA lists the exact same tasks as "dismantling work."

[22] Section 4 of the 1992 Specification outlines Allied's basic responsibilities as follows:

ALLIED ERECTING AND DISMANTLING COMPANY, INC. SHALL:
Perform all utility disconnection and/or relocation work captioned herein which is necessary to complete the proposed dismantling and removal work.

Perform all excavation, back-filling, construction and closure work captioned herein which is necessary to complete the proposed dismantling and removal work.

Provide all labor, materials, equipment, services and pay all necessary taxes to dismantle and remove the following structures and equipment[.]

(Doc. No. 59-2 at 883.) The 1992 Specification then sets forth in extensive detail all the structures and equipment contained in the "Base Bid."

Section 6 of the 1992 Specification, captioned "General Requirements," contains the following provisions dealing with "Removal" and "Non-hazardous Waste Disposal, respectively:

6.1.1.    [Allied] shall clear each dismantling site of existing equipment, structures, buildings and material, including debris and rubbish. . . .

* * *

6.2.5.    [Allied] shall use suitable solid fill such as brick debris, broken concrete, stone, slag and other solid fill for fill material in basements, excavations, pits and trenches at various dismantling sites. . . .

(*Id*. at 933, 935.)

11

floor slab" quite simply overrides § 6.1.2 of the 1992 Specification and does so in recognition of the fact that this provision in the later agreements was meant to settle a dispute between the parties, resulting in plaintiff's not being required to perform "the extremely expensive and time consuming basement work." (Doc. No. 57 at 815-16.) Therefore, although plaintiff does not dispute defendant's assertion that it must remove structures and equipment and do backfilling and all the rest, plaintiff asserts that any such work that occurs *below* top of floor slab must be compensated.

If the definition of "dismantling work" contained in § 6(a) of the 2003 AIP is reorganized according to the categories set forth in § III of the 2003 AIP, the various dismantling tasks would fall as follows:

|  | CATEGORY (a) ("No cost") | CATEGORY (b) | CATEGORY (c) ("for U.S. Steel's account") |
|---|---|---|---|
| **DISMANTLING TASKS** | • Structure Removal<br>• Equipment Sales<br>• Property Transfers<br>• Equipment Removal<br>• Backfilling and Grading | • Concrete Removal (to top of floor slab) | • Asbestos Abatement<br>• Environmental Remediation<br>• Utility Relocation<br>• New Construction |

Category (b) is in a kind of no-man's land between "no cost" and "on account." The general definition of "dismantling" includes "concrete removal." The 2003 AIP limits concrete removal to "top of floor slab," a limitation that was not contained in the 1992 Specification. Section V of the 2003 AIP provides:

> This Agreement in Principle sets forth the basic understandings and agreements upon which the parties have agreed to a dismantling services agreement in connection with the settlement of claims and counterclaims pending between them. **A definitive agreement shall be prepared so as to assist in the administration of the agreements and understandings set forth herein,**

**provided** that any such agreement shall remain faithful to all of the provisions in this Agreement in Principle. . . .

(Doc. No. 59-4 at 968, bolding added; underlining in original.) The "definitive agreement" that was later prepared is the 2004 DSA, which, in Section II, addresses the "further dismantling services at Fairless Works" as follows:

> (A) Any further Dismantling Work, regardless of time, at the steel-making facilities or former steel-making facilities owned by U.S. Steel at its Fairless Works that is released and authorized in writing for dismantling by U.S. Steel, shall be awarded to, and performed by, [Allied] pursuant to the same relevant terms contained in the 1992 Fairless Contract and Specification (with the exception of Articles 29 and 31 of the Contract and Articles 13-15 of the Specification). Such contract and specification shall also provide that: (i) such dismantling shall be at no cost to U.S. Steel **(other than the costs hereinafter provided for in the remainder of this paragraph)**, (ii) concrete removal will be to top of floor slab, (iii) asbestos abatement, hazmat removal, utility relocation and/or new construction will be for U.S. Steel's account . . . ; and **(iv) will include an agreed charging rate schedule for labor and equipment that will apply to extra work**, which charging rate schedule may be updated on a yearly basis.

(Doc. No. 59-7 at 1014, bolding added.)

Although this section organizes the "(a)," "(b)," and "(c)" categories of the 2003 AIP § III as "(i)," "(ii)," and "(iii)," it is otherwise virtually identical but for the two portions bolded by the Court. Because the parties agreed that the terms of the 2004 DSA would "remain faithful to all of the provisions of [the 2003 AIP]," (Doc. No. 59-4 at 968), the Court must assume that, by executing the 2004 DSA as it is, the parties agreed it met that faithfulness requirement.[23] Therefore, according to § II(A) of the 2004 DSA, it appears that anything in "the remainder of this paragraph," i.e, after "(ii)," was anticipated to incur costs to U.S. Steel, and

---

[23] The 2004 DSA also provides: "Except for clarifications and/or modifications necessary and appropriate for the implementation of the Agreement[ ] in Principle and the work contemplated thereunder, this Dismantling Service Agreement is not intended to conflict with or supersede the Agreement[ ] in Principle but rather should be construed and interpreted consistent with and in harmony with [that] Agreement[ ]." (Doc. No. 59-7 at 1017, § V(D).)

