IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALLIED ERECTING AND DISMANTLING CO., INC., | ) ) ) | Civil Action No. 4:12-CV-1390 |
| Plaintiff, | ) ) | |
| v. | ) ) | JUDGE SARA LIOI |
| UNITED STATES STEEL CORPORATION, | ) ) | |
| Defendant. | ) ) | MAGISTRATE JUDGE GEORGE J. LIMBERT |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO UNITED STATES STEEL CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Christopher R. Opalinski *(pro hac vice)*
Ohio Bar No. 0084504
Pa. I.D. #35267
copalinski@eckertseamans.com
F. Timothy Grieco (*pro hac vice*)
Pa. I.D. #81104
tgrieco@eckertseamans.com

Eckert Seamans Cherin & Mellott, LLC
U.S. Steel Tower
44th Floor, 600 Grant Street
Pittsburgh, Pennsylvania  15219
412-566-5963 *(telephone)*
412-566-6099 *(facsimile)*

Jay M. Skolnick
Ohio Bar No. 0006767
jmskolnick@nnblaw.com
Kevin L. Bradford
Ohio Bar No. 0080225
klbradford@nnblaw.com
Nadler & Burdman Co., LPA
6550 Seville Drive, Suite B
Canfield, Ohio  44406
330-533-6195 *(telephone)*
330-533-6198 *(facsimile)*

Attorneys for Plaintiff
Allied Erecting and Dismantling Co., Inc.

Dated:  March 26, 2014

## TABLE OF CONTENTS

**Page**

TABLE OF CASES AND AUTHORITIES ...........................................................................iii

STATEMENT OF THE ISSUES TO BE DECIDED.............................................................v

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................................1

ARGUMENT .........................................................................................................................2

I.  U.S. STEEL IS NOT ENTITLED TO SUMMARY JUDGMENT
    ON ITS COUNTERCLAIM II FOR A REFUND OF THE $10 MILLION
    MANUFACTURING ADVANCE ..............................................................................2

II.  ALLIED'S CLAIM FOR DISRUPTION/DELAY (COUNT III)
     IS SUPPORTED BY BOTH SUFFICIENT EVIDENCE OF RECORD
     AND THE TERMS OF THE PARTIES' CONTRACT.................................................4

     A.  Allied's Claims Are Based Upon A Scope of Work
         That Was Released And Authorized By U.S. Steel ...........................................4

     B.  The Dismantling Work At Sheet And Tin Was Governed
         By A Three-Year Schedule Under The 1992 Specification..............................8

     C.  The Disruptions Alleged By Allied Were Not Contemplated
         Or Foreseeable By Allied, Were Well Within The Control
         Of U.S. Steel And Were Caused By The Direct And Active
         Interference Of U.S. Steel ..............................................................................11

III.  U.S. STEEL MUST COMPENSATE ALLIED FOR BASEMENT
      DISMANTLING WORK BELOW "TOP OF FLOOR" SLAB..................................14

      A.  Neither The 2003 AIP Nor The 1992 Specification Require
          Allied To Perform Basement Backfilling At No Cost
          To U.S. Steel ....................................................................................................14

      B.  The "Top Of Floor Slab" Language In The 2003 AIP Has
          Everything To Do With Basement Work And Mandates
          That U.S. Steel Compensate Allied For This Work........................................15

      C.  The Basement Work At Sheet And Tin Requires Concrete
          Removal ............................................................................................................18

     D.     The Parties' Course Of Performance Confirms That
U.S. Steel Is Required To Compensate Allied For Basement
Work At Sheet And Tin ......................................................................20

IV.     U.S. STEEL MUST COMPENSATE ALLIED FOR FACILITIES
REMOVED FROM THE SHEET AND TIN SCOPE OF WORK
(COUNT IV) .............................................................................................21

V.     ALLIED IS ENTITLED TO RECOVER ON ITS RAILROAD
TRACK AND NON-FERROUS CLAIMS ....................................................23

     A.     U.S. Steel Breached The 2003 AIP By Failing To
Make Available The Railroad Track And Non-Ferrous
Material For Allied to Dismantle ......................................................23

     B.     The Track At Issue Is Not Excluded From Allied's
Dismantling Rights ...........................................................................24

     C.     The Hot End Track Is Not Exempted From Dismantling ................25

     D.     Res Judicata Does Not Bar Allied's Claims .....................................25

     E.     The Statute Of Limitations Does Not Bar Allied's Claims ............26

     F.     Allies Is Entitled To Payment For Disposal Of
Railroad Ties At Fairles ...................................................................27

     G.     Summary Judgment Regarding Allied's Claim For The
Costs Of Accelerated Salvage Removal (Count VI)
Should Be Denied .............................................................................29

CONCLUSION.................................................................................................30

# TABLE OF CASES AND AUTHORITIES

## Cases

Page

Coatesville Contractors & Engineers, Inc. v. Borough of Ridley Park
506 A.2d 862 (Pa. 1986) ........................................................................................... 12

Cole v. Lawrence
701 A.2d 987 (Pa. Super. Ct. 1997) .......................................................................... 27

Eastern Elec. Corp. v. Shoemaker Contr. Co.
657 F. Supp. 2d 545 (E.D. Pa. 2009) ........................................................................ 12

Gorzelsky v. Leckey
586 A.2d 952 (Pa. Super. Ct. 1991) .......................................................................... 14

Lichter v. Mellon-Stuart Co.
196 F. Supp. 149 (W.D. Pa. 1961) ............................................................................ 12

Melley v. Pioneer Bank
834 A.2d 1191 (Pa. Super. Ct. 2003) ........................................................................ 27

Mellon Bank v. Aetna Bus. Credit
619 F.2d 1001 (3d Cir. 1980) .................................................................................... 30

Morgan v. Covington Twp.
648 F.3d 172 (3d Cir. 2011) ......................................................................................

Morgantown Crossing, L.P. v. Mfrs. & Traders Trust Co.
2004 U.S. Dist. LEXIS 22949 (E.D. Pa. Nov. 10, 2004) ........................................... 13

Nowicki v. United Timber Co.
2000 U.S. Dist. LEXIS 12580 (E.D. Pa. Aug. 31, 2000) ............................................. 3

Phila. Fresh Food Terminal Corp. v. M. Levin & Co.
361 A.2d 886 (Pa. Super. Ct. 1976) .......................................................................... 28

Quinn Constr., Inc. v. Skanska USA Bldg., Inc.
730 F. Supp. 2d 401 (E.D. Pa. 2010) ........................................................................ 13

Rawe v. Liberty Mut. Fire Ins. Co.
462 F.3d 521 (6th Cir. 2006) ..................................................................................... 26

State Farm Fire & Cas. Co. v. PECO
54 A.3d 921 (Pa. Super. Ct. 2012) ............................................................................ 28

## <u>Authorities</u>

18 Moore's Federal Practice, § 131.22 (Matthew Bender 3d Ed.) .........................................26

42 Pa.C.S. § 5525(a)(8)......................................................................................................

Restatement 2d of Contracts § 251, 253 ...................................................................................3

## <u>STATEMENT OF THE ISSUES TO BE DECIDED</u>

1.　Whether U.S. Steel's Motion for Summary Judgment regarding the $10 million MFG Advance Payment should be denied, where (1) U.S. Steel has failed to set forth any facts showing that there was an absolute, unequivocal refusal by Allied to perform manufacturing work and, even if there was a repudiation, U.S. Steel alleges that it already has fully performed its duties; (2) the MFG Advance Payment is non-refundable; (3) U.S. Steel had no unconditional obligation to offer, and Allied had no unconditional obligation to perform, manufacturing work; and (4) U.S. Steel's satisfaction of the Profit/Gross Margin Commitment under the 2004 AIP extinguished any obligation by U.S. Steel to offer, or Allied to perform, discounted manufacturing work.

2.　Whether U.S. Steel's Motion for Summary Judgment regarding Allied's claims for delay and disruption at the Fairless Works should be denied, where (1) the Court has ruled that Allied's work at Fairless was subject to a three year schedule; (2) the parties' contract and Pennsylvania law unequivocally require U.S. Steel to compensate Allied for delay and disruptions; and (3) the contractual provisions invoked by U.S. Steel are not relevant to the issues before the Court.

3.　Whether U.S. Steel's Motion for Summary Judgment regarding the parties' claims for performing the basement work at the Fairless Works should be denied, where (1) the 2003 AIP clearly provides that this work is compensable; (2) multiple witnesses testified that Allied has been compensated for performing this same work in the past under the 2003 AIP; and (3) U.S. Steel's own documents recognize that this work is compensable.

4.　Whether U.S. Steel's Motion for Summary Judgment regarding Allied's claims for the value of buildings which were removed from its scope of work, railroad tracks and non-ferrous underground utility cables should be denied, where (1) U.S. Steel's legal arguments are incorrect in multiple respects; and (2) the testimony of multiple witnesses raises genuine disputes of material fact regarding each of these claims.

5.　Whether U.S. Steel's Motion for Summary Judgment regarding the parties' claims for the disposal of railroad ties should be denied, where there is a genuine issue of material fact over whether railroad ties constitute "Hazmats", and therefore the disposal thereof must be paid for by U.S. Steel.

