# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ALLIED ERECTING AND DISMANTLING CO., INC., | ) ) ) | CASE NO. 4:12CV1390 |
| PLAINTIFF, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) | **MEMORANDUM OPINION** |
| UNITED STATES STEEL CORPORATION, | ) ) ) | **AND ORDER** |
| DEFENDANT. | ) | |

Before the Court are the parties' cross-motions for partial summary judgment. Defendant seeks summary judgment on Counts I through VI of plaintiff's second amended complaint and on all three of its counterclaims; plaintiff seeks summary judgment on defendant's second counterclaim.[1] The cross-motions are fully briefed and the Court has the following documents under consideration:

**DEFENDANT'S MOTION**

**Doc. 118** -- Motion
Doc. 119 -- Appendix
Doc. 120 -- Sealed Appendix

**Doc. 164** -- Plaintiff's Opposition
Doc. 158 to162 – Appendix
Doc. 163 -- Sealed Appendix

**Doc. 169** -- Defendant's Reply
Doc. 172 -- Appendix
Doc. 173 -- Sealed Appendix

**PLAINTIFF'S MOTION**

**Doc. 134, 135** -- Plaintiff's Motion/Memo
(Sealed)  [Doc. 141, 142 – Redacted version]
Doc. 139 -- Appendix
Doc. 140 -- Sealed Exhibit

**Doc. 146** -- Defendant's Opposition (Sealed)
Doc. 148 -- Appendix
Doc. 154 -- Sealed Appendix

**Doc. 168** -- Plaintiff's Reply
Doc. 170 -- Appendix
Doc. 171 -- Sealed Appendix

**Doc. 59** -- Joint Submission of Contracts (with limited redactions)

---

[1] The pleadings in this case consist of plaintiff's second amended complaint (Doc. 43); defendant's partial answer, affirmative defenses, and counterclaims (Doc. 47); defendant's further answer (Doc. 99); and plaintiff's answer and affirmative defenses to the counterclaims (Doc. 51).

# I. BACKGROUND[2]

Plaintiff Allied Erecting and Dismantling Co., Inc. ("Allied") is an industrial dismantling contractor incorporated in Ohio with its principal place of business in Youngstown. Defendant United States Steel Corporation ("U.S. Steel") is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. Allied has performed work as an industrial dismantling contractor for U.S. Steel at numerous locations throughout the United States for over thirty years.

Between 1993 and 2003, Allied and U.S. Steel were embroiled in two lawsuits[3] concerning various disputes regarding the parties' rights and responsibilities under a long term contract for industrial dismantling work[4] at U.S. Steel's Fairless Works steelmaking facility in Fairless Hills, Pennsylvania ("the Fairless Works")[5] and at various other U.S. Steel locations throughout the United States.

On November 17, 2003, Allied and U.S. Steel entered into a settlement agreement in the 93-0575 Litigation, which was styled as an Agreement in Principle[6] ("the 2003 AIP").[7]

---

[2] Much of this background section is taken from the Court's earlier ruling on the motion to dismiss; here, for easier reading, the Court has deleted most of the record references. (*See* Doc. 84, with supporting record citations.) In the currently pending dispositive motions, neither party has objected to any of this previous factual recitation. Additional facts, now based on full discovery, are included *infra*, as necessitated by the discussion and analysis. Where appropriate or necessary, the Court will indicate herein whether it is now adhering to any legal conclusions it may have made at the time of its ruling on the motion to dismiss.

[3] These were Civil Action No. 93-0575 ("the 93-0575 Litigation") and Civil Action No. 02-2216 ("the 02-2216 Litigation"). Both cases were filed in the U.S. District Court for the Western District of Pennsylvania.

[4] In U.S. Steel's earlier-filed motion to dismiss, it described the projects at the Fairless Works (without any opposition from Allied) as having been conducted "in three basic stages beginning with the Hot End Facilities (1992), then the 80 Inch Hot Strip Mill (1999) and, most recently, the Sheet & Tin Facilities." (Doc. 46 at 649.) Only Allied's work at the Sheet & Tin facilities underlies the disputes in the present lawsuit.

[5] Fairless Works is an idled steelmaking facility that U.S. Steel converted into Keystone Industrial Port Complex ("KIPC"). (Doc. 43 ¶ 50.) While most record references are to "Fairless Works," occasionally there is mention of the new name. Both are referring to the same facility, the same location, and the same work.

[6] A copy of the 2003 AIP can be found at Doc. 59-4.

Further, in order to implement various terms of the 2003 AIP, on or about July 15, 2004, Allied and U.S. Steel entered into a Dismantling Services Agreement[8] ("the 2004 DSA").[9] Included in the terms of the 2003 AIP was the express renewal of a May 1, 1993 "Blanket Agreement Covering Work Performed on Behalf of USX Corporation" (the "1993 Blanket Agreement").[10]

On April 5, 2004, Allied and U.S. Steel entered into a settlement agreement in the 02-2216 Litigation, also styled as an Agreement in Principle[11] ("the 2004 AIP").[12] Once again, by its terms, the 2004 AIP renewed the 1993 Blanket Agreement.[13]

Prior to entering into the 2003 AIP, Allied's previous work at the first phase, or "Hot End," of the Fairless Works[14] was performed pursuant to a Construction Contract dated April 24, 1992 and an accompanying Final Conformed Specification (the "1992 Specification") dated September 11, 1992.[15]

---

[7] Under its terms, the 2003 AIP continued and/or preserved certain claims and issues from the 93-0575 Litigation for inclusion in the 02-2216 Litigation, and it stipulated how that would be accomplished procedurally. (*See* Doc. 59-4 at 962, § I(B).)

[8] A copy of the 2004 DSA can be found at Doc. 59-7.

[9] On February 11, 2010, the parties entered into another dismantling services agreement ("the 2010 DSA") that permitted Allied to perform certain dismantling work for U.S. Steel at sites other than the Fairless Works. A copy of the 2010 DSA can be found at Doc. 59-9; however, the 2010 DSA applied only to Count VIII, which was dismissed on September 27, 2013. (*See* Doc. 84 at 1369-72.)

[10] A copy of the 1993 Blanket Agreement can be found at Doc. 59-3.

[11] A copy of the 2004 AIP can be found at Doc. 59-6.

[12] By its terms, the 2004 AIP resolved all the issues in the 02-2216 Litigation, as well as the issues from the 93-0575 Litigation that had been continued and/or preserved for resolution in the 02-2216 Litigation. (Doc. 59-6 at 996, § I.)

[13] The provision that renewed the 1993 Blanket Agreement also made it applicable to "the work hereunder[,]" and provided: "However for any such work involving Asbestos and/or Environmental Remediation, the Environmental Rider attached as Attachment 3 to the [2004 DSA] shall also apply." (Doc. 59-6 at 1001, § II(B)(14).)

[14] A "Hot End" generally refers to those facilities where raw materials are processed and melted as part of ironmaking and steelmaking with the end-product being steel slabs, as opposed to the "Cold End" where the slabs are rolled, treated, cut and otherwise processed to customers' specifications. (Doc. 46 at 650, n. 2.)

[15] These documents can be found at Doc. 59-1 (Construction Contract) and Doc. 59-2 (Final Confirmed Specification).

Unfortunately, this patchwork of contracts makes analysis of the parties' arguments on summary judgment challenging, to say the least.

## II. STANDARD ON SUMMARY JUDGMENT

When a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202

4

(1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

### III. DISCUSSION[16]

All the claims between these two parties are breach of contract claims. As previously noted in the Court's ruling with respect to defendant's motion to dismiss, the relevant agreements specify that Pennsylvania contract law will apply. (*See* Doc. 84 at 1350, quoting Doc. 59-1 at 875 and Doc. 59-3 at 959.) Under Pennsylvania law,

---

[16] Throughout this discussion, the Court cites to the full deposition transcripts of the various deponents (where available), notwithstanding the fact that, pursuant to Court order, deposition excerpts are properly attached to, and cited in, the various briefs.

[w]hen the terms of a contract are clear and unambiguous, its meaning "must be determined from the four corners of the contract." *Glenn Distribs. Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 300 (3d Cir. 2002); *see also Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) ("When the words are clear and unambiguous, the intent of the parties must be determined from the express language of the agreement." (internal quotation marks omitted)). In contrast, "if the written contract is ambiguous, a court may look to extrinsic evidence to resolve the ambiguity and determine the intent of the parties." *Glenn Distribs.*, 297 F.3d at 300. A contract provision is ambiguous under Pennsylvania law

> if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

*Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995) (internal quotation marks omitted).

*In re Diet Drugs Prod. Liab. Lit.*, 706 F.3d 217, 223-24 (3d Cir. 2013) (internal footnote omitted); *see also Nova Chems., Inc. v. Sekisui Plastics Co., Ltd.*, 579 F.3d 319, 323 (3d Cir. 2009) ("[W]here language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended.") (quoting *Steuart v. McChesney*, 444 A.2d 659, 661 (1982)).[17]

"'The court, as a matter of law, determines the existence of an ambiguity and interprets the contract[,] whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact.'" *In re Old Summit Mfg.,*

---

[17] As noted by the Court in its ruling on the motion to dismiss, federal common law and Ohio law would be substantively the same as Pennsylvania law. *See, e.g. In re AmTrust Fin. Corp.*, 694 F.3d 741, 749-50 (6th Cir. 2012) (applying federal common law); *Dottore v. Huntington Nat'l Bank*, 480 F. App'x 351, 352 (6th Cir. 2012) (applying Ohio law).

6

*LLC*, 523 F.3d 134, 137 (3d Cir. 2008) (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (1986)).

In this case, the Court has already concluded that the contracts at issue are ambiguous, at least in certain respects;[18] therefore, consideration of parol evidence is permitted when construing the ambiguous portions of the contracts. (*See* Doc. 84 at 1348, n. 14.)

