**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **ALLIED ERECTING AND DISMANTLING CO., INC.,** | **Civil Action No. 4:12 CV 1390** |
| **Plaintiff,** | |
| **v.** | **JUDGE SARA LIOI** |
| **UNITED STATES STEEL CORPORATION,** | **MAGISTRATE JUDGE GEORGE J. LIMBERT** |
| **Defendant.** | |

---

**DEFENDANT UNITED STATES STEEL CORPORATION'S**
**MOTION TO EXCLUDE PURPORTED EXPERT TESTIMONY AND OPINIONS**
**OF ALLIED EXPERTS ED KLEIN, GORDON LINDQUIST, AND MARK GLEASON**

Pursuant to Federal Rule of Evidence 702, Defendant United States Steel Corporation moves to exclude the testimony and opinions of Plaintiff Allied Erecting and Dismantling Co., Inc.'s proffered experts Edward Klein, Gordon Lindquist, and Mark Gleason. The reasons for this motion are set forth in the attached Memorandum in Support.

Dated: November 26, 2014

Respectfully submitted,

s/ Michael R. Gladman
Michael R. Gladman
(Ohio Bar Registration No. 0059797)
E-mail:  mrgladman@jonesday.com
JONES DAY
Street Address:
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio  43215-2673
Mailing Address:
Post Office Box 165017
Columbus, Ohio  43216-5017

Telephone:  614.469.3939
Facsimile:  614.461.4198

Roy A. Powell
(admitted *pro hac vice*)
E-mail:  rapowell@jonesday.com
David M. Belczyk
(admitted *pro hac vice*)
E-mail: dbelczyk@jonesday.com
JONES DAY
500 Grant St., Suite 4500
Pittsburgh, Pennsylvania  15219-2514

Telephone:  412.391.3939
Facsimile:   412.394.7959

Timothy J. Cornetti
(admitted *pro hac vice*)
E-mail:  tjcornetti@uss.com
UNITED STATES STEEL
CORPORATION
600 Grant Street, Suite 1500
Pittsburgh, Pennsylvania  15219

Telephone:  412.433.992
Facsimile:   412.288.3063

*Counsel for Defendant*
*United States Steel Corporation*

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION & SUMMARY OF ARGUMENT ..................................................... 1

II.  LAW AND ARGUMENT ................................................................................ 2

    A.  This Court Is The Gatekeeper That Prevents Unqualified And Unreliable Opinions From Reaching The Fact-Finder ......................................... 2

    B.  Mr. Klein's Opinions On The Weight Of Ferrous And Non-Ferrous Scrap At Fairless Are Inadmissible Because He Utilized Unreliable Methods And Relied On Insufficient Facts And Data ......................................... 5

        1.  Mr. Klein's opinion about the weight of ferrous equipment at Sheet & Tin is guesswork insufficient to satisfy Rule 702 ................................. 6

        2.  Mr. Klein's repeated failure to independently verify the facts and data on which he relied also renders his opinions unreliable ..................... 9

    C.  Mr. Lindquist Is Not Qualified To Offer His Opinions Concerning Rail Length And Weight, And All Of His Opinions Are The Product Of Unreliable Methods And Insufficient Facts And Data ...................................... 13

        1.  Mr. Lindquist is unqualified to opine on the length and weight of rail at Fairless ............................................................................ 14

        2.  Mr. Lindquist's opinions regarding rail and non-ferrous scrap are unreliable ................................................................................ 15

    D.  Allied's Damages Expert Mark Gleason's Opinions Are Inadmissible Because He Unreasonably Relied On Unverified Data Outside His Expertise, Misapplied The Methodologies He Purported To Use, And Incorporated Inadmissible Opinions From Messrs. Klein And Lindquist .......... 21

        1.  Mr. Gleason's opinion on delay damages under Count III should be excluded because it rests on unverified factual assumptions he is unqualified to assess .................................................................. 22

        2.  Mr. Gleason's opinion on disruption damages under Count III is inadmissible because he misapplied the "Measured Mile" approach ...... 26

        3.  Mr. Gleason's damages opinions for Counts IV and V rest on the inadmissible expert opinions of Messrs. Klein And Lindquist, his faulty measured-mile analysis, and his failure to adhere to the contractual damage calculation he applies .............................................. 34

        4.  Mr. Gleason's opinion on Counts I and II related to basement work is unreliable because it improperly included income Allied is not entitled to and double-counted damages ................................................. 37

III.  CONCLUSION ....................................................................................... 38

## TABLE OF AUTHORITIES

**Page**

CASES

*Antioch Co. Litig. Trust v. Morgan*,
 No. 3:10-cv-156, 2014 U.S. Dist. LEXIS 47740 (S.D. Ohio Apr. 7, 2014).................9, 16, 18

*Ashland Hosp. Corp. v. Affiliated FM Ins. Co.*,
 No. 11-16-DLB-EBA, 2013 U.S. Dist. LEXIS 88068 (E.D. Ky. June 25,
 2013) .......................................................................................................................8, 25, 36

*Berry v. City of Detroit*,
 25 F.3d 1342 (6th Cir. 1994) .....................................................................................3, 26, 32

*Contract Mgmt., Inc v. Babcock & Wilson Tech. Servs. Y-12, LLC*,
 2013 U.S. Dist. LEXIS 1673 (E.D. Tenn. Jan. 4, 2013).........................................................33

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993)........................................................................................................ passim

*Dura Auto. Systs. of Ind., Inc. v. Excel Corp.*,
 285 F.3d 609 ..................................................................................................24, 32, 34, 35

*In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*,
 No. 1:08-wp-65000, 2014 U.S. Dist. LEXIS 141303 ..........................................24, 32, 34, 35

*Info-Hold, Inc. v. Muzak, LLC*,
 No. 1:11-cv-283, 2013 U.S. Dist. LEXIS 117953 (S.D. Ohio Aug. 20, 2013) .............. passim

*James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt. LLC*,
 No. 5:11-374-DCR, 2014 U.S. Dist. LEXIS 59689 (E.D. Ky. April 30, 2014) ..........16, 18, 20

*JMJ Enters., Inc. v. Via Veneto Italian Ice., Inc.*,
 No. 97-cv-0652, 1998 U.S. Dist. LEXIS 5098 (E.D. Pa. Apr. 15, 1998)...................26, 36, 37

*Kit-San-Azusa, J.V. v. U.S.*,
 32 Fed. Cl. 647 (Ct. Cl. 1995)...............................................................................................28

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137 (1999)................................................................................................................3

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
   387 F. Supp. 2d 794 (N.D. Ill. 2005) ........................................................24, 32, 34

*Nelson v. Tenn. Gas. Pipeline Co.*,
   243 F.3d. 244 (6th Cir. 2001) ...................................................................................4

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
   No. 5:08-cv-2632, 2010 U.S. Dist. LEXIS 65564 (N.D. Ohio July 1, 2010)
   *aff'd Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521 (6th Cir.
   2012) ................................................................................................................ passim

*P.W. Const., Inc. v. U.S.*,
   53 Fed. Appx. 555 (Fed. Cir. 2002)...............................................................28, 30, 33

*Southern Comfort Builders, Inc. v. U.S.*,
   67 Fed. Cl. 124 (Ct. Cl. 2005)...........................................................................28, 33

*Tamraz v. Lincoln Electric Co.*,
   620 F.3d 665 (6th Cir. 2010) ...................................................................................4

*TK-7 Corp. v. Estate of Ihsan Barbouti*,
   993 F.2d 722 (10th Cir. 1993) ...............................................................................23

*Tovey v. Nike, Inc.*,
   No. 1:12-cv-0448, 2014 U.S. Dist. LEXIS 93905 (N.D. Ohio April 2, 2014) ...............8, 9, 18

*U.S. ex rel. Greenmoor, Inc. v. Travelers Cas. and Sur. Co. of America*,
   No. 06-cv-0234, Doc. 123........................................................................................29, 33

*U.S. v. Blake Const. Co., Inc.*,
   671 F.2d 539 (D.C. Cir. 1982) ................................................................................28

**OTHER AUTHORITIES**

Federal Rule of Evidence 702 ................................................................................ passim

Federal Rule of Evidence 703 ......................................................................................23

Bruner and O'Connor on Construction Law, § 15.116 (2014) ...............................27, 28

Cushman, et al, Proving and Pricing Construction Claims, §3.07[C] (2013 Supplement)........... 29

Cushman, et al, Proving and Pricing Construction Claims, §3.07[C] (2001)..............................29

Schwartzkopf, Calculating Damages for Lost Productivity, §10.06 (2004).................................29

## STATEMENT OF ISSUES PRESENTED

I.      WHETHER MR. KLEIN'S OPINIONS ON THE WEIGHT OF FERROUS AND NON-FERROUS SCRAP AT FAIRLESS ARE INADMISSIBLE WHEN THEY (A) ARE BASED ON CONJECTURE WITHOUT ANY IDENTIFIABLE OR REPEATABLE METHOD, AND (B) RELY UPON FACTS AND DATA FROM THIRD PARTIES AND UNKNOWN SOURCES THAT HE DID NOT VERIFY.

II.     WHETHER MR. LINDQUIST'S OPINIONS CONCERNING THE LENGTH AND WEIGHT OF RAIL AT FAIRLESS ARE INADMISSIBLE WHEN HE (A) UTILIZED A GOOGLE POINT-AND-CLICK TOOL OF UNKNOWN ACCURACY TO "MEASURE" THE RAIL, (B) RELIED UPON A PAGE TORN FROM AN UNIDENTIFIED BOOK TO "WEIGH" THE RAIL, AND (C) RELIED ON UNVERIFIED STATEMENTS OF THIRD PARTIES AND AMBIGUOUS EXPERIENCE TO "CALCULATE" THE COST TO REMOVE RAIL AND NON-FERROUS SCRAP FROM FAIRLESS.

III.    WHETHER MR. GLEASON'S OPINIONS CONCERNING ALLIED'S PURPORTED DAMAGES ARE INADMISSIBLE WHEN HE (A) RELIED ON ALLIED'S UNVERIFIED ASSUMPTION THAT ANY DELAY SHOULD BE ATTRIBUTED TO U. S. STEEL TO THE EXCLUSION OF ALL OTHER SOURCES, (B) MISAPPLIED THE "MEASURED MILE" APPROACH TO DISRUPTION DAMAGES BY COMPARING PROJECTS THAT ARE DISSIMILAR, (C) RELIED ON THE INADMISSIBLE EXPERT OPINIONS OF MESSRS. KLEIN AND LINDQUIST TO CALCULATE ALLIED'S DAMAGES FOR FACILITIES "REMOVED" AND REMAINING TRACK AND NON-FERROUS SCRAP, AND (D) DOUBLE-COUNTED ALLIED'S ALLEGED DAMAGES PERTAINING TO BASEMENT WORK.

