**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ALLIED ERECTING AND DISMANTLING CO., INC., | ) | CASE NO. 4:12-cv-1390 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| UNITED STATES STEEL CORPORTION, | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court are two motions filed by the parties, and one later-filed related motion of plaintiff, which address the testimony of experts.[1] The Court conducted oral argument on January 9, 2015, and the transcript has been filed. (*See* Doc. No. 208 ["Daubert Tr."].)

## I. APPLICABLE LAW

The testimony of expert witnesses is governed by Fed. R. Evid. 702, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Sixth Circuit Court of Appeals recently explained:

. . . Rule 702, in concert with other Rules of Evidence, empowers the district court to ensure that the expert's testimony is both relevant and reliable. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993). The court plays this same gatekeeping function even if the expert's opinion is "technical," rather than

---

[1] There are additional motions in limine pending before the Court that are not addressed by this order.

scientific, in nature. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141
(1999). This line of cases governing the district court's screening of experts seeks
to "strike a balance between a liberal admissibility standard for relevant evidence
on the one hand and the need to exclude misleading 'junk science' on the other."
*Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir.2009).

*Ask Chems., LP v. Computer Packages, Inc.*, 593 F. App'x 506, 509 (6th Cir. 2014).

Where the proposed expert testimony is based on specialized knowledge rather

than strictly scientific or technical methodology, the court has broad latitude when deciding both

*how* to determine the reliability of such testimony and *whether* the testimony is sufficiently

reliable to be admissible. *Kumho Tire*, 526 U.S. at 142 (citation omitted). Notably, in cases

involving non-scientific experts, "'the relevant reliability concerns may focus upon personal

knowledge or experience.'" *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319 (6th Cir.

2001) (quoting *Kumho Tire*, 526 U.S. at 150).

The distinction between scientific and non-scientific expert testimony was aptly

explained in *Berry v. City of Detroit*, 25 F.3d 1342, 1349-50 (6th Cir. 1994):

> By way of illustration, if one wanted to explain to a jury how a bumblebee is able
> to fly, an aeronautical engineer might be a helpful witness. Since flight principles
> have some universality, the expert could apply general principles to the case of
> the bumblebee. Conceivably, even if he had never seen a bumblebee, he still
> would be qualified to testify, as long as he was familiar with its component parts.
>     On the other hand, if one wanted to prove that bumblebees always take off
> into the wind, a beekeeper with no scientific training at all would be an acceptable
> expert witness if a proper foundation were laid for his conclusions. The
> foundation would not relate to his formal training, but to his firsthand
> observations. In other words, the beekeeper does not know any more about flight
> principles than the jurors, but he has seen a lot more bumblebees than they have.

Although, "the gatekeeping inquiry must be tied to the facts of a particular

case[,]" *Kumho Tire*, 526 U.S. at 150 (internal quotes and citation omitted), a district court is not

"required to admit expert testimony 'that is connected to existing data only by the *ipse dixit* of

the expert. A court may conclude that there is simply too great an analytical gap between the data

and the opinion proffered." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L.Ed.2d 508 (1997)). Moreover, a district court will not permit an expert to offer legal opinions or conclusions, or interpret the parties' contracts. *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 549 (6th Cir. 1981) ("Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible.").

## II. ANALYSIS

### A.     Plaintiff's Motion in Limine to Preclude Selected Portions of Expert Testimony by Berkeley Research Group (Doc. No. 185)
###         *and*     Plaintiff's Motion to Strike Supplemental Rebuttal Report (Doc. No. 224)

In this motion (Doc. No. 185 ["Pl. Mot. 185"])[2] and memorandum in support (Doc. No. 186 ["Pl. Mot. 185 Mem."]), Allied Erecting and Dismantling Corporation ("Allied" or "plaintiff") challenges portions of the February 17, 2014 Berkeley Research Group ("BRG") Rebuttal Report (Doc. No. 187 ["BRG Rebuttal"])[3] submitted by United States Steel Corporation ("U.S. Steel" or "defendant"). Defendant filed an opposition brief. (Doc. No. 203 ["Mot. 185 Opp'n"].)

Defendant subsequently served the February 2, 2015 BRG Supplemental Rebuttal (Doc. No. 225-2 ["BRG Suppl. Rebuttal"]) that Allied has moved to strike (Doc. No. 224 ["Pl. Mot. 224"]) on grounds that the supplement was submitted, without leave, nearly one year after the deadline for rebuttal reports, eight months after the close of expert discovery, four months

---

[2] Although Allied filed this motion within the scheduled time frame for *Daubert* motions, it does not challenge the expert's credentials or methodology, but only the expert's conclusions. As such, the motion is properly styled as a "motion in limine," not as a *Daubert* motion. The Court considers it in this opinion only because it was addressed in the context of the *Daubert* proceedings.

[3] Plaintiff's appendix in support of its motion (Doc. No. 187) is a copy of the BRG Rebuttal without its exhibits. The same report, complete with exhibits, has been filed under seal by U.S. Steel. (*See* Doc. No. 190-2.) Any references herein are to the exhibit filed by Allied.

after the Court's summary judgment ruling, and two months after the deadline for *Daubert* motions.[4] (*Id.* at 11381.) As an alternative to striking, Allied seeks leave to conduct additional depositions of the BRG experts and/or permission to submit its own additional rebuttal materials, expert or otherwise. Defendant filed its opposition to the motion to strike (Doc. No. 227 ["Mot. 224 Opp'n"]), arguing that "[n]othing in Rule 26 . . . precludes an expert from revising or further clarifying opinions, particularly in response to points raised in the presentation of a case." (*Id.* at 11467, quoting *McHugh v. Olympia Entm't, Inc.*, 37 F. App'x 730, 735 (6th Cir. 2002).)[5]

The ruling on summary judgment was issued on September 30, 2014 (Doc. No. 174 ["MSJ MOO"]), and the Daubert hearing was conducted on January 9, 2015. At that hearing, defendant's counsel argued that its expert should be allowed to testify, in light of the Court's ruling that the three-year schedule in the 1992 Specification is a "relevant" term, as to whether Allied had even submitted a schedule that would have *permitted* completion of the work within three years after it was released. The BRG Suppl. Rebuttal appears to be an attempt by defendant to buttress that argument. Submission of this supplement does not violate Rule 26, which provides that a party filing a supplemental expert report must do so "by the time the party's pretrial disclosures [i.e., witnesses, deposition designations, and exhibits] under Rule 26(a)(3) are due." Those trial-related disclosures are not yet due. (*See* Doc. No. 226, Fourth Amended Final Pretrial Conference and Trial Order.) Therefore, the supplemental expert report was timely

---

[4] To the extent Allied's motion suggests that defendant waited until after the deadline for *Daubert* motions to file this supplement so as to "insulate [it from] the rigors of a Daubert challenge[,]" (Pl. Mot. 224 at 11389), that argument is a red herring. As already noted, Allied has not made a true *Daubert* challenge to the original expert report; therefore, there would be no basis to make a *Daubert* challenge based solely on a supplement that arguably only modifies the conclusions in light of the Court's rulings.

