# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ALLIED ERECTING & DISMANTLING CO., INC., | ) ) ) | CASE NO. 4:12-cv-1390 |
| PLAINTIFF, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) | **MEMORANDUM OPINION AND** |
| UNITED STATES STEEL CORPORATION, | ) ) ) | **ORDER (INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW)** |
| DEFENDANT. | ) ) ) | **[NUNC PRO TUNC TO CORRECT AMENDED JUDGMENT AMOUNT IN PARAGRAPH 3]** |

Before the Court is plaintiff Allied Erecting and Dismantling Co., Inc.'s ("Allied") Motion for Stay of Execution and Approval of Alternative Security [Doc. Nos. 318, 319].

## I.      PROCEDURAL HISTORY

1.      On September 25, 2015, the Court issued its Judgment Entry disposing of all the parties' claims and granting defendant United States Steel Corporation ("U.S. Steel") "a net judgment against Allied in the amount of $9,845,447.35, plus postjudgment interest from September 26, 2015 at the statutory rate set forth in 28 U.S.C. § 1961." [Doc. No. 314] ("Judgment Entry").

2.      On October 23, 2015, U.S. Steel moved to alter or amend the judgment with respect to Count II, arguing that it should not be required to pay any damages on that claim. [Doc. No. 328].

3.      On March 17, 2016, the Court granted U.S. Steel's motion to amend the judgment and issued an Amended Judgment Entry granting U.S. Steel "a net judgment against Allied in the

amount of $10,684,754.52, plus postjudgment interest from September 26, 2015 at the statutory rate set forth in 28 U.S.C. § 1961." [Doc. No. 369] ("Amended Judgment Entry").

4.       On October 9, 2015, Allied  filed its Motion for Stay of Execution and Approval of Alternative Security [Doc. No. 318] ("Motion for Stay") and Memorandum in Support [Doc. No. 319] ("Allied Memorandum"), along with supporting declarations from Allied President John Ramun [Doc. No. 320] and Allied's outside accountant Thomas Anness [Doc. No. 321] ("Anness October 9 Declaration").

5.       On October 22, 2015, U.S. Steel filed its Opposition to Allied's Motion for Stay [Doc. No. 324] ("U.S. Steel Opposition"). On that same day, U.S. Steel filed a Praecipe for Issuance of a Writ of Execution relating to a wide variety of Allied's assets, including Allied's vehicles, machinery, and equipment [Doc. No. 325] ("October 22 Writ").

6.       On October 23, 2015, Allied filed a Notice of Appeal [Doc. No. 327].

7.       On November 2, 2015, U.S. Steel filed a Praecipe for Issuance of a Writ of Execution relating to certain Allied bank accounts [Doc. No. 334] ("November 2 Writ").

8.       On November 2, 2015, Allied filed a Reply in Support of its Motion for Stay [Doc. No. 335] ("Allied Reply"), along with a supporting declaration from Allied President John Ramun [Doc. No. 336].

9.       On November 30, 2015, the Court conducted a hearing on the Motion for Stay and heard testimony from Thomas Anness[1] (by video deposition) and John Ramun. [Dec. 2, 2015 Minute Order].

---

[1] Mr. Anness is a CPA associated with the accounting firm of Anness, Gertech and Williams. He has performed tax and accounting services, including preparation of financial statements, for Allied since the early 1970's. Anness Depo. 6:5-7:5.

10.     On December 3, 2015, the hearing on the Motion for Stay continued, and the Court heard further testimony from John Ramun, as well as testimony from U.S. Steel's expert, James Falconi[2] of Berkeley Research Group ("BRG"). Tr. 59 and 174:12-14.[3]

11.     At the conclusion of the hearing, the Court requested Proposed Findings of Fact and Conclusions of Law from the parties [Dec. 4, 2015 Minute Order], which both parties timely submitted [Doc. Nos. 364 and 365].

## II.     FINDINGS OF FACT

### A.     Allied's Efforts To Get A Bond.

12.     Allied attempted to get a supersedeas bond in the full amount of the judgment. Tr. 60:1-4 (J. Ramun).

13.     As part of those efforts, Allied provided detailed financial information to three separate sureties. That financial information included information about Allied's assets, the Gordon Brothers equipment appraisal (discussed below in Section II.B.3), and the CBRE Report (discussed below in Section II.B.2(b)). Tr. 60:5-19 (J. Ramun); Exs. 3, 7.

14.     Allied pursued all possible options for securing a bond with those sureties, each of whom also had brokers involved, and Allied offered all of the assets of all Allied-related entities, which are comprised of Allied Consolidated Industries (the parent corporation), Allied Erecting and Dismantling, Allied Industrial Equipment, Allied Industrial Contracting, Allied Industrial Scrap, Allied Industrial Development Corporation, and Allied Gator (collectively the "Allied Entities") as collateral for the bond. Ex. 26; Tr. 10:6-18, 14:4-8; 60:20-61:5, 148:4-149:10. (J. Ramun).

---

[2] Mr. Falconi is a CPA and a certified fraud examiner who is also certified in financial forensics. Tr. 174:11-176:16 (J. Falconi). The Court finds that he is an expert in the field of accounting, pursuant to Fed. R. Evid. 702.

[3] Transcript citations used herein refer to the transcript of the November 30 and December 3, 2015 hearing on the Motion for Stay [Doc. Nos. 361-62]. Exhibit citations used herein refer to exhibits introduced at the same hearing.

15.     None of the three sureties was willing to issue a supersedeas bond utilizing those assets as collateral for the bond. Tr. 61:6-8 (J. Ramun).

**B.     Allied's Alternative Security Proposals.**

16.     In lieu of posting a bond in the full amount of the judgment, Allied is proposing to secure the judgment with some of Allied's equipment, real estate, and other assets; however, Allied's alternative security proposal does not include all of the assets that were offered to (and rejected by) the sureties as collateral for the bond. Tr. 61:14-62:2 (J. Ramun).

17.     Throughout the post-trial proceedings, in what seemed to be an ever-changing landscape, Allied has offered at least four iterations of its alternative security proposals.

18.     First, in its Motion for Stay, Allied offered to provide a security interest to U.S. Steel in "some combination" of Allied's dismantling equipment, attachment inventory, and/or structural steel to secure U.S. Steel's judgment. Allied Memorandum at 12; Tr. 116:8-12 (J. Ramun).

19.     Second, in its Reply, Allied offered to provide a security interest to U.S. Steel in certain parcels of Allied real estate, structural steel Allied salvaged from Fairless Works, and five categories of equipment and machinery. Allied Reply at 7; Tr. 118:3-6 (J. Ramun).

20.     Third, at the November 30, 2015 hearing on Allied's Motion for Stay of Execution, Allied seemingly offered to add to its alternative security proposal the Giddings & Lewis manufacturing equipment. Tr. 47:21-23, 118:7-15 (J. Ramun).

21.     Fourth, as it turns out, Allied's third alternative security proposal was "clarified" in its findings of fact as a willingness to substitute the Giddings & Lewis manufacturing equipment for another component that Allied offered in its Reply. [Doc. No. 365, proposed finding of fact at ¶ 37].

1.      **Structural steel.**

22.      As part of its alternative security proposal, Allied has offered to provide a security interest to U.S. Steel in certain structural steel owned by Allied. That structural steel is the material that Allied hand dismantled and match marked at Sheet & Tin during the Fairless project in order to reassemble it at Allied's headquarters in Youngstown, Ohio. Tr. 109:14-25 (J. Ramun).

23.      Allied values that structural steel at $7.1 million for purposes of its alternative security proposal. Allied Reply at 7; Tr. 110:1-4 (J. Ramun). The sole basis for that $7.1 million valuation, however, is a pre-trial estimate prepared by Mr. Falconi. Allied did not engage an independent expert to provide a valuation of the structural steel. Tr. 110:5-15 (J. Ramun).

