# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ALLIED ERECTING AND DISMANTLING CO., INC., | ) ) | CASE NO. 4:12CV1390 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| UNITED STATES STEEL CORPORATION, | ) ) | **AND ORDER** |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is the renewed motion for judgment as a matter of law filed by defendant United States Steel Corporation ("U.S. Steel"). (Doc. No. 405 ["Mot."].) Plaintiff Allied Erecting and Dismantling Co., Inc. ("Allied") has filed a memorandum in opposition (Doc. No. 407 ["Opp'n"]) and U.S. Steel has filed a reply (Doc. No. 408 ["Reply"]). For the reasons and to the extent set forth herein, the motion is granted.

## I.    BACKGROUND

After years of litigation, including extensive motions practice, a trial, and an appeal to the Sixth Circuit, the only claims remaining for resolution are Counts IV and V of the second amended complaint.[1] (Doc. No. 43 ["SAC"].) The February 23, 2018 remand order of the Sixth Circuit rejected this Court's ruling that these two counts were time-barred, but declined review of U.S. Steel's other arguments, since this Court had not addressed them in the first instance. The Court of Appeals directed as follows:

---

[1] There was a narrow portion of Count V (*i.e.*, certain Hot End rail removal that U.S. Steel awarded to Fox Construction Company ["the Fox rail claim"]) that went to the jury; the jury awarded judgment in Allied's favor. That Fox rail claim is not implicated by the instant ruling.

On remand, *the district court is free to consider or reconsider other arguments presented by U.S. Steel that may warrant the reissuance of judgment in favor of U.S. Steel as to these counts*. Specifically, U.S. Steel argued in support of its motion for judgment as a matter of law below that, in addition to its statute-of-limitations argument, "Allied has failed to present any evidence that it generated scrap from any of the buildings, basements, track and non-ferrous materials that it claims to own (relating to Counts IV and V)," and U.S. Steel "object[ed] to Allied's expert's use of the Measured Mile methodology for computation of damages." R.296 at 4–5. *The district court's order granting judgment as a matter of law rested its holding solely on statute-of-limitations grounds, but the district court did note that "all of [U.S. Steel's other] arguments have merit." We decline to treat this statement as an expression of alternative holdings, and, because these other arguments were not developed in the district court's order, we decline to address them on appeal*. But the parties may litigate these other arguments on remand.

(Doc. No. 398, Opinion at 23086–087[2] (emphases added).)

In its brief in opposition to U.S. Steel's renewed motion, Allied takes the position that a retrial is required. Moreover, Allied states that it "likely will have to call different fact and expert witnesses than those who testified in May 2015." (Opp'n at 23169 n.12.) Allied requests that, "[t]o avoid undue prejudice or unfairness to Allied, . . . this Court permit additional witnesses and evidence to be presented to support Allied's Count IV damages—which will satisfy the Court's prior concerns regarding Mr. Ed Klein's foundation and/or methodology regarding the estimates for the structural ferrous (Count [IV]) and hot end non-ferrous (Count [V])." *Id.*

Allied's view is not correct. As previously noted by this Court,

> The Sixth Circuit has not directed a retrial of Counts IV and V. Rather, it has directed a renewal of defendant U.S. Steel's motion for judgment as a matter of law and reconsideration by the Court in light of the arguments and trial record as it stands. The opinion of the Court of Appeals is clear that it simply would not rule on matters not [fully developed] in the first instance by this Court.

---

[2] All page number references are to the page identification number generated by the Court's electronic docketing system.

(Doc. No. 403, Order at 23124.) In other words, the Court of Appeals has effectively returned the Court and the parties to Friday, May 29, 2015, when, after Allied rested its case in chief, U.S. Steel moved for judgment as a matter of law on, *inter alia*, Counts IV and V. (*See* Doc. No. 281, Trial Transcript Volume 10 ["Trial Tr. 10"][3] beginning at 20818.) To assist with this reconsideration, the Court requested briefs from the parties and indicated that "each filed brief shall be properly supported by pinpoint references to the record, with copies supplied where appropriate or necessary." (Doc. No. 403, Order at 23124.)