13

those costs were to be determined according to the "agreed charging rate schedule" referenced in sub-section (iv).

This interpretation seems buttressed by § II(B)(2)(a) of the 2003 AIP, which provides for a revenue commitment and defines how that commitment will be met. It provides that "all revenues generated from any asbestos abatement, environmental remediation, utility relocation, **additional concrete removal**, and new construction will be counted toward the revenue commitment if awarded during the next thirty-six (36) months for immediate commencement[.]" (Doc. No. 59-4 at 964, emphasis added.) When compared to the chart of dismantling tasks above, it is clear that, in addition to costs related to asbestos abatement, environmental remediation, utility relocation, and new construction, it was also anticipated that there would be costs to U.S. Steel (and revenue to Allied) related to some concrete removal (perhaps concrete removal that was not "to top of floor slab").

The Court, therefore, concludes that, when Allied performs "concrete removal" that is not "to top of floor slab" (or, put differently, concrete removal that is below top of floor slab), Allied must be compensated for that work by U.S. Steel. That conclusion, however, does not resolve the matter for the simple reason that the parties do not agree on what constitutes "concrete removal." Furthermore, this dispute spills over into the dispute over what constitutes "backfilling" and whether that, too, in this particular setting, is an exception to the "no cost" provision (even though, according to the Court's chart, backfilling would seem to fall into the "no cost" category).

This definitional dispute was further highlighted during the oral argument on July 12, 2013, where defendant's counsel asserted that U.S. Steel has not asked Allied to remove any

14

concrete, but only to demolish the concrete and let it drop to the underlying basement as fill (i.e., to "backfill"). During oral argument, defendant's counsel argued as follows:

> . . . So the dismantling work, which includes basement backfilling and grading, has to be provided at no cost to U.S. Steel.
>
> Allied doesn't dispute that it's required to perform this basement work. They dispute that they are required to do it at no cost. . . .
>
> But Allied's only response is that concrete removal be to top of floor slab.
>
> \* \* \*
>
> . . . [Allied] use[s] this language ["concrete removal will be to top of floor slab"] to suggest that Allied could not be required to perform basement work at no cost because its no-cost obligation ended at the top of the floor slab. But this misses the most important point here, is that the basement work does not require concrete removal at all. It requires concrete demolition. That is specifically the breaking in of the floor slab. And that provides the first layer of fill in the basement for the basement work.
>
> And that's consistent with the 1992 specification in this case which says that Allied shall use suitable solid fill such as broken concrete for fill material in basements. And that's from Section 6.2.5 of the specification.
>
> \* \* \*
>
> . . . [Allied's] position essentially is that, A, to do the basement work that U.S. Steel authorized and released Allied to do it would require concrete removal. And our position is it does not require any concrete removal at all. It requires the breaking in of the concrete. That's the demolition issue. They seem to want to conflate the notion of removal with the notion of demolishing. And to us those have very separate and distinct terms.

(Doc. No. 73 at 1167-69.) Counsel further argued that plaintiff's own complaint, at ¶ 51, recognizes that U.S. Steel had asked Allied to demolish the floors, not remove them.[24] In an attempt to further clarify, at oral argument defense counsel notably stated:

> So all of that shows that what we're dealing with is not concrete removal such that the 'top of floor slab' language is implicated. But we are dealing with

---

[24] Paragraph 51 alleges: "This proposed scope of work [i.e., the Keystone Industrial Port Complex Subgrade Backfilling Procedures, Ex. J to the complaint] includes, inter alia, demolishing the existing floors that overlie the basements, the backfilling, grading and compacting of the basements, as well as other work beneath the slab on grade, all of which is compensable work which must be performed by Allied." (Compl. ¶ 51, emphases in original.)

concrete demolition. *Of course, that demolition was the only way that Allied could get the steel out of the concrete flooring.*

(*Id.* at 1172, emphasis added.) The italicized language is a reference to the fact that the primary way Allied makes money on the dismantling projects at the Fairless Works is to salvage the scrap for sale. As noted by plaintiff's counsel in his rebuttal at oral argument:

> No concrete under phase 1 or 2 was ever, quote, "removed" and taken off site. What's being discussed is the dismantling and taking apart of that concrete. That's where all the tremendous expense is.
>
> And so we believe U.S. Steel is playing semantics here. They're saying we're not asking you to remove this concrete. We're just asking you to break it up into very small little pieces, *remove the rebar*, and drop it into the basement. That's the expensive removal work and dismantling work that the parties agreed Allied would not have to perform. There is no separate removal. It's being dismantled and dropped in the basement.