6.　Whether U.S. Steel's Motion for Summary Judgment regarding Allied's claim for the costs of the accelerated removal of salvage material from the Fairless Works should be denied where the parties' contract and long-standing business practices recognize that Allied is entitled to one year to remove said materials from the Fairless Works after Allied's demolition work has ended.

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

As it did in its Motion to Dismiss, U.S. Steel has again made a sweeping attack on Allied's Second Amended Complaint and seeks summary judgment on six (6) of the remaining eight (8) claims.  U.S. Steel also seeks summary judgment on its affirmative counterclaim for a refund of the $10 Million Manufacturing Advance (Counterclaim II).

U.S. Steel's Motion should be denied in its entirety.  As to Allied's claims, U.S. Steel simply repeats many of the same arguments already rejected by this Court in its Motion to Dismiss ruling,  [Doc. No. 84] and offers very little, if anything, in terms of new evidence from discovery that would require the Court to alter its construction of the parties' contracts.  What little evidence U.S. Steel offers in support of its Motion comes from selective excerpts of U.S. Steel's "side" of the story, rather than undisputed facts or admissions by Allied.  Indeed, U.S. Steel ignores an abundance of contrary evidence that, when viewed in the light most favorable to Allied, at least creates genuine issues of material fact.

As to U.S. Steel's Counterclaim II, U.S. Steel seeks the extraordinary remedy of summary judgment on an affirmative claim for relief.  However, as evidenced by Allied's Motion for Summary Judgment [Doc. No. 141], this counterclaim is very much in dispute and, in fact, should be dismissed because, <u>inter alia</u>, Allied had no unconditional obligation to perform manufacturing work and the satisfaction of the Gross Margin Commitment under the 2004 AIP extinguished any obligation by Allied to perform manufacturing work – points that U.S. Steel's Motion wholly fails to address.[1]  Alternatively, if the Court determines that U.S. Steel's counterclaim is not deficient as a matter of law, there are, at the very least, substantial questions of disputed fact that require the submission of this claim to a jury – including but not limited to

---

[1] For relevant background and a general description of the relevant contracts, Allied refers the Court to its Memorandum in Opposition to Defendant's Partial Motion to Dismiss [Doc. No. 53] and the Parties' Joint Submission of Contracts.  [Doc. No. 59.]

U.S. Steel's "reasonable" grounds for insecurity, Allied's "adequate" assurances, U.S. Steel's use and treatment of the $10 Million MFG Advance, and the nature, amount and timing of any alleged manufacturing work U.S. Steel had, or might have had, to offer to Allied.

In its Motion to Dismiss ruling this Court acknowledged that "there may ultimately be a need for a finder of fact."  [Doc. No. 84 at 1348.]  Allied respectfully requests, based upon the clear factual disputes raised below, that the Court reject U.S. Steel's invitation to credit the movant's own factual characterizations and instead, viewing the evidence in the light most favorable to Allied, deny U.S. Steel's Motion for Partial Summary Judgment.

## ARGUMENT

I.    **U.S. STEEL IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS COUNTERCLAIM II FOR A REFUND OF THE $10 MILLION MANUFACTURING ADVANCE.**

Allied has filed its own Motion for Summary Judgment on U.S. Steel's Counterclaim II and hereby incorporates that Motion.  [Doc. Nos. 141, 142.]  As stated therein, U.S. Steel's motion should be denied because Allied did not have an unconditional obligation to perform any manufacturing work, and, even if it did, U.S. Steel cannot assert a claim for anticipatory repudiation where it has already paid the MFG Advance Payment to Allied.

U.S. Steel cites several cases contrasting non-refundable advance payments from gifts, concluding that an advance is recoverable if the recipient party fails to perform since a non-refundable advance is not "a license to provide little or no consideration and to still retain an advance payment." [Doc. No. 118 at 1753.]  Allied need not discuss these cases at length (which are distinguishable on their facts), because Allied has not failed to perform any unconditional obligation and, indeed, U.S. Steel has already received full consideration for the $10 Million MFG Advance.  The key point that U.S. Steel ignores is that U.S. Steel voluntarily chose to not

use the $10 Million as an "advance" for separate manufacturing work but instead chose to use it in partial satisfaction of its $63 Million indebtedness to Allied under the 2004 AIP. (See Doc. No. 142 at 5248-51, 5255-57.)

U.S. Steel cites no controlling Pennsylvania law on the doctrine of anticipatory repudiation. As the 2004 AIP contemplates the potential performance of dismantling and manufacturing "services" by Allied, there is no sale of goods and thus the Uniform Commercial Code does not apply. As to Section 251 of the Restatement (Second) of Contracts, assuming it does apply in Pennsylvania, "[i]t is one of the established limits on the doctrine of 'anticipatory breach' that an obligor's repudiation alone, whether under Section 250 or Section 251, gives rise to no claim for damages at all if he has already received all of the agreed exchange for it." Restatement 2d of Contracts § 253, cmt. c; see also Restatement 2d of Contracts § 253, illus. 4. Here, U.S. Steel alleges it has fully performed its duties by paying the $10 Million MFG Advance. As such, there can be no claim for anticipatory breach prior to the ripening of any putative claim for Allied's non-performance on April 1, 2015. [2]

Finally, even if Allied had an unconditional duty to perform manufacturing work and U.S. Steel could assert a claim for anticipatory repudiation (both of which Allied denies), the issues of whether a party has "reasonable" grounds for insecurity with respect to a party's performance of the contract and whether a party provided "adequate" assurances are "question[s] of fact for the jury." Nowicki v. United Timber Co., 2000 U.S. Dist. LEXIS 12580, *15 (E.D. Pa. Aug. 31, 2000). At the very least, Allied has raised a genuine issue of material fact concerning whether U.S. Steel had "reasonable" grounds for insecurity and whether Allied provided "adequate" assurances. [Doc. No. 142 at 5251-54.]

---

[2] As U.S. Steel acknowledges, pursuant to a January 2005 First Amendment to the 2004 AIP, U.S. Steel had the opportunity to potentially recover the advance by March 31, 2015 – over a year from now.

## II.  ALLIED'S CLAIM FOR DISRUPTION/DELAY (COUNT III) IS SUPPORTED BY BOTH SUFFICIENT EVIDENCE OF RECORD AND THE TERMS OF THE PARTIES' CONTRACT.

### A.  Allied's Claims Are Based Upon A Scope Of Work That Was Released And Authorized By U.S. Steel.

In re-packaging its already rebuffed "regardless of time" argument, U.S. Steel still maintains that the 2003 AIP "makes clear that there is no 'scope of work' for Allied at Sheet & Tin." [Doc. No. 118 at 1757.]  However, the 2003 AIP does not state or imply that anywhere. To the contrary, the 2003 AIP contemplates that dismantling work "released and authorized" by U.S. Steel would be performed "pursuant to" the 1992 Construction Contract and the 1992 Specification.  Emphasizing that a schedule "would make no sense" when it is "unknown what work U.S. Steel will decide to do, or when it will decide to do that work," U.S. Steel continues to confuse U.S. Steel's discretion to award work with Allied's right to perform work that has been awarded in an efficient and cost effective manner.

Discovery has confirmed what Allied has always maintained:  The Sheet and Tin facilities, with the exception of the operating Galvanizing line (and related minor facilities), were released and authorized in writing by U.S. Steel as a firm scope or phase of work.  (See Dep. Exs. 130 and 23.)[3]  This scope of work was fully consistent with what had been represented to Allied in negotiations over the 2003 AIP regarding the specific, immediate work that would become available at Fairless.  (John Ramun Decl. at ¶¶ 5-9.)  Thus, what "makes no sense" is U.S. Steel's contention that, in entering into the 2003 AIP, it was not aware of any facilities that were about to be released.

---

[3] All deposition exhibits cited herein are set forth in numerical order in Allied's Appendix, filed contemporaneously herewith.  The deposition transcript excerpts are also included in alphabetical order.  Finally, the Declarations of John R. Ramun, Gordon Lindquist, and Jacob McCrea are included, as well as a Basement Illustrative.

Authorization No. UHQ3-0353, dated December 18, 2003 (exactly <u>one</u> month after the signing of the 2003 AIP), authorizes the disposal of the finishing facilities at Fairless and provided that "each facility will be evaluated for relocation and use elsewhere within USS, dismantled and sold outright, or scrapped."  (Dep. Ex. 130.)  A subsequent Request for Cost Expenditure - dated May 7, 2004 and entitled "Site Utility Isolation and Modification Required for Site Demolition" – cited the December 18, 2003 Authorization and further authorized $2.5 million for site utilities isolation and modifications to be performed prior to demolition activities. (Dep. Ex. 23.)  Significantly, this Request states that "the <u>established demolition plan</u> calls for the demolition of the majority of the finishing facilities and [only] leaves T7 warehouse, the Galvanizing Line Building, and Batch Annealing Building No. 2 remaining for GAL 3 operations."  (<u>Id</u>.)