**A.    Counts I and II; Counterclaim I (The Basement Work Claims)**

In Count I, Allied seeks a declaratory judgment that it is not contractually obligated under the 2003 AIP and the 2004 DSA to remove concrete below "top of floor slab" or to backfill the foundation/basement areas at the Fairless Works at "no cost" to U.S. Steel. (Doc. 43 ¶ 74.) Allied further seeks a declaration that the backcharges U.S. Steel now intends to assess (to offset U.S. Steel's costs for obtaining a substitute contractor to do the work) are not authorized by the 2003 AIP, the 2004 DSA, or otherwise, and would be wrongfully assessed by U.S. Steel. (*Id*. ¶ 75.) Finally, Allied seeks a declaration that concrete removal below "top of floor slab" and backfilling of foundations/basements at the Fairless Works are within its scope of work under the 2003 AIP and the 2004 DSA, that U.S. Steel must compensate Allied for this additional work, and that U.S. Steel must cease and desist from performing the balance of this work through another contractor and, in the process, misappropriating Allied's property. (*Id*. ¶ 76.) In Count II, Allied alleges a claim for breach of contract, seeking damages related to the matters on which it seeks a declaratory judgment in Count I.

In Counterclaim I, U.S. Steel alleges that Allied has refused to remove non-concrete materials from the basements at the Fairless Works and to backfill the voided basements

---

[18] Sometimes the contracts are not so much ambiguous as merely confusing and challenging due to their patchwork nature. The Court will endeavor to clarify herein instances where actual ambiguity will permit, and require, consideration of parol evidence.

without additional compensation. (Doc. 47 ¶¶ 159-60.) As a result of this alleged breach, U.S.

Steel retained a third-party contractor to perform the work. (*Id.* ¶ 162.) U.S. Steel alleges that, as

of the date of the filing of the counterclaim, it had incurred in excess of $795,000.00 in damages.

#### 1.    *U.S. Steel's Position on Summary Judgment*

In its motion for summary judgment, U.S. Steel argues that, under the 2003 AIP §

III(a), the 2004 DSA § II(A)(i), and the 1992 Specification §§ 4 and 6.2.5, Allied is required to

perform basement work at the Fairless Works, including equipment removal and

backfilling/grading, "at no cost to U.S. Steel." U.S. Steel argues that "basement work," which the

parties purportedly agree includes breaking in concrete floors above basements, removing

equipment from basements, and backfilling and grading the basements,[19] is simply "dismantling"

that "shall be at no cost to U.S. Steel[,]" and that it involves no "concrete removal."

U.S. Steel argues that the "top of floor slab" language relied upon by Allied has

nothing to do with basement work and applies only to "concrete removal," not to all dismantling

work. It points out that, since backfilling always occurs below the floor, the contract provision

that backfilling was to be at "no cost" to U.S. Steel would be rendered meaningless under

Allied's interpretation. U.S. Steel asserts that the "top of floor slab" language was included only

to cover "concrete removal" associated with demolishing the Sheet & Tin above-ground

---

[19] U.S. Steel cites Doc. 119-12 at 2056-58 and Doc. 119-2 at 1843, 1844-45 in support of its assertion as to the parties' agreement regarding the definition of "basement work." (Doc. 118 at 1761.) Doc. 119-12 consists of excerpts from the deposition of Michael White, whose entire deposition is at Doc. 132, where the corresponding page numbers are 4482-84. Doc. 119-2 consists of excerpts from the U.S. Steel 30(b)(6) Deposition of Marc Stoken; the entire deposition is at Doc. 122, where the corresponding page numbers are 2633, 2634-35.

White worked for Allied at the Fairless Works, first as a foreman, and later as a supervisor. Over time, he worked on all the phases (i.e., the Hot End, the Hot Strip Mill, and Sheet & Tin). (Doc. 132 at 4379, 4382, 4386.) The testimony cited by U.S. Steel in support of its definition of "basement work" is White's testimony relating to cleanup and backfilling of the administration building basement at the Hot Strip Mill. Whether or not that testimony has any relevance to the instant dispute relating to the Sheet & Tin facilities is not entirely clear.

8

structures to a level that is even with the surrounding grade.[20] Finally, U.S. Steel argues that the parties' course of performance, as far back as the early 1990s, confirms that basement backfilling has always been at "no cost" to U.S. Steel.

### 2. *Allied's Opposition*

Allied does not challenge U.S. Steel's assertion that the definition of dismantling includes "backfilling and grading." Allied's contrary position is only that "[t]he 2003 AIP does not require Allied to back-fill basements at no cost to U.S. Steel." (Doc. 164 at 8185.) Allied argues that such backfilling involves "concrete removal" that is below "top of floor slab." Allied agrees that it has "back-filled and graded pits and voids which, unlike basements, have no concrete floor slab overtop—at no-cost." (*Id.*, underlining in original.) Indeed, Allied argues that U.S. Steel "has paid Allied to back-fill basements and remove equipment from basements at Fairless." (*Id.*, citing Dep. Exs. 8, 10, 11, 42.)[21] In Allied's view, "backfilling and grading" "may be at no cost or may be an extra cost to U.S. Steel." (*Id.* at 8186, underlining in original.)

---

[20] The floor slabs at Sheet & Tin are elevated above the surrounding grade and are supported by significant above-grade concrete foundations. (Doc. 118 at 1763; *see also* Adams Dep. [Doc. 123] at 2809 ("I recall with that four foot above ground concrete floor, that there was a lot of that floor that was basically just concrete that was slab on grade. There were other areas that it was concrete above basements that were underneath.").) Demolition to match the surrounding grade would require removing not only the floor slabs, but the concrete foundations they sit on. This would result in significant cost to U.S. Steel and revenue to Allied. Testimony shows that, as late as December 2008, U.S. Steel had not yet determined the extent of "concrete removal" for the Fairless Works. Marc Stoken testified that "the decision [was] whether we were going to have Allied remove all of the foundations to the surrounding grade level at the Fairless [W]orks dismantling projects or whether we were going to leave some or all of those, the concrete at the existing top of the floor slab, which in the case of Sheet and Tin was some four feet roughly above the surrounding grade." (Doc. 122 at 2525.) John Ramun, Allied's President, "was lobbying to have all of the concrete removed down to the surrounding grade." (*Id.* at 2528.) Stoken admitted that such removal would be "for U.S. Steel's account," even if the removed concrete was broken up and dumped into the basement as fill. (*Id.* at 2641.) As it turned out, U.S. Steel decided to just leave the elevated structures in place and simply backfill the basements. U.S. Steel argues that this course of action was permitted by the contracts. (Doc. 118 at 1764.)

[21] Unfortunately, Allied has failed to supply any deposition citations where a witness explains the cited exhibits. These exhibits are not self-explanatory and do not speak for themselves.

Allied finds it notable that "the 1992 Specification does not expressly state that Allied has a duty to backfill any basement areas. Nor does this specification mandate that basements shall be broken in and backfilled as U.S. Steel now claims." (*Id.*)

Allied points to the declaration of John Ramun, its President, who negotiated the 2003 AIP and who claims that the "top of floor slab" language was designed to compensate Allied and to make clear that it was not required to perform the time-consuming and costly dismantling of the massive floor slabs, foundations and basements at the Fairless Works without compensation. (*Id.*, citing Ramun Decl.[22] [Doc. 162-16], ¶¶ 3-4.)

Generally speaking, it is Allied's view that the contract language "limit[s] [its] 'no cost' scope of work to concrete dismantling above 'top of floor slab'." It believes that *any* work, including backfilling, performed below "top of floor slab" must be compensated; specifically it challenges U.S. Steel's assertion that it is only being asked to "break in" the concrete and let it drop to the basement as fill.[23]

---

[22] The Court notes that this declaration is undated. *See* 28 U.S.C. § 1746 (providing the form required for unsworn declarations under penalty of perjury, including the date upon which the declaration is executed). "[C]ourts have held that the absence of a date on such documents does not render them invalid if extrinsic evidence could demonstrate the period when the document was signed." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475-76 (6th Cir. 2002), citing *E.E.O.C. v. World's Finest Chocolate, Inc.*, 701 F. Supp. 637, 639 (N.D. Ill. 1988) (finding approximate date need merely be demonstrable to validate date-less document). Here, there is no such extrinsic evidence and, therefore, the utility and admissibility of the declaration is highly questionable.

[23] As noted in the Court's ruling on the motion to dismiss, this disagreement was highlighted during the oral arguments on that motion. Defendant's counsel argued:

> . . . [Allied] use[s] this language ["concrete removal will be to top of floor slab"] to suggest that Allied could not be required to perform basement work at no cost because its no-cost obligation ended at the top of the floor slab. But this misses the most important point here, is that the basement work does not require concrete removal at all. It requires concrete demolition. That is specifically the breaking in of the floor slab. And that provides the first layer of fill in the basement for the basement work.
>     And that's consistent with the 1992 [S]pecification in this case which says that Allied shall use suitable solid fill such as broken concrete for fill material in basements. And that's from Section 6.2.5 of the [S]pecification.

(Doc. 73 at 1262-63.) In opposition, Allied's counsel argued:

Allied asserts that, although "dismantling" is an aggregate of several tasks, only certain tasks are at "no cost" to U.S. Steel, and concrete removal below top of floor slab is not one of them. Allied also asserts that "[t]he concrete floor slab overlying the basements is 'removed' when it is busted up or demolished, thereby destroying its structural function and converting it to fill." (Doc. 164 at 8189, citing Klein Dep. [Doc. 158-12] at 7533.)[24] Allied asserts that concrete "removal" has "nothing to do with disposal or hauling off-site." (*Id.*) It points to the testimony of U.S. Steel's deponent, William Lamb, who testified that "[c]oncrete removal . . . is taking concrete from one location and putting it in another location[,]" but that such concrete is not "removed" from the site, since it is "eventually used for fill in some void, basement pit or something else[.]" (Lamb Dep. [Doc. 153] at 2013-14.)[25]

### 3. *Analysis*

In 2003, in order to settle a lawsuit between them, the parties entered into the 2003 AIP, which provides, *inter alia*, that Allied, in exchange for consideration set forth in the

---

And so we believe U.S. Steel is playing semantics here. They're saying we're not asking you to remove this concrete. We're just asking you to break it up into very small little pieces, *remove the rebar*, and drop it into the basement. That's the expensive removal work and dismantling work that the parties agreed Allied would not have to perform. There is no separate removal. It's being dismantled and dropped in the basement.