<u>**MEMORANDUM IN SUPPORT**</u>

**I.      INTRODUCTION & SUMMARY OF ARGUMENT**

Defendant United States Steel Corporation ("U. S. Steel") moves to exclude the testimony and opinions of Plaintiff Allied Erecting and Dismantling Co.'s ("Allied") proffered experts Edward Klein, Gordon Lindquist, and Mark Gleason, which all fail to meet the standards for admissibility set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  Specifically, the record demonstrates that the experts intend to offer opinions that they are not qualified to present and that are not reliable.

Mr. Klein's opinions regarding the weight of ferrous and non-ferrous scrap remaining at Fairless should be excluded because he utilized unreliable methods and repeatedly failed to independently verify the facts and data on which he relied.  For example, his opinion as to the weight of remaining ferrous equipment was based on a flashlight-aided walkthrough of Fairless's basements at a time when he did not expect to have any role in calculating Allied's damages.  Mr. Klein did not attempt to calculate the actual weight of any equipment but merely "sized up" its weight.  Seven months later, when he learned that he was to be proffered as an expert on these topics, he did nothing to supplement his original conjecture.  Rule 702 and *Daubert* require the exclusion of such guesswork.

Mr. Lindquist's opinions regarding the length and weight of rail remaining at Fairless should be excluded because he is unqualified to offer those opinions and utilized unreliable methods to perform his calculations.  More specifically, Mr. Lindquist used a Google point-and-click tool (that he had never used before) to estimate the length of rail remaining at Fairless, but he could not explain how it worked or its level of accuracy, and he kept no printouts of his results.  And to estimate the weight of that rail, Mr. Lindquist used a page torn from an unknown

1

book that he could not identify (by title, author, or date of publication).  Mr. Lindquist's amateurish attempts to offer expert opinions should be rejected.

Mr. Gleason's testimony regarding Allied's damages should be excluded because he relied on unverified data outside his expertise, misapplied the methods he purported to use, and incorporated inadmissible opinions from Allied's other purported experts.  For instance, Mr. Gleason's opinion regarding Allied's delay damages rests entirely on the unverified assumption that Allied was capable of demolishing Sheet & Tin in three years, even though he admitted that he has not (and could not) do a schedule analysis.  Moreover, Mr. Gleason's application of the "Measured Mile" approach to Allied's claimed disruption damages is fatally flawed because it does not compare Allied's productivity for "identical activities" on two substantially similar phases of the same project, but, instead, compares Allied's work on two vastly different projects. For similar reasons, Mr. Gleason's prior attempt to opine on Measured Mile damages was excluded by another court.  Finally, Mr. Gleason's reliance on the inadmissible Klein and Lindquist opinions to calculate Allied's damages for "removed" facilities and remaining scrap and track renders his opinions inadmissible as well.

## II.     LAW AND ARGUMENT

### A.     This Court Is The Gatekeeper That Prevents Unqualified And Unreliable Opinions From Reaching The Fact-Finder.

Expert evidence, as the Supreme Court has noted, "can be both powerful and quite misleading because of the difficulty in evaluating it."  *Daubert*, 509 U.S. at 595.  For this reason, federal district courts are charged with a gate keeping function to exclude evidence that does not meet the standards of reliability under Rule 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise, if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

> understand the evidence or to determine a fact in issue; (b) the
> testimony is based upon sufficient facts or data; (c) the testimony
> is the product of reliable principles and methods, and (d) the expert
> has reliably applied the principles and methods to the facts of the
> case.

Fed. R. Evid. 702.  This standard applies to all expert testimony, not just scientific testimony.

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (explaining that Rule 702 makes "no

relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized'

knowledge").

Thus, Rule 702 may be summarized by its three core requirements: (1) that the witness be

*qualified*; (2) that the witness's testimony must be *relevant*; and (3) that the witness's testimony

be *reliable*.  *See Newell Rubbermaid, Inc. v. Raymond Corp.*, No. 5:08-cv-2632, 2010 U.S. Dist.

LEXIS 65564, *9-10 (N.D. Ohio July 1, 2010) *aff'd Newell Rubbermaid, Inc. v. Raymond Corp.*,

676 F.3d 521 (6th Cir. 2012).

Regarding qualifications, the test is whether the expert's knowledge, skill, experience,

training, or education "provide a foundation for a witness to answer a specific question."  *Berry v.

City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) (excluding expert as unqualified where no

foundation was laid to demonstrate how expert's training and experience were related to the

opinions he offered); *Newell Rubbermaid, Inc.*, 2010 U.S. Dist. LEXIS 65564 at *15-16 (holding

that expert's training and qualifications did not relate to the subject matter on which he opined).

Presuming the proffered opinion is relevant to matters at issue in the litigation, the inquiry turns

to whether the expert's testimony is reliable.

Rule 702 breaks down the reliability element into a three-part inquiry.  First, is the

expert's opinion based upon sufficient facts and data?  Second, is the testimony the product of

reliable principles and methods?  Third, has the expert reliably applied those principles and

methods?  In assessing the reliability of the principles and methods utilized, courts in this Circuit

rely upon the non-exclusive list of factors set forth by the Supreme Court in *Daubert*: (1) whether the expert's theory or technique has been tested or is testable; (2) whether the theory or technique has "been subjected to peer review and publication"; (3) the theory or technique's "known or potential rate of error"; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique has been accepted in the relevant discipline.  *See Daubert*, 509 U.S. 579 at 593-94 (1993).

These are flexible criteria that may be tailored or amended to meet the needs of a specific case.  *Newell Rubbermaid*, 676 F.3d at 527.  What is inflexible, however, is the requirement that the expert's opinion rest on a foundation of more than "subjective belief or unsupported speculation."  *Tamraz v. Lincoln Electric Co.*, 620 F.3d 665, 670 (6th Cir. 2010) (quoting *Daubert*, 509 U.S. at 590).  Mere hypotheses and guesswork are insufficient to meet Rule 702's standard of reliability.  *See id.*  Similarly, the expert may not rely blindly on facts and data provided by others.  *See Info-Hold, Inc. v. Muzak, LLC*, No. 1:11-cv-283, 2013 U.S. Dist. LEXIS 117953, *13-14 (S.D. Ohio Aug. 20, 2013) (excluding testimony of expert because he failed to verify accuracy of data provided to him by proffering party).

The "[r]ed flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc.*, 676 F.3d at 527.  Thus, "[a] district court is not required to admit expert testimony that is connected to the existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Nelson v. Tenn. Gas. Pipeline Co.*, 243 F.3d. 244, 254 (6th Cir. 2001) (quoting *General Electric, Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

As set forth below, Allied cannot meet its burden to establish the admissibility of the Klein, Lindquist, and Gleason expert testimony.  *Id.* at 251.

**B.      Mr. Klein's Opinions On The Weight Of Ferrous And Non-Ferrous Scrap At Fairless Are Inadmissible Because He Utilized Unreliable Methods And Relied On Insufficient Facts And Data.**

Allied offers Edward Klein, P.E., an employee of Allied since 2004, as an expert on the quantities of ferrous and non-ferrous materials at the Fairless Works that Allied alleges it is entitled to harvest as scrap.  (Allied's Jan. 6, 2014 Rule 26(a)(2)(C) Disclosure ("Jan. 6 Disclosure") at 1-3 (attached to Appendix I ("Appx. I") as Ex. A)); (Nov. 8, 2013 Klein Dep. ("Klein I Dep."), at 16:1-12 [Doc. 126-1] (excerpt attached to Appx. I as Ex. B); (May 2, 2014 Klein ("Klein II") Dep. at 10:6-8 (excerpt attached to Appx. I as Ex. C).)  Mr. Klein had no role in the demolition work at Fairless. (Klein I Dep. at 24:16-18; 26:8-10; 43:13-22; Klein II Dep. at 10:9-11; 13:13-15.)  He admittedly does not know anything about Allied's scrap collection efforts at Fairless, (Klein I Dep. at 38:17-25), and he doesn't know how scrap is valued.  (Klein II Dep. at 156:4-5.)  In fact, he is "not involved in the scrap end of the business at all." (*Id.* at 31:12-15; Klein I Dep. at 39:11-12.)

As late as November 8, 2013, when Mr. Klein was deposed as a fact witness, he thought that he had "no role in calculating Allied's scrap damages."  (Klein II Dep. at 31:16-18.)  Nevertheless, he was designated as an expert less than two months later.  *See* (Jan. 6 Disclosure.)  Moreover, Mr. Klein's quantifications of the ferrous and non-ferrous materials are essential components of the damages analysis prepared by Allied's accounting expert, Mr. Gleason, with respect to Counts IV (value of facilities "removed") and V (remaining non-ferrous scrap and rail).

Specifically, Mr. Klein offers opinions on the quantity of ferrous materials (equipment and structures) at the Sheet & Tin facility, as well as non-ferrous materials found at both Sheet &

Tin and at the Hot End of Fairless.  (Jan. 6 Disclosure 2-3.)[1]  He disclosed that his opinions are based exclusively on three inputs:  (i) observations he and others made while on a site visit at the Fairless Works; (ii) Allied's supposed "original estimate" of ferrous material at the Sheet & Tin facility; and (iii) analyses of electrical drawings.  (*Id*.)  Based on those inputs, Mr. Klein opines that there are 31,365 Gross Tons of ferrous scrap at Sheet & Tin, and 1,002,319.46 pounds of non-ferrous scrap available at Sheet & Tin and the Hot End.  (*Id*. at 1-3.)

Mr. Klein's opinions are inadmissible under Rule 702.  ***First***, Mr. Klein failed to professionally apply any credible method to his work, and, instead, engaged in a haphazard effort to construct his opinions out of fragmented notes, memories, and documents of unknown provenance and veracity.  The product of that effort is best described as guesswork—not a methodologically sound conclusion.  ***Second***, he repeatedly relied on statements or documents provided to him by Allied employees, including its President John Ramun, but he never engaged in any effort to independently verify the accuracy of those sources.  His failure to do so is further grounds to exclude his opinions.  *See Info-Hold, Inc.*, 2013 U.S. Dist. LEXIS 117953, *13-14 (excluding testimony of expert because he failed to verify accuracy of data provided to him by proffering party).  For these reasons, all of Mr. Klein's opinions should be excluded.