[5] Defendant "does not object to offering the BRG experts for further depositions limited to their [BRG Suppl. Rebuttal,]" but asserts that "Allied never asked for such depositions." (Mot. 224 Opp'n at 11468-69, footnote omitted.)

produced.[6] In addition, the Court is now ruling, *infra*, that the expert *will* be permitted to testify regarding whether Allied's schedule would have been workable under a three-year completion time frame. Therefore, Allied's pretrial receipt of the BRG Suppl. Rebuttal actually places it in a better position to respond to any new information. There is still time to permit Allied an opportunity for limited discovery relating to any new material. Therefore, Allied's motion to strike (Doc. No. 224) is denied. Allied shall advise U.S. Steel within seven (7) days of the date of this order as to what, if any, specific discovery it would like to pursue as a direct result of the BRG Suppl. Rebuttal, and a proposed schedule for doing so. Such schedule will not be permitted to delay any of the current trial-related deadlines. If the parties cannot agree on a schedule, then they may seek intervention of the Court.

The Court turns now to Allied's primary motion, wherein Allied notes that it contests most, if not all, of the opinions and conclusions of BRG, but specifically challenges for purposes of the motion only those portions of the BRG Rebuttal that it believes are improper and inadmissible expert testimony. In particular, Allied argues (1) that some aspects of the BRG Rebuttal are not expert testimony because they weigh factual evidence, draw legal conclusions, or attempt to interpret the parties' contracts, all matters for either the Court or the jury;[7] and (2) some sections of the report do not rebut anything in Allied's expert reports, but instead relate to the reasonableness of defendant's damages on its Counterclaim I, matters that should have been

---

[6] The case management plan has been amended several times. The BRG Suppl. Rebuttal was timely even under the plan that was in place as of February 2, 2015. (*See* Doc. No. 181, Second Amended Final Pretrial Conference and Trial Order.)

[7] Allied argues that the BRG Rebuttal (1) improperly opines that the parties' contract did not include a three-year schedule; (2) impermissibly opines on Allied's obligation to perform basement work at Fairless at no cost to U.S. Steel; (3) improperly concludes that Allied has no ownership right to removed facilities or remaining non-ferrous and rail at Fairless; and (4) improperly opines on the issue of notice by Allied.

included in a timely affirmative expert report that Allied could have had an opportunity to properly rebut.

With respect to Allied's first challenge to the BRG Rebuttal, as already noted, no expert may opine as to any legal conclusion or as to the meaning of any contract terms, *TCP Indus., Inc.*, *supra*., let alone opine contrary to a matter already decided by this Court. Defendant does not dispute this. To that extent, Allied's motion is granted, and any such testimony that may be offered at trial will be ruled inadmissible, upon timely objection.

Allied specifically challenges the opinion in the BRG Rebuttal that "there was no three year contractual time for performance in the agreements." (Pl. Mot. 185 at 8738, quoting BRG Rebuttal at 8804.) Allied asserts that the opinion contradicts this Court's summary judgment ruling of September 30, 2014, wherein the Court reiterated its earlier ruling on a motion to dismiss that "the same time schedule set forth in the 1992 Specification for the Hot End demolition was a 'relevant' term that was incorporated and made applicable to the work at the Sheet & Tin facilities." (MSJ MOO at 8629.) The Court stated:

> To summarize, reading all the contracts together, U.S. Steel could release work at the Fairless Works to Allied at any time and promised to give Allied at least enough work during the first 36 months of the contract to generate $7 million in revenue. Once U.S. Steel released any phase of the work to Allied, Allied had to begin working on that phase within five days and had to work continuously until finished (unless granted a work stoppage by the Engineer). *Allied also had only three years to complete the work on each phase released to it* and an additional twelve months to remove the scrap.

(*Id.*, quoting Doc. No. 84 ["MTD MOO"], emphasis added.)

At oral argument, defendant assured the Court that its expert would not attempt to testify in conflict with the Court's ruling, which had not yet issued when the report was submitted. (Daubert Tr. at 11025.) That said, defendant confirmed that its experts will testify as

6

to the factual dispute relating to when and whether work was released *and* that Allied had not created a schedule that would have allowed it to complete the work in three years.

The Court concludes that defendant, who is in agreement that its expert cannot challenge the Court's ruling as to the applicability of a three-year time limit, may nonetheless elicit testimony from its expert as to whether and when work was released to Allied and as to whether the schedule Allied created would have permitted completion within three years of any work that had been released. It will be for the jury to decide whether to credit the testimony.

Allied is also attempting to prevent any expert from testifying regarding whether Allied previously did basement work for U.S. Steel at no cost and/or changed its practice in this regard in 2011. Allied asserts that these facts require no specialized knowledge and can be ascertained by the jury by examining purchase orders and other evidence offered by appropriate fact witnesses. During oral argument, Allied also emphasized that the parties fundamentally dispute the meanings of the contract terms: "concrete removal," "below top of floor slab," and "backfilling," and that the BRG Rebuttal is based on a belief that "concrete removal" entails hauling the material offsite, a view this Court has already rejected. (*See* Daubert Tr. at 11010-012.) Allied argues that, under this Court's opinion on summary judgment, the factual dispute relates to the parties' intent and mutual understanding with respect to these terms. In essence, Allied is arguing that *expert* testimony is not required to establish these facts, and the BRG Rebuttal does not address (as it could not) the intent of the parties with respect to these contractual terms. Finally, Allied argues that the BRG Rebuttal provides no basis for any expert testimony with respect to industry standards as they might relate to these terms.

As pointed out in defendant's opposition, Allied's own witnesses, cited in the BRG Rebuttal, supplied the factual information that Allied had previously performed basement

work at no cost, information relied upon by BRG (along with correspondence between Allied and U.S. Steel) to reach the conclusion that Allied had subsequently refused to perform basement work at no cost. (*See* BRG Rebuttal at 8829, 8831.) An expert may base conclusions and opinions on such a factual record. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.") At oral argument, defendant further argued that it only intends to elicit testimony as to how others in the industry would understand these contract terms, testimony that would provide helpful context for the jurors, who will undoubtedly be unfamiliar with this industry, and particularly unfamiliar "with large demolition projects on giant steel mills." (Daubert Tr. at 11020.)