24.      But Mr. Falconi, who the Court finds credible, clarified that Allied did not have a fair understanding of his earlier opinion. Tr. 196:25-197:3 (J. Falconi). Mr. Falconi's earlier opinion assumed that, instead of selling the steel for scrap, Allied would use the steel to re-build on its property in Youngstown the same buildings that Allied hand dismantled at Fairless Works. Thus, the buildings would essentially be moved, albeit in pieces, and then reassembled. Ex. 12 at 7-8; Tr. 196:5-24 (J. Falconi). The $7 million valuation was Mr. Falconi's estimate of what fabricated steel for such buildings would have cost on the market at the time the steel was acquired by Allied. In other words, it represented the value specific and unique to Allied in the sense that Allied otherwise would have had to spend approximately $7 million to acquire the same structural steel for use in the same buildings—buildings that Allied had a need for and wished to construct on its premises. *Id.*

25.      If the same steel were to be liquidated, however, there may not be any buyer who wishes to use the steel to rebuild those same buildings. Thus, in the liquidation context, the value of the steel on the scrap market is a better estimate of what the steel could actually garner to

satisfy U.S. Steel's judgment. Tr. 197:5-21 (J. Falconi). Using prevailing market prices for scrap, Mr. Falconi put a significantly lower scrap value on the steel of approximately $403,000. Ex. 12 at 7-8; Ex. 36; Tr. 197:15-24 (J. Falconi).

26.     Moreover, the structural steel that Allied is offering as part of its proposed alternative security was offered to the sureties as collateral for the supersedeas bond. The sureties rejected a package that contained that collateral. Tr. 61:6-8; 112:16-20 (J. Ramun).

### 2.     Real estate.

27.     As part of its alternative security proposal, Allied has offered to provide a security interest to U.S. Steel in a number of parcels of real estate owned by Allied or Allied Industrial Dismantling. The real estate consists of 2100 Poland Avenue (which includes the Allied corporate office building and manufacturing facility), 2039 Poland Avenue, 1312 Poland Avenue, and 166 parcels of vacant land. Tr. 64:3-66:12 (J. Ramun); Ex. 5; Ex. 22, Att. 3; Anness Dep. 23:3-24:12 (Nov. 25, 2015) [Doc. No. 363-1] ("Anness Dep.").

### (a)     Mahoning County tax appraisal.

28.     The real estate Allied is offering as part of its alternative security proposal has a total Mahoning County 2014 tax valuation of $6,972,820. Allied Reply at 7; Exs. 5-6; Ex. 22, Att. 3; Anness Dep. 24:20-25:14, 26:13-20.[4]

29.     The majority of the $6,972,820 tax valuation relates to the office building (Allied's headquarters) and manufacturing facility at 2100 Poland Avenue. Tr. 67:13-16 (J. Ramun); Ex. 22, Att. 3 ($6.28 million of $6.97 million tax valuation relates to office building and manufacturing facility).

---

[4] This value is substantially less than the $40 million in real estate carried on Allied's books, which is based on cost, not market, value. Ex. 1; Anness Dep. 10:13-11:15.

**(b)      Valuation of the 2100 Poland Avenue parcel.**

30.      At the request of one of its lenders, JP Morgan Chase, Allied undertook a valuation of the parcels on which its manufacturing facility and corporate headquarters sit--a 46.13-acre area at or adjacent to 2100 Poland Avenue and owned by Allied. Ex. 7; Anness Dep. 28:7-29:1; Tr. 69:9-17 (J. Ramun). The valuation was performed by an entity called CBRE, who generated a Valuation Report dated October 10, 2013. Ex. 7 ("CBRE Report"), at viii and1.

31.      The CBRE Report concludes that the value of the parcels at 2100 Poland Avenue is $7,330,000 "as is," and has an allocated real estate value of $6,998,000. CBRE Report at ix; Anness Dep. 29:18-20.

32.      The CBRE valuation is dependent on an assumption of the accuracy of Allied's 2013 cost estimation of $800,000 to $1,000,000 to complete the manufacturing facility. The CBRE Report specifically "reserve[s] the right to alter [its] opinion of value if that estimate is found to not be accurate or varies." CBRE Report at x.

33.      That assumption proved to be incorrect. Mr. Ramun testified at the hearing that, over two years later, the manufacturing facility is still not complete, and it will cost approximately $3 million to complete the facility. Tr. 68:11-16 (J. Ramun).

34.      The CBRE Report's valuation is also based on key market assumptions that may not hold true. First, it is based on market opportunities that Allied's accountant admits have changed since 2013, specifically regarding the energy (fracking) industry. CBRE Report at ix; Anness Dep. 93:13-94:5. Second, the over two-year age of the valuation means that it may no longer reflect current market conditions and is therefore unreliable. Tr. 198:20-199:3 (J. Falconi). Third, the CBRE Report does not reflect the parcel's "forced liquidation" value. In the execution or liquidation context, a perfect buyer who wants just such a facility may not emerge, and the

7

property is more likely to be sold at a discount. Tr. 198:12-19 (J. Falconi). Allied has offered no evidence of the property's liquidation valuation.

35.     Finally, the CBRE Report's valuation "specifically assumed that the property is not affected by any hazardous materials that may be present on or near the property," a key assumption that may not prove true. CBRE Report at 19; *see also id.* at 71; Anness Dep. 94:22-95:14. Both parties' accountants agreed that future remediation costs can affect the fair market value of a property. Ex. 12 at 8; Tr. 199:4-16 (J. Falconi); Anness Dep. 101:11-21. Potential environmental issues related to this and other Allied real estate parcels are discussed in the next Section.

### (c)     Environmental issues.

36.     Allied offered an LCS Environmental Site Assessment Report dated September 26, 2013 relating to the 46.13 acre parcel at 2100 Poland Avenue in Youngstown, Ohio. Ex. 23 ("LCS Report"); Tr. 82:2-8 (J. Ramun).

37.     The LCS Report includes the corporate office and manufacturing facility at 2100 Poland Avenue. LCS Report at 1.

38.     The LCS Report is a Phase 1 Environmental Assessment. LCS Report at 1. A Phase 1 Environmental Assessment is limited to interviews, a site reconnaissance, and a review of historical documents. LCS Report at 7; Tr. 83:8-11 (J. Ramun). The LCS Report did not involve any physical testing. LCS Report at 7; Tr. 83:23-25 (J. Ramun).

39.     The LCS Report states that "[t]he following conditions indicative of releases or threatened releases of hazardous substances on, at, in, or to the subject property were identified based on LCS' historical research: The subject property was used as a contractor's yard from at least 1989 through 1998[;] A previous study indicated that one to two feet of slag fill was present on a portion of the subject property . . . [; and] Adjacent properties have historically included an

east adjacent rail yard (from at least 1928 through at least 1998) and scrap specialists (from at least 1984 through at least 1998." LCS Report at 2.

40.     The LCS Report is the only environmental report, audit, or testing that Allied provided for the parcel that contains the Allied office building and manufacturing facility at 2100 Poland Avenue. Allied has not offered any environmental clearance from any government entity for the parcel that contains the Allied office building and manufacturing facility at 2100 Poland Avenue.

41.     Allied did not provide any meaningful environmental report, audit, or testing for any other real estate parcel that is part of its proposed alternative security. Allied has not offered any meaningful environmental clearance from any government entity for any other real estate parcel that is part of its proposed alternative security.[5]

42.     Many of the prior owners of the property on the north side of Poland Avenue (across the road from the Allied office building and manufacturing facility) were known to produce environmental waste, including Union Carbide, LTV Steel, Penn Iron and Metal, and Pittsburgh and Lake Erie Railroad Company. Tr. 88:17-89:11 (J. Ramun); Ex. 22, Att. 3.

43.     The real estate that Allied is offering as part of its proposed alternative security was offered to the sureties as collateral for the supersedeas bond. The sureties rejected a package that contained that collateral. Tr. 108:8-109:2 (J. Ramun).

---

[5] While Allied did offer a February 16, 1989 letter from LTV Steel that Allied alleges reflects soil testing at the parcels across the road from Allied's office building and headquarters, that document contains double, or even triple hearsay. Moreover, it purports to reflect testing that was performed 26 years ago and appears to pertain only to one 30.797-acre vacant parcel (53-042-0-008.01-0) located on Center Street in Youngstown, Ohio, and owned by Allied Industrial Development. Exs. 5, 6, 35; Tr. 155:18-157:18, 169:8-12 (J. Ramun). This is one parcel among the 166 vacant parcels offered by Allied, but its test results reveal nothing of the possible environmental hazards that might (or might not) be present on the other parcels and only accounts for a small percentage (less than 10%) of the total acreage being offered as alternate security.

### 3. Equipment and machinery.

44. As part of its alternative security proposal, Allied has offered to provide a security interest to U.S. Steel in certain equipment and machinery. Allied Reply at 7; Tr. 114:12-15 (J. Ramun).