The Court will now address the renewed motion, in light of the original trial transcript and record, as well as the parties' respective post-remand briefs.[4]

## II.    DISCUSSION

In Count IV of the second amended complaint, Allied alleges that, under the terms of the parties' agreements,[5] upon U.S. Steel's completion of asbestos removal (SAC ¶¶ 97, 98), and in consideration of Allied's payment of $1.00 (*id.* ¶ 96), U.S. Steel was contractually required to (and did) assign ownership to Allied of substantially all of the Sheet & Tin Facility ("Sheet & Tin") (*id.*

---

[3] Hereafter, trial transcripts will be cited in this fashion, by volume number.

[4] Although, in various opinions during the course of these proceedings, the Court drew some conclusions about contract interpretation (as required to rule on various motions), all of those orders were interlocutory at the time of the trial and, therefore, were always subject to reconsideration by the Court in light of the trial evidence. *See Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991) ("District courts have inherent power to reconsider interlocutory orders and reopen any part of a case before entry of a final judgment.") (citing *Marconi Wireless Tel. Co. v. United States*, 320 U.S. 1, 47-48, 63 S. Ct. 1393, 87 L. Ed. 1731 (1943)). In fact, as early as September 27, 2013, in its ruling on U.S. Steel's motion to dismiss, the Court "explicitly note[d] that any construction it now attributes to the relevant contracts will remain subject to change, as shown to be necessary, as this case proceeds." (Doc. No. 84, MOO at 1348.) The Court further noted that "the record as it stands is virtually devoid of facts upon which the Court could base its construction of the contracts, except for facts in the complaint, which are taken as true for purposes of a Rule 12 motion." (*Id.* n.14.) The Court stated that "modified constructions may later be required." (*Id.*) As already noted, by virtue of its remand order, the Sixth Circuit placed the Court and the parties back to a time before final judgment with respect to Counts IV and V. Therefore, in this current posture of the case, the contracts must be construed in light of the more developed trial record.

[5] All of the agreements between the parties were submitted by stipulation prior to trial. (*See* Doc. No. 269, Joint Stipulation of Facts.)

¶¶ 97, 98); that Allied commenced work at all areas of Sheet & Tin (*id.* ¶ 101); and that U.S. Steel later wrongfully removed/"took back" certain assigned buildings, or placed certain buildings on indefinite hold (*id.* ¶ 103), without compensating Allied (*id.* ¶¶ 102, 104).

In Count V of the second amended complaint, Allied alleges that, under the terms of the same agreements, Allied was assigned ownership of each facility to be dismantled at U.S. Steel's steelmaking facility in Fairless Hills, Pennsylvania ("Fairless"), including all ferrous and non-ferrous scrap and railroad track located within the dismantling area (*id.* ¶ 106), but U.S. Steel refused to permit Allied to remove the non-ferrous scrap and railroad track (*id.* ¶ 107).

In its renewed motion for judgment as a matter of law, U.S. Steel raises three arguments: (1) as to Counts IV and V, Allied offered no evidence that it "generated" scrap from the buildings, underground non-ferrous materials, and rail that are the subject of these counts; (2) as to Count IV, Allied produced no admissible evidence quantifying its damages for the buildings and related scrap it alleges U.S. Steel wrongfully "took back"; and (3) as to Count V, given this Court's trial rulings, there is no contractual or evidentiary basis on which Allied may prevail with respect to its claims for Hot End scrap and rail. (Mot. at 23130–131.) Because the Court finds the first argument dispositive, it will not address the other arguments.[6]

U.S. Steel argues that it is entitled to judgment as a matter of law as to both Counts IV and V because the relevant contracts require Allied to show that it actually "generated" scrap before it