(*Id.* at 1192-93.) In response to this argument, defendant's counsel stated:

> [Plaintiff's counsel] makes much of dismissing the distinction between a removal and demolition. We think, . . . that those words actually have meaning. They are not just semantics as Mr. Opalinski has suggested.
>
> There is no doubt that removal and demolition are not one and the same. And moreover, it's not clear how Allied would be able to get the equipment, the scrap, the materials out of the basement without demolishing the concrete. That's how it would be done, and that's how the work would be done, and that's why it makes more sense to look at this as a demolition and not as something falling under the terms of the contract when it talks about concrete removal.

(*Id.* at 1226-27.)

The parties agree that Allied, as a form of payment for its services (i.e., at "no cost" to U.S. Steel), was entitled to retain certain scrap materials for their salvage value. In light of that fact, defendant argues that the only way Allied could get to that scrap was to demolish the concrete floors, which both exposes the rebar (the steel supporting rods in the floors) and the basement level where other equipment and scrap was located. Therefore, in defendant's view,

16

that is simply part of the demolition deal and does not implicate the "concrete removal" language or the "backfilling" requirement. That, however, raises the question: what was the purpose of the language in the 2003 AIP (which was, after all, a *settlement* agreement) that *limited* concrete removal to "top of floor slab"? The Court must presume that all of the language in any contract has a meaning and purpose.

Although the Court construes the contracts as requiring U.S. Steel to pay Allied for "concrete removal" that is below "top of floor slab," this does not resolve the dispute, nor can it be resolved at this juncture. Rather, taking all the factual allegations in the complaint as true, as this Court must, the Court finds that plaintiff has sufficiently set forth facts in Counts I and II to state a claim. Therefore, the Court must deny defendant's motion to the extent it seeks dismissal of these counts.

### 2.    Count III (The Disruption and Delay Claim)[25]

In Count III, Allied asserts a claim for breach of contract due to disruption and delay at the Fairless Works. Allied alleges that, pursuant to the 2003 AIP, the 2004 DSA, and the 1992 Agreements, the dismantling work at the Fairless Works was to be performed on a "continuous basis" and was to be completed "within three years after [U.S. Steel] has authorized [Allied] to begin work." (Compl. ¶ 81; 1992 Specification § 3, Doc. No. 59-2 at 883.) It further alleges that U.S. Steel is contractually obligated to pay Allied for any additional cost and loss of revenue incurred by Allied as a result of any delay caused by U.S. Steel. (*Id.* ¶ 82; 1992 Construction Contract § 3.1, Doc. No. 59-1 at 867-68.) Allied alleges that payment for labor and equipment for any unanticipated "extra work" at Fairless Works was to be according to an agreed charging rate schedule. (*Id.* ¶ 83; 2004 DSA § II(A), Doc. No. 59-7 at 1014.) Allied

---

[25] *See also* Tr. at 1176-1184, 1201-1214.

alleges that U.S. Steel breached the contracts by causing extensive delays, hindrances, and numerous other impacts to Allied's work, resulting in greatly increased costs to Allied. (*Id.* ¶ 85.) Allied alleges that it has, nonetheless, substantially completed the work that has been released to it and has performed in accordance with the terms and conditions of the various contract documents. (*Id.* ¶ 88.) Allied further alleges that U.S. Steel has significantly impaired Allied's ability to do business and its ability to complete its manufacturing facility, and has caused Allied additional financial damages. (*Id.* ¶ 90.) Allied asserts that, under the Pennsylvania Contractor and Subcontractor Payment Act, 73 P.S. § 501, *et seq*., it is entitled to interest, penalty interest, and attorney's fees on its damages. (*Id.* ¶ 92.)

In its motion to dismiss, U.S. Steel argues that, under the 2003 AIP and the 2004 DSA, there were no time or work schedule restrictions, and it was free to authorize the dismantling "regardless of time." U.S. Steel asserts that Allied relies upon contractual provisions that do not apply to the work performed at the Sheet and Tin Facility, but only to the Hot End Facilities. U.S. Steel further argues that, even if Allied has properly pled a basis for a breach of contract claim, such claim is time-barred.[26]

In opposition to U.S. Steel's arguments regarding time frames, Allied asserts:

> While it is true that there was no specifically negotiated time as to when U.S. Steel was obligated to "release" other facilities, it is absurd to read into the contract language some ability of U.S. Steel -- once a facility is released -- to arbitrarily delay or extend the performance of Allied's work on that facility (no matter how long or how expensive it became) -- and even more absurd to suggest that Allied would have entered into that type of deal when the 2003 AIP was specifically designed to compensate Allied for past losses.[11]

---

[26] U.S. Steel also argues that Allied is not entitled to additional damages under Pennsylvania's Contractor and Subcontractor Payment Act. The Court need not address this issue at this juncture as it will only become relevant should plaintiff prevail on its breach of contract claim in Count III.