Consistent therewith, on January 15, 2004, U.S. Steel provided Allied a "Plan – Sheet & Tin Mill Area," showing the buildings and equipment to be demolished with, of course, only the Galvanizing line to remain.  (Dep. Ex. 18.)  Bill Lamb, who was the U.S. Steel employee[4] charged with overseeing the demolition activities of Allied, testified that this document was the "established demolition plan" cited in the Request for Cost Expenditure.  (<u>See</u> Lamb Dep. at 163-64, also stating that Ex. 18 was the "original plan" for demolition.)  Mr. Lamb also admitted that , when he was assigned the oversight of Allied's demolition in the spring of 2004, his understanding was that the Sheet and Tin facilities had been "authorized and released for

---

[4] Bill Lamb was the single most knowledgeable person, on the U.S. Steel side, with respect to Sheet and Tin and Allied's demolition activity.  Mr. Lamb served as the facility redeployment coordinator at Sheet and Tin starting in 2001 and was charged with overseeing the day to day activities of Allied's demolition starting in the spring of 2004. (Lamb Dep. at 56, 66-70, 77.)  He was a part-time U.S. Steel employee from 2004-2008, was let go due to cost-cutting measures on October 31, 2008 (during a critical period of Allied's demolition activities), and then was re-hired in late 2009 as an independent consultant to continue overseeing Allied's demolition activities.  (Id.)  He continues in that role to this day.  He has been consulted with by U.S. Steel regarding Allied's formal claim, was represented by Jones Day at his deposition, and is being paid for his testimony and consulting time.  (Lamb Dep. at 8, 10, 27, 71, 73.)

dismantling."   (Lamb Dep. at 66); Lam Dep. at 159-60, confirming Dep. Ex. 21 as Allied estimate of Sheet and Tin Facilities planned to be demolished.)

Tony Nuzzo, the manager of Facility Redeployment for U.S. Steel and the individual charged with administering the AIP's with Allied, similarly stated in an email dated April 28, 2004 that "Allied has been contracted by USS to demolish the remaining Fairless Mill except for the Galvanize Line."  (Allied Appendix Ex. AAAA.)  Consistent therewith, on July 24, 2004, another drawing entitled "Plan – Sheet & Tin Mill Area" was provided to Allied by U.S. Steel and this time it showed the sub-phases for demolition of Sheet and Tin, with the final phase facilities to be available to Allied by no later than January 1, 2005.  (Dep. Ex. 24.)  This drawing confirmed the scope of work delineated in the original plan and previous metings.  (Dep. Ex. 18; J. Ramun Decl. ¶¶ 7-8.)

On August 7, 2004, U.S. Steel issued a blanket property transfer order ("PT Order") to Allied to "assign ownership" of the ferrous scrap, non-ferrous scrap and equipment associated with various dismantling work to be performed at the Sheet and Tin Facility.  (Dep. Ex. 5.) Pursuant to Section 8.1 of the 1992 Specification, the purchase price was $1.00 for the Sheet and Tin Facilities.  Notably, this PT Order was valid for three years, through September 2007.  (Id.)[5]

In early March 2005 Allied prepared and submitted to U.S. Steel its sequence plan and schedule for its demolition work at Sheet and Tin.  (Dep. Ex. 25.)  This was a detailed facility-by-facility plan which showed how Allied would accomplish its work.  The plan showed a 36 month overall timeframe for the completion of the work.  U.S. Steel admits that it received this

---

[5] A similar PT Order was issued by U.S. Steel for the Pipe Mill on June 2, 2004, again valid for three years and, for $1.00, "transfer[ing] ownership of the Fairless Works Pipe Mill to [Allied] for purposes of dismantling."  (Dep. Ex. 15.)

plan from Allied (see U.S. Steel Partial Answer, Doc. No. 47 at 677, para. 28), and that there was never any objection to this schedule by U.S. Steel.  (Falkenhan Dep. at 145.)[6]

On April 28, 2005, Bill Lamb provided Allied with a list of "Fairless Buildings Planned for Demolition" for the purpose of securing a demolition permit.  (Dep. Ex. 27.)  This list included all of the Sheet and Tin facility, minus the Galvanizing Operation.  One month later, on May 27, 2005, Stephen Bilan, Regional Manager of USS Real Estate, submitted to Falls Township an Application for Demolition Permit.  (Dep. Ex. 216.)  This application included Bill Lamb's list of facilities and also included a Drawing FS-47ml, which depicted the facilities to be demolished by Allied, fully consistent with the established demolition plan provided by U.S. Steel to Allied back on January 15 and July 24, 2004.  (Dep. Ex. 217.)  The demolition permit for Sheet and Tin was issued by Falls Township on May 31, 2005, and was based on the scope of work earlier provided by Bill Lamb.  (Dep. Ex. 28.)

Based on all of these documents, there can be no dispute that there was a firm and definite scope of work, or demolition plan, based upon the facilities that were expressly released and authorized by U.S. Steel.  Indeed, U.S. Steel's own meeting minutes from February 3, 2009, drafted by Edwin Intong, the interim replacement for Bill Lamb, stated: "The original plan under contract agreement with Allied was to demolish all Fairless facilities except for Galvanizing Line.  Any change to the original plan may incur extra costs."  (Dep. Ex. 7.)  Moreover, while the dismantling work at Fairless was to be done at no-cost under the 2003 AIP, U.S. Steel realized it had "now incurred a liability" by attempting to change Allied's original scope of work at Sheet and Tin.  (Dep. Ex. 70.)  Indeed, Allied was paid for extra work due to U.S. Steel's

---

[6] Paul Falkenhan is the current manager of Facility Redeployment and is charged with administering Allied's contract.  (Falkenhan Dep. at 113-14.)  He admits that Allied submitted an "established demolition plan" shortly after the 2003 AIP was signed.  (Id. at 143-45.)  Bill Lamb also admitted that Allied submitted to U.S. Steel Exhibit 25 and told him it was important to have a sequence and a plan, and that Allied intended to follow this plan.  (Lamb. Dep. at 170-71.)

retention of buildings from Allied's original scope of work.  (Dep. Ex. 42; Lamb Dep. at 36.)[7] The payment of these additional costs is directly inconsistent with U.S. Steel's current position that it had the unfettered discretion to make changes and deductions to Allied's scope without incurring any obligation.

Furthermore, U.S. Steel recognized that, beyond the costs for these extra separations, Allied had incurred additional costs relating to changes to its original scope and interference by U.S. Steel with Allied's plan for demolishing the Sheet and Tin facility – essentially making it more costly to demolish the facilities that were made available.  (Lamb Dep. at 201-02, 36-37.) Bill Lamb further confirmed that U.S. Steel understood that it would have to pay Allied for those costs.   (Id. at 202; see also Dep. Ex. 195, stating that USS Realty was expecting to pay "additional Allied costs" relating to "the impact to other demolition activity" due to changes in the original scope.)

### B.    The Dismantling Work At Sheet And Tin Was Governed By A Three-Year Schedule Under The 1992 Specification.

Having released and authorized a firm scope of work or "established demolition plan," U.S. Steel agreed, pursuant to the 2003 AIP, that this work was to be performed pursuant to the 1992 Construction Contract and the 1992 Specification.  As this Court's Motion to Dismiss ruling stated,  Allied was to perform all work "according to the work schedule set forth in the applicable specifications."  [Doc. No. 84 at 1362, quoting the 1992 Construction Contract.]  As such, the parties "incorporated" the three year time schedule from Section 3 of the 1992 Specification and "made [it] applicable to the work at the Sheet and Tin Facility."  [Id.]

The record is replete with admissions by U.S. Steel that Allied was performing under a three-year schedule at Sheet and Tin.  See e.g., Lamb Dep. at 122 (acknowledging there was a

---

[7] These payments were for the extra work in order to perform "separations" of the facilities that were now to remain. They did not include the significant additional costs incurred by Allied relating to the corresponding impact on the adjacent demolition work, as well as Allied's overall plan and sequence.

three year schedule); Dep. Ex. 265 (internal U.S. Steel accounting email stating that "Allied expects to complete the dismantlement at Fairless within 3 years"); Dep. Ex. 133 (internal KIPC meeting minutes indicating that Allied was in the final phase of demolition work at Fairless and had a target of 2008 to complete its work); Dep. Ex. 267 (Tony Nuzzo email indicating that "Allied should have the Sheet and Tin Facility at Fairless demolished during the first half of 2008"); Dep. Ex. 26 (U.S. Steel letter to DEP stating that demolition was expected to be completed in 2008.)  Additionally, all of the documents issued by or to U.S. Steel confirming Allied's scope of work specify a three year period.  See e.g., Dep. Ex. 5 (PT Order valid for 3 years); Dep Ex. 19 (Blanket Purchase Order effective for 3 years); Dep Ex. 25 (Allied Demolition Plan showing 36 month period for demolition activities.)  The Pipe Mill work also was accomplished in three (3) years.  (Lamb Dep. at 124), as was the Hot Strip Mill at Fairless. (See also Allied Appendix Ex. FFFF.)

U.S. Steel, of course, ignores all of this testimony and documentary evidence and simply argues that the 1992 Specification – which only references the Hot End - counsels that a three year schedule could not apply to Sheet and Tin.  This is the same argument this Court has already rejected.  As the Court noted, "U.S. Steel places undue emphasis on phrases in the 1992 Construction Contract and the 1992 Specification, such as 'the work hereunder' or similar phrases.  However, once these contracts were incorporated by the later contracts, 'the work hereunder' became the newly contracted work."  [Doc. No. 84 at 1361.]  The bottom line is that the parties were free to incorporate the previously negotiated specification and apply it (and its three year schedule) to the new phase of work at the "Cold End", or Sheet and Tin; and that is precisely what they did.