(*Id.* at 1287-88.) In response, U.S. Steel's counsel merely argued that "it's not clear how Allied would be able to get the equipment, the scrap, the materials out of the basement without demolishing the concrete." (*Id.* at 1321.) [The Court notes here that the page number references in this footnote differ from those in Doc. 84 because the transcript was corrected and replaced on August 23, 2013.]

[24] Excerpts of Edward Klein's deposition are attached to Allied's opposition. His complete deposition is found at Doc. 126, where the corresponding page number is 3252.

Klein is a professional engineer. (Doc. 126 at 3204.) In 1994, he started Strenn Consulting Group, a structural engineering consulting firm that was purchased by Allied in 2004 when Klein "chose to join Allied." (*Id.* at 3203-05.)

[25] Lamb worked for U.S. Steel at the Fairless Works beginning in 1969. Over time, he was a foreman in various sections of the plant. He eventually became the area manager for Sheet & Tin, a position he held for about two years. He was briefly a project engineer, and then moved to environmental engineering at U.S. Steel's headquarters in Pittsburgh. He retired in 1996, but then returned to work for U.S. Steel during the demolition of the Hot Strip Mill in 1999 and remained to generally oversee U.S. Steel's responsibilities vis-a-vis the Fairless Works demolition. (Doc. 153 at 6216-20.)

2003 AIP, "agree[d] to perform dismantling work for U.S. Steel at U.S. Steel's Fairless Works pursuant to Item III below under a non-cancelable long-term dismantling contract with U.S. Steel (the 'Fairless Contract') . . . ." (Doc. 59-4 at 963, § II(A).) Section III, in turn, provides in relevant part as follows:

> Any further DISMANTLING WORK at . . . U.S. Steel's Fairless Works, regardless of time, that is released and authorized in writing for dismantling, will be awarded to and performed by [Allied] pursuant to the Fairless Contract which shall contain the same relevant terms and conditions contained in the Contract and Specification for the first phase or "Hot End" of Fairless . . . . [26] In accordance therewith, (a) such dismantling shall be at no cost to U.S. Steel (other than the Advance Payment);[27] (b) concrete removal will be to top of floor slab; and (c) asbestos abatement, Hazmat removal, utility relocation and/or new construction will be for U.S. Steel's account . . . .

(*Id.* at 967, § III, explanatory footnotes added.)

Section V of the 2003 AIP provided that a "definitive agreement" would be prepared "to assist in the administration of [the 2003 AIP], <u>provided</u> that any such agreement shall remain faithful to all of the provisions in this [AIP]." (*Id.* at 968, underlining in original.) The "definitive agreement" that was later prepared is the 2004 DSA, which, in Section II, addresses the "further dismantling services at Fairless Works" as follows:

> (A) Any further DISMANTLING WORK, regardless of time, at the steel-making facilities or former steel-making facilities owned by U.S. Steel at its Fairless Works that is released and authorized in writing for dismantling by U.S. Steel, shall be awarded to, and performed by, [Allied] pursuant to the same relevant terms contained in the 1992 Fairless Contract and Specification (with the exception of Articles 29 and 31 of the Contract and Articles 13-15 of the Specification). Such contract and specification shall also provide that: (i) such dismantling shall be at no cost to U.S. Steel **(other than the costs hereinafter**

---

[26] The "Contract and Specification for the first phase" is a reference to the September 11, 1992 Final Conformed Specification. (Doc. 59-2.) With respect to most of the claims in this lawsuit, the parties dispute which terms and conditions of that 1992 Specification are "relevant." The Court resolves that question in Section C, addressing Counts IV and V.

[27] Under § II(A), U.S. Steel paid Allied a non-refundable advance payment of $7 million "[i]n consideration of [Allied's] agreement to perform dismantling work for U.S. Steel at U.S. Steel's Fairless Works pursuant to Item III[.]" (Doc. 59-4 at 963, § II(A).)

**provided for in the remainder of this paragraph**), (ii) concrete removal will be to top of floor slab, (iii) asbestos abatement, hazmat removal, utility relocation and/or new construction will be for U.S. Steel's account . . . ; and (iv) will include an agreed charging rate schedule for labor and equipment that will apply to extra work, which charging rate schedule may be updated on a yearly basis.

(Doc. 59-7 at 1014, upper case in original; bolding added.) As noted in the ruling on the earlier motion to dismiss, the parties agreed that the 2004 DSA was to "remain faithful" to all the provisions of the 2003 AIP and it further provided that it was "'not intended to conflict with or supersede [the 2003 AIP] but rather should be construed and interpreted consistent with and in harmony with [that] Agreement[ ].'" (Doc. 84 at 1355 and n. 23, quoting the 2004 DSA.)

Based on those representations, the Court previously concluded (and adheres to the same conclusion herein) that anything in "the remainder of [§ II(A) of the 2004 DSA]," i.e., anything after (ii) (which corresponds to (b) in § III of the 2003 AIP), was anticipated by the parties to incur costs to U.S. Steel. (*Id.*) This is undisputed.

The dispute centers on what constitutes "concrete removal . . . to top of floor slab" for purposes of determining whether that particular work is at "no cost" to U.S. Steel or "for U.S. Steel's account." There is also some disagreement over whether backfilling of basements (which, obviously, occurs below the floor slab), particularly any backfilling that requires demolition of a concrete floor slab over a basement and any concrete demolition in the basement itself, is included in "such dismantling [that] shall be at no cost to U.S. Steel[]" or whether that constitutes "concrete removal" below "top of floor slab."

The Court has already determined that these contract provisions are ambiguous and that parol evidence is, therefore, required to understand the parties' intent for purposes of construing the contracts. Unfortunately, despite the voluminous record, including many depositions, the Court is unable to fully resolve the issues encompassed by these claims. At this

juncture, given this record, it is not possible, without a fact-finder, to determine whether there was ever a meeting of the minds with respect to the meaning of "backfilling" as it relates to "concrete removal . . . to top of floor slab."[28]

Reading all of these contracts together, in light of the parol evidence now available to assist in construing their ambiguities, the Court concludes that, when the parties entered into their settlement agreements, by dividing "any further dismantling work" at the Fairless Works into three categories (i.e., (a), (b) and (c) in the 2003 AIP § III, and (i), (ii), and (iii) in the 2004 DSA § II(A)), they were isolating the individual tasks that had always constituted "dismantling" (*see* the 2003 AIP § II(B)(6)(a)) into those tasks that would be at "no cost" to U.S. Steel and those tasks that would be "for U.S. Steel's account." The category of tasks "for U.S. Steel's account" specifically included asbestos abatement, Hazmat removal ("environmental remediation" in the original dismantling definition), utility relocation, and/or new construction. Concrete removal would be "for U.S. Steel's account" only if it was below top of floor slab. The remaining tasks were in the "no cost" category, including structure removal, equipment sales, property transfers, equipment removal, backfilling and grading, *and* concrete removal to top of floor slab.

The Court can conclude that "concrete removal to top of floor slab" refers to demolition of concrete structures of any kind that are on or above a floor slab, no matter how complicated or costly that demolition might be to Allied. This type of "concrete removal" may entail (but does not require) hauling the demolished materials away from the site or, as is more

---

[28] By adding the provision to the 2003 AIP and the 2004 DSA that concrete removal was to be only to "top of floor slab," the parties were modifying the 1992 Specification which had provided that "[a]ll structures, including foundations[,] are to be dismantled and removed down to final grade except where otherwise noted." (Doc. 59-2 at 933, § 6.1.2.) It is not clear whether the parties intended this modification to also affect the meaning of "backfilling."

14

likely the case, it may entail dumping the demolished materials into a basement as fill. Either way, it is at "no cost" to U.S. Steel.

Demolition of any floor slab itself, whether the slab is directly on grade or elevated above grade, but *not* if it is elevated over a basement, which remains a question,[29] is "for U.S. Steel's account." (*See* Doc. 122 at 2641 ("concrete removal . . . down to the surrounding grade would be to U.S. Steel's account[,]" even if the removed concrete was then broken up and dumped into the basement as backfill).)

What remains to be determined by a fact-finder is the parties' intent with respect to "backfilling." In this category, parol evidence has not clarified the parties' intent with respect to "no cost" or "for U.S. Steel's account" in some situations, including, but not limited to, the following: (1) when a floor over a basement is demolished and then used for backfilling on-site; and (2) when concrete structures of any kind in a basement itself are demolished and either removed or retained as fill.

Accordingly, although the Court has resolved some issues regarding Counts I and II and Counterclaim I, it cannot entirely resolve these claims on summary judgment. Therefore, defendant's motion with respect to these counts is **DENIED**.

## B.    Count III (The Delay and Disruption Claim)

In Count III, Allied asserts a claim for breach of contract due to delay and disruption at the Fairless Works. Allied alleges that, pursuant to the 2003 AIP, the 2004 DSA,

---

[29] U.S. Steel argues that backfilling a basement by breaking the floor over the basement and letting it drop down as fill is not "concrete removal." It insists that the third party contractor it hired to do the basement work Allied has refused to do (which is the work that forms the basis for Counts I and II and Counterclaim I) would affirm that it performed no "concrete removal." But the testimony of John Harshman, the project manager for Brandenburg Industrial Service Company (the third party contractor), is not that clear. It is true that some of what Allied would call "concrete removal," Harshman would characterize as simple "demolition." (Doc. 156 at 7107-09.) But he identified as "a gray area" demolition of concrete foundations in basements, even if the demolished materials were left there as fill. (*Id.* at 7109-11.)

and the 1992 Agreements, the dismantling work at the Fairless Works was to be performed on a "continuous basis" and was to be completed "within three years after [U.S. Steel] has authorized [Allied] to begin work." (Doc. 43 ¶ 81.) It further alleges that U.S. Steel is contractually obligated to pay Allied for any additional cost and loss of revenue incurred by Allied as a result of any delay caused by U.S. Steel. (*Id*. ¶ 82, quoting Doc. 59-1 at 867-68, § 3.1.) Allied alleges that payment for labor and equipment for any unanticipated "extra work" at the Fairless Works was to be according to an agreed charging rate schedule. (*Id*. ¶ 83.) Allied alleges that U.S. Steel breached the contracts by causing extensive delays, hindrances, and numerous other impacts to Allied's work, resulting in greatly increased costs to Allied. (*Id*. ¶ 85.) Allied alleges that it has, nonetheless, substantially completed the work that has been released to it and has performed in accordance with the terms and conditions of the various contract documents. (*Id*. ¶ 88.) Allied further alleges that U.S. Steel has significantly impaired Allied's ability to do business and its ability to complete its manufacturing facility, and has caused Allied additional financial damages. (*Id*. ¶ 90.) Allied asserts that, under the Pennsylvania Contractor and Subcontractor Payment Act, 73 P.S. § 501, *et seq.*, it is entitled to interest, penalty interest, and attorney's fees on its damages. (*Id*. ¶ 92.)