    **1.**    **Mr. Klein's opinion about the weight of ferrous equipment at Sheet & Tin is guesswork insufficient to satisfy Rule 702.**

Mr. Klein offers an opinion on the weight of ferrous equipment remaining at Sheet & Tin. (Jan. 6 Disclosure at 2.)  His opinion on the weight of this equipment derives from observations he and Allied employee Gordon Lindquist made during a walkthrough of Sheet & Tin between

---

[1] As the Court is likely aware, ferrous scrap contains iron, while non-ferrous scrap does not.  The vast majority of scrap at Fairless was ferrous (including equipment and structures), and the non-ferrous scrap consisted primarily of copper and lead found in components of the Fairless electrical system (including substations).

April 1 and 4, 2013—nearly seven months before he was asked to offer an opinion in this case. (Klein II Dep. at 13:22-14:8, 32:16-19, 96:15-20.)  At the time of the walkthrough, he didn't even know why he was doing it, and he had no idea it was for litigation purposes.  (*Id.* at 32:16-33:5; 33:21-34:1.)

The walkthrough of Sheet & Tin's basements was conducted in the dark by flashlight. (*Id.* at 97:18-19; 104:11-12.)  Mr. Klein did not take or record measurements for most of the equipment.  (*Id.* at 102:25-103:10.)  He simply "sized up" tunnels filled with pipes, valves, and miscellaneous equipment.  (*Id.* at 95:5-23.)  He also admitted that—rather than take measurements—he simply "sized up" other pieces of equipment.  (*Id.* at 102:16-24.)  For example, Mr. Klein surveyed a whole bay of machining equipment, that he "didn't go through," and "sized up" a weight of 120 tons.  (*Id.* at 104:24-106:6.)  Mr. Klein admits that his approach was not a calculation.  (*Id.* at 98:14-15.)  Mr. Klein's colleague, Gordon Lindquist, also confirmed that Mr. Klein's methods were so rough that all the "calculations" could be done "in your head."  (May 1, 2014 Lindquist Dep. ("Lindquist II") at 14:16-15:10 (attached to Appx. I as Ex. D).)

Mr. Klein testified to the scantiness of his walkthrough at his November 2013 deposition, seven months after the walkthrough but before he was proffered as an expert.  According to that testimony, Mr. Klein heard people talk about the scrap being in the basements, he saw it when he was there, and "that's about it." (Klein I Dep. at 50:18-52:15.)  In November 2013, Mr. Klein said nothing about making any estimate.  In fact, he was of the opinion that he had ***no role*** in calculating Allied's scrap damages, (*Id*. at 208:19-21), and he testified he had not done ***any*** calculations related to Allied's alleged damages.  (*Id.* at 208:22-5; Klein II Dep. at 31:19-22.)

All of Mr. Klein's notes on equipment weights from his April 2013 walkthrough of Sheet & Tin are set forth in Deposition Exhibit ("Dep. Ex.") 421 (attached to Appx. I as Ex. E).  (Klein II Dep. at 87:19-88:15.)  The notes consist of line after line with hundreds of tons in estimated weight with no measurements, no calculations, and no supporting evidence.  These notes demonstrate that Mr. Klein employed mere guesswork and assumption, not rigorous analysis, to arrive at his opinion.  Mr. Klein's failure "to fully articulate the steps" in his analysis, either in his report or deposition, provides no "evidence from which [the] Court can determine whether [his] conclusion" on the weight of the equipment at Sheet & Tin is the product of reliable principles and methods or whether such principles and methods were reliably applied to the facts of this case.  *Tovey v. Nike, Inc.*, No. 1:12-cv-0448, 2014 U.S. Dist. LEXIS 93905,*19-21 (N.D. Ohio April 2, 2014).

Mr. Klein applied no discernible or repeatable method to observing, charting, and calculating the weight of the equipment in the Sheet & Tin basements.  Instead, Mr. Klein relies on his ambiguous engineering "experience" as the basis for his conclusions.  (Klein II Dep. at 19:25-20:13.)  *See Ashland Hosp. Corp. v. Affiliated FM Ins. Co.*, No. 11-16-DLB-EBA, 2013 U.S. Dist. LEXIS 88068, *32 (E.D. Ky. June 25, 2013) (excluding expert whose sole methodology was reliance on his years of experience but who failed to "validate [his] conclusion through rigorous investigation" as "experience cannot substitute for a tested, and testable methodology."); *Tovey*, 2014 U.S. Dist. LEXIS 93905 at *19-21 (excluding testimony of expert who failed to "identify any methodology" used in forming opinions, and relied, instead, exclusively on her experience).  As the Advisory Committee notes to Rule 702 state, however, "[i]f the witness is relying solely or primarily on experience then the witness must explain how that experience relates to the conclusion reached, why that experience is a sufficient basis for the

opinion, and how that experience is reliably applied to the facts." Fed. R. Evidence 702, Advisory Committee Notes, 2000 Amendments; *see also Tovey.*, 2014 U.S. Dist. LEXIS 93905 at *19-21.

Mr. Klein's walkthrough of a dark basement, more than seven months before he had any role in calculating damages, and during which he guessed the weight of equipment that he (or others) observed, is not a reliable methodology on which to base his opinion.

### 2. Mr. Klein's repeated failure to independently verify the facts and data on which he relied also renders his opinions unreliable.

All Mr. Klein's opinions are infected by his unquestioning reliance on facts or data he failed to independently verify or assess for accuracy. Rule 702 requires that an expert's opinion be based on independent analysis and objective proof. *Info-Hold, Inc.*, 2013 U.S. Dist. LEXIS 117953 at *1 (citation omitted); *see also Antioch Co. Litig. Trust v. Morgan*, No. 3:10-cv-156, 2014 U.S. Dist. LEXIS 47740, *13 (S.D. Ohio Apr. 7, 2014). As one court recently held in excluding testimony under Rule 702, the failure of an expert to "independently verify anything that Plaintiff's CEO or Plaintiff's counsel told him" made his opinion "more advocacy than expert testimony." *Info-Hold, Inc.*, 2013 U.S. Dist. LEXIS 117953 at *13.

Thus, it is insufficient for an expert to rely without verification on the word of the party's employees or counsel for information "crucial to his opinions." *Id.* (excluding damages expert who relied "entirely on the numbers provided in the report" of a different expert because he did not independently verify the information underlying the other expert's report); *see also Newell Rubbermaid, Inc.,* 2010 U.S. Dist. LEXIS 65564 at *20-21 (finding expert's methodology for establishing the existence of a product defect unsound where he did not "question[] or verify[] the data" on accident rates that he relied on to reach his opinion).

> (a)     **Mr. Klein's opinion about the weight of structures at Sheet &
> Tin is inadmissible because Mr. Klein relied on unverified
> estimates of unknown provenance.**

Mr. Klein's opinion on the weight of the remaining structures at Sheet & Tin derives

from sources he did not verify, and is, therefore, unreliable and inadmissible.  Mr. Klein's

opinion on structure tonnage for Sheet & Tin comes from a document Mr. Klein identified as

"Allied's original estimate."  (Jan. 6 Disclosure at 2; *see also* Klein II Dep. at 47:17-48:1.)  The

reliability and authenticity of this supposed "estimate," however, are dubious, and Mr. Klein did

nothing to verify its accuracy.

Mr. Klein did not know when the supposed estimate was done.  (Klein II Dep. at 46:13-

14, 48:1-4.)  Nor did he know with any certainty who authored it.  Mr. Klein speculated that

Mike Ramun, John Ramun's brother and former business partner, created it.  (*Id.* at 46:11-12.)

Mike Ramun testified, however, that he did not recall any cost or other estimates.  (Dec. 23, 2013

Michael Ramun Dep. at 138:12-19 [Doc 129-1] (excerpt attached to Appx. I as Ex. F)  Nor did

Mr. Klein know how he came to possess it.  (Klein II Dep. at 68:1-69:3.)  Furthermore, he did

nothing to authenticate the estimate, or to determine that the weights he was given were in fact

an actual, original estimate.  (Klein II Dep. at 69:4-70:14, 70:15-72:1.)  Mr. Klein's failures are

particularly troubling, given that Allied's President testified that Allied did not undertake any

cost estimate before commencing the dismantling of Sheet and Tin.  (Dec. 18, 2013 John Ramun

Dep. at 175:13-20 [Doc.128-1] (excerpt attached to Appx. I as Ex. G).)  Moreover, the estimate

used by Mr. Klein, (Dep. Ex. 418 (attached to Appx. I as Ex. H).), is dated November 2011,

strongly suggesting that Mr. Klein adopted numbers that were far from "original" but were

instead prepared for claiming damages in this litigation.

Because he relied on this dubious estimate, Mr. Klein did not calculate the actual weight

of any of the remaining structures at Sheet & Tin.  (Klein II Dep. at 51:15-52:1.)  Moreover, the

estimate identified a weight-per-square-foot ratio for buildings at Sheet & Tin, but Mr. Klein did nothing to verify those ratios.  (*Id.* at 72:16-78:13.)  During his April 2014 walkthrough, Mr. Klein only determined what buildings were still standing and did not undertake any calculations of quantity or weight.  (*Id.* at 40:16-41:2.)  He didn't go in all the structures.  (*Id.* at 74:6-75:7.)  He didn't even have the estimate with him during his walkthrough.  (*Id.* at 67:2-3, 76:4-12.)  His notes from the walkthrough, (Dep. Ex. 422 (attached to Appx. I as Ex. I)), show the extent of what he did—simply highlight what buildings were there, nothing more.  (Klein II Dep. at 88:24-90:1.)

In sum, Mr. Klein did ***nothing*** to verify the accuracy "Allied's Original Estimate"—the sole source for his opinion on the structure tonnage at Sheet & Tin.  Nonetheless, he accepted this estimate—prepared by unknown Allied employee, using an unknown method, and at an unknown time—without question or further inquiry.  His blind reliance on this unverified document is an improper foundation for his opinion.  *See Info-Hold, Inc.*, 2013 U.S. Dist. LEXIS 117953 at *13; *see also Newell Rubbermaid, Inc.,* 2010 U.S. Dist. LEXIS 65564 at *20-21.

> **(b)   Mr. Klein did not verify his estimate of remaining non-ferrous material against actual site conditions.**

Mr. Klein's failure to independently verify the data sources on which he relied extends to his opinion about the amount of copper wire remaining at Fairless.  Mr. Klein's conclusions about this non-ferrous material are based on electrical drawings.  (Jan. 6 Disclosure at 3.)  To estimate non-ferrous weights, he determined the length of wire shown on site drawings and multiplied that length by weight-per-length metrics for given types of wire.  (Klein II Dep. at 130:5-9.)