To the extent Allied's challenge seeks to preclude expert testimony relating to the purely factual underpinnings of Allied's history regarding performance of basement work, matters that are undoubtedly not within the firsthand knowledge of the expert, the motion is granted. Of course, the expert is not required to testify in a vacuum and must necessarily rely upon the facts of the case in order to render an opinion. Thus, the expert will be permitted to express opinions on the basis of facts as he understands them to be. Ordinary fact witnesses and documentary evidence can establish these facts. But the expert will be permitted to testify generally as to how those in the industry understand the relevant contract terms.

Allied next challenges the BRG Rebuttal's conclusion that Allied has no ownership right to removed facilities or remaining non-ferrous materials and rail at Fairless. Again, Allied asserts that this is not an appropriate matter for expert testimony. During the hearing, Allied also argued that defendant's expert relies for its opinion on § 10.1 of the 1993 Blanket Agreement, which this Court has ruled does not apply. (Daubert Tr. at 11018.)

8

In opposition, defendant argues that its accounting expert will merely present its opinion that Allied's own accounting practices, as shown by its financial statements, are at odds with its current claim of ownership. Defendant's expert will, in essence, challenge the factual underpinnings of plaintiff's expert's damages calculation with respect to these materials. In addition, defendant's expert will testify as to what it means in the industry for materials to be "generated," given the fact that, under the contract, once a facility was released to Allied by U.S. Steel, Allied only owned materials that it subsequently "generated."

During the hearing, Allied argued that this Court's MSJ MOO already resolved the issue of "generation." That is not correct. The Court clearly stated that whether U.S. Steel had "released" facilities to Allied *and* whether Allied had "generated" any scrap are factual disputes. Allied further argued at the hearing that neither of these concepts require expert testimony because they are common terms within the average juror's understanding. (Daubert Tr. at 11015-016.)

The Court will permit testimony as to the meaning in the industry of terms, such as "generated." Additionally, to the extent Allied's expert has factored into his calculation of damages any amounts tied to what Allied "generated," the Court will permit U.S. Steel's accounting expert to rebut the claims by looking at Allied's accounting practices to the extent that they may shed light on Allied's claim of ownership.

Finally Allied challenges the BRG Rebuttal's opinion that Allied failed to give defendant any notice of its claim for disruption and/or delay. Allied asserts that this is not a matter for expert testimony, but is simply a conclusion reached by the expert on the basis of review of the evidence.

In opposition, U.S. Steel argues that it does not intend to offer any expert testimony as to whether Allied gave notice; rather, its experts, applying their specialized knowledge, will testify as to the importance of notice in the industry and the characteristics of sufficient notice in the context of a large-scale demolition project.

The Court is of the view that the average juror can understand the need for adequate notice in the context of a complex industry and does not need an expert's explanation. That said, the Court is not inclined to predetermine evidentiary calls that are more properly made during trial, in the context of the testimony. This aspect of Allied's motion is denied without prejudice to renewal should circumstances warrant it during the trial.

For its second argument, an argument that is very brief and overlaps somewhat with parts of the arguments above, Allied challenges the BRG Rebuttal's conclusion that "U.S. Steel's Counterclaim for the increased costs of basement work is reasonable." (Pl. Mot. 185 Mem. at 8741.) Allied asserts that this is not a rebuttal of anything in its expert's report, that the opinion is offered solely in support of defendant's Counterclaim I, and that it should have been raised in the BRG Counterclaim Report filed by U.S. Steel, which plaintiff could then have separately rebutted.

Defendant argues in opposition that, because plaintiff's expert, Mark Gleason, opined that Allied was entitled to damages related to remaining basement demolition work at Sheet & Tin, defendant's expert was merely rebutting that opinion. In fact, defendant claims that Gleason based his own basement-damages opinions on the premise that Allied would complete the same work as Brandenburg, in the same amount of time, and at the same rates. (Mot. 185 Opp'n at 10484, citing June 19, 2014 Deposition of Mark Gleason [Doc. No. 191 – "Gleason Dep."] at 9788, 9799-9800.) Defendant is of the view that, because Allied refused to perform the

10

basement work, defendant was required to contract with Brandenburg for the work, and its expert is merely opining that defendant's costs relating to Brandenburg's performance of the basement work were reasonable. (*Id.*) Defendant asserts that it, not Allied, is entitled to damages for basement work.

During the hearing on these motions, Allied's counsel waived this argument that the BRG Rebuttal is not, in some respects, actually rebuttal. (Daubert Tr. at 11232—"Tell you the truth, we don't fear their experts. Bring them on."; *see also*, *id.* at 11228-232.) Therefore, the Court need not address this second argument and, to that extent, Allied's motion is denied.

## B.    Defendant's Motion to Exclude Purported Expert Testimony and Opinions of Allied's Experts Ed Klein, Gordon Lindquist, and Mark Gleason (Doc. No. 188)

Defendant challenges the testimony of three of plaintiff's experts. (Doc. No. 188 ["Def. Mot. 188"].) Plaintiff opposes the motion. (Doc. No. 206 ["Mot. 188 Opp'n"].) The Court will address each of defendant's arguments in turn.

### 1.    Challenge to the Opinion of Edward Klein

Defendant generally argues that the opinion of Edward Klein regarding the weight of ferrous and non-ferrous scrap remaining at Fairless should be excluded because he utilized unreliable methods and repeatedly failed to independently verify the facts and data upon which he relied.

Klein has been employed by Allied since 2004. Klein had no role in the demolition work at Fairless. He has no knowledge about Allied's scrap collection efforts at Fairless, does not know how scrap is valued, and believes he had no role in calculating Allied's scrap damages. In fact, Klein admits that he was not involved with the scrap end of the business at all. (Doc. No. 126, November 8, 2013 Deposition of Ed Klein ["Klein I Dep."] at 3205, 3213,

11

3227-28; Doc. No. 192, May 2, 2014 Deposition of Ed Klein ["Klein II Dep."] at 9866, 9869, 9887, 10012.)