45. Allied values the specific equipment and machinery that it is proposing as alternative security at $1,020,000. Allied Reply at 7; Tr. 114:16-19 (J. Ramun).

46. The sole basis for that $1.02 million figure is a valuation, also conducted at the request of Allied's lender JP Morgan Chase, prepared by Gordon Brothers. Gordon Brothers produced a report dated June 17, 2015 reflecting its valuation of Allied's equipment and machinery. Ex. 3 ("Gordon Brothers Report"). The Gordon Brothers Report presented both a forced (lower) liquidation value and an orderly (higher) liquidation value for the equipment, and Allied chose to utilize the orderly (higher) liquidation value in reaching its $1.02 million valuation. Tr. 114:20-115:6 (J. Ramun).

47. But when Allied's assumptions about the sale of its equipment are tested against the actual results of Allied's two recent equipment auctions in September and November of 2015, it is clear that Allied's proposed valuation is grossly optimistic. At actual auctions, Allied's equipment sold below the forced (lower) liquidation value estimated by Gordon Brothers, and some of those diminished proceeds went to pay the auction company. Ex. 12 at 8-9; Exs. 39, 40; Tr. 200:5-203:13 (J. Falconi). In addition, Allied did not reduce the value of its remaining equipment fleet by the overhead costs associated with the sale of those assets. Anness Dep. 83:18-87:3.

48. When compared against Allied's historical performance at recent equipment auctions, the equipment and machinery Allied is offering as part of its alternative security is

10

likely worth significantly less than Allied suggests and, according to Mr. Falconi, perhaps even as little as $616,000. Ex. 12 at 8-9; Exs. 39, 40; Tr. 200:5-203:13 (J. Falconi).

49.     Moreover, the equipment and machinery that Allied is offering as part of its proposed alternative security was offered to the sureties as collateral for the supersedeas bond. The sureties rejected a package that contained that collateral. Tr. 61:6-8; 115:23-116:3 (J. Ramun).

### 4.     Manufacturing equipment.

50.     As part of its alternative security proposal, Allied—for the first time—offered at the November 30, 2015 hearing to provide a security interest to U.S. Steel in additional equipment and machinery. Tr. 47:21-23, 118:7-15 (J. Ramun).

51.     Specifically, Allied offered to provide a security interest to U.S. Steel in Allied's Giddings & Lewis manufacturing equipment. Allied purchased the manufacturing equipment in 2006, and it is nearly 10 years old. Tr. 118:16-19 (J. Ramun). As previously indicated, however, Allied is not offering this equipment in addition to the other property but, rather, in lieu of some of it. [Doc. No. 365, proposed finding of fact at ¶ 37.]

52.     The Gordon Brothers Report values the Giddings & Lewis manufacturing equipment at $4.8 million in an orderly liquidation and $3.5 million in a forced liquidation. Gordon Brothers Report at 18; Tr. 119:1-5 (J. Ramun).

53.     Once again, however, Allied's recent equipment auctions must guide the Court as to the accuracy of the Gordon Brothers valuation. That experience shows that this equipment is likely to garner less than 90% of its forced (lower) liquidation value or less than approximately $3.15 million. Tr. 203:22-204:10 (J. Falconi).

54.     Significantly, in its proposed findings of fact, Allied further clarified that this equipment was being offered in lieu of, or in substitution of, some portion of the alternative

11

security that Allied "already proposed." Thus, it is not being offered in addition to the other proposed security. [Doc. No. 365, proposed finding of fact at ¶ 37.]

55.     Moreover, the Giddings & Lewis manufacturing equipment that Allied is now offering as part of its proposed alternative security was offered to the sureties as collateral for the supersedeas bond. The sureties rejected a package containing that collateral. Tr. 61:6-8; 119:12-15 (J. Ramun).

### 5.     Professionals' security interest and offer to subordinate.

56.     As of November 3, 2015, Allied owed $1,266,304 to Eckert, Seamans, Cherin, and Mellott, LLC;  $175,462.52 to Nadler, Nadler, and Burdman Co., LPA; and $196,208 to Anness, Gerlach, and Williams. Ex. 24 at ¶ 8; Tr. 90:1-13 (J. Ramun).

57.     In August 2015, Eckert, Seamans, Cherin, and Mellott ("Eckert"); Nadler, Nadler, and Burdman ("Nadler"); and Anness, Gerlach, and Williams ("AGW") (Eckert, Nadler, and AGW referred to collectively as the "Allied Professionals") asked Allied to enter into a series of agreements to provide the Allied Professionals with a security interest in Allied's assets. Tr. 90:14-19 (J. Ramun).

58.     On August 24, 2015, Allied and the Allied Professionals entered into an Open-End Mortgage, Security Agreement and Assignment of Rents and Profits that assigned to the Allied Professionals a security interest in certain real property owned by Allied, including the Allied corporate office and manufacturing facility at 2100 Poland Avenue that Allied has offered as part of its alternative security proposal. Ex. 25 ("Mortgage"); Tr. 91:16-92:2, 92:14-18, 93:8-11 (J. Ramun).

59.     The amount of the Allied Professionals' security interest in the mortgaged real property includes all amounts then due and owing to the Allied Professionals, along with any

future additional amounts owed to the Allied Professionals, up to a maximum of $3 million. Mortgage § 5.4; Tr. 93:18-94:9 (J. Ramun).

60.    On August 24, 2015, the Allied Entities and the Allied Professionals also entered into a Consideration and Security Agreement All Assets that assigned to the Allied Professionals a security interest in essentially all of the assets of the Allied Entities, including the structural steel, machinery, and equipment that Allied has offered as part of its alternative security proposal. Ex. 26 ("All Asset Security Agreement") § 1; Tr. 94:14-97:17, 115:7-12, 119:6-9 (J. Ramun).

61.    The All Asset Security Agreement affords the Allied Professionals a number of rights with respect to the assets of the Allied entities, including "the right to take possession of all Goods in which [the Allied Professionals have] been granted a security interest pursuant to this Agreement . . . ." All Asset Security Agreement § 8.1; Tr. 97:18-98:20 (J. Ramun). In addition, the All Asset Security Agreement affords the Allied Professionals "the right to sell or otherwise dispose of the Collateral or any part thereof or any interest therein at any time or from time to time." All Asset Security Agreement § 8.4; Tr: 98:21-99:7 (J. Ramun).

62.    The security interests in favor of Allied's Professionals are reflected in a UCC Financing Statement that was filed with the Mahoning County, Ohio Recorder on August 25, 2015. Ex. 27 ("UCC Statement") (the Mortgage, the All Asset Security Agreement, and the UCC Statement are referred to collectively as the "Allied Professionals' Security Instruments").

63.    Allied and the Allied Professionals first discussed the possibility of entering into the Allied Professionals' Security Instruments after the trial in this matter concluded on June 4, 2015. Tr. 100:18-101:4 (J. Ramun). Despite their approximately 30-year history representing

13

Allied, none of the Allied Professionals had ever before asked Allied to sign such security agreements. Tr. 101:5-7 (J. Ramun).

64.     Allied does not know the amount of Eckert's security interest in August 2015 when the Allied Professionals' Security Instruments were signed, and Allied does not know the amount of Eckert's current security interest. Allied does know, however, that the amount of Eckert's security interest is increasing. Tr. 101:24-102:7 (J. Ramun).

65.     Allied does not know the amount of Nadler's security interest in August 2015 when the Allied Professionals' Security Instruments were signed, and Allied does not know the amount of Nadler's current security interest. Tr. 102:8-15 (J. Ramun).

66.     Allied does not know the amount of AGW's security interest in August 2015 when the Allied Professionals' Security Instruments were signed, and Allied does not know the amount of AGW's current security interest. Tr. 102:16-22 (J. Ramun).

67.     The Allied Professionals' Security Instruments were signed in late August 2015 after the jury verdict and before the Judgment Entry. The security interests reflected in those documents purport to attach to all the property in Allied's proposed alternative security.

68.     Near the end of the December 3, 2015 hearing on Allied's Motion for Stay, Allied's counsel represented that he had authority on behalf of the Allied Professionals to offer to subordinate their security interests in the proposed alternative security to that of U.S. Steel in the event the Court approves the proposed alternative security. Tr. 163:7-164:7. Notably, however, in its proposed findings of fact, Allied clarifies that the Allied Professionals "have not agreed to subordinate their security interest in any property or equipment of Allied above and beyond that contained within the alternative security package . . . comprised of the 'Secured Assets' specifically identified in Document No. 335-1, PageID# 21963-64." [Doc. No. 364 at n.