---

[6] Because these counts of the complaint were found by this Court to be time-barred, they were never submitted to the jury. That timeliness determination was reversed by the Sixth Circuit and this Court was directed to consider the merits of U.S. Steel's motion for judgment as a matter of law. Although U.S. Steel now argues that Allied completely failed to submit evidence of damages, Allied counter-argues that, even though some of the damages experts' calculations were rejected by the Court under *Daubert*, all of the damages evidence was not excluded and there was "a wealth of 'admissible evidence' of damages for Count [IV] that would have been submitted to the jury, but for this Court's statute of limitations ruling." (Opp'n at 23169 (footnote omitted).) Therefore, if a court reviewing the instant ruling were to conclude that its determination on the "generation" issue is incorrect, a new trial will be required with respect to at least some aspect of Count IV. The exact contours of any such new trial will need to be carefully circumscribed to avoid both unfair advantage and unfair prejudice to the respective parties.

could claim ownership of the scrap, a showing that Allied failed to make at trial. (Mot. at 23131; *see also* Trial Tr. 9 at 2471.) U.S. Steel points to § II(B)(7) of the 2003 Agreement in Principle, which provided that "[Allied] will own all ferrous and non-ferrous scrap generated on any projects awarded to [Allied]." (Doc. No. 269-4 ["2003 AIP"].)[7]

In opposition, Allied argues that its ownership rights were not contingent on "generation" of scrap. Rather, Allied believes that, pursuant to § III of the 2003 AIP, its work at Sheet & Tin was still governed by "the same relevant terms and conditions contained in the Contract and Specification for the first phase or 'Hot End' of Fairless[.]" (Opp'n at 23156; *see also* Trial Tr. 9 at 20864–865.)[8] According to Allied, under the 1992 Specification, after U.S. Steel performed asbestos removal at a site (§ 5.2), and after Allied paid $1.00 (§ 8.1), U.S. Steel was required to "assign to [Allied] ownership of each facility to be dismantled[]" (§ 5.2). Allied argues that this amounts to "pre-dismantling assignment of ownership rights" to Allied. (Opp'n at 23162.)

Further, the 1992 Specification provided that U.S. Steel's right to "remove any complete facility from the scope of [the specification would] terminate upon the commencement of work at that facility by [Allied]. (§ 10.2.) When U.S. Steel did remove a facility from a demolition package, Allied asserts it was required to "pay as compensation to [Allied] 50% of the 'Scrap Value,' *i.e.,* No. 1 Heavy Melt price per gross ton[.]" (§ 10.3.) Allied argues that, at trial, John Ramun testified that U.S. Steel issued a transfer order dated August 7, 2004, which assigned ownership to the scrap associated with dismantling at Sheet & Tin. (Opp'n at 23158, citing Trial Tr. 2 at 18805–807;

---

[7] *See also* § IV(A) 2004 Dismantling Service Agreement ("2004 DSA") ("Unless otherwise mutually agreed to, all ferrous and non-ferrous scrap generated as a result of any work or services awarded to [Allied] under this Agreement will be owned by [Allied].") (Doc. No. 269-7 at 18172.)

[8] This "first phase" contract consisted of the 1992 Construction Contract (Doc. No. 269-1) and the 1992 Final Conformed Specification (Doc. No. 269-2 ["1992 Specification"]).

Plaintiff's Exhibit ["PX"] 268.) It is Allied's position that, under the transfer order, it immediately owned all the *potential* scrap, whether or not "generated," and U.S. Steel could not remove any facility without compensating Allied for that lost scrap.

The Court previously explained: "Prior to entering into the 2003 AIP, Allied's previous work at the first phase, or 'Hot End,' of the Fairless Works was performed pursuant to a Construction Contract dated April 24, 1992 and an accompanying Final Conformed Specification (the '1992 Specification') dated September 11, 1992." (Doc. No. 174, MOO at 8612 (footnotes omitted).) The Court also noted: "While, obviously, there are certain very specific provisions in the 1992 Specification that could *only* apply to the Hot End, the more general articles, unless specifically overridden by or in conflict with the later contracts, still apply because they are 'relevant.'" (*Id.* at 8635.) The Court identified some of "the more general articles" as including Articles 1, 2, 3, 4, 5, 6, 8, 10 and 12 of the 1992 Specification, "unless specifically overridden by or in conflict with the later contracts[.]" (*Id.*)

Here, Allied insists that this Court has already accepted its interpretation of the contracts when, on summary judgment, it ruled that the central allegations of Count IV and V were "true so far as contract interpretation goes[.]" (Opp'n at 23165.) But Allied misquotes the Court, which actually said that the allegations "*may be* true so far as contract interpretation goes[.]" (Doc. No. 174, MOO at 8635.) In fact, the Court did not definitively decide the contract issues, stating only that whether facilities had been released, and/or whether scrap had been generated, were "factual disputes" that precluded summary judgment.