[11] The evidence will show that Allied provided U.S. Steel with a schedule for the Sheet and Tin Facility, which was consistent with the three-year time frame in the 1992 Specification and U.S. Steel never objected to this schedule.

(Doc. No. 57 at 820, footnote in original.) Allied's argument suggests that the dispute regarding timing of the work is two-fold: (1) that U.S. Steel simply failed to "release" facilities in a timely fashion; and (2) that after U.S. Steel had released facilities, it interfered, made changes, and otherwise disrupted Allied's work so much that serious delay resulted, causing Allied to incur considerable unanticipated cost.

U.S. Steel relies on the phrase "regardless of time" in the 2003 AIP and the 2004 DSA to argue that it had complete control over every aspect of the work to be done by Allied at Fairless Works and that none of the time restrictions in any of the other contracts apply.[27] The Court concludes that this interpretation is too broad. Rather, the Court construes "regardless of time" as a simple guarantee that Allied, and only Allied, would be U.S. Steel's dismantling contractor and that its dismantling work would always be pursuant to the terms of the Fairless Contract. There were time frames included in the contracts which might have otherwise suggested that, outside those time frames, U.S. Steel could contract with someone else. For example, § II(B)(1) of the 2003 AIP provided that U.S. Steel would guarantee to offer Allied "work . . . that will generate $17-1/2 million in revenue *over the next thirty-six (36) months* in order to generate a profit/gross margin of forty percent (40%) or $7.0 million[.]" (Doc. No. 59-4 at 963, emphasis added.) That was a revenue guarantee, but it was not a provision that would otherwise release U.S. Steel from its long-term Fairless Contract after 36 months. In fact, § III is

[27] U.S. Steel places undue emphasis on phrases in the 1992 Construction Contract and the 1992 Specification, such as "the work hereunder" or similar phrases. However, once these contracts were incorporated by the later contracts, "the work hereunder" became the newly contracted work.

19

clear that the time constraints set forth in the 1992 Construction Contract and 1992 Specification would continue to control the work:

> Any further DISMANTLING WORK at the steelmaking or former steelmaking facilities owned by U.S. Steel's Fairless Works, regardless of time [i.e., even if the work was outside the 36 months], will be awarded to and performed by [Allied] *pursuant to the Fairless Contract which shall contain the same relevant terms and conditions contained in the Contract and Specification for the first phase or "Hot End" of Fairless*[.]

(*Id.* at 967, emphasis added.) Because there were no time constraints for the work separately set forth in the 2003 AIP and/or the 2004 DSA, the time frames for the "first phase or 'Hot End' of Fairless" would still apply. The 1992 Construction Contract provided, in § 2.1, that Allied should complete all work "according to the work schedule set forth in the applicable specifications." (Doc. No. 59-1 at 867.) The 1992 Specification provided the following:

> 3.      TIME SCHEDULE

> Work on each phase of this contract shall begin within five (5) days after [Allied] has received notice from [U.S. Steel] to proceed, and shall be manned by sufficient personnel and equipment as may be required to complete the work in a timely manner.

> Dismantling work shall be performed on a continuous basis until all work described herein has been completed. [Allied] shall notify the Engineer in writing if he [sic] intends to stop work for any reason. No work stoppage will be made without approval by the Engineer.

> Work on each phase of the work shall be completed within three years after [U.S. Steel] has authorized [Allied] to begin work on that phase.

> [Allied] shall have an additional twelve (12) months to remove all accumulated scrap from the site.

(Doc. No. 59-2 at 883.) This time schedule governed the "first phase or 'Hot End' of Fairless." The Court construes this time schedule to be a "relevant" term that was incorporated into the 2003 AIP and the 2004 DSA and made applicable to the work at the Sheet and Tin Facility.

To summarize, reading all the contracts together, U.S. Steel could release work at the Fairless Works to Allied at any time and promised to give Allied at least enough work during the first 36 months of the contract to generate $7 million in revenue. Once U.S. Steel released any phase of the work to Allied, Allied had to begin working on that phase within five days and had to work continuously until finished (unless granted a work stoppage by the Engineer). Allied also had only three years to complete the work on each phase released to it and an additional twelve months to remove the scrap.