It is telling that after a year of extensive document discovery and over 20 depositions, the only testimony U.S. Steel cites to attempt to disprove the existence of a three year schedule is that of Michael Ramun, the former employee of Allied who is currently suing Allied and who was not involved with the scope of work which subsequently followed at Sheet and Tin.  Mr. Ramun's testimony is not a sufficient basis upon which to grant summary judgment for several reasons.[8]

First, U.S. Steel takes his testimony completely out of context.  Michael Ramun was speaking about all of the potential future potential work at Fairless, not the award of any specific work by U.S. Steel, like the Sheet and Tin facility.  "There was no end date in the Agreement in Principle or the Dismantling Services Agreement.  It would be my personal opinion that the spec section wouldn't apply to it, but I wasn't there."  (Michael Ramun Dep. at 137.)  In fact, Michael Ramun testified very clearly that the parties "could have agreed" that Section 3 and a three year schedule applied to the award of any specific work.  (Id. at 137, 156.)

Second, Michael Ramun testified that he did not recall being involved in the kick-off meeting with Fred Hemingway of U.S. Steel in January of 2004 and did not recall any of the established demolition plan drawings, authorizations, or demolition permits – which were developed either after he departed Allied or during the time leading up to his departure when he was not engaged in the relationship with U.S. Steel.  (Id. at 143-44, 151.)  Thus, Michael Ramun – due to his departure from Allied back in 2004 and his complete lack of involvement for the last

---

[8] U.S. Steel also misrepresents the record when it claims that several Allied employees never heard of a three-year schedule for Sheet and Tin.  Contrary to U.S. Steel's out of context citations, Gordon Lindquist, Allied's General Superintendent for Allied's demolition work at Fairless, clearly testified that the three year schedule from the 1992 Specification governed Allied's work at Sheet and Tin, and that he was in quarterly meetings where John Ramun constantly reminded U.S. Steel about that timeframe.  (Lindquist Dep. at 226-27, 65.)  As to Ed Klein, an engineer at Allied's home office in Youngstown, Ohio, he testified that he was not involved with the demolition at Fairless, including the planning and scheduling of it.  (Klein Dep. at 37-38.)  In answering U.S. Steel's questions about the schedule, Ed Klein was clear that he was not "part of that."  (Klein Dep. at 74-75.)

10 years, as well as his current dispute with Allied – is simply not a credible witness on this issue.

Finally, even if accepted as interpreted by U.S. Steel, Michael Ramun's testimony is simply a competing fact position.  His testimony in no way binds Allied and is contradicted by the wealth of evidence outlined above.

### C.    The Disruptions Alleged By Allied Were Not Contemplated Or Foreseeable By Allied, Were Well Within The Control Of U.S. Steel And Were Caused By The Direct And Active Interference Of U.S. Steel.

U.S. Steel likewise unsuccessfully raised this same argument in its Partial Motion to Dismiss [Doc. No. 58 at 849-50] and now raises it again - without a single citation to any testimony or discovery documents that would even suggest that Allied contemplated the alleged disruptions now at issue.

Allied claims that, U.S. Steel, through its own actions, failed to complete necessary predecessor work (i.e., environmental and utility work), interfered with the progress of its demolition activities, and significantly changed Allied's established scope of work.  (Dep. Ex. 253, Allied's Formal Claim Submission, dated December 14, 2011.)  There is no dispute that U.S. Steel had the obligation to perform various utility relocation and environmental work prior to Allied's demolition work so that Allied's work could proceed in an uninterrupted manner. (Dep. Exs. 22, 23, 140.)  U.S. Steel was aware that Allied would be employing mass demolition techniques in order to ensure that it performed its work in an efficient manner in order to receive its anticipated compensation under its settlement agreement with U.S. Steel.  See, e.g., Dep. Ex. 140; Falkenhan Dep. at 151-53; Lamb Dep. at 37-38 and 235-36 (acknowledging that changes in scope caused buildings to be taken down "one truss at a time" and thus impacted Allied's one-step mass demolition approach.)  Bill Lamb admitted that "utility relocations that were to

precede Allied's demolition work [] were not timely achieved."  (Lamb Dep. at 32-33.)  Mr. Lamb also admitted environmental issues relating to basement clean-up also interfered with Allied's work.  (Id. 33-35.)  Similarly, there was required asbestos remediation work that was missed by U.S. Steel.  (Id. at 39-42.)  While Mr. Lamb attempted to minimize the degree of impact, he admitted that there was "validity" to Allied's claims that it was impacted by U.S. Steel's various breaches of contract.  (Lamb Dep. at 30-31.)  For instance, Mr. Lamb testified that PCB's in the Sheet and Tin basements[9] "definitely" interfered with Allied's demolition plan.  Lamb Dep. at 217-18.; see also Dep. Ex. 43 (internal U.S. Steel timeline stating that "April 2009 through June 2010 a basement PCB issue was discovered and negatively affected the demolition sequence and activity of the Sheet and Tin area"); Dep. Ex. 140 (meeting minutes from September 2009 showing that, in 1.7 and 3.8, demolition was held up pending basement clean-up); Allied Appendix Ex. BBBB; Dep. Ex. 148 (email stating that there was "no other place for Allied to go" due to environmental issues);  Dep. Ex. 70 (internal U.S. Steel email recognizing U.S. Steel had "incurred a liability" by attempting to retain buildings.)  These disruptions were clearly within the control of U.S. Steel and, indeed, were "caused" by U.S. Steel.  (Lindquist Dep. at 204, testifying as to the presence of "live utilities" that impacted Allied.)  None of these impacts were contemplated by Allied.  (Dep. Ex. 253.)[10]

---

[9] The delay associated with the PCB's in the Sheet and Tin Basements was further aggravated when U.S. Steel let Bill Lamb go for cost-cutting reasons.  This was during a "critical" aspect of Allied's demolition when delays were already being experienced due to the environmental clean-up of Sheet and Tin basements.  (Dep. Ex.147.)  Bill Lamb was not brought back on until late 2009, after several U.S. Steel employees pushed for his return as the "key to get things moving again."  (Dep. Ex. 149.)

[10] U.S. Steel cites Lichter v. Mellon-Stuart Co., 196 F. Supp. 149, 151 (W.D. Pa. 1961) to support its contention that "a contractor may not bring a 'disruption' claim involving circumstances contemplated by the parties' contracts."  [Doc. No. 118 at 1759.]  Unlike in Lichter, here it is U.S. Steel, not a third party contractor, that caused Allied's delays.  Moreover, U.S. Steel cannot raise exculpatory language from the contract as a defense where U.S. Steel interfered with Allied's work, or failed to act in an essential manner necessary to the performance of Allied's work.  Eastern Elec. Corp. v. Shoemaker Constr. Co., 657 F. Supp. 2d 545, 557 (E.D. Pa. 2009), quoting Coatesville Contractors & Engineers, Inc. v. Borough of Ridley Park, 506 A.2d 862, 865 (Pa. 1986).  Implied in every construction contract is the promise the owner will do nothing to prevent, interfere, or hinder the contractor in his

U.S. Steel also cites Section 25.1 of the 1993 Blanket Agreement and asserts Allied agreed that certain ev ents could not serve as a basis for a disruption claim.  This argument is without merit for several reasons.[11]  First, U.S. Steel ignores this Court's Motion to Dismiss ruling citing Section 3.1 of the 1992 Construction Contract and recognizing Allied's right to any additional costs and revenues resulting from delays caused by U.S. Steel or any cause beyond the control of Allied.  [Doc. No. 59-1 at 867-68.]  According to this Court, Allied has sufficiently stated a claim for disruption and delay under this provision.  [Doc. No. 84 at 1363.]  Thus, the 1992 Construction Contract – specifically identified in Section III of the 2003 AIP – is what governs the parties' rights, not the 1993 Blanket Agreement, which is inapplicable for the reasons previously set forth in Allied's Memorandum in Opposition to Partial Motion to Dismiss. [Doc. No. 53 at 766, 782.]

Second, even if the 1993 Blanket Agreement applied to Fairless (which it does not), the Force Majeure clause in Section 25.1 simply does not apply here.  This provision, by its own terms, only applies to laws and regulations "hereinafter enacted."  Moreover, "[I]n order to use a force majeure clause as an excuse for non-performance, the event alleged as an excuse must have been beyond the party's control and not due to any fault or negligence by the non-performing party." Morgantown Crossing, L.P. v. Mfrs. & Traders Trust Co., 2004 U.S. Dist. LEXIS 22949, *16  (E.D. Pa. Nov. 10, 2004).  A party's own delay in seeking to comply with laws or

---

(continued…)

performance or increase the cost thereof. Quinn Constr., Inc. v. Skanska USA Bldg., Inc., 730 F. Supp. 2d 401, 411 (E.D. Pa. 2010).