### *1.      U.S. Steel's Arguments on Summary Judgment*

U.S. Steel argues that it is entitled to summary judgment on Count III because (1) there was no three-year time limit to "delay," and (2) several of the alleged "disruptions" were contemplated by the parties and, therefore, cannot be attributed to U.S. Steel.

As to the allegation of delay, U.S. Steel argues that there was no defined "scope of work" at the Sheet & Tin facilities and Allied was only entitled to perform whatever dismantling work "was released and authorized in writing for dismantling" by U.S. Steel. It also

16

argues, as it did in its motion to dismiss, that there was no timeframe within which U.S. Steel was obligated to release dismantling work and, therefore, there could be no resulting "delay." In support of its "no timeframe" argument, U.S. Steel points to the testimony of Michael Ramun, Allied's co-owner and former executive, and the testimony of other Allied employees to the effect that they were unaware of any three-year schedule. (Doc. 118 at 1757-58.) In addition, according to U.S. Steel, any three-year time limit contained in the 1992 Specification related only to the phases of work set forth in that specification, namely, the Base Bid facilities and the Optional facilities. U.S. Steel points out that there is no suggestion in either the 1992 Specification or the 2003 AIP that Sheet & Tin was to be considered a "phase" of work[30] with a three-year schedule.[31]

With respect to the alleged "disruptions," U.S. Steel argues that every disruption claimed by Allied was contemplated in the parties' contracts and, therefore, cannot form the basis of any breach of contract claim. U.S. Steel itemizes eleven alleged "disruptions" and argues how each is addressed by the relevant contracts. Further, U.S. Steel points out that the 1993 Blanket Agreement expressly provides that "neither party shall be liable for delays in performance caused by . . . compliance with or other action taken to carry out the intent or purpose of any law or administrative regulation having the effect of law now or hereafter enacted. . . ." (Doc. 59-3 ¶ 25.1.) U.S. Steel argues that several of the alleged disruptions resulted

---

[30] This current argument directly contradicts U.S. Steel's own description of the three phases in its motion to dismiss. *See*, n. 4, *supra*.

[31] U.S. Steel also argues that, even if the three-year limit were relevant, Allied would be precluded by its previous position in an arbitration proceeding from now asserting that it was supposed to complete the entire Sheet & Tin facilities in three years. In that arbitration, Allied's expert had concluded that the "phases" of work referred to in Article 3 of the 1992 Specification was a reference to the four phases of the scope of work, each of which would be allowed three years to complete, for a total of 12 years. (*See* Doc. 118 at 1758-59, citing Doc. 119-17.) Allied did not address this argument in its opposition brief. Further complicating the issue, in its reply brief, U.S. Steel appears to be relying on an entirely different expert report. (*See* Doc. 169 at 8450, n. 8.) If any of this expert testimony is relevant at all, which the Court cannot determine, it seems to set up just another factual dispute.

from its attempts to comply with legal requirements. (Doc. 118 at 1760-61, with record references.)

### 2. *Allied's Opposing Arguments*

In opposition, Allied attacks U.S. Steel's "re-packaging of its already rebuffed 'regardless of time' argument[.]" (Doc. 164 at 8175.) Allied asserts that "U.S. Steel continues to confuse [its] discretion to <u>award</u> work with Allied's right to <u>perform work that has been awarded</u> in an efficient and cost effective manner." (*Id.*, underlining in original.)

Allied argues that the Sheet & Tin facilities, with the exception of the Galvanizing line, were released and authorized in writing on December 18, 2003 (*id.* at 8176),[32] and that the subsequent course of proceedings between the parties confirms that fact.[33] Once those facilities were released,[34] Allied argues, it was operating under the contractual three-year schedule for completion. Allied challenges the fact that, after extensive discovery, "the only testimony U.S. Steel cites to attempt to disprove the existence of a three year schedule is that of Michael Ramun,

---

[32] In support of this assertion, Allied cites to "Dep. Ex. 130," an exhibit that was filed under seal (Doc. 163-1), and to "Dep. Ex. 23" (Doc. 159-12), without linking either exhibit to any deposition testimony. The exhibits are not self-explanatory nor self-authenticating. Allied further cites to "Dep. Ex. 18" and states that Bill Lamb, the U.S. Steel employee charged with overseeing the demolition activities of Allied, testified that this document was the "established demolition plan[.]" (Doc. 164 at 8176, citing Doc. 153 [Lamb Dep.] at 6335-36.) Lamb's cited testimony, however, is not crystal clear.

[33] Allied points to testimony from various depositions in support of its version of events. (*See* Doc. 164 at 8177-78.) In reply, U.S. Steel attacks Allied's argument as a "shotgun attempt to muddy the issue" and as mischaracterizing the particular cited evidence and/or testimony. (*See* Doc. 169 at 8449-50, n. 7.)

[34] In its reply brief, U.S. Steel asserts that it "does not contend that there was ***never*** any Sheet & Tin work released to Allied." (Doc. 169 at 8448-49.) "Rather, the key point is that ***there was no scope of work at the time the contract was signed*** because nothing had been released and authorized for dismantling at that time." (*Id.* at 8449, bolding in original.) The Court rejects this argument as unsupported by the contracts themselves. It does not follow that there could be no time limit set in advance simply because the exact scope of work was not known at the time the contracts were executed. U.S. Steel asserts: "It would have been impossible to set a meaningful schedule at the time of contracting when the scope was completely unknown." (*Id.*) Maybe so—in fact, *probably* so; however, whether it was possible to set a *meaningful* schedule without having a scope of work has no bearing at all on what the contracts actually say. If the three-year time limit clearly set forth in the Fairless Contract, specifically in the 1992 Specification, was intended *not* to apply at the Fairless Works, the parties could have easily said so. They did not.

the former employee of Allied who is currently suing Allied and who was not involved with the scope of work which subsequently followed at Sheet and Tin." (*Id.* at 8181.)

As to U.S. Steel's argument that the various disruptions alleged by Allied were all contemplated by the parties' agreements, Allied asserts that U.S. Steel points to not a single citation from any testimony or discovery document that would suggest Allied had contemplated the alleged disruptions. Allied claims that U.S. Steel, through its own actions, simply failed to complete the necessary predecessor work (i.e., the environmental and utility work), interfered with Allied's progress on the demolition activities, and significantly changed Allied's scope of work. (*Id.* at 8182.) According to Allied, any disruptions were solely within U.S. Steel's control, were "caused" by U.S. Steel, and were not contemplated by Allied.

### 3.      *Analysis*

The first question, which cannot be answered on summary judgment since the record evidence identified by the parties simply does not point in one direction, is whether U.S. Steel did release to Allied any dismantling projects at the Sheet & Tin facilities of the Fairless Works. It *appears* that at least some portion of the facilities may have been released, since Allied argues that the work was then delayed by U.S. Steel (greatly increasing the anticipated cost of the work and thus diminishing its value to Allied), and U.S. Steel argues that any delays or disruptions were all anticipated by the parties' contracts (which suggests that U.S. Steel concurs that there were delays in the work, which means that at least some work was released to Allied). The parties' respective versions of events are not only conflicting; they simply do not set out a clear story of what, if anything, happened at the Fairless Works.

That said, at least a couple issues can be resolved with reference to the contract language alone. First, the Court rejects U.S. Steel's argument that there is no three-year time

limit. The Court has already determined, in ruling on the motion to dismiss, that U.S. Steel has interpreted too broadly the phrase "regardless of time" in the 2003 AIP and the 2004 DSA. The Court adheres to its previous interpretation of the contracts as merely expressing assurances that, no matter how long it took for U.S. Steel to release dismantling work (i.e., even if the release occurred outside the 36-month revenue-guarantee period in § II(B)(1) of the 2003 AIP), the dismantling work would be released only to Allied. (Doc. 84 at 1361.) The Court further adheres to its conclusion that, because there were no actual time frames separately negotiated for the 2003 AIP and/or the 2004 DSA, the same time schedule set forth in the 1992 Specification for the Hot End demolition was a "relevant" term that was incorporated and made applicable to the work at the Sheet & Tin facilities. (*Id.* at 1361-62.) As the Court previously concluded, with detailed references to the various contractual terms:

> To summarize, reading all the contracts together, U.S. Steel could release work at the Fairless Works to Allied at any time and promised to give Allied at least enough work during the first 36 months of the contract to generate $7 million in revenue. Once U.S. Steel released any phase of the work to Allied, Allied had to begin working on that phase within five days and had to work continuously until finished (unless granted a work stoppage by the Engineer). Allied also had only three years to complete the work on each phase released to it and an additional twelve months to remove the scrap.

(Doc. 84 at 1363.)

Second, with respect to whether the parties' agreements contemplated or excused any delays, the Court also rejects U.S. Steel's reliance on §§ 10.1 and 25.1 of the 1993 Blanket Agreement, which provide:

> § 10.1 Purchaser [U.S. Steel] reserves the right to make changes in, deductions from and additions to work upon written order to Contractor [Allied].

> § 25.1 Other than expressly provided herein, neither party shall be liable for delays in performance caused by . . . compliance with or other action taken to

> carry out the intent or purpose of any law or administrative regulation having the
> effect of law now or hereafter enacted . . . .

(Doc. 118 at 1759-60, chart.)