Mr. Klein did not verify that the conditions at Fairless actually matched the drawings he used.  (*Id.* at 130:10-131:7.)  At best, he noticed certain electrical elements during his April 2013

-11-

walkthrough, (Klein II Dep. at 130:10-131:7); otherwise, his volume estimate is based "purely" on the drawings.  (*Id.* at 133:5-134:1).  But Mr. Klein did not have, and did not review, any electrical drawings during his walkthrough.  (*Id.* at 131:8-11.)  At the time of the walkthrough, he was not, in fact, looking for non-ferrous materials.  (*Id*. at 132:5-11.)  And he did not return to Fairless to examine the condition or existence of any non-ferrous material after learning he would offer an expert opinion in this case.  (*Id.* at 131:12-15.)

Mr. Klein admitted that he would have to open up manholes at Fairless to assess whether any of the wires were actually there, and he admitted he did not do so.  (*Id.* at 137:4-19.) Moreover, Mr. Klein did not take into the account the condition of any non-ferrous material, and thus cannot know what effect the condition of the material would have on his estimates.  (*Id.* at 155:15-18; 156:23-157:9.)

Similarly, Mr. Klein calculated the weight of lead jackets on the copper wire using unverified numbers given to him, again, by Allied President John Ramun.  (*Id*. at 142:15-145:4.) To calculate the weight of lead jacket, he applied a ratio of lead to copper composition of the wires.  (*Id.* at 142:15-145:4.)  But Mr. Klein did not determine that ratio or verify it in any way— he simply accepted Mr. Ramun's numbers at face value.  (*Id*.)

Mr. Klein's opinion derives from sources he made no effort to verify.  Mr. Klein's only attempt to verify the accuracy of the site drawings was to rely on his ***memory*** of seeing some (but not nearly all) electrical elements at Fairless during a walkthrough he conducted by flashlight ***seven-months before*** he reviewed the drawings to render his opinion.  Mr. Klein's method lacked any indicia of rigorous, professional analysis.  *See Newell Rubbermaid, Inc.*, 2010 U.S. Dist. LEXIS 65564 at \*27.  Instead, he abdicated professional judgment and relied on Allied's documents and representations that he did not test for accuracy or verify.

Mr. Klein's opinions and testimony should be excluded in their entirety.  His lack of any reliable methodology and complete (and unverified) reliance on Allied for critical components of his opinions fails to meet the requirements of Rule 702.

**C.    Mr. Lindquist Is Not Qualified To Offer His Opinions Concerning Rail Length And Weight, And All Of His Opinions Are The Product Of Unreliable Methods And Insufficient Facts And Data.**

Allied proffers Gordon Lindquist, another longtime Allied employee, as an expert on: (i) the length and weight of remaining rail at Fairless that Allied alleges it is entitled to remove; (ii) the length and weight of rail Allied claims was "wrongfully" removed by U. S. Steel or third parties; and (iii) the cost Allied would incur to remove the remaining underground non-ferrous scrap at Fairless.  (Jan. 6 Disclosure at 3-5.)  Like Mr. Klein's opinions, Mr. Lindquist's opinions are necessary components of the damage analysis performed by Allied's damages expert Mr. Mark Gleason.  (Jan. 6, 2014 Gleason Report ("Gleason Rpt.") at 43 (filed under seal, attached to Appendix II ("Appx. II") as Ex. A2).)

Mr. Lindquist's opinions are inadmissible because he opines on matters where he lacks any knowledge—whether from education, training, or experience—and therefore, fails to meet the requirement that he be qualified to offer such opinions.  Moreover, Mr. Lindquist failed to apply any reliable methodology to his work, relying, for example, on Google maps, a page torn from an unknown book, and an unsubstantiated "industry standard."  Finally, Mr. Lindquist's opinions are derived from insufficient facts and data, including hearsay statements of unknown individuals made at undetermined times to other Allied employees.  For these reasons, all of Mr. Lindquist's opinions should be excluded.

### 1. Mr. Lindquist is unqualified to opine on the length and weight of rail at Fairless.

Mr. Lindquist has no engineering or college degree associated with the testimony he offers.  (Lindquist II at 17:16-21.)  He has never built rail tracks.  (*Id*. at 64:3-4.)  His professional training is limited to asbestos removal, hazmat removal, OSHA, and mine safety, which have no bearing on his opinions in this case.  (Nov. 11, 2013 Lindquist Dep. ("Lindquist I") at 17:11-14 (attached as to Appx. I as Ex. J).)  He has never been qualified as an expert on any subject matter before, and he has never testified in any proceeding as an expert witness.  (Lindquist II Dep. at 5:13-25.)  Indeed, Mr. Lindquist readily admits that his sole qualification to offer expert testimony in this case is his ambiguous experience working in demolition.  (*Id*. at 17:22-18:20.)

Though Rule 702 permits testimony from experts based on their experience, the "witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments.  At his deposition, Mr. Lindquist could not do so.  Rather, when counsel for U. S. Steel pressed him to explain how his specific work experience related to his opinions concerning rail weight and removal in this case, Mr. Lindquist was evasive and vague.  (Lindquist II Dep. at 69:23-71:6) (testifying that only data supporting his rail removal opinions were " in [his] head").

While professional experience may serve as a proper basis to offer expert testimony, Mr. Lindquist failed to establish that anything in his experience qualified him to testify about the length and weight of railroad track at Fairless.

>  **2.**  **Mr. Lindquist's opinions regarding rail and non-ferrous scrap are unreliable.**
>
>  **(a)**  **Mr. Lindquist's internet measurements of remaining rail fail to meet Rule 702's standard for reliability.**

Mr. Lindquist testified at his deposition that he determined the length of remaining track at Fairless by using a tool on Google, which he claimed allowed a user to "click" on a length of track to retrieve an estimated length.  (Lindquist II Dep. at 56:15-57:3, 58:8-19, 101:5-102:23, 104:8-105:4.)  Mr. Lindquist has ***never*** used this internet method before in any other circumstance to measure lengths of railroad track.  (*Id.* at 106:24-107:3.)  He does not know how it works or its level of accuracy.  (*Id.* at 107:17-19; 108:1-5.)  Moreover, he kept no printouts of his online results, (*Id.* at 104:23-106:9), eliminating the chance to test the repeatability of his opinions.  He never compared the online estimates against scaled drawings, or conducted a physical confirmation of the results by spot-measuring lengths of rail.  (*Id.* at 103:2-8, 108:6-8.)  And, to be sure, neither he nor anyone else from Allied ever actually measured the remaining rail track, notwithstanding the fact they were continually at Fairless for a decade.  (*Id.* at 82:3-13.)

Mr. Lindquist's method of measuring rail using Google is unreliable under Rule 702.  Applying the *Daubert* factors, Mr. Lindquist has not offered any support to show that this method of measuring the length of rail has been tested, has been subject to peer review, has an acceptable error rate, utilizes appropriate standards, or has been accepted by other demolition or rail professionals.  *See Daubert*, 509 U.S. at 593-94.  In fact, he testified that he never used this method to measure the length of rail lines prior to offering testimony in this litigation. (Lindquist II Dep. at 106:24-107:3).  S*ee Newell Rubbermaid, Inc.*, 676 F.3d at 527 (noting that opinion developed solely for litigation is grounds for exclusion).

Simply stated, Mr. Lindquist has no knowledge of how Google's measurement tool works, how it performs measurements, or its accuracy in measuring lengths of rail.  Thus, Mr.

Lindquist's unquestioning reliance on Google's measurements demonstrate a lack of professional rigor in his analysis that fatally undermines its reliability.  *See Newell Rubbermaid, Inc.*, 2010 U.S. Dist. LEXIS 65564 at *16.

> **(b)** **Mr. Lindquist's rail weight calculations are unreliable because he used a page torn from an old and unknown book.**

Embedded in Mr. Lindquist's opinion on the total weight of remaining rail at Fairless are estimates of the weight of a variety of rail components.  He estimated the number of items such as tie plates, spikes, splice bars, and switches, by totaling the number of these components that he believes are used per mile of rail line.  (Lindquist II Dep. at 60:15-62:6.)  He did not take any representative sampling along rail lines at Fairless to confirm that belief.  (*Id.* at 62:7-14, 63:22-25.)

Instead, he relied on weights assigned to rail components found on a single page taken from a book—the full text of which Mr. Lindquist does not possess.  (*Id.* at 62:7-64:9.)  In fact, he does not know the title, authorship or the date on which the book was published.  (*Id.*)  He testified that he got the one-and-only page of the book that he relied on "a long time ago," and he may not even have that page any more.  (*Id.*)

Thus, Mr. Lindquist's opinion is based on an unverified, hearsay source, which he cannot identify or locate, and which U. S. Steel cannot test.  His analysis of component part weights is devoid of any independent analysis or verification that would indicate he applied sound, professional methods in reaching his opinion. *See Info-Hold, Inc.*, 2013 U.S. Dist. LEXIS 117953 at *13; *see also Newell Rubbermaid, Inc.,* 2010 U.S. Dist. LEXIS 65564 at *20-21; *Antioch Co. Litig. Trust,* 2014 U.S. Dist. LEXIS 47740 at *13; *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt. LLC,* No. 5:11-374-DCR, 2014 U.S. Dist. LEXIS 59689, *22-23 (E.D. Ky. April 30, 2014).

**(c)**     **Mr. Lindquist's opinion on the man-hours required to remove rail is inadmissible because he relied on unverified hearsay statements and performed no independent analysis.**

Mr. Lindquist opines not only on the length and weight of remaining rail at Fairless but also the man hours needed to recover it.  (Jan. 6 Disclosure at 3.)  His opinion is inadmissible because he relied on hearsay statements of unknown persons and entities to arrive at his estimate. In other words, he has no basis in any verifiable facts or data to opine about the length of time required to remove the remaining rail from Fairless.

Specifically, Mr. Lindquist estimates that the remaining rail at Fairless can be removed at a rate of two-miles per day, based upon a purported "industry standard" he never independently tested or confirmed.  (Lindquist II Dep. at 67:7-70:2.)[2]    When asked to provide the source for his "industry standard" at his deposition,  Mr. Lindquist stated, first, that he "thinks" a company called Fox might have removed rail at two miles a day while working at Fairless.  (*Id*.)  Second, he claimed that, his employer, John Ramun, called a rail company, which Mr. Lindquist "think[s]" but is "not sure" was called Foster, and according to John Ramun, an unidentified person at Foster said that Foster removes two miles of rail per day.  (*Id*.)  Lindquist had no personal contact with this company.  (*Id*.)