Defendant argues that, despite these undisputed facts, Allied's Rule 26 disclosures reveal that it intends to offer Klein's testimony at trial "regarding the quantities and weights of ferrous and non-ferrous materials at the Fairless Works which Allied is entitled to recover under the 2003 Agreement in Principle." (Doc. No. 189-1 ["Pl. R. 26 Discl."] at 8922; *see also* 8923-24.) Defendant asserts that Klein's opinions are based on: (1) observations made "from a site visit at the Fairless Works," nearly seven months before he was asked to render an opinion in this case, "and from Allied's original estimate of ferrous material at the Sheet and Tin facility[;]" as well as (2) "from an analysis of electrical drawings which were produced by U.S. Steel in this litigation, and from an analysis of electrical drawings which were provided to Allied by U.S. Steel as part of the parties' business relationship." (*Id.* at 8923, 8924.) Based on these sources, Klein opines that Allied is entitled to recover for 31,365.00 gross tons of ferrous scrap and 1,002,319.46 pounds of non-ferrous scrap. (*Id.*)

Defendant argues that Klein failed to apply any credible method to his work, merely engaging in a haphazard guess to arrive at his opinion as to the quantities of scrap. First, Klein's observations, upon which he partly bases his estimates, were made during a walkthrough, at a time when he "didn't know how [the estimates] were being used or what they were being used for." (Klein II Dep. at 9888.) Notably, he did not even know that the estimates were for litigation purposes. (*Id.*) Second, the walkthrough was performed "with flashlights" because "there's no electricity in these tunnels, no lights." (*Id.* at 9953.) Third, when asked how he calculated the tonnage, Klein stated that he "look[ed] at the equipment and estimat[ed] it." (*Id.* at 9958.) Gordon Lindquist, who accompanied and assisted Klein, confirmed that none of the

weights resulted from actual weighing of anything at the site, but were "simple calculations in your head[.]" (Doc. No. 193, May 1, 2014 Deposition of Gordon Lindquist ["Lindquist II Dep."] at 10041.) The weights listed in Klein's notes from the walkthrough of the basements were "estimated based on the size of the equipment[,]" and, for tanks, were based on "the surface area of the tank and . . . an assumption on the thickness of the shell in the tank," resulting in an "estimate [of] a weight." (Klein II Dep. at 9948-49; Doc. No. 189-5 ["Def. Ex. 421"].)

In light of the above, defendant argues that Klein "applied no discernible or repeatable method to observ[e], chart[], and calculat[e] the weight of the equipment in the Sheet & Tin basements[,]" and merely "relies on his ambiguous engineering 'experience' as the basis for his conclusions." (Def. Mot. 188 at 8884, citing Klein II Dep. at 9875-76.)

In opposition to defendant's motion, plaintiff asserts that Klein "is a professional engineer with over 30 years of experience." (Mot. 188 Opp'n at 10951.) According to plaintiff, Klein has had to "'deal with the weights of structures, buildings and foundations on a daily basis.'" (*Id.*, quoting Klein II Dep. at 9876.) He has substantial experience in electrical and mechanical engineering, has worked for several engineering firms, and started his own structural engineering consulting firm, which "focused on structural engineering relating to industrial design, steel mill facilities, fabricating facilities, forge facilities, and commercial projects[.]" (*Id.* at 10951-52.)

Plaintiff asserts that Klein has estimated weights and quantities of heavy industrial structures and equipment – both decommissioned and operating – literally "hundreds of times." (Klein II Dep. at 9883.) At Allied, over the last ten years, Klein's experience has included "estimating quantities and weights of U.S. Steel facilities and equipment in order to prepare bids, cost estimates, and crane lift plans for those jobs." (Doc. No. 204-1, December 19,

2014 Declaration of Ed Klein ["Klein Decl."] at ¶ 4.) In fact, Allied argues that it is disingenuous for defendant to challenge Klein's opinions regarding estimated weights and quantities as unreliable, since, in the past, U.S. Steel has repeatedly paid him to perform these very services. (Mot. 188 Opp'n at 10953; *see also* Klein Decl. at ¶ 20 ("I have regularly estimated scrap quantities for cost estimates for various U.S. Steel projects and regularly estimated weights for numerous sophisticated lift plans for U.S. Steel projects.").)

Allied also challenges defendant's assertion that Klein is unfamiliar with the Fairless site, pointing out that, at U.S. Steel's request, Klein visited the site several times over the years, and was specifically involved in "a cut and fill analysis" for the proposed demolition of all structures to grade level. (*Id.* at 10953, citing Klein II Dep. at 9864.)

Allied argues that Klein has been previously accepted as a qualified engineering expert in both federal courts and commercial arbitrations, in particular, in previous litigation between these two parties (*Id.* at 10952-53, citing Case No. 93-0575 (W.D. Pa.); Klein Decl. at ¶ 8), and that Klein's opinions as to the estimated quantities and weights of ferrous and non-ferrous equipment and materials at the Fairless basements[8] are reliably based upon an estimating methodology regularly used by professionals in the demolition and construction industries. (Mot. 188 Opp'n at 10955.) Klein attests that this very "method of estimating – based upon visual observation measurements, experience and familiarity with the type of equipment – and then quantifying tonnages is what [he and Lindquist] do every day for a living." (Klein Decl. at ¶ 17.)

---

[8] Plaintiff points out that the word "basements" does not do justice to what Klein and Lindquist confronted during their tedious, three-day walkthrough. "The Fairless basements are huge cavernous spaces, with multiple levels and pits and with virtually no electricity or lights. They are in a complete state of disrepair, having had thousands of tons of structure dropped above them, and many are completely flooded. Standing water is everywhere and they are very dangerous." (Klein Decl. at ¶ 11.) "Due to extensive flooding in many of the basements and other dangerous conditions, certain equipment was simply not accessible for actual measurements, and [Klein] had to estimate by observation." (*Id.* at ¶ 15.)

Allied further argues that, contrary to defendant's assertions, actual measurements were taken by Klein and Lindquist, where conditions permitted. Photographs were taken and have been provided to defendant. Where manufacturer's weights of equipment were available – because they were listed on the equipment identification tags – these were recorded. Pipes and conduits were counted; measurements were either taken or estimated using measuring tapes or EDM (Electronic Distance Measurement). (Mot. 188 Opp'n at 10956-57.) As properly noted by plaintiff, Klein's task was to estimate a scrap quantity, not to conduct an inventory. (*Id.*, citing Klein Decl. at ¶ 16.)

When Rule 702 was amended in response to *Daubert* and its progeny, the Advisory Committee noted that, while experience alone may provide a sufficient foundation for expert testimony, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory comm. note, 2000 amend. That said, the Sixth Circuit has explained "that 'rejection of expert testimony is the exception, rather than the rule.'" *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (citation omitted). Further,

> "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998) (quoting *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984)). "*Daubert* did not work a seachange over federal evidence law, and the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system." Fed. R. Evid. 702 advisory comm. note, 2000 amend. (quotation marks omitted). A court should not use its gatekeeping function to impinge on the role of the jury or opposing counsel. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

*Id.*

Applying this test, the Court concludes that Klein will be permitted to testify as an expert on the basis of his experience. The average lay person will be completely unfamiliar with the demolition of a steel mill and will certainly have no knowledge of the particular circumstances at Fairless. Klein will be permitted to testify as to the conditions of the basements and then explain how he arrived at his weight calculations. Defendant will then have an opportunity to rigorously cross-examine Klein regarding his experience, methodology, and conclusions. The jury will be free to determine whether to credit his testimony.