3.] The reason for this is that Allied may need to liquidate some of its other property to pay the Allied Professionals and other trade creditors. *Id.*

### 6.    Conclusions regarding the proposed alternative security.

69.    Based on his valuation of the proposed alternative security, Mr. Falconi reached a conclusion to a reasonable degree of accounting certainty that the proposed alternative security is insufficient to secure U.S. Steel's judgment pending the appeal of this matter. Tr. 204:11-15 (J. Falconi). The Court agrees with that conclusion.

70.    The Court finds that there are significant reasons to doubt Allied's valuation of its proposed alternative security and concludes that the value of the proposed alternative security is well short of the approximately $15 million estimate Allied has represented. Allied Reply at 7.

71.    Specifically, the Court finds that Allied has established a proposed alternative security value of approximately $4,169,000, given the scrap value of the structural steel, the uncertain value of the real estate, and the realistic value of the equipment based on recent, actual auctions of Allied's equipment. This figure consists of approximately $403,000 for the structural steel, approximately $616,000 for the originally-proposed equipment pieces, and approximately $3,150,000 for the Giddings and Lewis manufacturing equipment offered in lieu of other previously proposed alternate security. Ex. 12 at 5-9; Tr. 203:22-204:7 (J. Falconi).

72.    Moreover, the Court finds that the Allied Professionals' security interests have the potential to significantly impact the value of the proposed alternative security and spawn litigation regarding priority interests in the real property and equipment being offered to secure the judgment. The amount of that impact is unknown because Allied has failed to establish the amount of the security interest. Moreover, the Court finds that the Allied Professionals' control over the proposed alternative security (including the right to take possession of and sell those

15

assets) provides further evidence that the proposed alternative security is insufficient to secure U.S. Steel's judgment. Exs. 25, 26, 27; *supra* ¶ 60.

73.      Finally, the Court finds the three independent, third-party sureties' refusal to accept as collateral for the supersedeas bond the very assets that Allied is offering to U.S. Steel as alternative security is strong evidence that the alternative security is inadequate. Indeed, Allied unsuccessfully offered the sureties assets well in excess of the proposed alternative security, including all of the assets of the Allied Entities. Specifically, the Court finds that the sureties' refusal to accept all of the Allied Entities assets as collateral for an obligation of the same exact amount as the U.S. Steel judgment confirms that the proposed alternative security is insufficient. This is especially true when the assets being offered to U.S. Steel are only a portion of the value of the assets being offered to the third-party surities.

### C.      Allied's Post-Verdict and Post-Judgment Asset Transfers.

74.      Allied has engaged in several post-verdict and post-judgment asset transfers that lead the Court to question Allied's representations that it will secure its assets for U.S. Steel's eventual execution post-appeal. Those include the following.

#### 1.      Manufacturing equipment transfer from Allied Erecting and Dismantling to Allied Gator.

75.      A comparison of Allied's September 2015 and June 2015 financials reveals a recent movement of assets from Allied to Allied Gator. Specifically, Mr. Falconi identified a decrease in Allied's assets, coupled with an increase in Allied Gator's assets, and a corresponding increase in debt from Allied Gator to Allied, all of which occurred on September 30, 2015—after the Court's September 25, 2015 Judgment Entry. Exs. 1, 37; Ex. 12 at 10-13; Tr. 181:23-184:1, 189:20-190:22 (J. Falconi). Allied Gator's equipment assets increased by over $8

million, and the intercompany debt to Allied increased by a post-depreciation amount of nearly $7 million. Exs. 1, 10, 37; Ex. 12 at 10; Tr. 189:4-190:22 (J. Falconi).

76.     Allied does not contest the substance of its financial statements. Instead, it claims that Allied Gator initially bought equipment for Allied's manufacturing facility, but the equipment was wrongly placed on Allied's books. Ex. 38. Mr. Anness characterized the accounting as an "inadvertent error," and said that the machines were "reflected on the Allied Erecting fixed asset schedule when [they] should have been on the depreciation schedule of Allied Gator." Anness Dep. 43:16-44:7. Allied claims that it attempted to correct its mistake by placing the manufacturing equipment on Allied Gator's books instead of Allied's, on September 30, 2015. Ex. 38; Anness Dep. 38:7-9 (alleging that Allied corrected the mistake via "a reclassification from one depreciation schedule" to another). Mr. Anness initially, though not consistently, denied any transfer of assets. Anness Dep. 44:14-25.

77.     Allied's financials are not consistent with its explanation that this was simply an accounting mistake and not a transfer of assets.

78.     As Mr. Falconi explained, if the assets were mistakenly on the wrong books, one would expect to see a correction to shareholder's equity, with the equity of Allied decreasing (to account for assets that should not have been there) and the equity of Allied Gator increasing (in accordance with the additional assets). Tr. 186:10-188:9 (J. Falconi). Instead, Allied's financials show changes in intercompany receivables, or the amounts that Allied Gator owed to Allied, which is not consistent with Allied's explanation that it was fixing a "mistake." *Id.*

79.     Mr. Falconi further explained that it is not likely for such assets to have appeared on a depreciation schedule by mistake, because such schedules have to be reconciled to the company financials. Tr. 184:2-185:19 (J. Falconi). In this case, the transferred equipment

remained on Allied's books, as an asset, apparently for years, giving the impression that it was consciously accounted for in that manner. *Id.*

80.     Allied's own intercompany reconciliation reflects intercompany debt from Allied Gator to Allied that would result from a movement of assets. Ex. 13; Anness Dep. 103:8-104:10; Tr. 246:21-248:11 (J. Falconi).

81.     Additionally, Allied's September 30, 2015 accounting journal entries characterize the transaction as a "Transfer of Asset from Allied Erecting to Allied Gator," the amount of that transfer being $8,682,235. Ex. 10; Tr. 132:11-13 (J. Ramun). That $8.6 million "Transfer of Asset from Allied Erecting to Allied Gator" occurred five days after the Court issued the $9.8 million Judgment Entry in U.S. Steel's favor in this case. The same September 30, 2015 journal entries increased Allied's intercompany receivable due from Allied Gator by $6,752,849 and increased Allied Gator's intercompany payable to Allied by $6,752,849. Ex. 10.

82.     Thus, Allied's accounting records are consistent with Mr. Falconi's opinion that assets did move from Allied to Allied Gator.

83.     Moreover, despite his original denial, Mr. Anness characterized the relevant accounting as a "transfer" multiple times. Anness Dep. 46:21-47:6, 103:8-104:10, 106:7-107:9, 109:15-18, 110:25-111:15. Mr. Falconi testified that such characterizations were consistent with his opinions concerning the transfer. Tr. 191:12-192:5 (J. Falconi).

84.     In addition, the timing of the asset transfer is telling. Though the equipment was purchased in 2006, no purported correction was undertaken to Allied's financials until September 30, 2015. Ex. 10; Anness Dep. 39:24-40:3, 43:21-25. The Court entered judgment on September 25, 2015. It is not credible that a multi-million-dollar mistake could go unnoticed for

nearly a decade and then suddenly be discovered and corrected only five days after judgment was entered.

85.     The Court also rejects Allied's explanation for an additional reason: the contention that Allied Gator was the original purchaser of the transferred assets is not credible.

86.     Allied's own testimony defeats its position on this point. Allied originally contended that Allied Gator is the entity that bought the manufacturing equipment that is to be placed in Allied's manufacturing facility. Ex. 38; Tr. 131:2-6 (J. Ramun); *see also* Anness Dep. 38:12-16. Allied subsequently conceded, however, on multiple occasions, that the funds used to purchase the manufacturing equipment actually came from Allied Consolidated Industries, which obtained its funds from various entities, including Allied. Tr. 150:8-18 (J. Ramun); Anness Dep. 105:8-107:9, 108:10-109:9.

87.     Though invoices for the equipment show Allied Gator's name, the Court finds that that is not indicative of ownership, especially when Allied has admitted that the money to purchase the equipment did not come from Allied Gator. Ex. 10; Tr. 217:23-218:13, 244:12-25 (J. Falconi).

88.     Furthermore, Allied's own intercompany receivables identify the source of the funds used to buy the equipment, and they indicate it was Allied. Anness Dep. 110:4-111:15. If Allied Gator had bought the equipment in 2006, there would have been no need to ever associate the equipment with an intercompany debt to Allied. Tr. 188:10-18 (J. Falconi). Thus, the undisputed intercompany receivable is irreconcilable with Allied's claims.