In light of the Sixth Circuit's remand requiring the Court to rule on the merits of U.S. Steel's motion for judgment as a matter of law on Counts IV and V, the Court must now construe (and reconcile, if necessary) the contractual provisions relied upon by the respective parties. Under

Pennsylvania contract law, a court is permitted to consider evidence beyond the four corners of a contract in order "to resolve the [contractual] ambiguity and determine the intent of the parties." *Glenn Distribs. Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 300 (3d Cir. 2002).There can be no doubt that the sheer number of contracts in this case, simply layered one on top of another over the years, could result in significant ambiguity. That said, the two primary provisions relied upon by the opposing parties for purposes of this motion are actually not in conflict.

As pointed out by Allied, the 1992 Specification stated that, after U.S. Steel removed asbestos materials, it was required to "assign to [Allied] ownership of each facility to be dismantled." (§ 5.2). But Allied fails to also point out that this assignment was to include, *inter alia*, "[a]ll ferrous and non-ferrous scrap *resulting from* the dismantling work." (§ 5.2.1 (emphasis added).[9]) This latter provision is significant, in light of the 2003 AIP, which, as pointed out by U.S. Steel, stated that Allied would "own all ferrous and non-ferrous scrap *generated* on any projects awarded to [Allied]." (§ II(B)(7) (emphasis added).) Although both provisions assign ownership to Allied, they require that scrap actually *result from* or be *generated* before that ownership is fully consummated.

These two provisions are neither ambiguous nor in conflict. Moreover, it makes perfect sense to require "generation" of scrap as a means of perfecting Allied's ownership because, if Allied merely automatically owned the materials once there was an award of a facility by U.S. Steel and a $1.00 payment by Allied—with no requirement to generate any scrap through actual dismantling activities—U.S. Steel would have no way of forcing Allied to complete the

---

[9] In Count V of the complaint, Allied seeks recovery under §§ 5.2.2 and 5.2.5, which provide that it would own all ferrous and non-ferrous scrap and railroad track "located within" dismantling areas. (Compl. ¶ 106.) Inexplicably, it fails to cite § 5.2.1 as part of Count IV.

dismantling in a timely fashion, were that to be necessary.[10] With the "generation" requirement, Allied had to generate the scrap (*i.e.*, actually perform the dismantling) in order to have the ability to use the scrap or sell it for revenue. Since all the relevant contracts between the parties are fundamentally "dismantling" contracts, Allied's position that it "owned" the materials outright, whether or not it ever "generated" them by way of dismantling work, borders on ludicrous, and any such interpretation, even using Allied's version of what contractual provisions control, would not reflect the parties' intent.[11]

The trial record is devoid of any evidence that Allied generated scrap from Sheet & Tin. Allied has not denied this fact. That, however, does not end the analysis because Allied argues that U.S. Steel prohibited it from generating scrap by wrongfully removing facilities that had already been awarded for dismantling (Count IV) *and* by refusing to allow Allied to remove certain underground non-ferrous scrap and railroad track from Fairless (Count V). (Opp'n at 23159, 23164.) In support of this assertion, Allied points to the following testimony of Mr. Ramun on direct examination:

> Q.     On a number of occasions during the course of Allied's work at U.S. Steel, did you request U.S. Steel to make the rail and make the nonferrous available?
>
> A.     Yes.

---

[10] As noted in the Court's ruling on U.S. Steel's motion to dismiss, Allied had performed dismantling work for U.S. Steel for over twenty (20) years at the mostly-idle Fairless facility "as part of U.S. Steel's conversion from an operating steel mill to an industrial park." (Doc. No. 84, MOO at 1345 n.11.) The work took place in three phases, beginning with the Hot End Facilities in 1992, followed by the 80 Inch Hot Strip Mill phase in 1999 and the most recent Sheet & Tin Facility work. (*Id.*) To meet its goal of converting the cite into an industrial park, U.S. Steel would have had reason to include in the contracts some method of assuring that Allied would perform the final dismantling phase in a timely fashion and not just use the facilities as a storage place for potential scrap.