Given that construction, the Court turns to the specifics of Count III, where Allied seeks damages for U.S. Steel's alleged disruption and delay of Allied's work. With respect to delay, § 3.1 of the 1992 Construction Contract provided:

> Should [Allied] be delayed in the performance or completion of the work hereunder by [U.S. Steel] or by any cause beyond the control of [Allied], [U.S. Steel] will, at [Allied's] request, extend by written order to be signed by its Purchasing Agent the work scheduled for a period of time equivalent to any such delay. *[U.S. Steel] will pay [Allied] any additional cost and any loss of revenue incurred by [Allied] as a result of any such delay if such delay is caused by [U.S. Steel].*

(Doc. No. 59-1 at 867-68.) Allied alleges that U.S. Steel disrupted and delayed work that it had already released to Allied[28] and, therefore, is liable under § 3.1. Allied has sufficiently asserted its claim, in light of the Court's contract construction, to survive a motion to dismiss Count III as a breach of contract claim. The facts will bear out whether U.S. Steel actually did cause delay and/or disruption as alleged and, if so, what were the damages to Allied.[29]

---

[28] To the extent Count III may be read to allege injury to Allied because U.S. Steel delayed the initial release of a job, any such claim fails. There is no time frame within which U.S. Steel was required to release the work, except that it did have to release enough within the first 36 months to meet its $7 million revenue guarantee--and there is no claim that this failed to occur.

[29] Allied also alleges in its complaint that U.S. Steel's delays and disruptions "were not originally contemplated by the parties, were not reasonably foreseeable by Allied, were unreasonable in duration and were caused by the direct and active interference and breaches of U.S. Steel's contractual obligations to Allied." (Compl. ¶ 87.) In its

Finally, U.S. Steel argues that Allied cannot pursue its breach of contract claim set forth in Count III because it is time-barred under Pennsylvania's four-year statute of limitations for a breach of contract. *See* 42 Pa. Cons. Stat. Ann. 5525(8).

Allied alleges that, throughout 2004, U.S. Steel identified areas of the Sheet and Tin Facility that would be released to Allied for dismantling work and further indicated that the release would be no later than January 2005. (Comp. ¶¶ 23-26.) Allied alleges that U.S. Steel agreed to complete all the necessary predecessor work by April 8, 2005 so that Allied could proceed with the dismantling in an uninterrupted fashion. (*Id.* ¶ 24.) Finally, Allied alleges that U.S. Steel did not make the Sheet and Tin Facility available to Allied for demolition until July of 2006, more than two years after the entire facility was first officially contracted to Allied. (*Id.* ¶ 32.) In its motion to dismiss, U.S. Steel asserts that Allied's complaint concedes that Allied knew of the claimed breach of contract as early as 2006, but failed to filed its complaint until 2012.

In opposition to the motion, Allied first argues that the statute of limitations is an affirmative defense that must be raised in a pleading, *see* Fed. R. Civ. P. 8(c), and not by means of a Rule 12(b)(6) motion, which merely tests the sufficiency of the complaint. While ordinarily that is true, a complaint may be subject to dismissal under Rule 12(b)(6) where an affirmative defense appears on its face. *See Jones v. Bock*, 549 U.S. 199, 215 (2007) ("a complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief. If the allegations, for example, show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim; that does

---

opposition brief, Allied argues that U.S. Steel's alleged delays and disruptions caused "extra work" within the meaning of § II(A)(iv) of the 2004 DSA for which Allied should be compensated. (*See also* Compl. ¶ 83.) The section of the 2004 DSA that Allied relies upon, when read in the context of the entire contract, was meant to apply to true "extra work" that U.S. Steel might ask Allied to perform. It was not meant to apply to additional work that might have resulted from U.S. Steel's alleged delays and disruptions, a matter that is addressed directly in § 3.1 of the 1992 Construction Contract. The Court need not address this argument further.

not make the statute of limitations any less an affirmative defense") (dictum) (citing *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001) ("a complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense . . . appears on its face.") (alteration in original, citation omitted)).

Allied also argues that, under Pennsylvania law, "[t]he time within which a matter must be commenced . . . shall be computed . . . from the time the cause of action accrued," 42 Pa. Cons. Stat. Ann. § 5502(a), and, in this case, accrual is a determination that depends on presently disputed facts. Allied asserts that, in arguing for dismissal under a statute of limitations defense, "U.S. Steel ignores the myriad of other allegations of breach relating to the performance of (and interferences with) the dismantling of Sheet and Tin *after* it was made available" in 2006. (Doc. No. 57 at 822, citing Compl. ¶ 85.) Although Allied admits alleging, mostly in background information, that the Sheet and Tin Facility was not made available by U.S. Steel when it was supposed to be, it argues that the complaint "does not state how or when (or even if) that conduct by U.S. Steel caused harm to Allied." (*Id.* at 823.) Allied asserts that "[h]ow and when Allied was harmed by U.S. Steel must await the completion of discovery and expert reports[.]" (*Id.*)

Allied also argues that "Count III is based upon the breach of a long-term, 'continuing' construction contract[,]" (Doc. No. 57 at 823) and, since it had a three-year period (beginning in July 2006) for completion of the dismantling work, it would not have known until July 2009 whether U.S. Steel had caused any harm by its delay and disruption. In Allied's view, since the work at the Sheet and Tin Facility is still not complete, U.S. Steel's disruptions and interferences constitute a "continuing" breach.