[11] U.S. Steel also argues that Section 10.1 of the 1993 Blanket Agreement permitted U.S. Steel to change Allied's scope of work without regard to any impact on Allied.  This argument is meritless because (1) the 1993 Blanket does not apply to Fairless, (2) even if it did, the 1992 Specification and its provisions (i.e., Sections 5.1, 8.1, 10.2 and 10.3) have "primacy" over the applicable blanket contract, (3) U.S. Steel never issued any written order to Allied under Section 10.1 modifying the scope, (4) and any ability of U.S. Steel to change the scope does not eliminate Allied's ability to make a claim for compensation under Sections 10.2 and 10.4 – as amply demonstrated by U.S. Steel's recognition that it had "incurred a liability" in attempting to retain buildings from the original plan.  (Dep. Ex. 70.)

regulations which renders performance impracticable is not excused by a force majeure clause. Gorzelsky v. Leckey, 586 A.2d 952, 956-957 (Pa. Super. Ct. 1991).  Thus, the fact that environmental activities or back-filling procedures are governed by laws and regulations – to no one's surprise - does not excuse U.S. Steel's delay or nonperformance of its duties under force majeure clause.  U.S. Steel clearly knew, or should have known, at the beginning of the project that it had these responsibilities and its failure to meet them was well within its control.[12]  (See 2003 AIP, III(c); Lamb Dep. at 40-41, asbestos remediation was supposed to have been done by U.S. Steel from "top to bottom" at Sheet and Tin in 2003.)[13]

### III. U.S. STEEL MUST COMPENSATE ALLIED FOR BASEMENT DISMANTLING WORK BELOW "TOP OF FLOOR SLAB".

#### A. Neither The 2003 AIP Nor The 1992 Specification Requires Allied To Perform Basement Backfilling  At No Cost To U.S. Steel.

The 2003 AIP does not require Allied to back-fill basements at no cost to U.S. Steel.  The fact that the 2003 AIP defines dismantling work to include "backfilling and grading" does not matter.  Section II(B)(6)(a) of the 2003 AIP, which defines "Dismantling Work," also includes utility relocation, asbestos removal and new construction, but there is no claim that any of this work is to be done at no cost to U.S. Steel.  The same goes for "backfilling and grading" below top of floor slab.  Indeed, U.S. Steel has paid Allied to back-fill basements and remove equipment from basements at Fairless.  (See Dep. Exs. 8, 10, 11, 42.)  Allied also has back-filled and graded pits and voids which, unlike basements, have no concrete floor slab overtop - at no-cost.  (Dep. Ex. 182, describing PKL line conveyor pit and backfill work.)  As such, Allied's

---

[12] The PCB contamination was initially caused by U.S. Steel's actions and was further exacerbated by U.S. Steel's significant delays and indecision regarding the basement clean-up at Sheet and Tin.  (See Dep. Ex. 181; Parker Adams Dep. at 200-02.)

[13] Major disruptions also related to U.S. Steel's failure to relocate its own utilities.  U.S. Steel does not even allege that these activities were somehow impacted by laws or regulations.

interpretation does not render meaningless the inclusion of "backfilling and grading" in Section II (B)(6)(a), as this work may be at no cost <u>or</u> may be an extra cost to U.S. Steel.

Notably, the 1992 Specification does not expressly state that Allied has a duty to backfill any basement areas. Nor does this specification mandate that basements shall be broken in and backfilled as U.S. Steel now claims. (USS 30(b)(6) Dep. at 131-32; Cornelius Dep. at 170-71.) The specification speaks of tunnels but not basements. [Doc. No. 59-2, at 933-34.] This is not surprising given that there were tunnels at the Hot End, not basements. (<u>See</u> White Dep. at 82; Allied 30(b)(6) Dep. at 212-13.)

Thus, U.S. Steel's Motion for Partial Summary Judgment should be denied because U.S. Steel cannot point to a contract provision that requires Allied to perform this work at no cost, nor can U.S. Steel establish that this is an undisputed fact.

**B.** **The "Top Of Floor Slab" Language In The 2003 AIP Has Everything To Do With Basement Work.**

In limiting concrete removal to "top of floor slab", the parties drew a clear and bright line above the basements and limited Allied's "no cost" scope of work to concrete dismantling above "top of floor slab". Quite simply, the removal of the concrete floor slab overlying the basements is necessary in order to backfill the basements. As found by this Court in its Motion to Dismiss ruling, this limitation was an express exception to the no-cost nature of Allied's dismantling work at Fairless. [Doc. No. 84 at 1355-56].

As stated by John Ramun who negotiated the 2003 AIP, the central purpose of the "top of floor slab" language was that the parties recognized that the 2003 AIP was designed to compensate Allied and that Allied would not be required to perform the time consuming and costly dismantling of the massive floor slabs, foundations and basements at Fairless without being compensated for this extra work. (John Ramun Decl. ¶¶ 3-4.)

Curiously, up until 2011 (5 years after the start of the work at Fairless) and the dispute between Allied and U.S. Steel regarding Allied's delay and disruption claim, U.S. Steel consistently acknowledged that Allied's non-compensable work stopped at the "top of floor slab".  See, e.g., Dep. Ex. 6 (Nuzzo July 31, 2006 email stating that "Allied's obligation is to demo down to the top of foundations"; Dep. Ex. 32 (October 10, 2007 Nuzzo email stating the "Allied is under agreement to demo the site to top of foundations"); Dep Ex. 223; Dep. Ex. 266 (Nuzzo email regarding HNX concrete removal and asking if Allied would need change order "for this extra demo work since we are going below 'top of floor' as per the settlement agreement".)

Similarly, Dennis Jones admitted that Tony Nuzzo told him that USS Realty may have to pay Allied for the "busting up" of the floor slab that overlayed the basements.  (Jones Dep. at 267.)  Gordon Lindquist also testified that Tony Nuzzo agreed that Allied was not required to break-in floor slabs over basements.   (Lindquist Dep. at 158-59.)   Consistent with this understanding, U.S. Steel requested, and Allied provided U.S. Steel with multiple cost proposals relating to the backfilling of the basements using both the demolished concrete from the floor slabs over the basements and the elevated foundations.  (Dep. Exs. 237, 238, 239.)  Why was U.S. Steel repeatedly requesting cost proposals from Allied if it did not owe Allied for this work?

In a newly-minted position, U.S. Steel now takes the position that the meaning of the "top of floor slab" provision was "merely to clarify that U.S. Steel would incur charges to demolish the Sheet & Tin facility to a level that is even with the surrounding grade – it had nothing do with basement work."[14] [Doc. No. 118 at 1763.]  However, U.S. Steel's position makes no sense

---

[14] In its Partial Motion to Dismiss and Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, U.S. Steel instead maintained that the purpose of the "top of floor slab" language was to define "the extent of the concrete removal that U.S. Steel expected Allied to perform at Fairless, as many of the facilities contained significant concrete supports built above the floor slabs to support and anchor steelmaking equipment."  [Doc. No. 31 at 270; Doc. No. 46 at 658.]   Interestingly, U.S. Steel does not provide a single factual citation for its new assertion that the purpose of the top of floor slab limitation simply related to demolishing the foundations to grade.

as the removal of the floor slabs and foundations at Sheet and Tin were inextricably tied to the dismantling of the basements. The demolishing of the elevated concrete foundations to grade would generate concrete fill that would be used to back-fill the basements. (Lamb Dep. at 184; Jones Dep. at 256-57); (Dep. Exs. 237, 238, and 239.) Ironically, U.S. Steel contradicts itself on this very point a few sentences later by admitting that "[u]nder this scenario, Allied would have been paid a significant amount to perform the basement work." [Doc. No. 118 at 1764.] Thus, U.S. Steel itself acknowledges the link between the "top of floor slab" limitation and the backfilling of the basements. Moreover, in none of the documents of record can U.S. Steel show where it drew any distinction between paying Allied for the removal of "slabs on grade" (the elevated foundations) vs. the removal of "suspended slabs" (i.e., the concrete basement ceilings),[15] and the 2003 AIP makes no such distinction. (See Basement Illustrative, Allied Appendix Ex. GGGG.)

There is simply no basis in the 2003 AIP or in logic to distinguish between "demolishing" the suspended floor slabs overlying the basements (i.e., which constitutes the basement ceiling) and "demolishing" the elevated concrete foundations or slabs on grade. Both involve concrete removal and both generate fill that would then be used to fill the basements. (Klein Dep. at 69-71.)

U.S. Steel's claim that demolishing the foundations to grade involved taking concrete off-site is simply false. John Ramun never testified that any concrete would be moved off site. (John Ramun Dep. at 95-96.) In fact, the cut and fill analyses are clear that while excess soil would be generated – which would be used elsewhere on-site - all of the concrete would be used as fill in the basements. (Dep. Exs. 237, 238, and 239; Klein Dep. at 69-71.)

---

[15] To believe U.S. Steel's theory, U.S. Steel would have demanded a proposal that paid Allied only for the hauling of excess concrete off-site or, at best, the demolishing of only the elevated foundations. U.S. Steel never made either request.

In sum, U.S. Steel knew since the signing of the 2003 AIP that it would have to pay for the expensive and time-consuming dismantling of the massive foundations and basements at Sheet and Tin.  (Allied Appendix Ex. CCCC, Nuzzo October 12, 2007 email asking "Who is financially responsible (Realty, Steel , Legacy)" with respect to foundations and basements.)  In fact, as a result of the significant cost it knew it would bear for this work, for many years U.S. Steel did not know whether it would back-fill the basements or simply abandon them in place. (Lamb Dep. at 204; Jones Dep. 259-60; Falkenhan Dep. at 40; Dep. Exs. 26, 32, 173, 179.)  This further confirms that the back-filling of basements was not part of Allied's non-compensable base scope of work.