This is a perfect example of how the patchwork created over the years by these various agreements complicates matters. Indeed, the 2003 AIP provides that "[t]he existing (but now expired) [1993] Blanket Agreement entered into between [Allied] and U.S. Steel . . . , will be renewed and be made applicable to the work hereunder." (Doc. 59-4 at 966, § II(B)(10).) The "work hereunder," i.e., the work under the 2003 AIP, included both dismantling projects at the Fairless Works (*see*, the 2003 AIP §§ II(A) & III), *and* other general, *non*-Fairless dismantling work (*see*, the 2003 AIP § II(B)). But the 1993 Blanket Agreement that was "made applicable to the work [under the 2003 AIP]," further provides that it would control the work "[e]xcept as to any further work by Contractor at Purchaser's Fairless Works pursuant to [the 1992 Construction Contract and the 1992 Specification]." (Doc. 59-3 at 948, § 2.1.) Therefore, since this claim relates to delay and disruption at the Fairless Works, the sections of the 1993 Blanket Agreement cited by U.S. Steel are inapplicable to excuse any such delay or disruption.

Despite these contract interpretations, the Court cannot determine whether the *facts* support Allied's allegations. Therefore, the Court concludes that summary judgment on Count III would be inappropriate and, to that extent, defendant's motion is **DENIED**.

## C.    Counts IV and V (The Scrap Ownership Claims)

Counts IV and V assert breach of contract claims relating to loss of the value of facilities allegedly removed by U.S. Steel from Allied's scope of work at the Fairless Works (Count IV) and loss of the value of remaining non-ferrous scrap and railroad track at the Fairless Works (Count V).

21

In Count IV, Allied alleges that the scope of its work on the Sheet & Tin facilities at the Fairless Works "originally included the demolition of substantially all of the buildings, structures and facilities[.]" (Doc. 43 ¶ 95.) It asserts that, under § 8.1 of the 1992 Specification,[35] it had the right to pay U.S. Steel $1.00 as "payment in full for all equipment, material and structures." (*Id.* ¶ 96.) Allied alleges that, once U.S. Steel had completed asbestos removal at each facility, it was contractually obligated under § 5.2 of the 1992 Specification[36] to assign the ownership of each facility to Allied ("including all ferrous and non-ferrous scrap, all spare parts and equipment and all railroad track located within each dismantling area"). (*Id.* ¶ 97.) The asbestos removal was completed and, by way of PT Order No. 85012,[37] "U.S. Steel formally

---

[35] Section 8.1 of the 1992 Specification provides:

> [Allied] shall make one lump sum payment to [U.S. Steel] in the amount of $1.00. Said payment shall be payment in full for all equipment, material and structures described as Base Bid Facilities under this Specification.

(Doc. 59-2 at 945.)

[36] Section 5.2 of the 1992 Specification provides that U.S. Steel shall:

> After completion of RACM [Regulated Asbestos Containing Material] removal at each Base Bid facility, assign to [Allied] ownership of each facility to be dismantled. The assignment shall include:
>
> 5.2.1   All ferrous and non-ferrous scrap resulting from the dismantling work.
>
> 5.2.2   All ferrous and non-ferrous scrap located within each dismantling area.
>
> 5.2.3   All remaining ingot molds, ingot mold stools, ingot teeming cars, ingots, open hearth scrap boxes, open hearth scrap box cars, slabs, blooms and billets.
>
> 5.2.4   Spare parts and/or spare equipment which the Engineer designates to be associated with each facility. Spare parts and/or equipment which has been designated for transfer to other operating facilities within [U.S. Steel] shall not be assigned to [Allied].
>
> 5.2.5   Railroad track located within a specific dismantling area which exclusively serves that dismantling area. Any railroad track located within a dismantling area which serves an adjacent facility shall not be assigned to [Allied].

(Doc. 59-2 at 930-31.)

[37] A copy of this document is attached to the complaint as Ex. A. It is dated August 7, 2004 and states that it is "valid thru Sep, 2007." (Doc. 43-1 at 561.) It further states: "This order is to assign ownership of ferrous scrap, non-ferrous scrap and equipment associated with various dismantling work to be performed at the Fairless Works Sheet and Tin Facility. All work to be in accordance with the DSA, Blanket Agreement and any specifications, purchase orders, etc. that may be issued by [U.S. Steel] for such work." (*Id.*) The price is noted as $1.00. (*Id.*)

assigned ownership of all ferrous and non-ferrous scrap and equipment associated with the work at Fairless to Allied[.]" (*Id.* ¶ 98.) Further, Allied alleges that, under §§ 10.2 and 10.3 of the 1992 Specification,[38] once Allied had commenced work at any facility, "U.S. Steel no longer had the right to remove any 'complete facility' from Allied's scope of work[ ]" (*id.* ¶ 99), at least not without compensating Allied in the amount of 50% of the scrap value of the facility. (*Id.* ¶ 102.) Allied alleges that it "performed, commenced and/or completed some or all of this work for U.S. Steel at all released facilities at the Sheet and Tin Facility . . . and, hence, U.S. Steel no longer had the right to remove any 'complete facility' from Allied's scope of work." (*Id.* ¶ 101.) Allied alleges that U.S. Steel "breached its contractual obligations . . . by removing and/or placing on indefinite hold various facilities that were within Allied's scope of work[,]" without compensating Allied. (*Id.* ¶¶ 103-04.)

In Count V, Allied alleges, *inter alia*,[39] that U.S. Steel has breached its contractual obligation to allow Allied to remove articles within the dismantling area that belong to Allied by virtue of the assignment provisions in the various contracts. (Doc. 43 ¶¶ 106-07, citing §§ 5.2.2 and 5.2.5 of the 1992 Specification.)

---

[38] These sections of the 1992 Specification provide:

> 10.2 [U.S. Steel's] rights to remove any complete facility from the scope of this Specification shall terminate upon the commencement of work at that facility by [Allied].
>
> 10.3 Should [U.S. Steel] require a building be removed from this demolition package, [U.S. Steel] shall pay as compensation to [Allied] 50% of the "Scrap Value", *i.e.*, No. 1 Heavy Melt price per gross ton for the amount of gross tons removed as listed in second issue of IRON AGE, Pittsburgh, Pennsylvania on the month of the sale, but in no event less than $50.00 per gross ton.

(Doc. 59-2 at 945.)

[39] Count V also addresses removal of railroad ties. This issue is addressed separately in the next section, along with Counterclaim III.

23

### 1.    U.S. Steel's Position on Summary Judgment

U.S. Steel argues that the cited sections from the 1992 Specification relied upon by Allied are not "relevant" because they are explicitly limited to the "Base Bid" facilities at the Hot End of the Fairless Works, not to the Sheet & Tin facilities. U.S. Steel further argues that, even if these sections were "relevant" terms, they would be overridden by the 2003 AIP and the 2004 DSA because they would be in conflict with the newer agreements. In U.S. Steel's view: (1) there was no set scope of work at Sheet & Tin, so there can be no claim that a facility was removed from a scope that never existed; (2) U.S. Steel always retained the right under § 10.1 of the 1993 Blanket Agreement to change its mind about Allied's work at Sheet & Tin; and, (3) before it could take any ownership, Allied was required to "generate" scrap, and that has not occurred.

Turning to Allied's claim with respect to railroad track and non-ferrous scrap, U.S. Steel argues that (1) it only belongs to Allied after it is "released and authorized in writing" by U.S. Steel; (2) most of the track at issue does not serve dismantling areas; (3) most of the Hot End track was explicitly removed from the Base Bid dismantling package and preserved for U.S. Steel; (4) Allied has already litigated and lost its alleged right to some of the Hot End track and scrap and is, therefore, barred by res judicata; and (5) Allied's claim is barred the statute of limitations.

### 2.    Allied's Opposition

Allied asserts that, at a minimum, there are issues of fact relating to whether it is entitled to the ferrous and non-ferrous scrap and the railroad tracks at issue. From Allied's perspective, until filing its motion for summary judgment, U.S. Steel had neither previously rejected Allied's requests for these materials nor raised the defenses it now raises.

Allied rejects U.S. Steel's assertion that some of the track Allied seeks to salvage does not serve the dismantling area but, rather, serves U.S. Steel's own operations and its tenants' operations. Allied relies upon the declaration of Gordon Lindquist, Allied's general superintendent for all demolition projects. (*See* Doc. 162-17 at 8150, ¶¶ 11-12.)[40]

Allied further argues that the Hot End railroad track is exempted from dismantling under the 2003 AIP and the 1992 Specification. It claims that § III of the 2003 AIP makes clear that *any* scrap at U.S. Steel's "former steelmaking facilities . . . [at] Fairless Works[,]" which includes any remaining Hot End scrap, now belongs to Allied because it is within the scope of the "dismantling work."

Allied argues that there is no res judicata bar to this claim because the 2003 AIP "reset" its right to all remaining scrap at Fairless Works "regardless of time." Since its current claims are predicated on events that post-dated any prior litigation or arbitration, there is no bar, according to Allied.

Similarly, Allied argues that the statute of limitations is no bar to its claims for the value of the remaining track and non-ferrous scrap at the Hot End, as well as any remaining track at the Hot Strip Mill, due to the "resetting" of the clock by the 2003 AIP. Allied argues that, because U.S. Steel's own internal documents reflect that, as late as 2012, U.S. Steel was still considering which Hot End materials were within Allied's dismantling rights under the 2003 AIP, that is the earliest date upon which the statute could have started to run. Prior to that, it could not have been clear that U.S. Steel had breached Allied's rights by rejecting its request for these materials.

---

[40] In reply, U.S. Steel asserts that Lindquist's declaration is merely conclusory and cannot be used to create a material factual dispute. (Doc. 169 at 8461.) The Court notes that this declaration suffers from the same deficiency as that of John Ramun. *See*, n. 22, *supra*.

3.      *Analysis*

The facts underlying this claim are barely set forth by either party. Each side simply quotes various contract provisions (mostly out of context) and argues that each quoted provision gives that side the upper hand in the dispute.