While Mr. Lindquist also claimed to rely on his personal experience removing rail, he could not provide any specific examples of that experience when deposed.  (Lindquist II Dep. at 69:23-71:6.)  Further, he did not keep any data records of his unidentified prior work, and claimed that all his productivity data was "in [his] head."  (*Id*.)  Mr. Lindquist did not compare his "personal experience" to any actual man-hour figures for prior rail removal by Allied at Fairless.  (*Id.* at 65:14-66:8, 71:2-6.)  Mr. Lindquist's mere incantation of his "experience,"

---

[2] Mr. Lindquist provided no citation to any such "industry standard" in his expert disclosure.

without more specific guidance as to how that experience relates to the facts of this case or supports his opinions is not enough survive scrutiny under Rule 702.  *See Tovey*, 2014 U.S. Dist. LEXIS 93905 at *19-21 (excluding expert who relied on experience because she failed to "articulate the steps in her analysis").

Thus, the only specifically identified sources for his opinion on man hours to remove rail are the hearsay statements of unknown persons and entities.  (Lindquist II Dep. at 67:7-70:2.)  In at least one instance he relied on ***double hearsay***—as it was a statement made by an unknown person, working for an unknown entity, to his boss John Ramun, who then relayed it to Mr. Lindquist.  (*Id*.)  Mr. Lindquist cannot attest to the veracity and accuracy of the "industry standard" he relies on because he did nothing to confirm it.  *See Antioch Co. Litig. Trust*, 2014 U.S. Dist. LEXIS 44740, *13 (stating "while an expert can rely upon hearsay, s/he cannot do so blindly without independently confirming its reliability").  His opinion amounts to nothing more than restating representations Mr. Ramun and other unknown persons made to him.  *See James T. Scatuorchio Racing Stable, LLC* , 2014 U.S. Dist. LEXIS 59689, at *22-23(excluding testimony of expert who relied on statements of defendant's president for "90%" of his opinion); *Newell Rubbermaid, Inc.*, 2010 U.S. Dist. LEXIS 65564 at *30 (finding lack of reliability where expert relied on, among other things, hearsay statements and anecdotal information).

**(d)     Mr. Lindquist's opinion on the time and cost to remove non-ferrous scrap is unreliable.**

Mr. Lindquist's opinion on the time and cost to remove underground non-ferrous materials should be excluded because his calculation methods lacked any professional rigor and are unreliable.  *See* (Jan. 6 Disclosure at 4; Lindquist II Dep. at 6:24-7:4.)

### (i)  Time to remove non-ferrous scrap.

Relying on Mr. Klein's flawed non-ferrous weight "calculations," Mr. Lindquist estimated the time to remove that non-ferrous material based on the number of manholes allowing access to the wire, and the time required to recover wire from each manhole. (Lindquist II Dep. at 16:6-17:4, 22:19-23:4.)  To determine the required days of work per manhole, Mr. Lindquist again relied on his ambiguous "past experience."  (*Id.* at 43:6-44:20.)

However, he never reviewed any records of Allied's actual labor and equipment hours for similar prior work.  (*Id.* at 43:6-45:16.)  In fact, Allied had previously done comparable work at Fairless, yet Mr. Lindquist ignored Allied's time or cost data for that work when he prepared his opinion.  (*Id.* at 44:21-45:16, 46:21-23.)  He simply calculated "what [he] figured [he] needed to do the job," without any more specific reasoning.  (*Id.* at 49:5-11.)  He did not undertake any investigation or analysis of any specific manhole, to spot-check his opinions.  (*Id.* at 47:2-48:4.)  Nor did he consider the volume of wire to be removed from any particular manhole.  (*Id.*)  Rather, he merely applied the exact same days of work for all the manholes identified to him by Mr. Klein.  (*Id.* at 47:2-48:4.)

Mr. Lindquist's opinion on the labor time required to remove non-ferrous materials from Fairless is *ipse dixit*—it is what he says it is.  Though Allied had ***actual*** data on labor times for removal of non-ferrous materials at Fairless, Mr. Lindquist chose, instead, to rely solely on subjective and anecdotal data of "what [he] figured [he] needed to get the job done."  *See Newell Rubbermaid, Inc.*, 676 F.3d at 527.  Thus, his "method" to determine the labor hours needed to remove non-ferrous wire was nothing more than gut-instinct and guesswork, as he "took no steps that would show professional rigor in" his assessment.  *Newell Rubbermaid, Inc.*, 2010 U.S. Dist. LEXIS 65564 at *27.

**(ii)    Cost to remove non-ferrous scrap.**

In his expert disclosure, Mr. Lindquist's purported to opine that it would cost

$169,155.76 to remove the remaining non-ferrous wires at Fairless, (Jan. 6 Disclosure at 5, Ex.

A), but, at his deposition, Mr. Lindquist admitted he did not actually perform the calculation

underlying that opinion.  (Lindquist II Dep. at 51:13-52:15.)  In fact, he testified that he only

prepared the man-hour estimates related to rail and non-ferrous materials, and that he had no role

in determining or applying equipment rates, labor rates, scrap value, avoided costs, or lost

revenue to those labor times.  (*Id.* at 24:7-25, 28:18-25, 39:13-21, 40:7-14, 41:1-13, 41:24-42:12,

49:24-50:2, 65:3-12, 66:20-67:6.)  Thus, Mr. Lindquist's disclosure proffers an opinion he does

not in fact hold or have any basis to offer.  *See James T. Scatuorchio Racing Stable, LLC*, 2014

U.S. Dist. LEXIS 59689 at *22-23.

**(e)    Mr. Lindquist's  purported opinion about rail already removed from Fairless contains no independent analysis and relies solely on documents he merely read.**

Finally, Mr. Lindquist claims to offer an opinion on the "length and weight" of track

previously removed by other parties that Allied believes it was entitled to remove.  (Jan. 6

Disclosure at 3-4; Lindquist II Dep. at 6:24-7:4.)  In reality, Mr. Lindquist has no opinion on this

topic at all.  Admittedly, he only read and restated documents showing length and weight of rail

removed by a company called Fox.  (*Id*. at 33:12-34:9, 36:22-25, 37:15-25.)

Mr. Lindquist's opinion only recites data contained in documentary evidence.  His

testimony is not tethered to any specialized knowledge, whether through his experience or

otherwise that will assist the trier of fact.  Jurors are equally capable of reviewing the same

documents and drawing their own conclusions about their meaning.

Mr. Lindquist's opinions and testimony should be excluded in their entirety.  Despite his lacking experience and utilization of highly questionable methods, Allied designated its 39-year employee to give Allied's preordained opinions.

> **D.    Allied's Damages Expert Mark Gleason's Opinions Are Inadmissible Because He Unreasonably Relied On Unverified Data Outside His Expertise, Misapplied The Methodologies He Purported To Use, And Incorporated Inadmissible Opinions From Messrs. Klein And Lindquist.**

Mark Gleason, CPA—a long time consultant and repeated expert witness on behalf of Allied—offers a series of opinions purporting to calculate Allied's damages arising from the alleged wrongdoing of U. S. Steel.  (June 19, 2014 Gleason Dep. ("Gleason Dep.") at 83:17-84:8 (excerpt attached to Appx. I as Ex. K.)  Each of his opinions assumed U. S. Steel's liability (Gleason Dep. at 39:25-40:20), and he calculated Allied's damages as follows: (i) $1,001,210 in lost profits associated with U. S. Steel's alleged wrongful use of a replacement contractor to perform concrete removal and basement backfill work at Sheet & Tin as set forth in Counts I and II of the Complaint; (ii) $11,648,613 from U. S. Steel's alleged disruption of Allied's dismantling work at Sheet & Tin under Count III of the Complaint; (iii) $1,913,383 from U. S. Steel's alleged delay of Allied's dismantling work also under Count III; (iv) $5,138,759 or $5,601,210, representing alternative theories of damage for U. S. Steel's alleged conduct under Count IV of the Complaint for removing certain facilities from Allied's purported scope of work; (v) $2,883,870 in lost profits associated with the sale of non-ferrous scrap and railroad track at Fairless; and (vi) $772,849 in lost profits for U. S. Steel's alleged failure to award Allied dismantling contracts for certain railcars and barges under Count VII of the Complaint.  (Gleason Rpt. at 8-9.)

His opinions, however, are  not grounded in observable, measurable damages.  Instead, they project Allied's most hopeful (and unreasonable) expectations for recovery.  In serving

Allied's ends, Mr. Gleason relied on unverified assertions from Allied and its employees to fill in for the gaps in his own knowledge and expertise in valuing Allied's alleged delay damages, misapplied the "Measured Mile" methodology he purported to follow in quantifying Allied's alleged disruption damages, utilized the inadmissible opinions of Messrs. Klein and Lindquist to value Allied's alleged facilities "removed" and remaining non-ferrous scrap and railroad track damages, and double-counted Allied's alleged basement damages.

Therefore, Mr. Gleason's opinions on Allied's damages as alleged under Counts I, II, III, IV and V of the Complaint should be excluded.

      1.      **Mr. Gleason's opinion on delay damages under Count III should be excluded because it rests on unverified factual assumptions he is unqualified to assess.**

          (a)      **Mr. Gleason's opinion that delay damages run from the end of the three-year period Allied originally scheduled for Sheet & Tin's demolition is outside his expertise.**

Mr. Gleason's opinion that Allied is entitled to $1,913,383 in damages for delays is inadmissible because he has no reliable foundation—factual, experiential, or otherwise—to assert, as he does, that Allied is entitled to recover almost every penny of cost spent beyond the first three years of demolition work on Sheet & Tin.

Mr. Gleason calculated delay damages related to Count III in this litigation by totaling time-related costs from 2009 through 2013.  (Gleason Dep. at 137:13-16.)  His calculation posits that, but for delays allegedly caused by U. S. Steel, Allied would not have incurred these costs and would have demolished Sheet & Tin by 2009 (within three years from the start of demolition in 2006).  (Gleason Rpt. at 34.)  Thus, his damages calculation rests entirely on the assumption that Allied was capable of demolishing Sheet and Tin in three years.  (Gleason Dep. at 131:19-132:4.)

However, he admitted that he "had not independently gone through and done a scheduling analysis." (*Id.* at 37:8-9.)  And nor could he, as Mr. Gleason is an accountant, not an engineer, and he has never worked on the technical side of any demolition project.  (*Id.* at 26:24-27:14.)  He lacks expertise in the technical aspects of demolition scheduling, project management, as well as the feasibility or appropriateness of demolition means and methods.  (*Id.* at 27:15-28:25.)  He did not—and cannot—offer any opinion on causation as to the alleged delays, (*Id.* at 30:3-31:4), or on how demolition at Sheet & Tin should have (or could have) been performed at Sheet & Tin.  (*Id.* at 34:3-8, 32:12-33:2.)