Accordingly, with respect to the testimony of Ed Klein, defendant's motion is denied.

**2.      Challenge to the Opinion of Gordon Lindquist**

Next, defendant argues that the opinions of Gordon Lindquist should be excluded because he is both unqualified to offer them and utilized unreliable methods to perform his calculations. As to his methods, defendant challenges in particular: (1) Lindquist's use of Google Earth to estimate the track length; (2) his calculation of rail weight based on a page torn from and old and unknown book; (3) his calculation of man-hours to remove the rails based on unverified hearsay statements, with no independent analysis; (4) his estimates of the time and cost to remove non-ferrous scrap based on "what [he] figured [he] needed to do the job"; and (5) his estimates of the length and weight of rail removed from Fairless by other parties based only on his reading and restating of data contained in documentary evidence.

Lindquist, a longtime Allied employee, is expected to provide testimony "regarding his methods of calculation and conclusions with respect to the length, weight and time required to remove the rail and other miscellaneous ferrous track materials at the Fairless

16

Works which Allied is entitled to recover under the 2003 Agreement in Principle, including the length and weight of the rail and other miscellaneous ferrous track materials which were wrongfully removed from the Fairless Works by U.S. Steel and/or third parties." (Pl. R. 26 Discl. at 8924.) In addition, Lindquist is expected to testify "regarding the required time and cost to remove the underground non-ferrous materials at the Fairless Works which Allied is entitled to recover under the 2003 Agreement in Principle." (*Id.* at 8925.)

Defendant asserts that Lindquist has no engineering or college degree associated with the testimony he will offer. (Lindquist II Dep. at 10044.) He has never built rail tracks (*id.* at 10091), and his professional training is limited to asbestos removal, hazmat removal, OSHA, and mine safety, which have no bearing on his opinions in this case. (Doc. No. 127, November 11, 2013 Deposition of Gordon Lindquist ["Lindquist I Dep."] at 3423.) Lindquist has never been qualified as an expert on any subject matter and has never testified as an expert witness. (Lindquist II Dep. at 10032.) Lindquist identifies his thirty-nine plus years in the industry as the basis for his qualifications to testify. (*Id.* at 10044-45.)

In opposition, Allied argues that, Lindquist, who is the General Superintendent for demolition operations at Allied, has nearly 40 years of experience with Allied, one of the largest industrial dismantling contractors in the country. As such, he may be one of the most experienced industrial dismantling contractor professionals in the country. (Mot. 188 Opp'n at 10966.) Lindquist has performed, planned, and supervised all facets of Allied's demolition activity, including estimating quantities and weights of structural facilities and equipment in decommissioned U.S. Steel plants across the country. (Lindquist I Dep. at 3423-25; Lindquist II Dep. at 10044-45; Doc. No. 204-2, December 19, 2014 Declaration of Gordon Lindquist ["Lindquist Decl."] at ¶ 2.) In just the last ten years, Lindquist has worked on and supervised

17

over 750 projects for U.S. Steel, preparing estimates, bids, work plans, schedules and Project Scope Documents. (Lindquist Decl. at ¶ 3.) He has served as the chief estimator for Allied's demolition projects – including all U.S. Steel projects – since 2004, preparing the cost estimates and quantity take-offs from which U.S. Steel has paid Allied over the past decade. (*Id.* at ¶ 4.) U.S. Steel has been charged for and/or paid Allied for nearly 21,000 hours for engineering and specification development services performed in large part by Lindquist. (*Id.* at ¶ 5.)

Since most industrial steel facilities have extensive railroad track associated with them, Lindquist's demolition work has involved disposition of rail. (*Id.* at ¶ 6.) Lindquist managed the removal of over 27 miles (7,275 Gross Tons) of track at the Hot End of Fairless Works, including the 80-Inch Hot Strip Mill. (*Id.* at ¶ 8.) As part of this experience, he regularly estimated the length and weight of rail, as well as the time and equipment necessary to remove the rail, and has prepared a comprehensive summary as part of Allied's claim in previous litigation with U.S. Steel. (*Id.* at ¶ 9.) As a result, Lindquist is very familiar with the railroad track at Fairless and, over the years, "physically walked every one of [them]." (Lindquist II Dep. at 10108.)

Defendant argues that, aside from having no credentials to qualify him as an expert, Lindquist used unreliable methodology when determining the length of remaining track at Fairless. In particular, Lindquist testified that he used a tool on Google Earth, which he claimed allowed a user to "click" on a length of track to receive an estimated length. (*Id.* at 10083-84.) He has never used this method before for measuring rail, although he has used it to estimate the square footage of buildings. (*Id.* at 10134.) He also admitted that neither he nor anyone at Allied ever actually measured any track, although they could have. (*Id.* at 10109.)

Allied argues, in opposition, that Lindquist either relied upon previous take-offs he made that were performed using U.S. Steel's own drawings of the tracks at the Hot End, or, where detailed drawings were not available, he used GPS-aided Google Maps to measure the length of the track. (Mot. 188 Opp'n at 10968.) To confirm his estimates, he pulled the available drawings of the track at the Hot End and performed a comparison between the drawings and the Google maps. (Lindquist Decl. at ¶ 12.) This comparison revealed a difference of less that 1/10 of a foot between the two measurements. (*Id.*) Allied further argues that various courts have approved the GPS measuring method as reliable, generating results that can be admissible in court. (Mot. 188 Opp'n at 10969 (citing cases).)

Defendant also challenges Lindquist's conclusions regarding the weight of the rail because those conclusions are based on estimates of various components per mile of rail line (e.g., tie plates, spikes, splice bars, and switches). (Def. Mot. 188 at 8892, citing Lindquist II at 10087-89.) Lindquist did not take any representative sampling of the actual track at Fairless to confirm his estimates; rather, he relied on weights listed in "a paper that [he] received a long time ago that broke down the weight of the track [and listed the numbers of other components per mile]." (Lindquist II Dep. at 10089.) Defendant argues that Lindquist's opinion is based upon "a single page taken from a book – the full text of which Mr. Lindquist does not possess." (Def. Mot. 188 at 8892.) Defendant asserts that this is an unverified hearsay source, which Lindquist cannot now identify or locate, and which U.S. Steel cannot test.