89.     Additionally, in his analysis of Allied Gator's financials, Mr. Falconi testified that Allied Gator had not generated enough cash historically to have paid for the transferred equipment. Ex. 12 at 11-12; Tr. 188:19-189:3 (J. Falconi).

90. There are other, non-financial, reasons for believing the equipment was purchased by Allied, not Allied Gator. Allied is the entity that owns the office building and manufacturing facility at 2100 Poland Avenue. Tr. 130:16-19 (J. Ramun). Allied is the entity that contracted with U.S. Steel to perform manufacturing work. Tr. 130:20-23 (J. Ramun). Allied is the entity that accepted the $10 million manufacturing advanced payment from U.S. Steel. Tr. 130:24-131:1 (J. Ramun). It is likely that Allied would have funded the equipment put in the facility.

91. The evidence that Allied Gator did not initially purchase the equipment at issue bolsters the conclusion that the assets must have been transferred from Allied to Allied Gator.

92. The effect of this transfer is to remove millions of dollars in assets from the entity against which U.S. Steel has a judgment. Allied's Intercompany Reconciliation statement reveals that, as of September 30, 2015, Allied Gator owes Allied $13,246,998, an amount which includes this transfer and which Allied's accountants admit Allied Gator cannot pay. Ex. 13; Anness 103:17-105:7. Allied's President, John Ramun, also admitted that there's no plan for Allied Gator to pay Allied the $13.2 million; in fact, he denied that Allied Gator owes Allied the $13.2 million recorded in Allied's own financials. Tr. 143:19-144:4 (J. Ramun). Thus, the effect of this transfer is that Allied has replaced tangible assets of real value with a debt from Allied Gator that is likely uncollectible. Tr. 190:23-191:11 (J. Falconi).

### 2. Scrap transfers from Allied Erecting and Dismantling to Allied Industrial Scrap.

93. Mr. Anness explained that Allied generates scrap, which it owns, as part of its operations, but those scrap assets are sold by another entity, Allied Industrial Scrap ("AIS"), and the proceeds are kept in yet another entity, Allied Consolidated Industries. Anness Dep. 62:22-64:15, 65:18-66:25; Tr. 192:19-193:13 (J. Falconi).

94.     After the proceeds of Allied's scrap are accounted with AIS, AIS "loans" the proceeds back to Allied, leaving Allied with approximately $20 million in debt to AIS for the value of the scrap Allied generated. Ex. 13; Tr. 194:3-16 (J. Falconi). Essentially, Allied's tangible scrap assets are converted to a liability to another entity. *Id.*

95.     Allied's own intercompany reconciliation shows the magnitude of this asset diversion, indicating that Allied owes AIS over $20 million. Ex. 13; Tr. 193:14-194:19 (J. Falconi).

96.     This ongoing practice of value migration from Allied to AIS will continue to drain Allied of assets. Tr. 220:11-17 (J. Falconi).

### 3.     Purported security interests created post-verdict.

97.     The Allied Professionals' security interests also constitute a post-verdict transfer of assets that U.S. Steel has argued is voidable under the Ohio Fraudulent Transfers Act. *See generally* Objection to Distribution of Auction Proceeds [Doc. No. 344] ("U.S. Steel Objection").

98.     As set forth above and in U.S. Steel's Objection, despite their approximately 30-year history representing Allied, none of the Allied Professionals had ever asked Allied to sign security agreements before the verdict in this case. Tr. 101:5-7 (J. Ramun). The timing of the attempted creation of these purported security interests, which were executed after the jury verdict but before the entry of an executable judgment, raises suspicion as to the propriety of Allied's behavior with respect to U.S. Steel's collection efforts.

### 4.     Conclusions regarding Allied's asset transfers.

99.     Based on the post-judgment transfer of Allied's equipment assets to Allied Gator, Allied's ongoing scrap asset transfers to AIS, and the post-verdict but pre-judgment attempts to create a secured interest in essentially all of the Allied Entities' assets in favor of the Allied

Professionals, Mr. Falconi reached a conclusion to a reasonable degree of accounting certainty that U.S. Steel has reasonable grounds for insecurity concerning the availability of assets to satisfy the judgment after an appeal. Tr. 194:25-195:16 (J. Falconi). The Court agrees.

### D.   Allied's Financial Condition.

100.    While Allied claims that it currently has sufficient assets to satisfy U.S. Steel's judgment or to secure a full supersedeas bond, the Court finds that Allied's financial status is likely to deteriorate significantly during the time that an appeal is pending in this case.

#### 1.   Allied's current ability to secure a bond.

101.    In September and November 2015, Allied sold hundreds of pieces of its equipment. Tr. 120:16-19 (J. Ramun). Those equipment auctions generated over $7 million in net proceeds and were used to pay off Allied's secured debt with JP Morgan Chase. Exs. 2, 39, 40; Anness Dep. 18:4-19:12.

102.    Allied's business plan going forward includes selling additional assets to generate revenue. Tr. 48:22-49:3, 120:20-23 (J. Ramun).

103.    Allied concedes that it has sufficient additional assets that it could sell in order to post the bond or to pay the judgment in the event that Allied's appeal is unsuccessful. Tr. 119:18-22, 120:3-9 (J. Ramun); Allied Memorandum at 7-8, 11 ("In sum, if and when U.S. Steel is permitted to execute on the judgment, there will be adequate resources available to pay the judgment amount."); Ex. 4 ¶¶ 7-9. Allied's accountant agrees that Allied currently has sufficient assets to satisfy the judgment. Anness Dep. 15:4-7.

104.    Allied has refused to liquidate those assets to pay for the bond, asserting that "[t]he damage would be horrific." Tr. 120:3-9 (J. Ramun). Yet, Allied is signaling a willingness to sell assets to pay the Allied Professionals and other creditors. [Doc. No. 365 at n. 3.]

## 2.    Allied's deteriorating financial condition.

### (a)    No current contracts.

105.    At the hearing, it was established that Allied has no contracts in progress where it is actually performing work. Tr. 122:9-11 (J. Ramun); Anness Dep. 72:5-18.

106.    Allied is not currently performing any work for U.S. Steel, and the parties' 2010 Dismantling Services Agreement expired at the end of December 2015. Tr. 121:6-15 (J. Ramun).

107.    Moreover, it is likely that Allied's operations will be further "diminished" as Allied goes forward. Tr. 48:1-14, 124:22-125:9 (J. Ramun).

108.    Allied's manufacturing facility is still not complete. Tr. 68:11-16 (J. Ramun).

109.    In addition, Allied Gator does not have any pending orders for Gator attachments, and its business is "slower than normal." Tr. 122:12-23 (J. Ramun).

### (b)    Losing money.

110.    Allied and the affiliated Allied Entities do not currently exhibit signs that they are financially healthy companies.

111.    *First*, Allied concedes that the Allied Entities collectively have very little cash on hand—only $1,009 as of September 30, 2015—and owe their creditors (outside of U.S. Steel) between $2.6 million and $2.7 million. Anness Dep. 10:10-12, 56:25-57:3; Tr. 123:11-13 (J. Ramun).

112.    *Second*, Allied's current cash flow is negative. Mr. Anness produced a cash-flow analysis for Allied, which allegedly demonstrated a "burn rate," or a loss of cash, of approximately $105,000 per month. Ex. 9; Anness Dep. 33:22-34:6. Thus, even under Allied's own best estimate, it is losing money.

113.    Furthermore, there are reasons to believe that Allied has presented an overly optimistic picture of its financial condition. Mr. Anness' estimate includes income resulting from

23

the one-time disposition of assets, deferred contract revenue, and other sources of income that are not representative of ordinary operating income. Tr. 210:21-212:1 (J. Falconi); Anness Dep. 36:3-6 (admitting that the cash-flow analysis includes income from at least one auction); *id.* at 73:19-79:3 (admitting that Allied's accounting of its working capital and cash flows are affected by numerous sums that are not tied to actual operating income).

114.    To produce a more meaningful assessment of Allied's cash flows related to actual operating income, Mr. Falconi used a standard accounting metric called EBITDA (earnings before interest, taxes, depreciation, and amortization). Ex. 12 at 18-19; Tr. 212:2-214:9 (J. Falconi). Focusing on Allied's income from actual operations demonstrates that, even when considering all income generated by all the Allied Entities, the Allied Entities collectively lose over $200,000 per month. *Id.*

115.    This means that the Allied Entities are likely to continue to lose money, further diminishing future assets. Tr. 214:10-16 (J. Falconi).