[11] As further support for its argument that "generation" is not a requirement, Allied cites the fact that it was awarded damages by the jury for scrap it did not generate for both the Fox rail claim (part of Count V) and the Brandenburg basement claim (Count II). (Opp'n at 23164.) But, as properly pointed out by U.S. Steel, *somebody* (other than Allied) generated that scrap and Allied was merely compensated for its loss. (Reply at 23180 n. 2.)

Q.	Was the rail and the nonferrous ever made available to Allied?

A.	No, it was not.

* * *

Q.	Could Allied have removed the nonferrous and the rail at this point had U.S. Steel made this available?

A.	Yes.

Q.	Was it ever made available to Allied?

A.	No, it was not.

(Trial Tr. 2 at 18871-872 (pages cited by Opp'n at 23159).)

"For a case to be properly submitted to the jury, there must be 'more than a scintilla' of evidence supporting the claim." *Wilkins v. Eaton Corp.*, 790 F.2d 515, 522 (6th Cir. 1986) (citing *Brady v. S. Ry. Co.*, 320 U.S. 476, 479, 64 S. Ct. 232, 88 L. Ed. 2d 239 (1943)). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury properly could find a verdict for that party[.]" *Demcyzk v. Lesh, Casner & Miller* (*In re Kirkpatrick*), 254 B.R. 378, 383 (N.D. Ohio 2000). *See also Groeneveld Transp. Efficiency, Inc. v. Lubecore Intern., Inc.*, 730 F.3d 494, 507 (6th Cir. 2013) (rejecting "entirely conclusory" testimony and reversing trial court's denial of motion for judgment as a matter of law under Rule 50).

Other that Mr. Ramun's unspecific, vague, and conclusory testimony above, Allied offered no evidence of when U.S. Steel's denial(s) supposedly occurred. Furthermore, any evidence of U.S. Steel's denial would have contradicted Allied's trial theory that all of Sheet & Tin was released and authorized to Allied shortly after the signing of the 2003 AIP. Mr. Ramun himself was adamant that Allied had started work at "every part of [S]heet and [T]in" in January of 2004.

(Trial Tr. 2 at 18868, 18891.) It was incumbent upon Allied, therefore, to submit evidence as to how, if it had started work at the entire facility in 2004, it could have been "prevented" by U.S. Steel from removing the non-ferrous scrap and railroad track "located within" the facility. Further, since Allied now claims that it believes it *owned* these materials, it was further incumbent upon Allied to submit evidence that it protested contemporaneously to U.S. Steel when it was supposedly prevented from removing the materials it believed it owned. Allied failed to submit any such evidence and its current reliance on Mr. Ramun's very brief, self-serving testimony that Allied was prevented in some way from removing the materials "located within" Sheet & Tin, is not sufficient to require jury consideration.[12]

In the final analysis, it is undisputed that the contractual prerequisite to Allied's ownership was never satisfied because Allied never "generated" scrap at Sheet & Tin (*see* 2003 AIP § II(B)(7)) and no scrap ever "resulted from" Allied's dismantling work (*see* 1992 Specification § 5.2.1) at Sheet & Tin. That is sufficient reason to grant U.S. Steel judgment as a matter of law on Counts IV and V.

## III.  CONCLUSION

For the reasons set forth herein, U.S. Steel's renewed motion for judgment as a matter of law is granted, resolving all remaining claims and closing this case.

**IT IS SO ORDERED**.

Dated: March 15, 2019

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[12] As indicated above with respect to the "generated" issue (*see* n.6), if a reviewing court were to determine that this conclusion is incorrect and Count V should now go to a jury, presumably there would need to be a new trial. Again, the contours of any such retrial would need to be carefully circumscribed to avoid both unfair advantage and unfair prejudice.