Finally, Allied claims that it repeatedly notified U.S. Steel of the various problems and impacts, which U.S. Steel never contemporaneously disputed. Nor did U.S. Steel

ever indicate that it would not compensate Allied for its losses. In fact, according to Allied, U.S. Steel requested that Allied submit a formal claim, which it did in December 2011. U.S. Steel waited until September 12, 2012 to deny the claim. It was at that time that Allied knew U.S. Steel was in breach of the contract provisions that required U.S. Steel to compensate Allied for losses caused by U.S. Steel.

Under Pennsylvania law, a cause of action accrues at "the time when the plaintiff could have first maintained the action to a successful conclusion." *Kapil v. Ass'n of Pa. State Coll. & Univ. Faculties*, 504 Pa. 92, 99, 470 A.2d 482, 485 (Pa. 1983).

Given the factual disputes underlying this count of the complaint, dismissal under Rule 12(b)(6) would be inappropriate. Accordingly, to the extent defendant's motion seeks dismissal of Count III for failure to state a claim or, in the alternative, for being time-barred, the motion is denied.

### 3.     Counts IV and V (The Facilities, Scrap and Railroad Track Ownership Claims)[30]

Counts IV and V assert breach of contract claims relating to loss of the value of facilities allegedly removed by U.S. Steel from Allied's scope of work at the Fairless Works (Count IV) and loss of the value of remaining non-ferrous scrap and railroad track at the Fairless Works (Count V).

In Count IV, Allied alleges that the scope of its work at Fairless on the Sheet and Tin Facility originally included the demolition of substantially all the buildings, structures and facilities. (Compl. ¶ 95.) Pursuant to § 8.1 of the 1992 Specification,[31] Allied paid U.S. Steel

---

[30] *See also* Tr. at 1184-11-87, 1214-1221.

[31] Section 8.1 of the 1992 Specification provides:

$1.00 as "payment in full for all equipment, material and structures." (*Id.* ¶ 96.) Once U.S. Steel had completed asbestos removal at each facility, it was contractually obligated under § 5.2 of the 1992 Specification[32] to assign the ownership of each facility to Allied (including all ferrous and non-ferrous scrap, all spare parts and equipment, and all railroad track located within each dismantling area). (*Id.* ¶ 97.) The asbestos removal was completed and, by way of PT Order No. 85012,[33] U.S. Steel formally assigned ownership of all ferrous and non-ferrous scrap and equipment associated with the work at Fairless to Allied. (*Id.* ¶ 98.) Further, under §§ 10.2 and 10.3 of the 1992 Specification,[34] once Allied had commenced work at any facility, U.S. Steel no

---

[Allied] shall make one lump sum payment to [U.S. Steel] in the amount of $1.00. Said payment shall be payment in full for all equipment, material and structures described as Base Bid Facilities under this Specification.

(Doc. No. 59-2 at 945.)

[32] Section 5.2 of the 1992 Specification provides that U.S. Steel shall:

After completion of RACM [Regulated Asbestos Containing Material] removal at each Base Bid facility, assign to [Allied] ownership of each facility to be dismantled. The assignment shall include:

5.2.1    All ferrous and non-ferrous scrap resulting from the dismantling work.

5.2.2    All ferrous and non-ferrous scrap located within each dismantling area.

5.2.3    All remaining ingot molds, ingot mold stools, ingot teeming cars, ingots, open hearth scrap boxes, open hearth scrap box cars, slabs, blooms and billets.

5.2.4    Spare parts and/or spare equipment which the Engineer designates to be associated with each facility. Spare parts and/or equipment which has been designated for transfer to other operating facilities within [U.S. Steel] shall not be assigned to [Allied].

5.2.5    Railroad track located within a specific dismantling area which exclusively serves that dismantling area. Any railroad track located within a dismantling area which serves an adjacent facility shall not be assigned to [Allied].

(Doc. No. 59-2 at 930-31.)

[33] A copy of this document is attached to the complaint as Ex. A. It is dated August 7, 2004 and states that it is "valid thru Sep, 2007." (Doc. No. 43-1 at 561.) It further states: "This order is to assign ownership of ferrous scrap, non-ferrous scrap and equipment associated with various dismantling work to be performed at the Fairless Works Sheet and Tin Facility. All work to be in accordance with the DSA, Blanket Agreement and any specifications, purchase orders, etc. that may be issued by [U.S. Steel] for such work." (*Id.*) The price is noted as $1.00. (*Id.*)

[34] These sections of the 1992 Specification provide:

10.2    [U.S. Steel's] rights to remove any complete facility from the scope of this Specification shall terminate upon the commencement of work at that facility by [Allied].