### C.    The Basement Work At Sheet And Tin Requires Concrete Removal.

U.S. Steel bases its position that basement work at Sheet and Tin does not involve concrete removal on the fact that no concrete was ultimately transported off-site.  This definition of concrete removal is misguided and contradicts U.S. Steel's own witnesses.  The concrete floor slab overlying the basements is "removed" when it is busted up or demolished, thereby destroying its structural function and converting it to fill.  (Klein Dep. at 63.)  Concrete "removal" has nothing to do with disposal or hauling off-site.  Indeed, it is undisputed that Allied never hauled any concrete off-site – above or below "top of floor slab".  (Lamb Dep. at 91-92, 95, 268; Falkenhan Dep. at 59.)  Concrete removal is making the floor slab "disappear", and that happens even if the concrete is used as backfill in the basements.  (Lamb Dep. at 95-100; White Dep. at 66.)  According to Bill Lamb: Allied performed "concrete removal" at Fairless when the concrete was used as back-fill; Allied did not dispose of any concrete off-site and Allied was compensated by U.S. Steel for this work.  (Lamb Dep. at 91-92, 100, 144, 273.)  Indeed, in recognizing that Allied should get paid for demolishing the elevated concrete foundations "to-

grade" – where the generated concrete  is used as back-fill for the basements -  U.S. Steel is likewise confirming that the basement work at Sheet and Tin entails "concrete removal."

Despite Brandenburg's attempts to oppose Allied, its competitor, and support U.S. Steel as its customer,[16] the actual basement work at BAI performed by Brandenburg involved concrete removal.  See, e.g., (Lamb Dep. at 266; Harshman Dep. at 93; Dep. Ex. 114 (photographs of work and large pieces of concrete removed and put aside on grade); Intong Dep. at 115-16 (admitting that breaking-in concrete slab over a basement is concrete removal.)  Brandenburg's proposal and project survey even identified the demolishing of the concrete floor slab as "roof removal" and "remove basement ceilings."  (Dep. Exs. 51, 110.)  Brandenburg witnesses also testified that, in the demolition industry, :removal" and "demolish/demolition" are synonymous. (Harshman Dep. at 104; Foster Dep. at 32.)  All of Brandenburg's witnesses acknowledged that the definition of concrete "removal" had nothing do with hauling it off-site.  (Foster Dep. at 17; Harshman Dep. at 104.)  Furthermore, the Brandenburg witnesses also confirmed that the basement work they performed at BA1 also entailed additional concrete demolition in the basements themselves (under the suspended floor slab) and extensive utility and new construction work, all of which is clearly for "U.S. Steel's account."  (Wenzel Dep. at 31; Harshman Dep. at 71-73, 77, 80-81; Foster Dep. at 21; Lamb Dep. at 260; Dep. Exs. 105, 114; see also USS 30(b)(6) Dep. at 128-134, admitting KIPC backfill specification imposed work inconsistent with 1992 Specification and 2003 AIP.)  Brandenburg also confirmed that the remainder of the basements at Fairless that Brandenburg provided U.S. Steel quotes for entail a significant amount of environmental clean-up.  (Wenzel Dep. 43, 48; Dep. Exs. 116, 119, 120.)

---

[16] Brandenburg witnesses were made aware in advance of the dispute between Allied and U.S. Steel over the meaning of the phrase "concrete removal."  Staying loyal to their customer, Brandenburg witnesses uniformly testified, at least initially, and  in conclusory fashion that their work involved no concrete removal.  (Harshman Dep. at p. 98.)

### D.     The Parties' Course Of Performance Confirms That U.S. Steel Is Required To Compensate Allied For Basement Work

John Ramun testified that the Hot End did not involve any significant basement work, certainly not of the type and scale of what was involved at Sheet and Tin.  (John Ramun Dep. at 57-58.)  Despite U.S. Steel's attempt to paint this situation as a continuation of a "standard practice", nothing could be further from the truth.  This was further confirmed by U.S. Steel's prolonged indecision about whether it would backfill the basements at Sheet and Tin or simply leave them abandoned in place due to the significant cost for this work.  (Lamb Dep. at 204; Jones Dep. 259-60; Falkenhan Dep. at 40; Dep. Exs. 26, 32, 173, 179.)

The Motor Room, Administration Building, and Store Room at the Pipe Mill, which U.S. Steel point to, had elevated above-grade concrete foundations and floor slabs.  (Lindquist Decl. ¶¶ 4-5.)  Allied demolished the elevated concrete foundations and floor slabs at all three structures (Id.), and as is conceded by U.S. Steel's position, Allied should have been paid for that work.  Also, the floor slabs at these structures were nothing like the massive basements and thick floor slabs elsewhere at Sheet and Tin.  (Lindquist Decl. ¶ 8.)  Those areas were very small and had concrete floors that were thin and weak and practically destroyed themselves during the demolition of the above-floor structures.  (Id.; see also John Ramun Dep. at 64-69.)  In any event, even though Allied performed this incidental work, John Ramun discussed his reservations with Marc Stoken about Allied not being paid for this work.  (John Ramun Dep. at 64-69; White Dep. at 92-93.)  Similarly, Allied's backfilling work at the Pickle Line was not below "top of floor slab" work, but rather the backfilling of a pit after the conveyor was removed out of the void.  (Dep. Ex. 182; Chapman Dep. at 97; Lindquist Dep. at 124-26; White Dep. at 67-68, 121; John Ramun Dep. at 72-74.)

The evidence actually shows that U.S. Steel always compensated Allied for any additional costs associated with basement work at the Sheet and Tin.  (Dep. Exs. 8 (BA2 "concrete removal" work), 10 (HNX concrete removal), 11 (below top of floor equipment removal), 266 (HNX concrete removal); Lamb Dep. at 100, 273-74; Lindquist Dep. at 256-57, 264-269.)  At the very least, the competing examples of what Allied got paid extra for and what it did not get paid extra for are fact questions that cannot be resolved at this stage.

## IV.  U.S. STEEL MUST COMPENSATE ALLIED FOR FACILITIES REMOVED FROM THE SHEET AND TIN SCOPE OF WORK (COUNT IV ).

As set forth above, U.S. Steel released and authorized to Allied a specific scope of work at Sheet and Tin (i.e., the "established demolition plan").  In accordance with that scope of work, and in light of the fact that asbestos remediation had been performed "top to bottom" in all of the Sheet and Tin facilities in 2003, (Lamb Dep. at 40), U.S. Steel assigned ownership of these facilities to Allied for $1.00 pursuant to Section 8.1 of the 1992 Specification.  See Dep. Ex. 5 (Property Transfer Order for Sheet and Tin); Dep. Ex. 15 (PT Order for Pipe Mill.)  Thus, U.S. Steel itself was operating under the "ownership" provisions of (Sections 5.1, 8.1, 10.2 and 10.3) of the 1992 Specification.  U.S. Steel's references to "Base Bid facility," "this Specification," or "this demolition package" simply ignores this Court's earlier admonition that these arguments are not helpful because "once these contracts were incorporated by the later contracts, the "work hereunder" became the newly contracted work."  [Doc. No. 84 at 1361.]

Discovery has confirmed that, consistent with these ownership provisions, U.S. Steel itself believed that Allied had rights to the assigned facilities and that U.S. Steel would have to compensate Allied for the removal of any buildings from Allied's scope.  See Jones Dep. at 218 (admitting that Tony Nuzzo advised him that Realty may have to compensate Allied for retaining specific facilities); Dep. Ex. 33 (email from lease prospect to Steve Bilan stating that, regarding

No. 1 Tin Warehouse, "I remember you explaining to me that these buildings are slated for demolition and no longer under control of USS Realty.)  Dep. Ex. 41 and Jones Dep. at 41, 209, 212 (explaining U.S. Steel's request to "talk Allied into selling" U.S. Steel the Air Separation Plant Building, which had not been dismantled yet); Dep. Ex. 133 (Nuzzo email stating "another issue that needs to be resolved is who owns these buildings and will we need to compensate Allied per the settlement agreements"); Lamb Dep. at 243.

U.S. Steel's remaining arguments about Section 10.1 of the 1993 Blanket and the "generation" language from Section II(B)(7) of the 2003 AIP have already been addressed above and elsewhere.  (See Section II(C), fn. 10, supra; Doc. No. 53 at 764-65, 780-82.)  Section II(B)(7) of the 2003 AIP confirming that Allied owns scrap it "generates" does not conflict with Sections 10.2 and 10.3 of the 1992 Specification.  There is no doubt Allied owns the scrap it "generates," but Section II(B)(7) is not a timing provision relative to ownership and does not speak to the situation where U.S. Steel removes a facility from Allied's scope of work such that it cannot now be dismantled.  Sections 10.2 and 10.3 of the 1992 Specification expressly address that scenario and do not conflict with the 2003 AIP.