At first blush, one might be persuaded by U.S. Steel's argument that the specific provisions in the 1992 Specification relied upon by Allied applied only to the Hot End facilities. U.S. Steel points to language in each provision indicating that it applies to the "Base Bid facilities." But, § III of the 2003 AIP specifically incorporates "the same relevant terms and conditions contained in the Contract and Specification for the first phase or 'Hot-End' of Fairless[.]" (Doc. 59-4 at 967; *see also* § II(A) of the 2004 DSA [Doc. 59-7 at 1014].) Therefore, the "base bid" facilities under the contracts changed with each phase of the demolition (Hot End phase, Hot Strip Mill phase, or Sheet & Tin phase). While, obviously, there are certain very specific provisions in the 1992 Specification that could *only* apply to the Hot End, the more general articles, unless specifically overridden by or in conflict with the later contracts, still apply because they are "relevant." These would include Art. 1 (Scope of Work), Art. 2 (Authority of Engineer), Art. 3 (Time Schedule), Art. 4 (Allied's basic duties [i.e., "Allied . . . shall"]), Art. 5 (U.S. Steel's basic duties [i.e., "USS shall"]), Art. 6 (General Requirements), Art. 8 (Purchase of Base Bid Facilities), Art. 10 (Removal of Complete Facilities from the Scope),[41] and Art. 12 (Scrap and Salvage Sales).[42]

Therefore, although several of the allegations in Counts IV and V of Allied's complaint may be true so far as contract interpretation goes, that does not completely resolve the

---

[41] The Court notes that the 1992 Specification contains no Article 7 or Article 9.

[42] Articles 13, 14 and 15 of the 1992 Specification were specifically excluded. (*See* § III of the 2003 AIP; § II(A) of the 2004 DSA.)

26

question on summary judgment. The gravamen of Count IV is that U.S. Steel allegedly wrongfully removed facilities from Allied's scope of work at the Sheet & Tin facilities after Allied had already begun its dismantling work. That cannot be determined from the record as it stands and needs a fact-finder. The gravamen of the portion of Count V addressed in this section of this opinion relates to Allied's assertion that U.S. Steel has refused to allow it to remove non-ferrous scrap and railroad track. U.S. Steel argues that Allied can only remove such scrap that it has "generated." It claims Allied has not generated any scrap because facilities have not yet been released to Allied. These are factual disputes.

The Court concludes that, although the articles of the 1992 Specification cited above are "relevant" for purposes of the dismantling of the Sheet & Tin facilities at the Fairless Works, this alone does not entitle either party to summary judgment.[43]

The motion is **DENIED** with respect to the scrap ownership claims in Counts IV and V.

**D.       Count V and Counterclaim III (The Railroad Tie Removal Claims)**

Count V of the complaint also contains an allegation that U.S. Steel has committed a breach of contract by requiring Allied to bear the cost of removal of non-salvageable railroad ties, a cost that allegedly resides with U.S. Steel (because the railroad ties supposedly contain a hazardous material) and has, in the parties' course of dealings, always been

---

[43] U.S. Steel also raises defenses of *res judicata* and statute of limitations. It argues that many of Allied's claims relating to the Hot End and the Hot Strip Mill have either already been litigated or are time-barred. The Court finds these arguments somewhat confusing because it has been operating under the impression that all of Allied's claims relate to dismantling work at the Sheet & Tin facilities of Fairless Works, not the Hot End or the Hot Strip Mill. If this is incorrect, it further illustrates the need for a fact-finder to sort out the exact claims.

paid by U.S. Steel. (Doc. 43 ¶¶ 108-10, citing § III(c) of the 2003 AIP[44] and §§ 5.8,[45] 6.4.5, and 6.4.6[46] of the 1992 Specification).

Counterclaim III is related to this portion of Count V. U.S. Steel alleges that Allied is obligated, as part of the dismantling work, to remove certain railroad track at the Fairless Works, and, in connection with such removal, to remove, haul and legally dispose of railroad ties associated with the track. Allied has refused to do this removal of railroad ties at its expense, which U.S. Steel asserts is a breach of contract. (Doc. 47 ¶¶ 183-84.)

## 1.    *The Parties' Positions on Summary Judgment*

As to Allied's claim that it is not required to bear the cost of removal of railroad ties because those constitute hazardous materials under the relevant contract provisions and responsibility for that cost is U.S. Steel's, U.S. Steel asserts that those "hazardous materials" provisions are general and are overridden by the specific provision in the 1992 Specification § 6.1.6 that "[i]n areas where railroad track is removed [Allied] shall remove, haul and legally dispose of associated railroad ties at its expense." U.S. Steel asserts that Allied's President has conceded that Allied is responsible for the cost of railroad tie removal if it takes the associated railroad track out of the plant.

---

[44] Section III of the 2003 AIP is quoted, *supra*, in Section A, 3 of this opinion.

[45] Section 5.8 the 1992 Specification provides:

> [U.S. Steel shall] [c]hose [sic] all methods and locations for disposal of all HAZMATs generated as a result of work performed under this specification. Said HAZMATs disposal methods and locations shall conform to all applicable Federal, State and Local laws, statutes, ordinances and regulations. [U.S. Steel] shall pay all costs associated with the disposal of HAZMATs except as specifically set forth herein.

(Doc. 59-2 at 932.)

[46] Sections 6.4.5 and 6.4.6 of the 1992 Specification are located in a section of the contract relating to "HAZMATs Removal." The sections are lengthy and need not be quoted herein. However, Allied alleges they apply because they deal with "coke plant by-products," and one component in the railroad ties is creosote, allegedly a coke-plant by-product. (Doc. 59-2 at 939-40.)

Allied holds the view that there is a material factual dispute regarding whether the railroad ties constitute Hazmat removal under the contract, a cost that is for U.S. Steel's account.

>  **2.**  *Analysis*

The Court rejects U.S. Steel's contract interpretation. The 2003 AIP and the 2004 DSA both make removal of hazardous materials "for U.S. Steel's account." That said, there remains a material factual dispute as to whether the relevant railroad ties contain hazardous material that would shift the cost from Allied (under § 6.1.6 of the 1992 Specification) to U.S. Steel (under § III(c) of the 2003 AIP and § II(A)(iii) of the 2004 DSA).

Accordingly, to that extent the motion for summary judgment as to Count V and Counterclaim III is **DENIED**.

## E.      Count VI (The Lay Down Area Claim)

In Count VI, Allied alleges that, pursuant to Art. 3 of the 1992 Specification, U.S. Steel was required to provide Allied, upon the completion of all dismantling work at the Fairless Works, "an additional 12 months to remove all accumulated scrap from the site." (Doc. 43 ¶ 113.) It further alleges that U.S. Steel agreed, in an August 7, 2006 email, that a particular 40-acre parcel west of the Sheet & Tin facilities (the "lay down area") could be used by Allied for the accumulated scrap, and that such area would not be "sold or leased until demolition is complete." (*Id.* ¶¶ 114-115.) Despite this agreement, and despite the fact that Allied alleges its work is still not complete, U.S. Steel did sell this parcel and demanded that Allied remove the accumulated scrap, at additional costs to Allied. (*Id.* ¶¶ 116-118.) Allied seeks to recover those additional costs as damages.

>    ### 1.    *U.S. Steel's Position of Summary Judgment*

In its motion for summary judgment, U.S. Steel argues that Allied never stored "accumulated scrap" on the relevant parcel, but only stored disassembled buildings from the Fairless Works that it intended to transport to Youngstown for use in its manufacturing facility. (Doc. 118 at 1777-78.) U.S. Steel argues that Allied used entirely different parcels to store its "accumulated scrap," and U.S. Steel never asked it to remove that scrap. U.S. Steel asserts that it was under no obligation to allow Allied to continue to use the relevant sold parcel for materials that were not "accumulated scrap."

>    ### 2.    *Allied's Opposition*

In opposition, Allied argues that Article 3 of the 1992 Specification "explicitly provides Allied an unfettered right to additional time to remove any material generated from its demolition work." (Doc. 164 at 8201.) It asserts that a reasonable jury could find that salvage steel from disassembled buildings is "scrap." At the very least, it argues, "accumulated scrap" is an ambiguous term.

>    ### 3.    *Analysis*

The Court disagrees with Allied's position. Notwithstanding the unfortunate, and sometimes needless, complexity of the various contracts at issue, plain meaning applies here as the Court construes the contract. This is not the province of a jury.

Scrap is scrap, and *salvage* steel is *not* scrap. Although, admittedly, "scrap" might have "salvage value," that does not mean that parts of disassembled buildings that were to be "salvaged" and reassembled for use elsewhere can be called "scrap." It is completely conceivable that, while dismantling was occurring, Allied would simply pile up the scrap (the real scrap) to

be hauled away as a final step after all the work was completed, whereas it would undoubtedly remove salvage materials as quickly as possible, so as to benefit from their salvageability.

Summary judgment is **GRANTED** in defendant's favor on Count VI.

**F.     Counterclaim II (The MFG Advance Payment Refund Claim)**

>    **1.     *U.S. Steel's Counterclaim Allegations and the Parties' Arguments on Summary Judgment***

Both parties have moved for summary judgment on the second counterclaim, where U.S. Steel alleges that, pursuant to the 2004 AIP § II(A)(2), it agreed to make a $10 million advance payment to Allied (the "MFG Advance Payment") in consideration of Allied's agreement to perform manufacturing work for U.S. Steel at Allied's facility in Youngstown, Ohio.[47] (Doc. 47, ¶ 165.)[48] There is no dispute that U.S. Steel tendered the MFG Advance Payment to Allied in July 2005. (*Id.* ¶ 168; Doc. 51, ¶ 168; Doc. 121 at 2329-31.)

U.S. Steel further alleges that, pursuant to the 2004 AIP § II(B)(2), it was to recover the MFG Advance Payment over the ten-year term[49] of the agreement through discounts on Allied's invoices for manufacturing work. (Doc. 47 ¶ 166.)[50] U.S. Steel alleges that, because Allied has failed to perform any manufacturing work for U.S. Steel at Allied's Youngstown

---

[47] The 2004 AIP also provided for a $10 million Advance Payment to Allied for dismantling work. (Doc. 59-6 at 996, § II(A)(1).) Although the advanced amounts are both $10 million, the advances were for different purposes. Only the MFG Advance Payment is at issue in Counterclaim II.