Instead, he relied on Allied's anecdotal assertions about how demolition might have proceeded, and how long it might have taken in the best-of-all-possible worlds.  (Gleason Dep. at 34:3-11); *see TK-7 Corp. v. Estate of Ihsan Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (excluding testimony of damages expert who relied on unverified sales projection and failed to take any steps to corroborate them).  While Rule 703 permits experts to support their opinions in certain circumstances by relying on the opinions of others, it does not sanction an expert's reliance on those opinions "where the expert failed to demonstrate any basis for concluding that another individual's opinion . . . was reliable, other than the fact that it was the opinion of someone he believed to be an expert" in the relevant field.  *Id.* at 732.

Here, Mr. Gleason has no independent expertise with demolition or construction scheduling, and thus relies entirely on the opinions of Allied employees who subjectively believed that the demolition of Sheet & Tin would have taken only three years.  (*See* Gleason Rpt. at 35.)  For example, he merely took Allied at its word that additional labor would have been available to meet the three-year construction schedule.  (*Id.* at 35.)

In the end, Mr. Gleason is merely restating the opinions of Allied and its employees about Allied's technical capabilities, scheduling, and demolition methods appropriate at Sheet & Tin. (*See Id.* at 34 (stating "to evaluate the reasonableness of this assertion, we have discussed the Sheet & Tin phase of dismantling at Fairless Works with Allied Management . . .").) This is insufficient to permit him to offer these opinions to a jury. *See In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, No. 1:08-wp-65000, 2014 U.S. Dist. LEXIS 141303, *34-35 (excluding opinion of expert that parroted findings of another expert whose conclusions he was unable to verify based on his own expertise); *Dura Auto. Systs. of Ind., Inc. v. Excel Corp.*, 285 F.3d 609, 614 (stating that a "scientist no matter how well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty"); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005) (excluding expert because his unquestioning reliance on defendants' employees made him their "mouthpiece").

Other than his lack of appropriate expertise, the larger failure of Mr. Gleason's analysis is that he has not developed any causal relationship between specific events and any resultant delays, otherwise known as a "discrete-cost" analysis. (Gleason Dep. at 151:11-23.) In fact, he is not able to identify ***any*** delay resulting from ***any*** specific event at Sheet & Tin. (*Id.* at 39:25-46:12.) His failure to conduct a cause-and-effect analysis means that he cannot attribute delay-causing events to particular circumstances or actors, including U. S. Steel. Thus, his opinion that Allied would have finished by a date certain under any and all circumstances but for delays allegedly caused by U. S. Steel finds no support in his analysis.

### (b)     Mr. Gleason improperly ignored or wrote-off delays and inefficiencies attributable to Allied.

Further, Mr. Gleason's calculation ignored or discounted inefficiencies and delays caused by Allied. Through his opinion, he asserts—without any factual or experiential basis to do so—

that Allied did not cause any delay sufficient to reduce his damages calculation, even though Mr. Gleason acknowledged that Allied chose to painstakingly hand dismantle five buildings at Sheet & Tin for transport and reassembly at Allied's yet-to-be-completed manufacturing facility. (Gleason Dep. at 106:17-107:15, 108:9-25.)  Hand dismantling involves carefully hand-marking and preserving a structure for reassembly, which can be "very inefficient." *See* (*Id*. at 109:3-5, 109:18-21, 108:1-8.)  The decision to hand dismantle buildings was Allied's alone, (*Id*. at 106:17-107:15, 108:9-25), and the buildings could have been demolished using faster methods. (*Id*. at 109:18-21.)

Indeed, Mr. Gleason acknowledged that Allied's own records showed that Allied's hand dismantling work took substantially longer than Allied's original demolition schedule predicted. (Gleason Rpt. at 35; Gleason Dep. at 119:20-120:7.)  Yet, without any appropriate qualifications, Mr. Gleason insists that the hand dismantling work would not have prevented Allied from completing demolition within three-years—irrespective of any delays allegedly caused by U. S. Steel.  (Gleason Dep. at 109:7-11)

To reach his remarkable conclusion, Mr. Gleason relied on Allied's assertion that "it had the ability to increase its labor force" to work more efficiently if more dismantling work had been made available to it.  (Gleason Rpt. at 35 (citing only deposition testimony of Mr. Lindquist for the proposition that additional labor could be found).)  There is simply no evidence that Mr. Gleason did anything to test the veracity Allied's assertion (and his assumption) that in the best-of-all-possible worlds the labor time for hand dismantling buildings at Sheet & Tin would not have caused the same delays it actually caused in the real world.  Nor did he verify or test the assumption that Allied had a readily available supply of labor sufficient to prevent hand dismantling work from delaying other work at Sheet & Tin.  *See Ashland Hosp. Corp.*, 2013 U.S.

Dist. LEXIS 88068 at *30-33 (excluding expert for unreliably applying his methodology because he failed to verify or validate conclusions).

Similarly, Mr. Gleason recognized—but ignored—other inefficiencies in Allied's operations at Sheet & Tin.  (Gleason Dep. at 133:8-134:9.)  Exhibit I1 to Mr. Gleason's January 6, 2014 Report identifies only *six days* of Allied-imposed delay throughout a ***decade-long*** project; nonetheless, he excluded even these meager inefficiencies from his calculation, because he deemed them unworthy of consideration.  (Gleason Dep. at 148:24-149:5.)

Thus, Mr. Gleason assumed that none of the identified inefficiencies in Allied's work caused any delay.  Yet, his opinion assumes that each-and-every alleged interference by U. S. Steel, no matter how slight, caused some measure of compensable delay.  (Gleason Dep. at 133:22-134:24, 149:19-21.)  Mr. Gleason's disparate treatment of Allied and U. S. Steel's conduct goes beyond a mere defect in his credibility and, instead, points to an unsound methodology as "a reasonable accountant does not report certain expenses, and choose to omit other, like expenses." *JMJ Enters., Inc. v. Via Veneto Italian Ice., Inc*., No. 97-cv-0652, 1998 U.S. Dist. LEXIS 5098 *25 (E.D. Pa. Apr. 15, 1998) (excluding testimony of accountant offered as damages expert).  Moreover, Mr. Gleason lacks any training or experience that permits him to opine on the causes of construction delays—thus his decision to include some delays and not others in his calculation is unsupportable.  *See Berry*, 25 F.3d at 1351-52 (6th Cir. 1994); *see also Newell Rubbermaid, Inc.*, 2010 U.S. Dist. LEXIS 65564 at *16.

### 2. Mr. Gleason's opinion on disruption damages under Count III is inadmissible because he misapplied the "Measured Mile" approach.

Mr. Gleason's entire opinion on disruption damages is inadmissible because he improperly applied his proffered methodology—the "Measured Mile" approach—when he compared the demolition work at Sheet & Tin to vastly different demolition work Allied

performed at other parts of Fairless a decade or more earlier.  Specifically, Mr. Gleason

compared Allied's labor and equipment productivity rates for the dismantling of Sheet & Tin

(measured in labor hours per ton of produced scrap and equipment hours per ton of produced

scrap) to work Allied performed in the 1990s at the Fairless Hot End and the 80-Inch Strip Mill

("Hot End/80-Inch Strip Mill").  (Gleason Dep. at 170:17-173:3, 174:5-17.)

To compare Allied's productivity at the different projects, Mr. Gleason utilized the

"Measured Mile" approach.  The Measured Mile calculates disruption damages by comparing

the cost of work done during the allegedly impacted period against the cost of work performed

during an unimpacted period.  Thus, the touchstone of the measured mile analysis is the

similarity of the two projects being compared.  *See* 5 Philip L. Bruner et al., <u>Bruner and

O'Connor on Construction Law</u>, § 15.116 (2014) ("<u>Bruner & O'Connor</u>") (attached to Appx. I as

Ex. L).

Here, Mr. Gleason determined a weighted average of the combined productivity rates at

the Hot End/80-Inch Strip Mill and then compared their productivity ratios to the same ratios at

Sheet & Tin.  (Gleason Dep. at 170:17-173:3, 174:5-17.)  Embedded in his analysis is the

assumption that, but for the disruptions allegedly caused by U. S. Steel, Allied could—and

would—have completed Sheet & Tin at the ***same exact*** productivity ratio as the Hot End/80-Inch

Strip Mill.  (*Id*. 171:24-172:17.)  Reminiscent of his opinion on delay damages, Mr. Gleason's

opinion rests on the unverified assumption that U. S. Steel caused any and all meaningful

disruption, to the exclusion of all other factors (*Id*. at 149:6-10), even though he has not

completed a discrete-cost analysis to demonstrate that.  (*Id*. at 151:11-23.)

Mr. Gleason's use of the Measured Mile in this case was inappropriate because the

projects he compared were vastly different in size, scope, and complexity, and they were

temporally disparate.  Moreover, Mr. Gleason has no technical expertise to assess the comparability of these projects.  Rather, he relied on Allied and its employees' determination that these projects were sufficiently similar such that the use of the Measured Mile would result in a meaningful and valid productivity calculation.  Thus, Mr. Gleason's use of the Measured Mile was improper, unreliably applied to the facts in this case, and rests on unverified facts and unsupported assumptions.

**(a)      The Measured Mile approach is only appropriate for substantially similar projects.**

The Measured Mile approach is limited to comparing "productivity on ***identical activities*** during impacted and unimpacted periods" of two substantially similar phases of the same project. Bruner & O'Connor, § 15.116 (citation omitted) (noting that "it is often difficult if not impossible to find areas where the work" being compared is substantially similar except for the impact factors) (emphasis added); *see U.S. v. Blake Const. Co., Inc.*, 671 F.2d 539, 547 (D.C. Cir. 1982).   As such, courts exclude or discount Measured Mile analyses that do not respect this limitation.  *See, e.g., P.W. Const., Inc. v. U.S.*, 53 Fed. Appx. 555, 557 (Fed. Cir. 2002) (rejecting Measured Mile where one project requires the use of a more time intensive labor technique than the comparator work); *see also Southern Comfort Builders, Inc. v. U. S.*, 67 Fed. Cl. 124, (Ct. Cl. 2005) (rejecting Measured Mile analysis that compared labor rates for two different contractors working on similar projects); *Kit-San-Azusa, J.V. v. U.S.*, 32 Fed. Cl. 647, 660 (Ct. Cl. 1995) (Measured Mile inappropriate to assess productivity where it could not discern impacts caused by defendant).