Allied opposes this argument by pointing out that Lindquist also testified that his many years of experience with rail removal and estimating over the course of his career have made him intimately familiar with the weight of the rail. (Lindquist Decl. at ¶¶ 13-14.) It asserts that "[t]here is no better evidence to show that Mr. Lindquist's weight calculations are reliable

19

and accurate than U.S. Steel's utter failure to show any other industry standard or calculation to prove they are wrong." (Mot. 188 Opp'n at 10970.) Allied argues that "rail is rail" and not much has changed since the 1950s when much of this track originated. As a result, Lindquist is justified in relying upon reference material that he has maintained for years, material that was supplied to U.S. Steel during expert discovery. Allied asserts that Lindquist "has used this document as a simple reference sheet in the ordinary course of business for years, and it was completely consistent with his knowledge of the industry standard." (*Id.* at 10971, citing Lindquist Decl. at ¶ 15.) Finally, Allied argues that its research shows that "every available railroad reference resource is either identical to or extremely close to the weight calculations use by Mr. Lindquist." (*Id.*, citing references.)

Next, defendant challenges Lindquist's opinion on the man-hours required to remove rail. Lindquist estimates that the remaining rail at Fairless can be removed at a rate of two miles per day, based upon a purported "industry standard" he never independently tested or confirmed, and whose source he could not, in fact, remember. (Def. Mot. 188 at 8893, citing Lindquist II Dep. at 10094-97.) Allied has not specifically opposed this challenge by defendant.

Defendant further argues that Lindquist's opinion on the time required to remove non-ferrous scrap from Fairless is *ipse dixit*, not based on actual available labor data from Allied, but only on anecdotal data of "what [he] figured [he] needed to get the job done." He estimated the time to remove the non-ferrous material (i.e., copper wire) based on the number of manholes allowing access to the wire, and the time required to recover wire from each manhole. (Def. Mot. 188 at 8895.) In defendant's view, Lindquist's estimate is no more than gut instinct and guesswork, involving no professional rigor. Similarly, defendant argues that Lindquist's estimate

20

as to the cost of removing the non-ferrous scrap was not even prepared by Lindquist himself. (*Id.* at 8896.)

In opposition, Allied asserts that removal of copper wires is a routine part of Lindquist's demolition duties, a straightforward task that he has overseen countless times. As a result, Allied states that Lindquist "knows the necessary equipment, the necessary crew size and how long this work takes." (Mot. 188 Opp'n at 10972.) His calculations were based on the number of manholes directly provided by U.S. Steel's own drawings. (*Id.*) As for spot-checking against Allied's historical data, Allied argues that there is no such segregated cost data, but that Mr. Gleason performed the actual dollarization of the task by applying the actual labor and equipment rates used by Allied, and agreed to by U.S. Steel, at Fairless. (*Id.* at 10973.)

Finally, defendant challenges Lindquist's opinion about rail removed from Fairless by other parties, arguing that it was not an opinion independently arrived at, but is really no more than a marshalling of evidence from documents he read and restated. Defendant is of the view that Lindquist actually has no independent opinion on this issue. (*Id.*) Allied did not specifically respond to this argument.

As with the testimony and opinions of Klein, the Court is of the view that Allied has sufficiently established Lindquist's credentials, based on his years of experience. Lindquist will be permitted to offer his opinions, and U.S. Steel will have the opportunity to rigorously cross-examine him to attempt to discredit his methods. It will be up to the jury to decide whether the testimony, and the various bases for the testimony, should be credited.

3.      **Challenge to the Opinions of Mark Gleason**

Mark Gleason, CPA, is offered by Allied as an expert witness on Allied's damages related to the surviving claims in the complaint. Gleason's opinions are based on an assumption that U.S. Steel's liability on each claim will be proven at trial.

Gleason has calculated Allied's damages as follows: (1) $1,001,210 in lost profits associated with U.S. Steel's alleged wrongful use of a replacement contractor to perform concrete removal and basement backfill work at Sheet & Tin as set forth in Counts I and II of the complaint; (2) $11,648,613 from U.S. Steel's alleged disruption of Allied's dismantling work at Sheet & Tin under Count III of the complaint; (3) $1,913,383 from U.S. Steel's alleged delay of Allied's dismantling work, also under Count III; (4) $5,138,759 or $5,601,210, representing alternative theories of damage for U.S. Steel's alleged conduct under Count IV of the complaint for removing certain facilities from Allied's purported scope of work; (5) $2,883,870 in lost profits associated with the sale of non-ferrous scrap and railroad track at Fairless; and (6) $772,849 in lost profits for U.S. Steel's alleged failure to award Allied dismantling contracts for certain railcars and barges under Count VII of the complaint. (Doc. No. 190-1 ["Gleason Report"] at 9238-39.)

a.      *Gleason's Opinion as to Damages on Count III*

Defendant argues that Gleason's opinion regarding Allied's damages under Count III should be excluded because it rests on unverified factual assumptions he is unqualified to assess.

First, defendant asserts that Gleason's calculation for delay damages posits that, but for delays by U.S. Steel, Allied would not have incurred any time-related costs from 2009 through 2013 because Allied would have completed its work at Sheet & Tin within three years of

22

its 2006 commencement. Therefore, Gleason calculated Allied's delay damages by totaling all time-related costs from 2009 through 2013. (Gleason Dep. at 9717.) Defendant argues that Gleason, an accountant who admits he has never worked on the technical side of a demolition project and that he did not independently do any scheduling analysis (Def. Mot. 188 at 8899, citing Gleason Dep. at 9606-07, 9617), is unqualified to opine whether Allied could have completed the demolition work in three years. His reliance on Allied's anecdotal assertions about how the demolition might have proceeded and how long it might have taken in the best of all possible worlds was impermissible, in defendant's view. (*Id.*, citing *TK-7 Corp. v. Estate of Ihsan Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (excluding testimony of damages expert who relied on unverified sales projection and failed to take any steps to corroborate them) (citing Fed. R. Evid. 702).) Defendant further argues that Gleason is not permitted to merely restate the opinions of Allied's management and employees about Allied's technical capabilities, scheduling, and demolition methods. (*Id.* at 8900, citing Gleason Report at 9264 ("[t]o evaluate the reasonableness of this assertion, we have discussed the Sheet and Tin phase of dismantling at Fairless Works with Allied management").)

In opposition, Allied argues that defendant's challenge goes to the weight of Gleason's testimony, not its admissibility. Allied asserts that damage experts routinely incorporate factual assumptions and opinions of others into their calculations. (Mot. 188 Opp'n at 10974, citing *LG Elec. U.S.A., Inc. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 3397358, at *6 (N.D. Ill. Aug. 24, 2010) (expert testimony found admissible for damage expert who relied solely on the parties' documents and data, and who assumed liability).)