116.    Furthermore, both parties' accountants agreed that, if one does not consider the one-time sale of income-generating assets, Allied lost approximately $7 million between March and September 2015, before taxes. Ex. 1; Anness Dep. 67:6-69:11; Tr. 214:17-24 (J. Falconi).

117.    Finally, Allied's accountant admitted that Allied currently cannot generate income from any source other than the sale of its assets. Anness Dep. 82:6-12. And Allied's two recent auctions to pay off its defaulted line of credit resulted in the loss of 40% of it its income-generating fleet of equipment, reducing its ability to generate future revenue. Tr. 206:9-21 (J. Falconi).

118.    **Third**, the Allied Entities do not have sufficient working capital, even when considering all their resources combined. *See generally*, Ex. 12 at 14-16; Tr. 206:22-210:20 (J. Falconi).[6]

119.    In addition, Allied can no longer draw working capital from its line of credit. As discussed below, Allied lost its line of credit with JP Morgan Chase and has not replaced it with another line of credit. Anness Dep. 58:3-21.

### (c)      JP Morgan default and loss of letter of credit.

120.    Prior to the equipment auctions Allied held in September and November of 2015, JP Morgan Chase had declared multiple events of default relating to its loans to Allied. Exs. 31, 32; Tr. 126:15-128:17 (J. Ramun).

121.    The primary reason for the September and November equipment auctions was to pay off loans that Allied owed to JP Morgan Chase. Tr. 125:14-21 (J. Ramun). Specifically, Allied paid off a JP Morgan Chase term loan and letter of credit. Tr. 130:8-11 (J. Ramun).

122.    Allied has been unable to replace the JP Morgan Chase line of credit. Tr. 130:12-14 (J. Ramun).

123.    A line of credit is an essential aspect of a business like Allied's, where the use of credit allows the company sufficient resources to carry out projects that generate cash, which is then used to pay down credit, as well as operate and grow the business. Ex. 12 at 13-14; Tr. 204:16-206:8 (J. Falconi). Loss of a line of credit is a red flag as to whether the company can continue to operate as a going concern, and can signal uncertainty about a company's future. *Id.*

---

[6] Allied claims that Allied Gator is an operational company with an active inventory, but Allied has not offered any evidence to contradict the evidence that Allied Gator's inventory is slow-moving, such as proof of sales, work in progress, or other financial analyses. Tr. 122:12-23 (J. Ramun).

**(d)    Business plan.**

124.    Allied's business plan going forward includes processing and selling scrap, as well as selling other assets. Tr. 48:22-49:3, 120:20-23 (J. Ramun).

125.    Allied has not produced any sufficient business plan, recovery plan, or scaling plan that would indicate a viable plan to continue operating as a going concern. Tr. 215:3-9 (J. Falconi).

**3.    Conclusions regarding Allied's financial condition.**

126.    Based on Allied's lack of contracts, continuing loss of cash, negligible, if any, working capital, and lack of credit, Mr. Falconi reached a conclusion to a reasonable degree of accounting certainty that it is very questionable whether Allied can continue as a going concern. Tr. 215:18-216:4 (J. Falconi). The Court agrees.

127.    Mr. Falconi also concluded that the value of Allied's assets is likely to decrease going into the future. Tr. 216:5-9 (J. Falconi). The Court agrees.

128.    In contrast, Allied's accountant expressed no analysis or opinion regarding Allied or any of the other Allied Entities as a going concern. Anness Dep. 13:17-20, 55:24-56:12. He offered no evaluation of Allied's ability to generate additional revenue. Anness Dep. 57:4-16, 59:7-13. Nor has Allied produced audited financial statements. (Plus the financial statements that were provided by Allied were stamped "PRELIMINARY DRAFT SUBJECT TO REVISION.") Anness Dep. 49:25-50:2; Ex. 1.

129.    While Allied asserts that it currently has sufficient assets to satisfy the judgment, the Court concludes that it is unlikely to maintain its current financial status into the future and during the appeal of this matter. Accordingly, the Court finds that U.S. Steel's ability to recover on the judgment is likely to be hampered by a stay of execution if Allied does not post a full bond.

### E.    Allied's Related Arguments.

130.    Allied contends that several other items "should be taken into consideration" as the Court assesses Allied's alternative security proposal. Allied Memorandum at 8.

131.    Specifically, Allied contends that the Court should consider the fact that U.S. Steel has taken a $281,090.65 offset against its judgment.[7] Allied Memorandum at 8; Ex. 21.

132.    Additionally, Allied also contends that the Court should consider Allied's allegation (which U.S. Steel denies) that U.S. Steel has improperly retained some scrap that Allied left at Fairless Works. Allied Memorandum at 10; Tr. 145:21-24 (J. Ramun); Ex. 33.

133.    The Court concludes that neither of these "other items" or "claims" are properly before the Court and do not affect the Court's analysis with respect to Allied's requested stay or alternative security.[8]

## III.    CONCLUSIONS OF LAW

### A.    A Full Supersedeas Bond Is Required Absent Extraordinary Circumstances.

134.    Rule 62(d) provides that an appellant may obtain a stay of execution on a judgment pending appeal by supersedeas bond. Fed. R. Civ. P. 62(d) ("If an appeal is taken, the appellant may obtain a stay by supersedeas bond … .").

135.    The two-fold purpose of Rule 62(d) is to balance both parties' interests. As district courts in this Circuit, including this Court, have recognized,

> Rule 62(d) permits an appellant to obtain a stay "to avoid the risk of satisfying the judgment only to find that restitution is impossible after reversal on appeal." However, to preserve this right, the appellant must forego the use of the bond money during the appeal period.

---

[7] But the Court notes that the October 22 Writ and November 2 Writ both reflect a credit in the full amount of the $281,090.65 offset to U.S. Steel's net judgment.

[8] Allied also contends that the Court should consider Allied's "claim as to Count VII of its Complaint, relating to railcar and barge work," but, as Allied recognizes, that claim is "pending" and "unliquidated." Allied Memorandum at 10.

For the appellee, Rule 62(d) effectively deprives him of his right to enforce a valid judgment immediately. Consequently, the appellant is required to post the bond to provide both insurance and compensation to the appellee. The supersedeas bond protects the non-appealing party "from the risk of a later uncollectible judgment" and also "provides compensation for those injuries which can be said to be the natural and proximate result of the stay." Therefore, Rule 62(d) establishes not only the appellant's right to a stay, but also the appellee's right to have a bond posted.

*Physicians Ins. Capital, LLC v. Praesidium Alliance Grp., LLC*, No. 4:12-CV-1789, 2013 WL 5232817, at *2 (N.D. Ohio Sept. 16, 2013) (quoting *Hamlin v. Charter Twp. of Flint*, 181 F.R.D. 348, 351 (E.D. Mich. 1998)) (internal citations omitted).

136.    Although the Court may, in its discretion, approve a stay on other terms, "[b]ecause of Rule 62(d)'s dual protective role, a full supersedeas bond should almost always be required." *Id.* at *1-2 (quoting *Hamlin*, 181 F.R.D. at 351); *see also Arban v. West Pub. Corp.*, 345 F.3d 390, 409 (6th Cir. 2003).[9]

137.    Furthermore, a full supersedeas bond "should only be excused where the appellant has demonstrated the existence of extraordinary circumstances." *Johnson v. Connecticut Gen. Life Ins. Co.*, No. 5:07-cv-167, 2008 WL 918459, at *1 (N.D. Ohio Apr. 1, 2008), quoting *Verhoff v. Time Warner Cable, Inc.*, No. 3:05-CV-7277, 2007 WL 4303743, at *4 (N.D. Ohio Dec. 10, 2007) (collecting cases).

---

[9] Allied relies on *Arban* for the proposition that when assurance can be obtained that the judgment creditor's interests can be protected without a bond, the requirement should be waived. Allied Memorandum at 3. But that reads the case too broadly. In *Alban*, the Sixth Circuit affirmed the grant of a stay without bond because of "the vast disparity between the amount of the judgment … and the annual revenue of the [judgment debtor.]" 345 F.3d at 409. The same is not true here.