25

longer had the right to remove any "complete facility" from the scope of Allied's work, at least not without compensating Allied in the amount of 50% of the scrap value of the facility. (*Id*. ¶ 99.) Allied alleges that it "performed, commenced and/or completed some or all of this work for U.S. Steel at all released facilities at the Sheet and Tin Facility . . . and, hence, U.S. Steel no longer had the right to remove any 'complete facility' from Allied's scope of work." (*Id*. ¶ 101.) Allied further alleges the, "[e]ven assuming U.S. Steel had the right to remove or indefinitely withhold any complete facility from Allied's scope of work, under Section 10.3 of the [1992] Specification, U.S. Steel then owes Allied the agreed value of any removed facility." (*Id*. ¶ 102.) Allied alleges that U.S. Steel "breached its contractual obligations . . . by removing and/or placing on indefinite hold various facilities that were within Allied's scope of work[,]" without compensating Allied. (*Id*. ¶¶ 103-04.)

In Count V, Allied alleges that U.S. Steel has breached its contractual obligation to allow Allied to remove articles within the dismantling area that belong to Allied by virtue of the assignment provisions in the various contracts (Compl. ¶¶ 106-07, citing §§ 5.2.2 and 5.2.5 of the 1992 Specification), and by requiring Allied to bear the cost of removal of non-salvageable railroad ties, a cost that allegedly resides with U.S. Steel and has, in the parties' course of dealings, always been paid by U.S. Steel. (*Id*. ¶¶ 108-10, citing § III(c) of the 2003 AIP[35] and §§ 5.8,[36] 6.4.5, and 6.4.6[37] of the 1992 Specification).

---

10.3    Should [U.S. Steel] require a building be removed from this demolition package, [U.S. Steel] shall pay as compensation to [Allied] 50% of the "Scrap Value", *i.e.*, No. 1 Heavy Melt price per gross ton for the amount of gross tons removed as listed in second issue of IRON AGE, Pittsburgh, Pennsylvania on the month of the sale, but in no event less than $50.00 per gross ton.

(Doc. No. 59-2 at 945.)

[35] For § III(c) of the 2003 AIP, see n. 21, *supra*.

[36] Section 5.8 the 1992 Specification provides:

26

With respect to these counts, U.S. Steel argues that, under § II(B)(7) of the 2003 AIP[38] and § IV(A) of the 2004 DSA, Allied does not own any scrap material until it "generates" it through dismantling work released to it by U.S. Steel. U.S. Steel argues that Allied has not generated any scrap for the simple reason that U.S. Steel did not release the facilities. In the alternative, U.S. Steel also argues that § 10.1 of the 1993 Blanket Agreement gives it the right to "make changes in, deductions from and additions to work upon written order to [Allied]." (Doc. No. 59-3 at 952.)

While it is not clear (1) what, if any, facilities were or were not released to Allied, or (2) whether some of the work is part of the work that Allied complains was released to another subcontractor, or (3) whether it is simply work that was never released, the complaint, nonetheless, contains sufficient facts to state a claim for relief.

Accordingly, U.S. Steel's motion to dismiss Counts IV and V for failure to state a claim is denied.

### 4. Count VIII (Unanticipated Scrap Claim)[39]

---

5.8    [U.S. Steel shall] [c]hose [sic] all methods and locations for disposal of all HAZMATs generated as a result of work performed under this specification. Said HAZMATs disposal methods and locations shall conform to all applicable Federal, State and Local laws, statutes, ordinances and regulations. [U.S. Steel] shall pay all costs associated with the disposal of HAZMATs except as specifically set forth herein.

[37] Sections 6.4.5 and 6.4.6 of the 1992 Specification are located in a section of the contract relating to "HAZMATs Removal." The sections are lengthy and need not be quoted herein. However, Allied alleges they apply because they deal with "coke plant by-products," and one component in the railroad ties is creosote, allegedly a coke-plant by-product. (Doc. No. 59-2 at 939-40.)

[38] Section II of the 2003 AIP is captioned "Dismantling Service Agreement." Subsection (B) deals with "Future Work and Services." Subsection (B)(7) provides that "[Allied] will own all ferrous and non-ferrous scrap generated on any projects awarded to [Allied]." (Doc. No. 59-4 at 966.)

Similarly, under § IV of the 2004 DSA, which addresses "Additional Provisions Regarding Scrap Ownership, Sales and Valuation," subsection (A) provides: "Unless otherwise mutually agreed to, all ferrous and non-ferrous scrap generated as a result of work or services awarded to [Allied] under this Agreement will be owned by [Allied]." (Doc. No. 59-7 at 1016.)

[39] *See also* Tr. at 1187-1189, 1221-1226.