Finally, the conclusory statement in U.S. Steel's brief that it "retained the discretion to remove facilities from any supposed Allied scope of work at Sheet & Tin without consequence" is fundamentally belied by its own recognition that it "incurred a liability" to Allied relative to retaining facilities.  (Dep. Ex. 70.)  To the contrary, recognition of such a liability is fully consistent with Allied's position that: (1) there was a set scope of work, (2) U.S. Steel could not change this scope without consequence, and (3) Allied had ownership rights to these facilities pursuant to Section 8.1 of the 1992 Specification.  (Dep. Ex. 5.)

## V.      ALLIED IS ENTITLED TO RECOVER ON ITS RAILROAD TRACK AND NON-FERROUS CLAIMS.

### A.      U.S. Steel Breached The 2003 AIP By Failing To Make Available The Railroad Track And Non-ferrous Material For Allied To Dismantle.

Under the 1992 Specification, which is incorporated by the 2003 AIP, after asbestos removal at a facility is complete, U.S. Steel is obligated to "assign to [Allied] ownership of each facility to be dismantled," which "shall include … [a]ll ferrous and non-ferrous scrap located within each dismantling area; … [and] [r]ailroad track located within a specific dismantling area which exclusively serves that dismantling area."  (1992 Specification, §§ 5.2.2; 5.2.5.[17])

Consistent with these contractual provisions, numerous documents and testimony create, at a minimum, issues of fact regarding Allied's entitlement to this material.  In an email dated August 5, 2010, Marc Stoken recounted a conversation with Messrs. Terza and Cornelius of U.S. Steel wherein he admitted that they "need to determine if there is additional work that should be awarded to Allied.  Potential items discussed include: - Out of service underground electrical cables [and] Out of service RR tracks.  … I would like to get a meeting scheduled with Realty to review these issues ASAP."  (Dep. Ex. 280.)  U.S. Steel meeting minutes from a year later state:

> Underground copper – Allied wants to retrieve underground copper conductors that were not removed during earlier demolition activity.  If they identify the specific cables, USSRE [USS Real Estate] will review them on a case-by-case basis.  If the cables are not in use or are not expected to be part of future development and they are not subject to existing lease or sales agreements, USSRE may be able to make them available for salvage.

(Dep. Ex. 132.)  In fact, in a letter as late as July 20, 2012 (after this action was commenced), U.S. Steel asked Allied to "please specifically identify the locations of the non-ferrous scrap associated with the abandoned underground and above-ground utility system which you state

---

[17] Mr. Ramun testified that Article 5 of the 1992 Specification was a "relevant term" and, as such, was incorporated into the 2003 AIP.  (John Ramun Dep. at 42-43.)

U.S. Steel has not yet made available to Allied so that we can further review" and also to "please specifically identify the specific dismantling areas where railroad track exists for which Allied contends it has been assigned ownership rights."  (Dep. Ex. 366.)  Thus, even after this action was filed, U.S. Steel had neither rejected Allied's request for these materials, nor had it raised the various contractual defenses it now raises.

Consistent with the foregoing, William Lamb testified that after Allied raised the issue of the remaining non-ferrous this led to him "provid[ing] prints to Allied that shows the layout of all the underground feeders of the plant in an effort for them to" identify the materials for U.S. Steel to further consider.  (Lamb Dep. at 28-29.)  Gary Cornelius likewise did not contest that the remaining rail and underground copper was within Allied's dismantling rights.  (Cornelius Dep. at 254.)

With respect to whether the remaining rail and non-ferrous scrap was "released for dismantling," both the Pipe Mill and Sheet and Tin were authorized and released for dismantling, and therefore are owned by Allied under Sections 5.2.2 and 5.2.5 of the 1992 Specification.[18] U.S. Steel's refusal to permit Allied to dismantle these remaining materials breaches its contractual obligation to Allied, as well as its implied duty of good faith to Allied.

**B.    The Track at Issue Is Not Excluded From Allied's Dismantling Rights.**

U.S. Steel contends that some of the track sought by Allied "serves active U.S. Steel operations and tenants.  [Doc. No. 118 at 1772, citing Dec. of William K. Ream].  However, as the Declaration of Gordon L. Lindquist demonstrates, the tracks listed in Exhibits N4 and N5 expert report (1) exclusively serve dismantled areas of Fairless; and/or (2) now serve buildings which were wrongfully removed from Allied's scope of work.  (Lindquist Decl. ¶¶ 11-12.)  Mr.

---

[18] Mr. Goodish, the senior level executive, who negotiated the AIP's with Allied acknowledged that the railroad track and underground non-ferrous was ancillary to the buildings that were releases.  (Goodish Dep. at 47-48.)

Lindquist confirms that the calculations in Exhibits N4 and N5 <u>exclude</u> tracks which serve operating areas of Fairless.  At a minimum, there are issues of fact regarding whether certain of the tracks shown on Exhibits N4 and N5 are within Allied's rights.

     **C.**     <u>**The Hot End Track Is Not Exempted From Dismantling**</u>.

U.S. Steel also incorrectly argues that various tracks at the Hot End of Fairless are somehow exempted from dismantling under the 2003 AIP and the 1992 Specification.  [Doc. No. 118 at 1772.]  Article III of the 2003 AIP clearly provides that "[a]ny further DISMANTLING WORK at the steelmaking or former steelmaking facilities owned by U.S. Steel's Fairless Works, regardless of time, that is released and authorized in writing for dismantling, will be awarded to and performed by [Allied]"  However, the words "former steelmaking facilities owned by U.S. Steel's Fairless Works" and "regardless of time" make clear that any scrap remaining at the "Hot End," a <u>former</u> <u>steelmaking</u> <u>facility</u> at Fairless, is now within Allied's dismantling rights under the 2003 AIP.  On this issue, Mr. Ramun testified as follows:

> We have a settlement in 2003.  Anything that would be related to Phase I [the "Hot End"] <u>was</u> <u>reset</u> <u>by</u> <u>this</u> <u>agreement</u>, along with the pipe mill and sheet and tin and any further work, any other further work that is defined as dismantling work as a defined term in this agreement [the 2003 AIP].

(John Ramun Dep at 15-16.)  In other words, so long as the work is within the scope of "DISMANTLING WORK" under the 2003 AIP (and railroad track and remaining non-ferrous at the Hot End clearly are), it is within Allied's dismantling rights under the 2003 AIP.

     **D.**     <u>**Res Judicata Does Not Bar Allied's Claims.**</u>

U.S. Steel also argues that Allied's Hot End track and non-ferrous claims are barred because those claims were raised and decided in an arbitration almost twenty (20) years ago.  [Doc. No. 118 at 1773.]  However, this argument fails for the same reason that the previous argument fails: the 2003 AIP effectively "reset" Allied's right to all remaining scrap materials at

Fairless "regardless of time".  See <u>Morgan v. Covington Twp.</u>, 648 F.3d 172, 177-78 (3d Cir. 2011) ("[R]es judicata does not bar claims that are predicated on events that postdate the filing of the initial complaint").[19]  In other words, regardless of whether or not this material was within the original Hot End specification, so long as the work is now within the broader scope of "DISMANTLING WORK" under the 2003 AIP (and the Hot End track and remaining non-ferrous certainly are), it is now within Allied's rights under the 2003 AIP.

For all of these reasons, there is, at the very least, a genuine issue of material fact regarding whether Allied's broader rights under the 2003 AIP supersedes any determination in the 1993 Arbitration Award with respect to any remaining track and non-ferrous materials at the former Hot End.

### E.    The Statute Of Limitations Does Not Bar Allied's Claims.

U.S. Steel's final argument is that the statute of limitations bars Allied's claims for the value of the remaining track and non-ferrous scrap at the Hot End, as well as any remaining track at the Pipe Mill.  [Doc. No. 118 at 1775.]  As discussed above, the 2003 AIP reset Allied's rights at Fairless, and nothing in the 2003 AIP excludes the remaining track and non-ferrous scrap at the Hot End (or elsewhere).  For this reason alone, Allied's claim for the remaining track and non-ferrous at the Hot End could not have accrued in 1997, and therefore has not lapsed. Allied's work at the Pipe Mill did not even start until 2004 and therefore its rights could not have lapsed seven years earlier in 1997.

U.S. Steel's position is further refuted by the internal documents described above, wherein as late as 2012 U.S. Steel was still considering which Hot End materials were within Allied's dismantling rights under the 2003 AIP.  Consistent therewith, Mr. Ramun's notes from a

---

[19] <u>See</u> <u>also</u> <u>Rawe v. Liberty Mut. Fire Ins. Co.</u>, 462 F.3d 521, 529 (6th Cir. 2006); 18 Moore's Federal Practice, § 131.22 (Matthew Bender 3d Ed.) ("claim preclusion does not apply" if "such [new] facts in themselves establish independent grounds for a claim against the [party] in the previous action").

July 6, 2011 meeting with U.S. Steel demonstrate that the remaining rail and non-ferrous scrap now at issue were still being considered by U.S. Steel.  (Dep. Ex. 343; USS Appendix Ex. V.)  A July 20, 2012 letter from U.S. Steel confirms this fact.  (Dep. Ex. 366.)  The limitations period would not begin to accrue until U.S. Steel breached Allied's rights by rejecting Allied's request for this material.  Cole v. Lawrence, 701 A.2d 987, 989 (Pa. Super. Ct. 1997).  Therefore, at the earliest Allied's claim for these materials only accrued in 2012.[20]  In any case, the accrual of the limitations period is a question of fact for the jury.  Melley v. Pioneer Bank, 834 A.2d 1191, 1201 (Pa. Super. 2003.)