[48] There is no dispute that, in order to perform manufacturing work at the Youngstown location, Allied first had to design and build the facility, and there was no specific timeframe for the construction. (*See* Doc. 137 [Gooden Dep.] at 5097-98; Doc. 122 at 2549.)

[49] The parties agree that the term was extended from ten to eleven years (ending on March 31, 2015) pursuant to the January 2005 First Amendment. (*See* Doc. 59-6 at 1005, ¶ 1.)

[50] The parties agree that, on February 14, 2005, they entered into a Manufacturing Services Agreement (Doc. 59-8 [the "2005 MSA"]), which set forth procedures for administering the manufacturing work contemplated by the 2004 AIP. The 2005 MSA became effective April 1, 2004. (Doc. 47 ¶ 169; Doc. 59-8 at 1032.)

facility (whose construction has never been completed),[51] U.S. Steel has been precluded from recovering the MFG Advance Payment (*id.* ¶¶ 170-72; Doc. 118 at 1754 ("U.S. Steel has not recovered a dime of the $10 million MFG Advance Payment.")), which constitutes a breach by Allied of the 2004 AIP.

U.S. Steel alleges that, despite requests that Allied provide adequate assurances that it would perform manufacturing work for U.S. Steel, Allied has failed to provide such assurances, a failure that constitutes either repudiation or anticipatory breach by Allied of the 2004 AIP and the 2005 MSA. (Doc. 47 ¶¶ 173-75, 177.) In light of Allied's failure, U.S. Steel has demanded that Allied return the MFG Advance Payment, plus interest. (*Id.* ¶ 176.) U.S. Steel has raised essentially the same assertions in its motion for summary judgment with respect to its second counterclaim. (Doc. 118 at 1751-56.)

In opposition, Allied relies largely on the arguments in its own motion for summary judgment on the second counterclaim (*see, infra*), but, in any event, asserts that, as to any claim for anticipatory repudiation, at the very least, there are factual questions for a jury as to whether U.S. Steel had reasonable grounds for insecurity with respect to Allied's performance of the contract and as to whether Allied gave adequate assurances. (Doc. 164 at 8174.)

In reply, U.S. Steel attacks Allied's assertion that it could "accept the $10 million and then simply refuse to perform ***any*** manufacturing work." (Doc. 169 at 8445, emphasis in original.) Although acknowledging that the MFG Advance Payment is non-refundable, U.S. Steel emphasizes that it was supposed to be *recoverable* through discounts on manufacturing work to be performed by Allied. (*Id.*) It further argues that Allied has failed to address the cases

---

[51] In answer to this paragraph of Counterclaim II, Allied asserts that the "manufacturing facility is nearly complete and would be completely finished 'but for' the wrongful conduct of U.S. Steel." (Doc. 51 ¶ 171.)

cited for the proposition that a non-performing party is not entitled to retain an advance payment. (*Id.*, citing Doc. 118 at 1752-54.) U.S. Steel rejects as flawed the notion that it already received "full consideration" for the MFG Advance Payment through a reduction in the $63 million Profit/Gross Margin Commitment, pointing out that this position "ignores the fact that U.S. Steel's bargained-for consideration for the MFG Advance Payment was ***both*** a reduction in the [Profit/]Gross Margin Commitment ***and*** the right to receive sufficient discounted manufacturing work to permit U.S. Steel to recover fully the MFG Advance Payment." (*Id.*, citing Doc. 146 at 5323-24.)

### 2.    *Allied's Position on Cross-Motion for Summary Judgment*

By way of cross-motion, Allied argues that it is entitled to summary judgment on Counterclaim II. First, Allied asserts that there is no basis for a claim of anticipatory repudiation, since the relevant contracts need not be fulfilled until March 31, 2015, and since U.S. Steel "has failed to allege any facts that would meet the heightened standard for anticipatory repudiation[.]" (Doc. 135 at 4975.)

Allied notes that, under the 2004 AIP § II(A)(2), the MFG Advance Payment is "non-refundable" and, further, that it has "no unconditional obligation to perform any manufacturing work." (*Id.* at 4978.) In support of this assertion, Allied cites §§ II(B)(13) and II(B)(3) of the 2004 AIP. Section II(B)(13) provides, in part, that "U.S. Steel shall have the unilateral right to award any non-dismantling [i.e., manufacturing] work to contractors other than [Allied], provided that U.S. Steel will consider [Allied] for any such work." (Doc. 59-6 at 1001.) Section II(B)(3) provides that Allied "shall have the absolute right to reject any work offered by U.S. Steel under this Agreement." (*Id.* at 998.) In summary, Allied asserts that it "had no obligation to perform any manufacturing work, just like U.S. Steel had no obligation to offer any

manufacturing work to Allied, and Allied has no legal duty to return the $10 million 'non-refundable' MFG Advance Payment." (Doc. 135 at 4979.)

Allied additionally argues that, so long as U.S. Steel provided Allied with sufficient dismantling work to satisfy the Profit/Gross Margin Commitment in the 2004 AIP § II(B)(3), there was no obligation on U.S. Steel's part to provide Allied with *any* manufacturing work. (*Id.* at 4980, quoting § II(B)(3): "U.S. Steel's commitment to provide [Allied] with additional work under this Agreement, beyond that which is already under contract, shall be complete when the profit/gross margin generated by [Allied] under this Agreement, including any advance payments made under Sections II(A)(1) and II(A)(2) and any shortfall payments that may be made under Section II(B)(4) . . . equal $63.0 million.".) Because U.S. Steel satisfied the Profit/Gross Margin Commitment to Allied prior to March 31, 2008, without providing Allied any manufacturing work (an option not prohibited by the parties' agreement[52]), Allied argues that U.S. Steel thereafter had no obligation to supply Allied with any work of any kind. (*Id.*) In Allied's view, "all of the parties' obligations to provide or perform work under the 2004 AIP, including any obligation by Allied to provide U.S. Steel with discounted manufacturing work, were satisfied and extinguished [as of March 31, 2008]." (*Id.*)[53]

---

[52] The 2004 AIP does not link computation of the recovery of the MFG Advance Payment through manufacturing work to computation of the Profit/Gross Margin Commitment. Section II(B)(2) provides that, once the MFG Advance Payment is fully recovered, "no further discount will be required."  (Doc. 59-6 at 997.) Similarly, Section II(B)(3) provides that, once the requisite Profit/Gross Margin is generated, that commitment "will be deemed satisfied." (*Id.* at 998.)

[53] Allied asserts that U.S. Steel's current position is "directly inconsistent" with its previous explicit rejection of the notion that "the $10 million dollar [sic] Advance Payment for Manufacturing Work creates an obligation for [U.S. Steel] to provide Allied with $25 million in revenues for manufacturing work . . . ." (Doc. 135 at 4980, citing deposition testimony.)

Summarizing, Allied argues that U.S. Steel is attempting to "double-dip" with the MFG Advance Payment by first counting it toward its own obligation to satisfy the $63 million Profit/Gross Margin Commitment, but now seeking a refund of this "non-refundable" payment.

In opposition to Allied's motion, U.S. Steel argues that Allied is confusing U.S. Steel's *right* to award manufacturing work with U.S. Steel's *obligation* to do so. It reiterates its position that Allied made a commitment "to perform manufacturing work at [Allied's] facility in Youngstown, Ohio[,]" in return for U.S. Steel's payment of the $10 million MFG Advance Payment, which U.S. Steel would be able to "recover" over the term of the agreement through discounts on Allied's invoices for the manufacturing work. (Doc. 146-1 at 5286-87.) U.S. Steel rejects Allied's argument that its obligation to perform any manufacturing work for U.S. Steel was based on two contingencies that never occurred: (1) its completion of the Youngstown facility, and (2) its acceptance of any manufacturing work that U.S. Steel might send its way. (*Id.* at 5292.) U.S. Steel argues that this is tantamount to an assertion by Allied that the MFG Advance Payment was a "gift," an assertion that "does not withstand scrutiny." (*Id.* at 5293.)[54] U.S. Steel insists that the 2004 AIP provides that the MFG Advance Payment was recoverable by U.S. Steel. (*Id.* at 5293, citing 2004 AIP § II(A)(2).)

In connection with this rights/obligation argument, U.S. Steel further rejects Allied's argument that the parties' manufacturing relationship somehow ended upon U.S. Steel's full satisfaction in 2008 of the 2004 AIP's Profit/Gross Margin Commitment. U.S. Steel agrees with Allied's assertion that, once the Profit/Gross Margin Commitment to Allied was satisfied, U.S. Steel no longer had an *obligation* to give Allied any more work. (*Id.* at 5287, citing Doc.

---

[54] Although Allied is now arguing that it was never obligated to provide U.S. Steel with any manufacturing work because the 2004 AIP § II(B)(3) provided that it had "the absolute right to reject any work offered by U.S. Steel[,]" U.S. Steel points out that this position is inconsistent with Allied's accounting practices, its own expert's testimony, and its own accountant's testimony. (Doc. 146-1 at 5290-92, citing evidentiary support.)

135 at 4971; 2004 AIP § II(B)(3) ("U.S. Steel's commitment to provide [Allied] with additional work under this Agreement . . . shall be complete when the profit/gross margin generated by [Allied] under this Agreement . . . equal[s] $63 million.").) But U.S. Steel argues that its *obligation to give* Allied work "says nothing about U.S. Steel's **right to receive** discounted manufacturing work from Allied." (*Id.*, emphasis in original.)[55] U.S. Steel claims that its satisfaction of the Profit/Gross Margin Commitment did not satisfy and/or extinguish Allied's obligation to perform manufacturing work. (*Id.* at 5288.)[56]

As regards repudiation, U.S. Steel asserts that Allied's litigation position "reveals unequivocally that it does not believe it is obligated to perform, and does not intend to perform, any manufacturing work for U.S. Steel." (Doc. 146 at 5300.) U.S. Steel adheres to its original arguments and adds that, despite Allied's declaration that repudiation is unwarranted because the contract has not run its full course, "[i]t is now impossible for Allied, in the one year that remains in the 2004 AIP's term, to both finish its manufacturing facility and perform sufficient manufacturing work for U.S. Steel to recover the $10 million MFG Advance Payment." (*Id.* at 5301.)