Comparable projects that are appropriate for measured-mile comparison are strikingly different from the comparison attempted by Mr. Gleason, for example:

-28-

- Installation of metal duct on the same project (Cushman, et al, <u>Proving and Pricing Construction Claims</u>, §3.07[C] (2013 Supplement) (attached to Appx. I as Ex. M));

- Installation of masonry work on the same project (*Id.*);

- Construction of parallel bridge spans in the same time frame (Cushman, et al, <u>Proving and Pricing Construction Claims</u>, §3.07[C] (2001), p. 87) (attached to Appx. I as Ex. N);

- Partition erection in occupied versus unoccupied military barracks (*Id.*);

- Installation of pipe on the same project at different times (Schwartzkopf, <u>Calculating Damages for Lost Productivity</u>, §10.06 (2004) (attached to Appx. I as Ex. O)); and

- Electrical conduit installation on the same project (*Id.* at 198)

It is also critical that the Measured Mile analysis be based on reliable facts and data that accurately assess the actual time spent on the subject projects to calculate the effective labor productivity rates. *See U.S. ex rel. Greenmoor, Inc. v. Travelers Cas. and Sur. Co. of America*, No. 06-cv-0234, Doc. 123, Memorandum and Order at 7-8 (W.D. Pa. May 1, 2009) (excluding testimony and report from Mr. Gleason for relying on "proxy" data rather than actual time records in performing measured mile analysis) (attached to Appx. I as Ex. P).

Mr. Gleason agrees that the Measure Mile approach is restricted to substantially similar projects. Indeed, in a prior report using Measured Mile, Mr. Gleason wrote, "[t]he Measured Mile approach compares ***identical activities*** on impacted and non-impacted sections of the project in order to ascertain the loss of productivity resulting from the impact." *See Greenmoor, Inc.*, No. 06-cv-0234, Mark Gleason Expert Witness Report at 4 (W.D. Pa. Jan. 31, 2008) (emphasis added; internal quotations omitted) (attached to Appx. I as Ex. Q).

**(b)** **The projects compared by Mr. Gleason were not substantially similar, nor was he qualified to assess their similarity.**

Mr. Gleason's comparison of the Sheet & Tin and the Hot End/80-Inch Strip Mill projects was improper because they are too dissimilar for valid application of the Measured Mile approach. *See P.W. Const., Inc.*, 53 Fed. Appx. at 557 (Fed. Cir. 2002).

There are numerous, critical differences between the facilities compared that make valid, reliable application of the Measured Mile approach impossible, including:

- The Hot End and 80-Inch Strip Mill were a series of stand-alone structures accessible from all sides, while Sheet & Tin was composed of tightly fit structures that are interconnected and contiguous;

- The Hot End and 80-Inch Strip Mill demolition was completed in the 1990's, while Sheet & Tin was completed in 2013;

- The Hot End and 80-Inch Strip Mill were completely decommissioned facilities slated for total demolition, while Sheet & Tin incorporated operational facilities that required functioning utilities, all of which had to be preserved;

- The Hot End and 80-Inch Strip Mill were loaded with loose scrap and "pit scrap" that could be collected and sold in large quantities with minimal effort, while Sheet & Tin did not have significant loose scrap;

- The Hot End and 80-Inch Strip Mill did not include preservation related to hand dismantling, while Sheet & Tin included hand-dismantled buildings that Allied wished to transfer to its own facility;

- The Hot End and 80-Inch Strip Mill had scrap-rich structures and cranes that were constructed differently than those at Sheet & Tin;

- The projects had highly-divergent amounts of labor hours;

- The projects were highly-divergent in size and scrap quantities; and

- The facilities had different purposes and thus different equipment and layouts for their interiors.

(Feb. 17, 2014 BRG Rebuttal Report, at 44-49 (filed under seal, attached to Appx. II as Ex. B2)[3]

Allied's own witnesses testified to these differences, noting that the Hot End and Sheet & Tin were not similar types of dismantling because Sheet & Tin had more obstructions stemming from active utilities and preserved buildings. (Oct. 25, 2013 Michael White Dep. at 26:7-27:8 [Doc. 132-2] (excerpt attached to Appx. I as Ex. T).)  They also recognized that the Hot End had "a completely different spec" (Dec. 17, 2013 Allied 30(b)(6) Dep. at 211:12-212:19 [Doc. 121-1](excerpt attached to Appx. I as Ex. U)) and comprised a substantial portion of all Fairless facilities, covering approximately 50% of the entire plant. (Lindquist I Dep. at 26:8-27:2.)

In fact, Mr. Gleason admitted that there were meaningful differences between each of the facilities and the nature of the work done at each.  For example, he agreed the Hot End was "a much larger facility," with three times as much available scrap. (Gleason Dep. at 180:23-24, 181:11-14.)  He also wrote in his report that the smaller size of a facility could negatively affect productivity, (*Id.* at 183:8-14), and he even held this opinion, initially, during his deposition. (*Id.* at 181:25-182:4.)  Though, he later contradicted his report and testimony by saying definitively that facility size had no effect on productivity. (*Id.* at 184:7-11.)

Mr. Gleason also discounted or ignored other substantial differences in the projects.  For example, he testified that he did not think differences in building construction affected productivity. (*Id.* at 185:14-186:10.)  Nor did he account for the impact of environmental and

---

[3] *See also* May 15, 2014 Robert Lewis Dep. at 101:10-22, 129:17-130:12 (Hot End was full of loose scrap that required less effort to recover); *Id.* at 120:17-121:20, 123:4-13 (time gap between projects led to differing productivity because of changes available equipment and different governmental and environmental regulations); *Id.* at 123:14-124:2 (large differences in labor hours and scrap tonnage between projects); *Id. at* 123:23-125:7 (Hot End had separate structures open on all sides versus contiguous buildings intertwined with operational facilities at Sheet and Tin); *Id. at* 125:8-127:2, 128:23-129:1 (Hot End had heavier cranes and structures, so more scrap was produced for equal effort); *Id. at* 130:13-23 (active utilities at Sheet and Tin versus no utilities at Hot End) (excerpts attached to Appx. I as Ex. R).; May 13, 2014 Richard Fultineer Dep. at 68:4-69:2 (Hot End was larger and inoperable, with separate buildings, no live utilities, and more readily-available scrap) (excerpts attached to Appx. I as Ex. S).

safety regulations that changed over the 20 intervening years between when Allied performed

work at the Hot End and Sheet & Tin.  (*Id.* at 186:18-187:12.)  Mr. Gleason also admitted that he

did not remove "pit scrap" from his productivity ratio for the Hot End/80-Inch Strip Mill.  (*Id.* at

183:1-5.)  Thus, his productivity ratio for the Hot End/80-Inch Strip Mill included all the scrap

Allied could simply collect and sell with minimal-to-no processing, skewing his ratio higher than

it should be.  Moreover, Mr. Gleason admitted that he did not actually know whether

productivity ratios would be identical for the different projects in the absence of claimed U. S.

Steel disruptions (Gleason Dep. at 187:13-188:17), a critical admission since that is the very

heart of Measured Mile reliability.

In the end, Mr. Gleason's Measured Mile comparison is inadmissible for two primary

reasons.  ***First***, Mr. Gleason has no technical expertise and no foundation to opine that all of the

differences between the projects had no effect on the productivity ratios.  *See Berry*, 25 F.3d at

1351-52 (6th Cir. 1994) (excluding expert as unqualified where no foundation was laid to

demonstrate how expert's training and experience were related to the opinions he offered).

Rather, his opinion relied entirely on assertions about the similarity in the buildings and the

demolition plans made by Allied and its employees.  As already set forth, Mr. Gleason lacks

sufficient knowledge to test or verify either the similarity of the projects or the technical ability

of Allied to obtain certain productivity levels, and therefore, he is merely parroting Allied's

opinions, which is improper.  *See Info-Hold, Inc.*,  2013 U.S. Dist. LEXIS 117953 at *13 (expert

cannot simply rely on unverified assertions of the party); *see also In re Whirlpool Corp.*, 2014

U.S. Dist. LEXIS 141303 at *34-35; *Dura Auto.*, 285 F.3d at 614; *Loeffel Steel Prods., Inc.* 387

F. Supp. 2d at 808 (N.D. Ill. 2005).

-32-

**Second**—irrespective of who made the assessment of the projects' similarities—it is clear that there were material differences in the projects being compared.  Measured Mile is simply an improper method to determine lost productivity when, as here, the projects and the work performed are so dissimilar.  *P.W. Const., Inc.*, 53 Fed. Appx. at 557; *see also Southern Comfort Builders, Inc.*, 67 Fed. Cl. at 147.  As one court noted,  "[t]he probative value of the measured mile analysis 'necessarily depends upon the comparability of the circumstances surrounding the sample to the circumstances which would have prevailed for the work which could not be directly measured.'"  *Contract Mgmt., Inc v. Babcock & Wilson Tech. Servs. Y-12, LLC*, 2013 U.S. Dist. LEXIS 1673, *106-107 (E.D. Tenn. Jan. 4, 2013) (declining to accept measured mile productivity analysis because of differences in labor forces during the impacted and unimpacted period, and differences in pipe being cleaned during "base" period and the "impacted" period) (internal citations omitted).

Here, there are myriad differences—qualitative, quantitative, temporal—that distinguish the work at each of these facilities.  Mr. Gleason's attempt to apply the "Measured Mile" fails its first principle—that it compare substantially similar projects—and, therefore it cannot reliably be applied in this case.

### (c)      Gleason misapplied the Measured Mile approach before.

This is not the first time Mr. Gleason has misapplied the Measured Mile.  *Greenmoor, Inc.*, No. 06-cv-0234, Doc. 123, Memorandum and Order at 6-8.  In *Greenmore*, Mr. Gleason attempted to compare the productivity of two asbestos-abatement contractors, using the volume of the contractors' administrative correspondence as a proxy for their efficiency.  *Id*. at 4-5.  The court excluded Mr. Gleason's opinions because he failed to show that his use of correspondence was an appropriate proxy for efficiency, and because he failed to explore other possible means of comparison.  *Id*. at 6-7.  The court found an "analytical gap" in Mr. Gleason's approach.  *Id*. at 8.

Here,  as in *Greenmore*, Mr. Gleason used an improper measuring stick to perform the Measured Mile analysis.  *Greenmore* involved correspondence as an inadequate measure for efficiency, while this case involves the Hot End/80-Inch Strip Mill as an inadequate measure for productivity at Sheet & Tin.  As set forth above, Mr. Gleason's analysis in this matter has its own "analytical gaps," including Mr. Gleason's unqualified leaps concerning attainable productivity, and his blanket assumption that U. S. Steel caused any and all disruption to the exclusion of all other factors.  Mr. Gleason's testimony should again be excluded.

> **3.      Mr. Gleason's damages opinions for Counts IV and V rest on the inadmissible expert opinions of Messrs. Klein And Lindquist, his faulty measured mile analysis, and his failure to adhere to the contractual damage calculation he applies.**

All of Mr. Gleason's opinions on Allied's Count IV (value of facilities "removed") and V (remaining track and non-ferrous scrap) are derived from the inadmissible opinions of Messrs. Klein and Lindquist.  Approximately $8 million in alleged damages rely entirely on Messrs. Klein and Lindquist's unreliable estimates of remaining material at Fairless (Gleason Dep. at 229:22-230:19, 248:11-22, 252:9-14.), and Mr. Lindquist's unreliable estimates of the man-hours to recover portions of that material.  (*Id*. at 249:11-250:10.)