Although Allied sets forth a lengthy argument in its opposition, the Court need not address every aspect of that argument, for the simple fact that Allied generally has the better

23

view on the issue raised by defendant. As correctly noted by the court in *LG Electronics*, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Id.* (internal quotes and citation omitted). U.S. Steel will have the opportunity at trial, on cross-examination, to challenge Gleason's reliance on facts and data supplied by Allied and to discredit that reliance and the opinions based on it.

Defendant next challenges Gleason's calculation because it ignored or discounted inefficiencies and delays caused by Allied. Defendant argues: "Through his opinion, [Gleason] asserts – without any factual or experiential basis to do so – that Allied did not cause any delay sufficient to reduce his damages calculation, even though Mr. Gleason acknowledged that Allied chose to painstakingly hand dismantle five buildings at Sheet & Tin for transport and reassembly at Allied's yet-to-be-completed manufacturing facility." (Def. Mot. 188 at 8900-01, citing Gleason Dep. at 9686-88.) Gleason relied on Allied's assertion that it could increase its labor force in order to complete even this hand dismantling (which admittedly takes substantially longer than ordinary dismantling) within the three-year time frame. Defendant argues that there is no evidence that Gleason took any steps to test the veracity of Allied's assertions. Gleason also ignored other identified inefficiencies in Allied's work, assuming that none of the inefficiencies resulted in delay. Defendant argues that Gleason's disparate treatment of Allied's conduct as compared to U.S. Steel's conduct "goes beyond a mere defect in his credibility and, instead, points to an unsound methodology as 'a reasonable accountant does not report certain expenses, and choose to omit other, like expenses.'" (*Id.* at 8902, quoting *JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*, No. 97-cv-0652, 1998 WL 175888, at *10 (E.D. Pa. Apr. 15, 1998).)

Allied opposes defendant's argument, asserting that Gleason indeed made adjustments for several factors, including: "problems with a subcontractor, Rectec; supervisory time not dedicated to dismantling work; vacation and other non-labor time included in payroll records; certain fuel expenses, and various charges where an equipment operator was not specifically identified as operating a specific piece of equipment and all of the costs associated with Allied's salvage operations." (Mot. 188 Opp'n at 10979, citing Gleason Dep. at 9262.) Allied also asserts that Gleason did properly consider and address whether Allied's hand dismantling had any adverse impact on the project, but that, in any event, this assessment is a matter for the jury.

The Court concludes, again, that Allied has the better view. Defendant's challenges go to the weight of Gleason's opinions, not to admissibility.

In addition to challenging Gleason's computation of delay damages, defendant also asserts that his opinion on disruption damages under Count III is inadmissible because he misapplied his proffered methodology – the "Measured Mile" approach – when he compared the demolition work at Sheet & Tin to vastly different demolition work Allied performed at other parts of Fairless Works a decade or more earlier.[9]

---

[9] Defendant argues that this is not the first time Gleason has misapplied the Measured Mile approach, pointing to *U.S. ex rel Greenmoor, Inc. v. Travelers Cas. & Sur. Co. of Am.*, Case No. 06-0234 (W.D. Pa. May 9, 2009) (copy at Doc. No. 189-16). However, as properly pointed out by Allied, this case is distinguishable. Greenmoor, an asbestos abatement subcontractor, sued the general contractor, Burchick Construction Co., for breach of contract. Burchick counterclaimed, arguing that it had incurred certain additional administrative costs due to Greenmoor's poor performance and Burchick's need to accommodate for what Greenmoor was not properly doing. Gleason was hired as Burchick's expert and claimed to have used the Measured Mile methodology to reach his opinion that Burchick suffered administrative costs in the amount of $205,000. To reach this conclusion, Gleason needed to compare Burchick's administrative costs during a period when another asbestos abatement contractor (PDG) was doing the work, to its administrative costs when Greenmoor was doing it. But because Burchick did not specifically track labor or overhead costs associated with any subcontractor, Gleason "sought out some alternative with the idea that a proxy may be the amount of correspondence [to, from or about subcontractors] which would be an indicator of the [administrative] work that Burchick was doing with Greenmoor relative to other subcontractors and, specifically, PDG." *Id.* at 9180. Gleason used the amount of correspondence as a proxy for time spent by Burchick on the administrative function. Gleason also examined the scheduled dollar value of the abatement work to assess the

25

Defendant explains that "[t]he Measured Mile calculates disruption damages by comparing the cost of work done during the allegedly impacted period against the cost of work performed during an unimpacted period." (Def. Mot. 188 at 8903.) "Thus, the touchstone of the measured mile analysis is the similarity of the two projects being compared." (*Id.*, citing 5 Philip L. Bruner et al., *Bruner and O'Connor on Construction Law*, § 15.116 (2014).)[10] The article cited by defendant further clarifies that the Measured Mile method, which is "the measure viewed judicially as most acceptable for proving loss of productivity damages[,] . . . assumes that a direct 'apples to apples' comparison can be made between actual labor hour productivity related to specific work activities performed during an undisrupted period of contract performance and actual labor hour productivity for the same work during the period of disruption." (Bruner, *supra*.)

Defendant asserts that "Gleason determined a weighted average of the combined productivity rates at the Hot End/80-Inch Strip Mill and then compared their productivity ratios to the same ratios at Sheet & Tin." (Def. Mot. 188 at 8903, citing Gleason Dep. at 9750-54.) Defendant claims as error the fact that, embedded in this analysis is the assumption that, but for disruptions allegedly caused by U.S. Steel, Allied could have and would have completed Sheet & Tin at the exact  same productivity ratio as the Hot End/80-Inch Strip Mill. (*Id.*)

---

amount of abatement that was taking place in both the impacted and nonimpacted phases. From this he derived a relationship or percentage between the correspondence and the amount of abatement being performed. He then compared this percentage in the impacted and nonimpacted periods to quantify the increased administrative costs at $205,000. The court concluded that the "core" of the measured mile methodology is the "labor productivity ratio," which reflects a relationship between *time* spent on an activity and the *quantity of work* performed on that activity. But the core of Gleason's methodology was an "asbestos abatement correspondence ratio," which reflected a relationship between the amount of correspondence and the amount (i.e., the schedule dollar value) of abatement. The court concluded that Gleason had failed to establish how the amount of correspondence and the value of abatement work were suitable proxies for time and quantity of work performed.

[10] A copy of this article can be found at Doc. No. 189-12.