**B.    Allied Has Not Established Extraordinary Circumstances Justifying A Departure From The Full Bond Requirement.**

138.    Allied has failed to establish extraordinary circumstances warranting a departure from the general requirement that an appellant seeking to stay execution pending appeal must provide a full supersedeas bond.

139.    Indeed, Allied's proposed justifications for departing from the full supersedeas bond requirement confirm that a full bond is required.

**1.    Allied's purported ability to satisfy the judgment does not justify a departure from the full bond requirement.**

140.    Allied contends that there is no need for a bond because it is so asset-rich that it can easily satisfy U.S. Steel's judgment in the event that U.S. Steel prevails on appeal. *See* Allied Memorandum at 8, 9, 11; T. Anness October 9 Declaration ¶¶ 7-9. Specifically, Allied contends that it has approximately $37.5 million in assets, including: machinery/equipment valued at approximately $23.4 million, structural steel valued at approximately $7.1 million, and real estate with an estimated tax valuation of just under $7 million.

141.    However, "[t]he requirement of a bond balances and protects the parties' interests and is not a mere formality that should be waived simply because [the judgment debtor] may have the financial wherewithal to pay the judgment if [it does] not prevail on appeal … ." *Progressive Foods, LLC v. Dunkin' Donuts Inc.*, No. 1:07-cv-3424, 2011 WL 1601335, at *3 (N.D. Ohio Apr. 27, 2011). Thus, courts in this District generally decline to waive the full supersedeas bond requirement, even where a party clearly has the ability to pay. *See, e.g., id.*; *Mengelkamp v. Lake Metro. Housing Auth.*, No. 11-cv-2589, 2012 WL 6085084, at *2 (N.D. Ohio Dec. 6, 2012) (rejecting defendant's motion to waive the full bond requirement based on its ability to pay from its insurance coverage, reasoning that a stay without full bond "may only be granted in the most extraordinary of circumstances"). Indeed, numerous courts in this District

have held that even corporations with millions or billions of dollars in annual revenues cannot escape the full bond requirement, even for much smaller judgments than the one at issue here. *See, e.g., Progressive Foods*, 2011 WL 1601335, at *2-3 (requiring Dunkin' Donuts to post a full supersedeas bond for a $236,000 judgment despite its assets in excess of $40 million and $119 million in annual net income); *Johnson*, 2008 WL 918459, at *2 (requiring Cigna to provide a full bond in the amount of $270,000 despite the court's recognition that "Defendant Cigna will likely have the ability to pay the judgment[]"); *Verhoff*, 2007 WL 4303743, at *3 (denying Time Warner Cable's request to waive the full bond of $300,000 when it earned over $2.1 billion in the previous year). These cases demonstrate that even companies in significantly better financial condition than Allied, whose ability to pay the judgment after an appeal is much more uncertain, are not able to avoid the full bond requirement.

142.    The Sixth Circuit has held, in a case relied upon by Allied, that a district court did not abuse its discretion in permitting less than the full supersedeas bond required under Rule 62(d) where a corporate judgment debtor had $2.5 billion in annual revenues and was facing a $225,000 judgment. *Arban*, 345 F.3d at 409. Unlike the corporate judgment debtor in *Arban*, however, Allied has a negative cash flow, no current contracts, no projected annual revenues, almost no cash on hand, and no line of credit. In addition, Allied is facing a much more significant judgment of over $10 million.

143.    Based on these authorities, Allied's weak and deteriorating financial condition, and Allied's lack of substantial annual revenues, the Court concludes that Allied's current ability to pay the judgment does not warrant waiving the full supersedeas bond generally required under Rule 62(d).

### 2. Allied's limited cash assets do not justify a departure from the full bond requirement.

144.    Allied contends that the full bond requirement should be excused because it has insufficient cash assets to pay for a bond. Allied Memorandum at 11.

145.    But, as noted above, Allied also contends that it has more than sufficient assets to satisfy the full judgment. Indeed, as Mr. Ramun recognized, Allied could sell those assets to pay for the full bond. Tr. 119:18-22, 120:3-9 (J. Ramun); Allied Memorandum at 7-8, 11 ("In sum, if and when U.S. Steel is permitted to execute on the judgment, there will be adequate resources available to pay the judgment amount."); Ex. 4 ¶¶ 7-9; Anness Dep. 15:4-7.

146.    Allied has demonstrated a willingness to sell its assets to satisfy other creditors. *See supra* ¶¶ 101-1014. Indeed, Mr. Anness and Mr. Ramun testified that selling assets for the benefit of Allied and its creditors is part of Allied's business plan going forward. Tr. 48:22-49:3, 120:20-23 (J. Ramun). Thus, it appears that, if it chose to, Allied could post the full bond by voluntarily liquidating assets not needed for its business operations.

147.    District Courts in this Circuit, however, have rejected similar claims of "extraordinary circumstances." *See, e.g., Valley Nat'l Gas, Inc. v. Marihugh*, No. 07-11675, 2008 WL 4601032, at *2 (E.D. Mich. Oct. 14, 2008) (requiring full supersedeas bond over an objection that it would "severely impact the firm's financing[,]" reasoning that "the fact that [a party] may need to finance the award or that it may be subject to unrecoverable finance charges and interest does not constitute 'extraordinary circumstances'").

148.    The Court concludes that Allied's claimed lack of cash assets does not warrant a departure from the full bond requirement.

### 3. Allied's bankruptcy concerns do not justify a departure from the full bond requirement.

149.  Allied contends that it may go bankrupt if judgment execution proceeds. Allied Memorandum at 12.

150.  But if Allied has "such diminished assets that allowing judgment to proceed or requiring bond to grant a stay would cause [it] to go into bankruptcy, this is exactly the type of injury against which a supersedeas bond is designed to protect—the possibility that a judgment may later be uncollectible." *Physicians Insurance*, 2013 WL 5232817, at *3 (quoting *Bank v. Byrd*, No. 10-2004, 2012 WL 5384162, at *3 (W.D. Tenn. Nov. 1, 2012); *see also Infocision Mgt. Corp. v. Found. for Moral Law, Inc.*, No. 5:08CV1342, 2012 WL 369454, *4 (N.D. Ohio Feb. 3, 2012) ("Precisely because Defendant 'has minimal reserves,' Plaintiff (i.e., the prevailing party) needs protection from the possibility that, while the appeal is pending, Defendant's financial resources become even more diminished or, for that matter, non-existent."); *Valley Nat'l Gas*, 2008 WL 4601032, at *2.

151.  Thus, if Allied's financial status is so diminished that requiring the bond would force it into bankruptcy, that is precisely the injury against which a supersedeas bond is designed to protect—the possibility that after an appeal, the judgment would no longer be collectible.

152.  The Court concludes that Allied has failed to establish the extraordinary circumstances that would justify a departure from the full supersedeas bond requirement. Rather, the Court concludes that requiring Allied to provide a full supersedeas bond appropriately balances the parties' interests by placing the risk that Allied's financial state may deteriorate onto Allied, the judgment debtor and the appellant, rather than onto U.S. Steel. As set forth above, "Rule 62(d) establishes not only the appellant's right to a stay, but also the appellee[']s right to

have a bond posted." *Physicians Ins.*, 2013 WL 5232817, at *2 (quoting *Hamlin*, 181 F.R.D. at 351).

### C. Even If Allied Had Established Extraordinary Circumstances Justifying Departure From The Full Bond Requirement, Its Proposed Alternative Security Is Inadequate To Secure U. S. Steel's Judgment.

153. Because Allied has not established extraordinary circumstances justifying a departure from the full bond requirement, the Court need not consider Allied's proposed alternative security.

154. But even if the Court were to consider Allied's proposed alternative security, it would be inadequate to secure U.S. Steel's judgment.

155. Allied cites several out-of-Circuit authorities for the proposition that a party in financial distress may provide alternative security in lieu of the full supersedeas bond generally required by Rule 62(d). Allied Memorandum at 5-6 (citing *Miami Int'l Realty Co. v. Paynter*, 807 F.2d 871 (10th Cir. 1986); *Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189 (5th Cir. 1979); and *Alexander v. Chesapeake, Potomac, and Tidewater Books, Inc.*, 190 F.R.D. 190 (E.D. Va. 1999)). These and other similar authorities make clear, however, that courts generally consider alternative security only when: (a) a party is currently unable to satisfy the judgment or to obtain a full supersedeas bond; and (b) the alternative security would preserve the status quo that exists at the time execution is stayed. *See, e.g., Poplar Grove*, 600 F.2d at 1191 (if "posting of a full bond would impose an undue financial burden, the court [could] … fashion some other arrangement for substitute security through an appropriate restraint on the judgment debtor's financial dealings, which would furnish equal protection to the judgment creditor.").