27

In Count VIII, Allied alleges that, pursuant to the 2010 DSA, it performed dismantling work for U.S. Steel on the Gary Sinter Plant Cooler and Stack Project and the Granite City #6 Galvanize Line Project. (Compl. ¶ 127.) On both projects, Allied calculated an initial walk through estimate of the scrap tonnages expected; however, Allied subsequently encountered "significant additional unanticipated scrap tonnages for a variety of reasons," (*id.* ¶ 128), all within U.S. Steel's control. While the cost for Allied's work resulting from this additional scrap increased, so did U.S. Steel's benefit from the sale of the scrap. While U.S. Steel has accepted the benefit, it refuses to accept responsibility for the added cost necessarily associated therewith. (*Id.* ¶ 129.) This change in tonnage is a compensable "change in the work," according to Allied; however, when Allied twice sought additional compensation from U.S. Steel under the 2010 DSA, U.S. Steel denied both requests, allegedly incorrectly claiming that no change orders were permitted under the operative contracts. (*Id.* ¶¶ 130-31.)

U.S. Steel argues in its motion that this claim must fail because § 3(C) of the 2010 DSA requires that "[a]ll change orders must be agreed upon on any project prior to the commencement of work required by reason of the change order." (Doc. No. 59-9 at 1039.) Since it fails to allege the existence of any such agreed change order and, in fact, affirmatively pleads that U.S. Steel has refused to issue one (Compl. ¶ 131), U.S. Steel argues that Allied has failed to state a claim for relief under the contract.

In opposition, Allied asserts that U.S. Steel misconstrues its claim, which it characterizes as "a claim for differing site conditions." (Doc. No. 57 at 829.) According to Allied, that kind of claim is discovered only after work has begun and is not amenable to obtaining a previous change order. Further, Allied argues that, "under Pennsylvania law, written change order (and notice) provisions cannot be used by the owner to bar claims for constructive

28

changes where, among other things, the owner interfered with the contractor's work, was aware of the project conditions, or was not prejudiced by the lack of a formal written claim." (*Id.* at 830, citing *James Corp. v. N. Allegheny Sch. Dist.*, 938 A.2d 474, 485-86, 487 (Pa. Commw. Ct. 2007); *Coatesville Contractors & Eng'rs, Inc. v. Borough of Ridler Park*, 506 A.2d 862 (Pa. 1986)).[40]

   The 2010 DSA clearly requires written change orders. The complaint unambiguously states that Allied performed a walk-through to obtain its own estimate of the scrap tonnage. This walk-through permitted Allied to provide U.S. Steel with the "Project Cost Estimate for the entire scope of work on the project," as required by § 3(B) of the 2010 DSA, "[t]o assist [Allied and U.S. Steel] to negotiate a price for the specific project to be awarded[.]" (Doc. No. 59-9 at 1039.) The fact that Allied later learned its estimate fell short, allegedly due to inaccurate information provided by U.S. Steel, does not amount to a breach of the 2010 DSA. Allied has not pointed to a single section of the 2010 DSA that required U.S. Steel to provide *any* information to Allied to assist with this process of creating its Project Cost Estimate. Rather, the burden appears to be solely on Allied to create that estimate. If the Project Cost Estimate is rejected by U.S. Steel, the project can be opened to other contractors for bids. Allied then has the right to either participate in that process or to agree to do the job for U.S. Steel according to the terms of the otherwise most acceptable bid. (*See* §§ 3(B) and 3(E) of the 2010 DSA, Doc. No. 59-9 at 1039, 1040.) Clearly, under this arrangement, Allied has an incentive to "bid" as low as it reasonably can when it submits its initial Project Cost Estimate, so U.S. Steel will accept it

---

[40] Allied also cites *Brinderson Corp. v. Hampton Roads Sanitation Dist.*, 825 F.2d 41, 43-44 (4th Cir. 1987). That case is inapplicable because it was applying Virginia, not Pennsylvania, law.

without the necessity of the alternative process. If Allied later learns that its accepted cost estimate missed the mark, no fault can be attributed to U.S. Steel.

The Pennsylvania case law cited by Allied does not require a different result. In *James Corp*., the court held that a written change order was not required because the owner had directed the contractor to perform the extra work. There is no such allegation here. Allied merely alleges that its cost estimate was wrong, an error that cannot be attributed to U.S. Steel. In *Coatesville*, the court determined that contractual provisions amounting to a change order requirement did not apply because the owner had affirmatively interfered with and prevented the contractor's completion of the work as bid. Again, there is no such allegation.

Accordingly, U.S. Steel is entitled to dismissal of Count VIII for failure to state a claim. To that extent, its motion is granted.

## IV. CONCLUSION

For the reasons set forth herein, defendant's partial motion to dismiss is **GRANTED IN PART and DENIED IN PART**. Only Count VIII is dismissed; all other counts of the second amended complaint survive the motion.

**IT IS SO ORDERED**.

Dated: September 27, 2013                    _____
                                             **HONORABLE SARA LIOI**
                                             **UNITED STATES DISTRICT JUDGE**

30