### F.    Allied is Entitled To Payment For Disposal Of Railroad Ties At Fairless.

U.S. Steel's third counterclaim requests a declaratory judgment that Allied is obligated to remove railroad ties from Fairless at no cost under Article 6.1.6 of the 1992 Specification which states that "[i]n areas where railroad track is removed [Allied] shall remove, haul and legally dispose of associated railroad ties at its expense."  However, the 2003 AIP overrides the 1992 Specification and summary judgment should be denied on this issue because there is an issue of fact regarding whether U.S. Steel must pay Allied to dispose of railroad ties under Article III of the 2003 AIP which provides that "Hazmat removal," will be "for U.S. Steel's account."  See J. Ramun Dep. at 46-47 (explaining that Article 6.1.6 of the 1992 Specification was amended by the 2003 AIP and the 1992 Specification's terms regarding "Hazmats").

Article II of the 1992 Specification defines a "HAZMAT" as "[a]ny hazardous, toxic or regulated substance controlled under RCRA, CERCLA or any other Federal, State or Local law, statute, regulation or ordinance pertaining to the handling, transportation or disposal of any

---

[20] Under the dispute resolution provision of the 2003 AIP, Section IV, this dispute was not ripe for adjudication until U.S. Steel definitively denied Allied's claim/request for the materials.  These claims were added to this litigation in the Second Amended Complaint only after the parties mediated these claims (and others) during the initial stages of this litigation.  See Minutes of Proceeding dated 8/20/12.  Consistent with the 2003 AIP, Allied added these claims only after that mediation failed.

substance."  As Mr. Ramun testified, railroad ties are "Hazmats" because they contain creosote. (John Ramun Dep. at 57.)  Parker Adams, U.S. Steel's Manager of Environmental Affairs, also testified that creosote can be a hazardous or regulated material "depending on its use."  (Adams Dep. at 87.)  Moreover, the parties' historical course of conduct  - wherein U.S. Steel either paid Allied to remove ties or Allied left them for U.S. Steel's disposal - creates an issue of fact regarding whether the ties are to be considered "Hazmats".  (John Ramun Dep. at 49-51.)  Allied has <u>never</u> had to pay for the disposal of railroad ties, nor has it had to pay to dispose of wood block flooring, which is essentially the same material.[21]

U.S. Steel's citation to Mr. Ramun's testimony on this issue misconstrues the point he was making.  Mr. Ramun testified that "if [he] would take rail road track out of the plant and [he] would take the rail road ties, [he] would be responsible for those ties after that point."  (John Ramun Dep. at 49.)  Thus, if Allied decided to salvage and resell any ties which were in good condition it would then be responsibile for them.  (John Ramun Dep. at 49.)  But this is different than responsibility for the disposal of any scrap ties Allied did not want to salvage.  The Court should also reject U.S. Steel's cite to the <u>dissent</u> in <u>State Farm Fire & Cas. Co. v. PECO</u>, 54 A.3d 921 (Pa. Super. Ct. 2012).  While specific provisions of a written contract ordinarily will be regarded as qualifying the meaning of broad general terms," "Hazmat removal" being "for US. Steel's account" is such a specifically negotiated provision.  Moreover, "if the language is ambiguous and the parties have put their construction on it in the past, that construction will be considered the best evidence of their intent." <u>Philadelphia Fresh Food Terminal Corp. v. M. Levin & Co.</u>, 361 A.2d 886, 891 (Pa. Super. Ct. 1976).

Consistent with the foregoing, under Section III of the 2003 AIP U.S. Steel is obligated to

---

[21] <u>See</u> <u>also</u> Adams' Dep. at 100 (wood block flooring "would be analogous to a railroad tie.").  Mr. Adams also testified that the presence of creosote in an item makes it a hazardous material. (Adams Dep. at 96.)  William Lamb confirmed that Allied was paid for the disposal of wood block flooring because "[i]t's been determined it's an environmental issue." (Lamb dep. at 108.)

pay for the disposal of ties because they are "Hazmats" which are for U.S. Steel's account. U.S. Steel, by contrast, has not submitted any evidence that the ties are not "Hazmats," which in any event would contradict how it has historically and consistently treated them.

### G. Summary Judgment Regarding Allied's Claim For The Costs Of Accelerated Salvage Removal (Count VI) Should Be Denied.

U.S. Steel argues that salvage steel is not "scrap" under Article 3 of the 1992 Specification, and therefore Allied is not entitled to an additional 12 months to remove this material from Fairless.

However, a reasonable jury could find that this "salvage" steel constitutes "scrap" under Article 3 of the 1992 Specification. U.S. Steel draws an artificial distinction between material from dismantled buildings that Allied elects to salvage for reuse from material from dismantled buildings that Allied elects to scrap. To read the term "accumulated scrap" to exclude salvage materials contradicts what is plainly intended by Article 3: to give Allied an additional year to remove any material generated from its dismantling work. Allied unquestionably owned the dismantled buildings and salvage materials at issue in this claim, and therefore it had the unilateral right to decide whether or not the material should be sold as "scrap" or sold as "salvage". See Dep. Ex. 50 ("Allied owns the salvage material and it had the right to scrap or salvage any facility").

The cited testimony of Mike White does not prove that salvage material is not "accumulated scrap." Mr. White simply testified that Allied used two separate areas to process material from its demolition work, and nothing in his testimony excludes the materials on the 40-acre parcel from Allied's "accumulated scrap." (White Dep. at 258-59.) As Mr. Ramun explained in Deposition Exhibit 50, "Allied requested a specific lay down area from U.S. Steel for this contractually permitted purpose and when U.S. Steel specifically authorized the use of

this parcel it was not done as an 'accommodation and courtesy' and it never advised Allied that it would be a 'temporary' lay down area."

Summary judgment should also be denied because Article 3 of the 1992 Specification is not explicitly limited to any specific scrap processing area; it explicitly provides Allied an unfettered right to additional time to remove any material generated from its demolition work. To the extent that "accumulated scrap" is ambiguous in this context, the ambiguity is a question of fact for the jury.  Mellon Bank v. Aetna Bus. Credit, 619 F.2d 1001, 1011 n.10 (3d Cir. 1980).

## CONCLUSION

Based upon all of the foregoing reasons and authorities, the Court should deny U.S. Steel's Motion for Partial Summary Judgment in its entirety.

Respectfully submitted,

/s/  F. Timothy Grieco
Christopher R. Opalinski
(Ohio Bar Registration No. 0084504)
copalinski@eckertseamans.com

F. Timothy Grieco
(admitted *pro hac vice*)
tgrieco@eckertseamans.com

Jacob C. McCrea
jmccrea@eckertseamans.com

Eckert Seamans Cherin & Mellott, LLC
U.S. Steel Tower
44th Floor, 600 Grant Street
Pittsburgh, Pennsylvania  15219
(412) 566-5963
Fax: (412) 566-6099

Jay M. Skolnick, Sr., Esquire
(Ohio Bar Registration No. 0006767)
jmskolnick@nnblaw.com

Kevin L. Bradford, Esquire
(Ohio Bar Registration No. 0080225)
klbradford@nnblaw.com

NADLER, NADLER & BURDMAN
6550 Seville Drive, Suite B
Canfield, Ohio  44406
(330) 533-6195
Fax: (330) 533-6198

Dated:  March 26, 2014              Attorneys for Plaintiff
                                   Allied Erecting and Dismantling Co., Inc.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

I hereby certify, pursuant to Local Rule 7.1, that this action has been assigned to the "standard" track, and that Plaintiff's Memorandum in Opposition to United States Steel Corporation's Motion for Partial Summary Judgment complies with the increased page limit of thirty (30) pages established by the Order dated March 11, 2014 (Doc. No. 145).

/s/  F. Timothy Grieco
F. Timothy Grieco
fgrieco@eckertseamans.com

Eckert Seamans Cherin & Mellott, LLC
U.S. Steel Tower
44th Floor, 600 Grant Street
Pittsburgh, PA  15219

Attorneys for Plaintiff
Allied Erecting and Dismantling Co., Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Plaintiff's Memorandum in

Opposition to United States Steel Corporation's Motion for Partial Summary Judgment was

served by operation of the Court's CM/ECF system this 26th day of March, 2014, as follows:

> Timothy J. Cornetti, Esquire
> U.S. Steel Corporation, Suite 1500
> 600 Grant Street
> Pittsburgh, Pennsylvania  15219
>
> Roy A. Powell, Esquire
> David M. Belczyk, Esquire
> Jones Day
> 500 Grant Street, Suite 4500
> Pittsburgh, Pennsylvania  15219
>
> Michael R. Gladman, Esquire
> Matthew R. Jolson, Esquire
> Jones Day
> 325 John H. McConnell Blvd., Suite 600
> Columbus, Ohio 43216

> /s/  F. Timothy Grieco
> F. Timothy Grieco, Esquire
>
> Eckert Seamans Cherin & Mellott, LLC
> U.S. Steel Tower
> 44th Floor, 600 Grant Street
> Pittsburgh, Pennsylvania  15219
>
> Attorneys for Plaintiff
> Allied Erecting and Dismantling Co., Inc.

(J1820271.1;docx)