3.  *Analysis*

Under the 2004 AIP, the parties made *mutual* commitments. Notably, U.S. Steel agreed to provide Allied with enough dismantling work to afford Allied at least $63 million in

---

[55] U.S. Steel further argues that Allied's current position is inconsistent with its pre-litigation position and prior admissions. It directs the Court to Doc. 139-6 at 5194, where Allied took the position that the MFG Advance Payment was separate and apart from the Profit/Gross Margin Commitment, and the former did not apply to satisfy the latter. (Doc. 146 at 5288.) It also notes that, as late as January 6, 2012, Allied had promised "to complete the [Youngstown] Facility as quickly as possible . . . in order to be in a position to perform manufacturing work for U.S. Steel in accordance with the terms of the Manufacturing Services Agreement[.]" (*Id.*, quoting Doc. 139-8 at 5201.)

[56] U.S. Steel also rejects Allied's assertions, in the section of Allied's motion reciting the factual background, that the "sole purpose" of the 2005 MSA was to allow U.S. Steel to satisfy the Profit/Gross Margin Commitment *and* Allied's assertion that the 2010 Dismantling Services Agreement (the "2010 DSA") superseded Allied's manufacturing obligation under the 2004 AIP. (Doc. 146 at 5289-90.)

profit/gross margin and to advance Allied $10 million, the MFG Advance Payment, which could be included in the $63 million calculation, and which would be non-refundable, but recoverable over the term of the AIP by way of discounts Allied would give U.S. Steel on manufacturing work Allied agreed to perform for U.S. Steel at its facility in Youngstown, Ohio.

There is no dispute that U.S. Steel met the $63 million Profit/Gross Margin Commitment to Allied. There is no dispute that Allied has never performed any manufacturing work for U.S. Steel at its as-yet-to-be completed facility in Youngstown[57] from which U.S. Steel could recover its $10 million by way of discounts given by Allied. There is also no dispute that, when the parties originally entered into the agreement, there would have been ten (10) years during which U.S. Steel could recover its advance payment, a period that was later extended to eleven (11) years, ending on March 31, 2015. As it stands now, Allied has only a few months to meet its commitment, a virtual impossibility.

Despite these undisputed facts, Allied insists it is entitled to keep the $10 million MFG Advance Payment because it was designated "non-refundable." But "the word non-refundable cannot be construed as a license to provide little or no consideration and to still retain an advance payment." *Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC* 842 F. Supp. 2d 502, 516 (S.D.N.Y. 2012) ("the non-refundable fee was paid by Soroof not as a gift but as one element in a bargained for exchange") (internal quotation marks and citation omitted). The Court rejects Allied's position.

U.S. Steel also argues that Allied has repudiated the portion of the 2004 AIP under which Allied promised to perform discounted manufacturing work at its facility in

---

[57] Neither party argues that U.S. Steel has actually offered Allied any manufacturing work; but, that is not surprising, since the Youngstown manufacturing facility has not been built.

Youngstown. Under Pennsylvania law, a contract is repudiated when: (1) a party has reasonable grounds for insecurity with respect to the other party's performance; (2) the party demands adequate assurance of the other party's performance; and (3) the other party fails to provide such adequate assurance. 13 Pa. C.S. § 2609; Restatement 2d of Contracts § 251.

Here, U.S. Steel's reasonable grounds for insecurity are quite apparent: it had a commitment from Allied that it could "recover" its MFG Advance Payment through discounted manufacturing work performed over a period of eleven (11) years; there are now only a few months remaining on that commitment period and, to date, no manufacturing work has been performed by Allied; the manufacturing facility where Allied would perform the work has not yet been completed; and, Allied's President has repeatedly expressed his belief that Allied simply gets to keep the $10 million, without ever doing any discounted manufacturing work for U.S. Steel.

The elements relating to adequate assurance are also satisfied. In 2012, eight years into an 11-year term, U.S. Steel asked Allied to provide adequate assurances regarding Allied's "intentions and plans to perform manufacturing work for U.S. Steel" in accordance with the 2004 AIP, so that U.S. Steel could be assured of recovery of its MFG Advance Payment. (Doc. 120-5 at 2233.) Allied initially represented that it intended to complete its Youngstown facility by August 2012, but later told U.S. Steel it could provide neither a date by which the facility would be completed nor any assurance of its ability to perform manufacturing work. (Doc. 120-7 at 2238; Doc. 120-9 at 2246-47.)

In its briefing on these motions, Allied has made quite clear that, in its view, it is not obligated to perform manufacturing work for U.S. Steel, although it would apparently be willing to do so voluntarily. (*See* Doc. 135 at 4977.) Allied is of the view that it has no

contractual obligation to U.S. Steel to perform manufacturing work since that obligation was extinguished by U.S. Steel's performance of *its* obligation to provide the $63 million profit/gross margin. The Court rejects Allied's view in this regard and concludes that U.S. Steel has shown that Allied has repudiated this portion of the parties' agreement.

The Court also rejects Allied's argument that U.S. Steel's early satisfaction of the $63 million Profit/Gross Margin Commitment (solely through dismantling work) somehow altered the mutual promises made by the parties. Allied asserts that, once that commitment was met by U.S. Steel, U.S. Steel no longer had an obligation to give Allied manufacturing work that Allied could bill back to U.S. Steel at a discounted rate so that U.S. Steel could recover the $10 million MFG Advance Payment. This argument completely disregards the mutuality of the promises, what each party had bargained for, and what each party was supposed to enjoy as a result of their respective promises. Allied was to receive a minimum $63 million profit/gross margin – which it *did* receive. In turn, U.S. Steel was supposed to receive manufacturing work at a discounted rate – which it *never* received. Allied got what it was entitled to out of the deal; U.S. Steel did not.

A case relied upon by U.S. Steel is instructive here. In *Wm. F. Mosser Co. v. Cherry River Boom & Lumber Co.*, 138 A. 85 (Pa. 1927), defendant failed to perform under a contract to produce to plaintiff on an annual basis a certain amount of tree bark for use in plaintiff's tanneries. Defendant's failure was the result of impossibility of performance—the trees on land covered by the contract simply did not produce enough bark; this fact was not in dispute. As part of the contract, plaintiff had made an advance payment of $150,000, which was "to be returned [to plaintiff] . . . by allowing a credit of one dollar ($1.00) per ton on all bark shipped . . . until the aggregate amount of credits so made shall amount to the advance payment .

. . or until one hundred and fifty thousand (150,000) tons of bark shall have been delivered[.]" *Id.* at 86. The defendant argued that it should not have to return the advance payment because it was discharged of any further obligation as soon as it had turned over all the bark it could secure from the land specified in the contract. Although recognizing that, at the time the contract was executed, both parties assumed there was sufficient bark available from the trees on the relevant land, the court in *Mosser* rejected defendant's argument and required a return of the advance payment.

Allied has not directed the Court to any contrary authority under which it would be entitled to retain the $10 million MFG Advance Payment despite having performed no discounted manufacturing work for U.S. Steel.[58] Furthermore, the contract simply does not support that position. That is true even though U.S. Steel entered into the agreement to advance Allied $10 million, which it was to recover via discounted manufacturing work, despite its knowledge that the Youngstown manufacturing facility had yet to be built by Allied. Although the 2004 AIP was entered into in settlement of a lawsuit, the Court cannot simply construe the $10 million as purely some sort of damages payment to Allied. Doing so would render Allied's contractual commitment to perform discounted manufacturing work completely meaningless.

The Court concludes that, with respect to the MFG Advance Payment, Allied has "provide[d] little or no consideration[.]" *Soroof Trading Dev. Co.*, 842 F. Supp. 2d at 516. Since there is no dispute that Allied has not performed, and cannot now perform, its end of the bargain, U.S. Steel is entitled to a reimbursement of the full MFG Advance Payment.

---

[58] John Ramun testified that, in his view, the contract contemplated a circumstance in which U.S. Steel would pay $10 million and get no manufacturing work from Allied. (Doc. 121 at 2315.) In fact, it is his belief that Allied could reject all manufacturing work that U.S. Steel might offer during the entire 11-year period and that Allied had no obligation to do any manufacturing work in exchange for the $10 million. (*Id.* at 2363.)

Finally, in the interest of thoroughness, before closing, the Court will briefly address Allied's attempt to assert that the 2004 AIP has been superseded by the 2010 DSA. (*See* Doc. 146 at 5289-90.) Allied has not moved for summary judgment based on any argument that the 2010 DSA is now the *only* controlling contract. Allied has never before made this assertion-- notably, the assertion was not made in its opposition to U.S. Steel's earlier motion to dismiss, where both parties agreed that the 2010 DSA applied only to the claim asserted in Count VIII, a count that has been dismissed. The substance of Allied's argument with respect to U.S. Steel's second counterclaim is only that the 2004 AIP has been fulfilled by virtue of defendant's having satisfied the $63 million Profit/Gross Margin Commitment, not that it has been superseded by a different contract. The Court will not elevate into arguments Allied's mere passing remarks about the 2010 DSA.

That said, the 2010 DSA did not supersede Allied's obligations under the 2004 AIP. The 2010 DSA "supersede[d] prior Dismantling Services Agreements or Agreements in Principle[]" only "regarding the subject matter [of the 2010 DSA]." (2010 DSA [Doc. 59-9] at 1048-49, §4(F).) The "subject matter" of the 2010 DSA was "certain Dismantling Work and other services at all other [i.e., non-Fairless Works] [U.S. Steel] domestic facilities[.]" (*Id.* at 1037.)

For the reasons set forth above, summary judgment is **GRANTED** in favor of U.S. Steel with respect to Counterclaim II.

## IV. CONCLUSION

For the reasons set forth herein, and with the contract constructions set forth, the Court grants summary judgment in favor of U.S. Steel on Count VI of Allied's complaint and on its own Counterclaim II. Summary judgment is denied in all other respects.

**IT IS SO ORDERED**.

Dated: September 30, 2014

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**