But an expert is not permitted to resurrect (and validate) the inadmissible opinions of other experts especially—as the case is here—where the opinions relied on fall outside the expert's own area of expertise.  *See In re Whirlpool Corp.*, 2014 U.S. Dist. LEXIS 141303 at *34-35; *Dura Auto.*, 285 F.3d at 614; *Loeffel Steel Prods., Inc.* 387 F. Supp. 2d at 808 (N.D. Ill. 2005).

Mr. Gleason readily acknowledged that he relied on Messrs. Klein and Mr. Lindquist's opinions to perform his calculations.  (Gleason Rpt. at 38, 38 n. 164, 42, 42 n. 177; Gleason Dep. at 229:22-230:19, 248:11-18, 248:16-22, 252:9-14.)  Mr. Gleason did not test or verify the

calculations performed by either Mr. Klein or Mr. Lindquist, and he lacks the technical expertise to do so.  To the contrary, Mr. Gleason claims to have no objection at all to Messrs. Klein and Lindquist's lacking methods.  (Gleason Dep. at 232:1-17, 253:15-19.)  Mr. Gleason adopted their figures as unquestioningly as they adopted Allied's.

Messrs. Klein and Lindquist's opinions are not mere support for Mr. Gleason's opinion, but are—in fact—essential inputs for his damages calculations.  He relied on their opinions wholesale in order to perform his damages calculation.  He is not merely using their work as a check to verify his own calculations; rather, their work is the sole basis for an essential input— volume—in his calculation.  *See Dura Auto.,* 285 F.3d at 615 (affirming expert's exclusion where his opinion rested on findings of other experts outside his area of expertise and "without their testimony explaining and justifying discretionary choices that they made, his testimony would have rested on air.").  His opinion thus necessarily is that their calculations are valid and correct, but he is not permitted to bootstrap Messrs. Klein and Mr. Lindquist's opinions in that manner.  *See In re Whirlpool Corp.*,  2014 U.S. Dist. LEXIS 141303 at *34-35 (expert not permitted to opine that opinions of another expert outside his field of expertise were valid and correct).

Further, Mr. Gleason's valuation of "removed" structures under Count IV fails for reasons beyond Mr. Klein's faulty opinion on material weight.  Mr. Gleason calculates Allied's damages relating to the "removed" structures utilizing two alternative approaches, but each is impermissibly flawed, rendering the results unreliable.  **First,** Mr. Gleason attempted to calculate damages relating to these structures by comparing the value of the material against the cost to recover it.  (Gleason Dep. at 232:18-233:3.)  But his costs to recover the material are based on Allied completing the demolition at the Hot End/80-Inch Strip Mill productivity ratio.  (*Id*. at

237:4-238:5.)  Therefore, his damages determination fails for all the same reasons as his Measured Mile analysis.

**Second**, Mr. Gleason calculated damages by wrongly applying the 1992 Specification. Mr. Gleason admits that Section 10.3 of the 1992 Specification refers to a publicly available market price known as No. 1 Heavy Melt in setting forth the mechanism for calculating damages for buildings removed from the 1992 Specification demolition package.  (Gleason Dep. at 243:15-244:12.) [4]  But Mr. Gleason chose not to perform that calculation.  Mr. Gleason did not even investigate how utilizing the No. 1 Heavy Melt price would have affected his damage calculations, but he expected it would reduce them.  (*Id.* at 244:16-245:6.)  His decision to ignore the very contractual language he purports to apply thus appears calibrated to obtaining a higher damages calculation, rather than an accurate one.  *Info-Hold, Inc.*, 2013 U.S. Dist. LEXIS 117953,*13-14; *JMJ Enter., Inc.*, 1998 U.S. Dist. LEXIS 5098 at *27; *see Ashland Hospital Corp.*, U.S. Dist. LEXIS 88068 at *30-33 (excluding expert opinion where expert failed to consult readily available evidence to validate his theory).[5]

---

[4] As set forth in prior filings, U. S. Steel contends that 1992 Specification Section 10.3 is not "relevant" to Allied's claim of "removed" structures at Sheet & Tin.  (U. S. Steel's Feb. 24, 2014 Motion for Partial Summary Judgment, [Doc. 118] at Page ID #1767-68.)

[5] Mr. Gleason admits that his valuation of remaining structures and equipment has limited accuracy and is too uncertain for use in financial reporting.  (Gleason Dep. at 76:2-79:4.)  In fact, Allied never reported income when it allegedly received ownership of the remaining structures, and Mr. Gleason thinks Allied's failure to do so is acceptable because the remaining ferrous material could not be accurately valued.  (*Id.*)  Similarly, Mr. Gleason believes that Allied would not have to pay taxes on the thousands of tons of material it allegedly obtained, again because his valuation approach would not be sufficiently accurate to trigger tax reporting obligation.  (*Id.* at 79:10-80:14.)

4.      **Mr. Gleason's opinion on Counts I and II related to basement work is unreliable because it improperly included income Allied is not entitled to and double-counted damages.**

(a)     **Mr. Gleason improperly included equipment removal costs and additional demolition costs in his Counts I and II damages calculation.**

Mr. Gleason's damages opinion for Counts I and II is over-inclusive because it includes income related to equipment removal, which is at no additional cost. Mr. Gleason's damages model is based on the premise that Allied was to be paid for any work below the mill floor. (Gleason Dep. at 201:13-23.) He admitted that his calculation could change if some work below floor slab was not at additional cost. (*Id*. at 201:13-23.) Part of the work that Mr. Gleason calculated as income to Allied included removal of equipment in the basements. (*Id.* at 205:21-24, 208:8-19.) However, the Court already recognized that equipment removal is designated by the contracts as no-cost work (though there are other remaining issues of fact related to what is no-cost work). (Opinion and Order [Doc. No. 174] at Page ID #8623-24.) By including income for equipment removal that Allied is not entitled to, Mr. Gleason's opinion as to the damages under Count I and II is over-inclusive, and it not be admitted. *See JMJ Enters., Inc.*, 1998 U.S. Dist. LEXIS 5098 at *27 (expert's damages opinion was unreliable where it simply supported maximum recovery for his client).

Mr. Gleason also bases his damages calculation on income from extra work that Allied was never asked to do. Specifically, his damages are calculated based on an assumption that Allied would take all concrete to grade. (Gleason Dep. at 203:7-204:22) He admits his calculation would change if Allied was not required to do so. (*Id.* at 204:2-7.) In fact, U. S. Steel did not ask Allied to take all foundations to grade, and thus Mr. Gleason's calculations include income related to superfluous work. Gordon Lindquist—whom Mr. Gleason relied upon and whose deposition Mr. Gleason reviewed—explained that U. S. Steel had asked Allied only

to drop floor slabs into basements and backfill, leaving the surrounding walls above grade.

(Lindquist I Dep. at 151:20-152:9.)

> **(b)** **Mr. Gleason improperly included duplicative damages in his Counts I and II calculations.**

Mr. Gleason's damages calculations related to Counts I, II, and III of the Complaint evidence misapplication of his purported methodology because they included improper duplicate damages.  Specifically, in calculating lost income from basement work allegedly removed from Allied's purported scope under Counts I and II of the Complaint, Mr. Gleason calculated income to Allied for demolishing basements during the first quarter of 2012.  (Gleason Dep. at 208:8-19, 211:20-24.)  However, included in his delay damages calculation for Count III were idle equipment costs from 2009 through 2013.  (*Id.* at 137:13-16, 141:15-144:15.)  Undeniably, if Allied had done work demolishing basements in early 2012 it would have used the very equipment that Mr. Gleason counted as idle until 2013.  (*Id.* at 226:6-13, 226:21-25.)

When Mr. Gleason was asked at deposition, "[a]ren't you counting in your delay damage[s] equipment as idle and also assuming that Allied would use that equipment to generate lost income . . ." Mr. Gleason agreed.  (*Id.* at 226:21-25.)  When asked, "[i]f Allied had demolished the basements in 2011 [sic] and recovered the scrap and processed it, would Allied have used some of the equipment that went into your idle damages calculation," he first said he didn't know, then admitted, "[t]hey may have."  (*Id.* at 226:6-13.)

Thus, Mr. Gleason's calculation treats the equipment as idle for purposes of calculating his delay damages under Count III, while simultaneously assuming that Allied would have used that same equipment to generate income through basement demolition under Counts I and II.

## III.    CONCLUSION

For the foregoing reasons, the Court should exclude the opinions of Messrs. Klein and Lindquist in their entirety and Mr. Gleason's damages opinions with respect to Counts I, II, III, IV and V.

Dated: November 26, 2014                    Respectfully submitted,


                                            s/ Michael R. Gladman
                                            Michael R. Gladman
                                            (Ohio Bar Registration No. 0059797)
                                            E-mail:  mrgladman@jonesday.com
                                            JONES DAY
                                            Street Address:
                                            325 John H. McConnell Blvd., Suite 600
                                            Columbus, Ohio  43215-2673
                                            Mailing Address:
                                            Post Office Box 165017
                                            Columbus, Ohio  43216-5017

                                            Telephone:  614.469.3939
                                            Facsimile:  614.461.4198

                                            Roy A. Powell
                                            (admitted *pro hac vice*)
                                            E-mail:  rapowell@jonesday.com
                                            David M. Belczyk
                                            (admitted *pro hac vice*)
                                            E-mail:  dbelczyk@jonesday.com
                                            JONES DAY
                                            500 Grant St., Suite 4500
                                            Pittsburgh, Pennsylvania  15219-2514

                                            Telephone:  412.391.3939
                                            Facsimile:   412.394.7959

                                            Timothy J. Cornetti
                                            (admitted *pro hac vice*)
                                            E-mail:  tjcornetti@uss.com
                                            UNITED STATES STEEL
                                            CORPORATION
                                            600 Grant Street, Suite 1500
                                            Pittsburgh, Pennsylvania  15219

                                            Telephone:  412.433.992
                                            Facsimile:   412.288.3063

                                            *Counsel for Defendant*
                                            *United States Steel Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Defendant United States Steel Corporation's Motion To Exclude Purported Expert Testimony And Opinions Of Ed Klein, Gordon Lindquist, And Mark Gleason was served by operation of the Court's CM/ECF system on all counsel of record.

s/ Michael R. Gladman
Michael R. Gladman

*Counsel for Defendant United States Steel Corporation*