Although defendant outlines the basis for this argument in some detail in its motion, in the end, its challenge is two-fold: "[f]irst, Mr. Gleason has no technical expertise and no foundation to opine that all of the differences between the projects had no effect on the productivity ratios[;]" (Def. Mot. 188 at 8908), and "[s]econd – irrespective of who made the assessment of the projects' similarities – it is clear that there were material differences in the projects being compared." (*Id.* at 8909.) Defendant argues that these failures render Gleason's opinions unreliable and inadmissible under Rule 702 and under *Daubert* and its progeny.

Allied argues, as to the first challenge, that it is immaterial whether Gleason holds expertise in the fields of project management, engineering, and scheduling, because he need only verify that any of the factual assumptions underpinning his analysis are reasonable. (Mot. 188 Opp'n at 10978.) Allied notes that defendant does not challenge Gleason's credentials as a financial and accounting expert capable of evaluating delay damages. (*Id.*)

As to defendant's second challenge, Allied argues that it is not the Measured Mile methodology that defendant attacks, but only Gleason's conclusions. Allied asserts that it was appropriate for Gleason to compare the work done at the Hot End and the 80-Inch Strip Mill to Sheet & Tin because these were all phases of work at Fairless. Allied notes that "[i]deally, the comparison will be made on the same project, but practitioners will allow for a comparison between what they consider to be similar projects." (*Id.* at 10983, quoting Bramble & Callahan, *Construction Delay Claims*, CNDCL § 12.08 Lost Productivity.) Thus, a comparison "will be accepted if it is between kinds of work that are 'reasonably alike, such that the approximations it involves will be meaningful'" to a fact finder. (*Id.*, quoting Schwartzkopf & McNamara, *Calculating Construction Damages*, Calc. Constr. Dmgs. § 2.09 (further citation omitted).)

27

Allied argues that Gleason performed an analysis of all of Allied's previous demolition work at Fairless and thoroughly evaluated the similarities. His report speaks at great length as to how he selected the Hot End and the 80-Inch Strip Mill as the comparables for use of the Measured Mile approach. (*Id.*, citing Gleason Report at 9248-58.) Allied does not, however, directly address defendant's argument that Gleason, an accountant, was not *qualified* by training or experience to himself determine whether or not the work he selected was truly comparable.[11] Instead, Allied devotes this portion of its opposition to arguing why the work was comparable and to debunking defendant's assertion of dissimilarity. (*See id.* at 10987-88.)

Although defendant challenges Gleason's qualifications to select the comparables for purposes of his analysis, and although Allied has not directly addressed this particular challenge, the Court's own reading of the relevant sections of Gleason's report, including its internal citations to the record he had before him, satisfies it that Gleason was using information supplied by Allied that described and quantified the various demolition projects it had performed over several years at Fairless when he determined which of those he would select as sufficiently similar to perform the necessary comparison under the Measured Mile method. Gleason himself was not defining the work; he was only summarizing the work as it was defined for him by Allied. This is routine for an expert. A jury will be free to reject the underlying assumptions and, presumably, defendant will do its best at trial to convince the jury that Gleason's evaluation of damages for disruption are founded on faulty data and incorrect or over-reaching assumptions.

---

[11] As already noted, Allied does make an argument that Gleason is well qualified to opine with respect to scheduling of construction and demolition projects, as related to the *delay* damages calculation, asserting that he was entitled to rely upon data supplied to him by Allied. But, here, defendant is challenging Gleason's ability as an accountant to make the very detailed project analysis required to determine, as he did, that the demolition projects at the Hot End and the 80-Inch Strip Mill were comparable to those that would have been performed at Sheet & Tin but for U.S. Steel's alleged disruption.

28

Defendant's motion to exclude Gleason as an expert with respect to damages for Count III is denied.

### b.        *Gleason's Opinion as to Damages on Counts IV and V*

Defendant argues that Gleason's opinions regarding Count IV (value of facilities "removed") and Count V (remaining track and non-ferrous scrap) must be excluded because they are based upon the inadmissible opinions of Klein (as to the amount and weight of ferrous and non-ferrous scrap at Fairless) and Lindquist (as to the length and weight of track remaining at Fairless), which were based on unreliable estimates. Defendant asserts that Gleason was required to independently test or verify the calculations performed by Klein and Lindquist before he could rely upon them for his own calculations.

Allied argues (as it did with respect to defendant's separate challenges to each expert's testimony) that, because Klein's and Lindquist's opinions are reliable and admissible, under Rule 703, Gleason was entitled to rely upon them in reaching his own opinions as to damages.

The Court has already ruled that the opinions of Klein and Lindquist are admissible and that it will be up to the jury to determine how much weight to give those opinions. Surely, defendant will be able to argue to the jury that, if it discredits the opinions of either Klein or Lindquist, or both, then that should cause it to discredit any of Gleason's calculations that were based on the discredited information.

Defendant's second argument is that Gleason "wrongly appl[ied] the 1992 Specification[,]" and that "[h]is decision to ignore the very contractual language he purports to apply [i.e., his decision not to utilize the No. 1 Heavy Melt price to perform his calculation] thus appears calibrated to obtaining a higher damages calculation, rather than an accurate one." (Def.

Mot. 188 at 8912.) Allied asserts that Gleason did not use the No. 1 Heavy Melt price to calculate the damages because that language in the 1992 Specification is merely an example and does not mandate its use.

This second argument raised by defendant to exclude Gleason's opinion is not a proper *Daubert* challenge. The Court will not exclude the testimony on that basis. However, this does not preclude any of the usual and appropriate evidentiary challenges that may be raised during the trial.

Defendant's motion to exclude Gleason's testimony with respect to damages as to Counts IV and V, on the basis of a purported *Daubert* challenge, is denied.

### c.    *Gleason's Opinion as to Damages on Counts I and II*

Defendant's challenge to Gleason's opinion as to damages on Counts I and II does not even come close to being a *Daubert* challenge. As properly pointed out by Allied in its opposition, all of defendant's arguments go to the weight of Gleason's opinion, not its admissibility.

This portion of defendant's motion is denied.

30

### III. CONCLUSION

As set forth in detail herein, plaintiff's motion in limine to preclude selected portions of the expert testimony of Berkeley Research Group (Doc. No. 185) is granted in part and denied in part; plaintiff's motion to strike supplemental rebuttal report of Berkeley Research Group (Doc. No. 224) is denied. Defendant's motion to exclude purported expert testimony and opinions of Allied experts Ed Klein, Gordon Lindquist, and Mark Gleason (Doc. No. 188) is denied.

**IT IS SO ORDERED**.

Dated: April 6, 2015

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**