156. Allied has cited no cases demonstrating that these authorities state the law of this Circuit or this District. Even if Allied's authorities applied here, however, granting Allied's

proposed alternative security would not be consistent with these authorities because doing so would not preserve the current status quo: Allied's admitted ability to satisfy the judgment in full.

> **1.  Allied currently has the ability to satisfy the judgment but its rapidly deteriorating financial state and its post-verdict behavior raise serious doubts that anything but a full supersedeas bond would preserve the status quo.**

157.    In light of Allied's admissions about the value of its assets, its current ability to satisfy U.S. Steel's judgment, its precarious financial condition going forward, its granting of a security interest to the Allied Professionals, its accounting and business practice of migrating value from Allied to AIS, and its post-verdict transfers of assets, a supersedeas bond in the full amount of the judgment is the only way to preserve the status quo pending appeal.

> **(a)  Allied's current ability to satisfy the judgment or to obtain a bond confirms the need for a full supersedeas bond.**

158.    Allied admits that it presently possesses significant assets that would allow U.S. Steel to collect on the judgment if execution were not stayed. Those assets include, for example, Allied's real estate, the structural steel, and Allied's machinery and equipment (most of which Allied has not offered as part of its proposed alternative security).

159.    The Court concludes that, based on Allied's representations about its assets, it could satisfy the judgment in full if execution were allowed to proceed today.

160.    The Court concludes that, based on Allied's representations about its assets, Allied is capable of obtaining a bond, although the Court recognizes that Allied may need to liquidate some of its assets in order to do so.

> **(b)** **Allied's deteriorating financial condition confirms the need for a full supersedeas bond.**

161.    Allied's current financial condition leads the Court to question its ability to continue operating as a going concern even absent U.S. Steel's execution on the judgment debt. Allied currently has no contracts for work, almost no cash on hand, and no operating line of credit, and it is losing hundreds of thousands of dollars each month.

162.    Allied's weakened financial state is only underscored by its recent equipment auctions, in which it sold millions of dollars in equipment to satisfy some of its outstanding debts. And Allied has admitted that it will continue selling assets for the benefit of Allied and its creditors as a part of its business plan going forward.

163.    In sum, the Court finds it unlikely that Allied will maintain its current financial state while the appeal is pending, regardless of U.S. Steel's execution on the judgment. To the contrary, the Court finds that it is likely that Allied's financial state will continue to deteriorate, perhaps significantly, while the appeal is pending.

164.    In light of Allied's deteriorating financial condition, the Court concludes that Allied's proposed alternative security would not secure U.S. Steel's judgment. Allied appears to recognize as much when it states that, in the event of an Allied bankruptcy, "U.S. Steel would arguably be in a worse position as U.S. Steel would lose its judgment lien priority and it would become but one in a pool of other trade creditors." Allied Memorandum at 12. Again, this is precisely the type of injury from which a supersedeas bond is meant to protect the appellee. Namely, "the bond secures the prevailing party against any loss sustained as a result of being forced to forgo execution on a judgment during the course of an ineffectual appeal." *See, e.g.,* *Hall v. Consol. Freightways Corp. of Del.*, 142 F. App'x 875, 879 (6th Cir. 2005) (internal citation omitted).

**(c)** **Allied's Post-Judgment Asset Transfers Confirm The Need For A Full Supersedeas Bond.**

165.    In denying a stay of execution pending appeal in another case, this Court looked to the judgment debtor's behavior as failing to "engender in the Court any hope that the [judgment debtors] would, without some exterior pressure, feel any need to protect sufficient funds to pay a judgment should they not prevail on appeal." *Physicians Ins.*, 2013 WL 5232817, at *3. Similarly, Allied's post-verdict and post-judgment conduct in this case does not engender confidence that its proposed alternative security would adequately protect U.S. Steel's ability to collect on the judgment following an appeal.

166.    In addition to the post-trial equipment sales, Allied has engaged in other post-judgment asset transfers that concern the Court and suggest that Allied may be engaging in attempts to shield its assets from execution.

167.    Specifically, the Court concludes that Allied's transfer of $8 million in equipment from Allied to Allied Gator in exchange for a $6.5 million intercompany receivable confirms that the proposed alternative security will not secure U.S. Steel's judgment. The Court concludes that Allied Gator is unlikely to pay Allied Erecting and Dismantling the intercompany payable. Moreover, the Court notes that the intercompany asset transfer occurred five days after the Court's Judgment Entry and may reflect an intent to shield assets from judgment execution.

168.    In addition, the Court concludes that Allied's ongoing transfers of its valuable scrap to AIS in exchange for significant intercompany debt also suggest an attempt to shield Allied's assets from execution.

169.    Finally, Allied's creation of an ever-increasing security interest in all its assets for the Allied Professionals suggests an intent to frustrate U.S. Steel's collection efforts in favor of Allied's long-time professionals. That this security interest, which was the first one granted in

the Allied Professionals' 30-year history of representing Allied, was created in the short window between the jury's verdict and the judgment entry speaks volumes.

170.    In light of these post-verdict and post-judgment asset transfers, the Court concludes that Allied's proposed alternative security would not adequately secure U.S. Steel's judgment.

### 2.    Allied's alternative security proposal is inadequate at any rate.

171.    Even if the Court were to find alternative security appropriate in this case, which it does not, Allied's proposed alternative security is inadequate, and not in line with the alternative security accepted in the cases Allied cites.

172.    As discussed above, there are significant reasons to doubt Allied's valuation of its proposed alternative security, and the Court has found that the value of the alternative security is much closer to $4 million than to Allied's valuation of $15 million. *See supra* Section II.B.6 at ¶¶ 69-70.

173.    For example, in the out-of-Circuit alternative security cases Allied has cited, the Court required the judgment debtor to provide nearly twice the value of the judgment debt in alternative security. *See, e.g., LPP Mortgage Ltd. v. J. Gardner and J. Gardner Co.*, No. 02-cv-1331, 2005 WL 2078339, at *2 (D. Or. Aug. 16, 2005). Similarly, in *C. Albert Sauter Company, Inc. v. Richard S. Sauter Company, Inc.*, the district court required the judgment debtors to place into escrow all outstanding shares of the company. 368 F. Supp. 501, 520-21 (E.D. Pa. 1973).

174.    It is also noteworthy that the proposed alternative security was rejected by the sureties that Allied approached in its attempts to obtain a supersedeas bond. The fact that three independent, third party sureties have rejected as collateral for the bond the very assets Allied is now offering to U.S. Steel as alternative security is strong evidence that the alternative security is inadequate and should be rejected. If independent third parties did not feel sufficiently secure in

37

providing a bond in the exact same amount as the judgment based on the same collateral (in fact, greater collateral), this is evidence that Allied's proposal is an inappropriate attempt to shift onto U.S. Steel the risk that Allied's assets will be insufficient to secure the judgment after an appeal. This Court has rejected similar efforts to "place the entire burden" of a stay on a prevailing party, stating: "Rule 62(d) establishes not only the appellant's right to a stay, but also the appellee[']s right to have a bond posted." *Physicians Ins.*, 2013 WL 5232817, at *2 (quoting *Hamlin*, 181 F.R.D. at 351).

175.    The Court concludes that Allied's proposed alternative security, realistically valued at less than half of the judgment debt, is not in line with previously approved alternative security and rejects it on that basis as well.

## IV.    CONCLUSION

For the foregoing reasons, Allied's Motion for Stay of Execution and Approval of Alternative Security [Doc. No. 318] is **DENIED**. In order to seek a stay of execution of the Amended Judgment Entry, Allied must submit a supersedeas bond in the full amount of the Judgment Entry. In accordance with Fed. R. Civ. P. 62(d), any stay will take effect only if and when the Court approves the bond.

Until such time, U.S. Steel may continue to execute upon the Amended Judgment Entry. Accordingly, simultaneous with the entry of these Findings of Fact and Conclusions of Law, the Court is signing and entering U.S. Steel's October 22 Writ and November 2 Writ [Doc. Nos. 325, 334].

**IT IS SO ORDERED**.

Dated: March 21, 2016

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**